CHAD REEVES,

Plaintiff

vs.

CARNIVAL CORPORATION
a Panamanian Corporation,

Defendant

______________________________/

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-cv-21295-RAR

The deposition of BRITTNEY BOWMAN was held on Tuesday, September 17, 2024 commencing at 11:38 a.m. Via Zoom before Eric Leichter, Notary Public.

REPORTED BY: Eric Leichter

EXHIBIT
E

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

JOSHUA P. PADRON, ESQUIRE

The Haggard Law Firm

330 Alhambra Cir

Coral Gables, FL 33134-5004

305-446-5700

jpp@haggardlawfirm.com

ON BEHALF OF THE DEFENDANT:

ASHLEY GENOESE, ESQUIRE

GrayRobinson, P.A.

515 North Flagler Drive, Ste. 650

West Palm Beach, Florida 33401

561-268-5727

# INDEX

Deposition of BRITTNEY BOWMAN

September 17, 2024


| Examination by: | Page |
|---|---|
| MS. GENOESE | 4 |

PROCEEDINGS,

Whereupon,

BRITTNEY BOWMAN,

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MS. GENOESE:

Q Good morning. Still morning. My name is Ashley Genoese and I represent the Defendant in this matter, Carnival Corporation.
Could you please state your full name for the record?

A Yes. My name's Brittany Jo Bowman.

Q Ms. Bowman, have you ever been known by any other names?

A Yes. I have a former married name. Last name is Pasciuta. And then my maiden last name is Reeves.

Q Could you spell your former married name?

A Yes. P-A-S-C-I-U-T-A.

Q Thank you. Ms. Bowman, have you ever had your deposition taken before?

A No, ma'am.

Q So let me just go over some ground rules for this deposition. Basically, this is a question-and-answer session. I'm going to be asking you specific questions and all I ask is that you answer to the best of your ability. If you don't know the answer to a question, please say so. Both myself and the other attorney on this call do not want you to have to guess at anything. As you can see on your screen, there's a court reporter here. He is going to be typing down all of the words that we say, so please respond verbally with a yes or a no as opposed to an uh-huh or an uh-uh that we sometimes use in conversation.

A Okay.

Q I don't believe this will be terribly long, but if you -- any time you need a break, please let me know. We could take one. I just ask that if there's an unanswered question, that you finish answering the question that I have at the time. And then finally, if you don't understand my question, please let me know so I'll do my best to rephrase the question. However, if

you provide me an answer, I'll assume that you fully understood the question.

Is that fair?

A Yes, ma'am.

Q Great. Have you reviewed any materials today before your deposition?

A No, ma'am.

Q Have you spoken to anyone about this case?

A No, ma'am.

Q What is your date of birth?

A March 20th, 1978.

Q And where were you born in?

A I was born in Lynchburg, Virginia.

Q Where do you currently live?

A I live in Phenix, Virginia, P-H-E-N-I-X.

Q Have you lived in any other states?

A No, ma'am.

Q Are you presently married?

A No, ma'am.

Q You had mentioned that you were previously married?

A I've been previously married twice.
Q To who were you married to previously?
A The most recent, his name was Warren, W-A-R-R-E-N, Bowman. And before that, it was Anthony Pasciuta.
Q When were you last married to Mr. Bowman?
A We were divorced in 2022.
Q And Mr. Pasciuta?
A We divorced in 2009.
Q Do you have any children?
A Yes, ma'am.
Q What are their names and ages?
A I have a daughter, Hannah, last name, Robinette. She's 24. I have a daughter, Anna, last name, Lopez. She's 24. Both of those are married. And then I have a daughter, Gracie, last name, Pasciuta, and she's 20.
Q Do any of your daughters live with you?
A Yes. The 20-year-old.
Q Do your other daughters live nearby or in the same town?

A They live close by.

Q Do you currently live with anyone else besides Gracie? Ma'am, did you hear my question?

MR. PADRON: Were you --

A You asked -- yes.

Q Let me repeat my question. Do you live with anyone else currently besides Gracie?

A No, ma'am.

Q And, Ms. Bowman, could you give me your educational background, starting with any high school that you may have completed?

A I completed high school in 1996. I went to community college for a year. I then went on to Virginia Tech University and graduated in 2000. And since then, I've gotten my master's in education.

Q Did you receive a degree from Virginia Tech?

A I did. I completed a bachelor's degree in business marketing.

Q Do you hold any professional licenses or certifications?

A Yes. I hold a teaching license.
Q And is that currently valid?
A Yes, ma'am.
Q And that's for the state of Virginia?
A Yes, ma'am.
Q Do you have any medical training or background?
A I'm certified in CPR as a employee with our school system but also certified to provide training more of a layman's-type CPR to my staff there and my school.
Q Any other medical training or background?
A No, ma'am.
Q And you have mentioned -- are you currently employed?
A Yes, ma'am.
Q Who is your employer?
A I work for Mecklenburg County Public Schools in Virginia.
Q And are you a teacher?
A Yes, ma'am.

Q What grade do you teach?
A I teach elementary school PE.
Q How long have you been a elementary school PE teacher?
A I've been an elementary school teacher for 24 years.
Q And I'm required to ask this next question of everybody I depose. Have you ever been arrested?
A No, ma'am.
Q Ever been a party to a lawsuit?
A No, ma'am.
Q So, we're here today about an incident involving Chad Reeves, your brother, while on board the Carnival Freedom cruise ship.
Do you remember this incident?
A Yes, ma'am.
Q So you were not on the cruise ship at the time with Chad Reeves. Is that right?
A Correct.
Q Any reason why you weren't on the ship?
A Our mom has some medical issues that can

sometimes be a hindrance when going on trips such as that. And so, I chose to stay at home and not necessarily take care of her -- she doesn't need anybody to take care of her -- but to give her an alternative trip as opposed to being able to go with the rest of the family.

Q So while they were on the cruise, where were you with your mother?

A That Saturday, the same Saturday that they left on the cruise ship, my mom and myself and two of my girls had gone to Myrtle Beach for a short vacation. So we had arrived at Myrtle Beach on that Saturday.

Q And which of your daughters were with you?

A My oldest daughter, Hannah, and then my youngest daughter, Gracie.

Q Any specific plans while you were in Myrtle Beach?

A No, ma'am. Just to enjoy.

Q And your father was not with you. Is that correct?

A No, ma'am. He was at home.

Q So when did you first hear of any medical concerns while Chad was on board the cruise ship?

A I received a Facebook message from my sister-in-law, my brother's wife, from her phone -- well, her account -- sometime roughly -- it was after 6:00 that evening. And I don't know if it was at 6:00 or 6:30 when I received that message, but it was sometime around that time, that there was a medical emergency and the request was, please call Daddy and ask him to start praying, and please get everybody you know to start praying that -- it's appearing that Chad's having what is -- what seems like a heart attack. And that -- at that point, it was all speculation coming from my sister. It was my sister at the moment, but it was from my brother's -- I mean, my sister-in-law's account.

Q Understood. And so, what did you start doing then?

A I immediately made a phone call home to my dad. He did not answer. I assumed he was out on a tractor or on the farm somewhere. I knew that I needed

to get this information to him immediately, so I called my uncle, which is my daddy's brother, and I asked him to go find my daddy. And I briefly told him what was going on and just said, please get Daddy to give me a call. And within about six or eight minutes, my dad had called, and I relayed the message that there was a medical emergency going on at the time and that I would update him of any more information. My daddy does not have access to social media or anything like that, so, I was going to be his contact and update.

Q Did you speak with your brother, Chad, direct?

A No.

Q At any time while Chad was on the cruise ship, did you speak with him directly?

A No.

Q This was always through either your sister or your sister-in-law?

A Yes.

Q Is it -- well, let me ask you. Did you ever speak to any of Chad's doctors on the cruise ship?

A No, ma'am.

Q So, what happened next? If you could walk me through after you called your dad, after you spoke with him, and after you received that initial message from your sister.

A So the four of us in Myrtle Beach, we went out for -- we went out to eat supper. We came back to our place that evening. I had messaged back and forth a couple of times and it was just updates of they've done another EKG or his levels were, you know, slightly elevated. At this point, when we got back, it was confirmed that the doctors had said that it was an actual heart attack and it wasn't just us presuming anymore. I would say from about -- from the time I got back from eating supper -- I don't know what time it was -- until late that evening, 11:00-ish, I chatted back and forth with my sister and my sister-in-law, just trying to get updates. At some point in the evening, I said -- of course, I kept asking, you know, what's the next step? What are the doctors saying? Are they considering getting him off the boat? You know, this is

not just a, you know, broken arm. Are -- you know, are we considering getting him off the boat? Every time, the answer was no. I then told them, my sister and sister-in-law, that I would make a phone call to Carnival, and it was late on a Saturday night. I had no clue what a phone call to Carnival would even look like. I pretty much didn't even know how to call Carnival. But after googling some numbers and trying to call around, I made that phone call. It was at that point that I knew I couldn't get anywhere with Carnival. Their hands -- I mean, they -- it was more of a customer service kinda call. So, I don't know who -- I cannot remember who put the thought in my mind, whether it was a cousin of ours or somebody who was communicating with us as to what was going on, but the Coast Guard came up. And so somewhere between 11:00 and 12:00-ish on that Saturday night, I googled the Coast Guard. And I had no idea that I would get anywhere with them, and the Lord worked miracles and a human being answered the phone, asked what my emergency was. I explained to them what was going on. And I had called location that I didn't

go out that far or as far as the boat was or it wasn't in that vicinity. So they gave me another number to call. I called that number and went through the whole story again, explained to them the situation, that my brother was on a cruise ship. They had just left the port several hours before that. The doctors had documented that he was having a heart attack. I even mentioned to them at that moment that he -- what kind of heart attack it was, that it was a STEMI heart attack. The Coast Guard knew the severity of what I was telling them. They took me very, very serious. They took down as much information from me that they could possibly get -- the name of the boat, where it was headed, what the location was at that moment. I was contacting the people on the boat and my family, trying to get as detailed information from them as I could possibly get and relaying that to the Coast Guard. I was told numerous times through numerous phone calls that they were capable of going to get him. It was never a hiccup or question as to whether or -- location or being out of their district or division or anything like that. It

was always told to me, we are able to get him. They also said that they could not break protocol, and their protocol was that they had to have a request from the ship that there was an emergency and that they were needed. I relayed that information to my family on the ship. They relayed that message to the doctors there. And at one point, the Coast Guard actually took my number down and they called the boat themselves to ask if there was a medical emergency on the boat. And they got some information, and they returned the call to me, and they said, yes. Your brother is having a medical emergency. But the doctors feel like they have him stable, and they will not request for us to come pick him up. This was somewhere around 2:00 a.m. on that Sunday morning.

Q Thank you, ma'am, for that whole run-through. I'm going to go back a little bit to some -- I was writing some notes and some of the things that you had said so I can ask a little bit further questions about it. You had mentioned that the first call that you made was to Carnival, a number that you had found on

Google.

Is that correct?

A Yes, ma'am.

Q So, did you speak to someone from Carnival in person?

A I spoke with someone. Yes. But it was more like a customer service number or whatever. They did not handle emergencies.

Q Did they tell you to call somewhere else or do anything else?

A I can't remember if they were the ones who mentioned the Coast Guard or not. I can't remember.

Q When you said it sounded more of like a customer service representative from Carnival, how do you know that?

Did they tell you their title, or did they tell you what they do?

A I don't recall. I just -- I know that they were not able to help me with the emergency.

Q And you don't happen to know the name of the person you spoke with. Do you?

A No, ma'am.

Q Do you happen to know the phone number that you tried to call?

A No, ma'am.

Q Going back to what you said before about calling the Coast Guard, how did you find the number to locate the Coast Guard?

A I googled it.

Q Do you remember what you were looking at?

A I do not recall what I -- what my search was to google that number. I do not.

Q So when you eventually reached a human contact -- well, let me first get back. Was there only one person that you spoke to at the US Coast Guard?

A Throughout the night, I spoke to several different people. I had to speak to someone at the first location that we -- that I called. And then I spoke to another person at the next location. And there may have even been a third person, but I did speak to a couple o' different people throughout the night.

Q So the first person that you spoke with, do

you know what location this was and what Coast Guard division that you called?

A It was a northern Florida division. I don't know if it was the -- I don't know what's equivocal to Orlando, but that's where they -- wherever they ported is where I would've call -- is where I called for the first one. And they from then advised me that the boat was no longer in their, you know, servicing area, and they gave me a number to call for a different location.

Q So, if the boat had departed from Port Canaveral in Florida, does that sound familiar to you?

A Yes.

Q You think that would be the first person of contact that you called?

A Correct. Correct.

Q So then, do you know if you called the port agent themselves or the US Coast Guard for that first person contact?

A So, the very first thing I called was the port, and I guess that's where I'm thinking Carnival. I

called the port --

Q Okay.

A -- very first call. From there is when I called the Coast Guard of that region.

Q So, you're not sure if you spoke to someone from Carnival Corporation. Is that correct?

A That's correct. That's correct. I spoke with someone at the port --

Q Okay.

A -- where Carnival cruise took off. Yes.

Q Thank you for clarifying that.

A Yes, ma'am.

Q So, then you were advised the boat was no longer in the service area, and you were given a different number to call. That correct?

A Yes, ma'am.

Q So did someone pick up at that next phone call?

A Yes, ma'am.

Q Do you know what location you called?

A I am not 100 percent sure on the location.

Q Okay.

A I called whatever they told -- whatever they advised me to at the time, and I do not recall what the location was.

Q And what did that second person say to you?

A That second person was genuinely interested in the emergency. It was a man, and he wanted -- that's the guy that wanted as much information as he could possibly get so that he could talk to his superiors to find out what to do next. He assured me that they were able to go get him but they had to follow protocol. And he took down all of my information -- the name o' the boat, my brother's name, what was going on. And that's when he proceeded to -- whether it was him who made the phone calls, I don't know. I just know that somebody from the Coast Guard called the boat to, you know, get facts on what was going on, and then someone called me back.

Q So that person that called you back, was that the same person as the one that you had spoke to before, or was this a different person?

A No. It was the same person that had spoke to me before, and he told me he would call me back when he got some information.

Q And did you ever get his name?

A I probably did at the time, but I don't know what it is. I didn't write down any of this, you know, at the time.

Q Did you get his position with the Coast Guard?

A No, ma'am.

Q And then was there any other human person contacts that you spoke to from the US Coast Guard?

A No, ma'am.

Q So, at this point, after the US Coast Guard called you back and said, I spoke with the ship and they're not requesting a medical evacuation, what did you do next?

A I thanked the guy for trying his best and for relaying that information to me. And we talked just a little bit about how it didn't seem fair that my brother was gonna have to lay there with his heart

attack and that the boat wasn't gonna request help. He didn't understand why either, and he more or less told me his hands were tied and they were not able to just -- he kept saying, I can't just appear at the boat. I -- he said, can we go? Sure, we can. I cannot just appear at the boat and request to have your brother taken on. It has to come the other way. So, from that point on, you know, I thanked him and we hung up.

Q What did you do after that, if any?

A I was in communication with my sister-in-law and my sister to let them know that, you know, this had been done; these are the steps that I had taken, you know; these are the people that I talked to. They've talked to your boat and your doctors are saying that he is stable enough to ride this out.

Q So you had mentioned that you had not spoken to Chad Reeves' doctors on the cruise ship. Is that right?

A Correct.

Q So how did you come to believe that he was having a medical emergency?

A My sister is a nurse and been a nurse for many, many years. And so, I mean, she knows what the signs are and what they look like, and after seeing his EKG, she informed that that's what was going on.
Q So the medical emergency information was coming from your sister, the nurse?
A Correct.
Q I'm going to show you some photographs that we received from Chad Reeves' attorney in discovery. And they appear to be screenshots of phone call records from a phone. I'm going to pull it up over your screen in a second. But I want you to take a look at it and tell me if the photograph looks familiar to you. And there's going to be --
A Okay.
Q -- three. So I'll start with the first one. Can you see that on your screen, ma'am?
A Yes.
Q Does this look familiar to you?
A It doesn't look familiar. No.
Q Share a different one. How about that one?

Does that one look -- actually, I think they are the exact same thing, so, let me show you one more. Okay. Do you see that photograph on your screen?

A Yes.

Q Does this photo look familiar to you?

A I mean, I don't know. Don't know what that is.

Q Would this have come from your phone? Do you remember taking a screenshot of this?

A I took many screenshots over the course of the hours that he was being treated on the boat. That possibly could've come from my phone. If it came from my phone number, then the answer is yes. But just to look at that number, I have no idea who that is.

Q Sure. So you don't know this number on the screen, this 305 number. That's not familiar to you?

A It's not familiar. No. It's not a number that I call.

Q And what is your phone number?

A 434-315-1635.

Q And what type of brand of phone do you

have?

A UScellular.

Q What is the model of your phone?

A The phone I have at the -- at -- currently is a Samsung S22 Ultra.

Q And was it the same phone at the time of this incident, July 2023?

A Yes.

Q And did you have the same number in July of 2023?

A Yes, ma'am.

Q I'm going to share the photograph I shared with you earlier. So I have this back on your screen. This is a photograph of what looks to be a screenshot of a call log highlighted. And my question for you is if you could take a look at those phone numbers and let me know if any of those phone numbers look familiar to you.

A Again, I have -- they don't look familiar.

Q Do you think this could've been a screenshot from your phone taken?

A It absolutely could have been a screenshot

from my phone. Yes. The number -- the time stamps on those look very familiar as far as how chaotic things were that night and how many phone calls I was making.

Q And you had mentioned earlier that you have taken several screenshots on that day while Chad Reeves was on the vessel. Is that right?

A Yes.

Q Do you still have those screenshots?

A I do not. I had taken screenshots to send to some family that were not with me on my trip, and I was just relaying those.

Q Who did you send those screenshots to?

A I sent those screenshots to a cousin of ours -- well, a cousin's wife who is also a nurse. And I sent those screenshots to -- I can't say for sure that I sent 'em to my dad. I can't say for sure. I know that I was communicating with him, but I don't know if I was actually sending him the screenshots.

Q And would you still have these messages to this day?

A I do not. I have looked.

Q Why do you not have those messages?

A I'm not quite sure. I've scanned back through and I'm unable to find those. And I'm not a person that deletes anything, so --

Q So I'll ask you, if you do happen to run across any of those screenshots during the time of the subject cruise, that you not delete them in the case that I have a legal formal request for those.

A Absolutely.

Q So I just want to briefly go back to, I guess, a little bit of the maybe misunderstanding about who you were speaking to originally. Now that we sit here, now that we talked today, do you know if you've had any conversations with anyone from Carnival Corporation?

A No, ma'am. I'm (inaudible) I did. I'm certain that I called the (inaudible) --

Q I'm sorry. You broke up just a little bit. Could you please repeat that?

A I'm sorry. I'm not certain that I spoke with anyone from Carnival Corporation. I'm only certain

that I called the port.

Q So, is it fair to say that you don't remember having any conversations with anyone from Carnival Corporation?

A That's correct. That's correct. I think I just confused the fact that the boat left from the port and I was just thinking, you know, that's where the boat left. But after -- you know, once we started talking, I did not speak with anyone from Carnival. I spoke with a customer service person at the port.

Q Understood. So, at some point, I've come to know that you went down to the Florida Osceola Hospital. Is that correct?

A Yes, ma'am.

Q So, when did you go down there and when did you arrive to the hospital?

A So I left Myrtle Beach around lunchtime on Sunday. And I drove to Osceola to Orlando. Picked my dad up at the airport, and the two of us went to the hospital with my brother. And we arrived there around 11:30 that night.

Q Was Chad already at the hospital when you arrived, or did you get there first?
A He was already there.
Q And while you were at the hospital with him, did you speak to any of his doctors or nurses?
A We spoke with his doctor when we arrived that night.
Q And what did his doctor tell you?
A That my brother was a miracle.
Q Anything else he told you?
A Oh, I'm sure he told us some technical stuff about what he had done and the catherization [sic]. He told us that it was 100 percent blockage. He told us that he knew the ship had given him a clot block and -- a clot-busting -- sorry -- a clot-busting medicine that did not appear to have worked but that something had kept him alive.
Q Did he ever say what kept him alive?
A He did not have an answer.
Q And did he say anything to you about Chad's prognosis?

A I don't recall at that time if he said anything about that.

Q So how long did you spend in the hospital with Chad?

A I arrived to the hospital Sunday night late, and I was at the hospital with him all day Monday up until late evening time to go to bed. I was with him all day Tuesday, all day Wednesday. And Thursday, I was there until our family got off of the cruise ship and arrived at the hospital. So, I was there -- I think we left the hospital about 12:00-ish, somewhere around lunchtime, on that Thursday, heading back to Virginia, my dad and I.

Q And you two drove back up to Virginia together?

A Yes, ma'am.

Q Were you present during any of Chad's medical care and treatment at the hospital when doctors were giving him treatment?

A Yes, ma'am.

Q Do you recall what they were doing with

him?

A I don't recall the specifics or the correct terminology of anything.

Q Based on your observation, what was Chad's condition in the hospital?

A Just based on my observation, he was extremely weak. His mental state was a little bit shaky because he was concerned about whether, you know, he was gonna live long enough to see his family get back from that boat. We talked with his family. When I say his family, I meant his wife and his children. We talked with the folks left on the boat several times each day. He was able to video chat them. And he was extremely concerned as to whether he would get to see them again.

Q Did any of the doctors or nurses tell you that he was going to be okay?

A I don't recall anybody ever saying, yes, he's gonna be okay. I think that was a -- I think that's something that they didn't really know.

Q Did anyone else visit him in the hospital besides you and your dad before -- the setting before

the whole family came back from the cruise ship?

A Yes. Some local people from the fire department in that area because my brother is a professional firefighter. Some locals came to visit him and offer him some encouragement as well as one of his bosses who was at a conference a couple of hours away. He heard about the situation, and he was just a few hours from there, so he rented a car and came to visit Chad at the hospital.

Q You know the name is his boss who came to visit him?

A Yes. His name's Marcus Bush.

Q And this is a boss from Virginia. Is that right?

A Yes.

Q The local firefighter personnel, how did they come to know that Chad Reeves was in the hospital?

A I can't recall. I don't remember how they found out.

Q And are these people that Chad had known previously?

A Again?

Q Sorry. Are these people that Chad had known previously?

A No. He did not know them previously. There was also -- now that I'm thinking about it, there was also one other guy and his wife from the outside Lynchburg area, which my brother works in the Lynchburg area. And he used to work with my brother. He was in the area for a fishing convention, a fishing show. And so, him and his wife also came to visit in the hospital prior to our family getting back.

Q So how did all these people come to know that Chad was in the hospital?

MR. PADRON: Form.

A The people who are friends with him, I'm assuming, learned on Facebook. I have no way of knowing how they learned.

Q When you were with them, did any of the people say to you, oh, we heard from his other sister, or, oh, we heard from Chad? Like did they tell you how they came to arrive at the hospital?

A I don't recall any of them saying -- my brother, I don't think, made a post of anything that very little time on his phone during those days. He was trying to rest and recuperate.

Q And were you present when Chad was discharged from the hospital?

A No, ma'am.

Q When did you next see Chad after he had left Florida?

A I saw Chad when he got out of the hospital. They spent another night or maybe two in Florida so that he would have time to rest before making a long trip home. And I saw him when he arrived back at home. As he arrived home, we were all there to welcome him home.

Q And how often do you see Chad or have you seen Chad since this cruise?

A I see him once or twice a month and have seen him once or twice a month, if not more often than that, since then.

Q How does he seem now since the cruise?

A A little last year and several months,

there had been a wave of emotions. I won't say that anything's been constant. He had a little more fearful premonition about -- I won't say to take a vacation because he's not fearful to take a vacation. He's okay with that. But he's fearful of taking another cruise. Our family's going on another cruise this coming summer, the summer coming up in '25, and he won't go on that. You know, my brother's -- he has seen his career flash before his eyes. And to some of us -- I know that everybody holds their career in different standards, you know. I'm a schoolteacher and I love what I do. But if somebody came to me and said today that I can't go back to work, you know, for whatever reasons, I'll be a little sad but I could figure out and go on about life. My brother's life is his fire department, so, when this all happened and the unknowns and uncertainties of whether he would even be able to ever fight a fire again, it took an extreme toll on his emotional state. He battled depression for a while. And he was trying to get stronger and do the necessary steps that he had been told he had to do in order to get back to the level of

being able to do what he wanted to do in the fire department. So, it was just watching the roller-coaster of emotions then and the fearful thoughts that, you know, were there when he got home and sometimes still pop up. He will sometimes make comments now about, you know -- as we all know, we might not be here tomorrow, but when something happens like this, it kinda just puts it a little more in the forefront of your mind that I've got two small children and a wife that I could leave behind at any day.

Q And to your knowledge, did Chad return then to work as a firefighter?

A He did.

Q Do you know when he returned back to work?

A I do not know when he returned to work.

Q You have mentioned that he was battling depression for a while. Are you speaking after the subject cruise?

A Yes.

Q And did he have depression before the subject cruise?

A He had had some issues here and there. Nothing that I don't think he took medicine for or anything like that. Just at, you know, particular times in his life, he would become a little down in the dumps. Yeah.

Q Do you know if he treated with any physicians for depression before the subject cruise?

A I do not know if he was treated by any physicians. No. I don't know.

Q When you had mentioned that there were some particular times in his life that were up and down, do you recall any of the specific particular times?

A I recall one specific time, and that's when he was -- it was many years ago. He was hired on with the fire department. He had been through all of his necessary schooling and training. He was given a job there. And due to his weight, he was advised to resign the position so that it wouldn't look bad on him if he lost his job because of his weight. So if he resigned, he would potentially be able to come back and reapply for the job later on down the road and, you know,

possibly be able to get the job. I do (inaudible) taken an (inaudible) he --

(THE REPORTER asks THE WITNESS to repeat answer.)

MS. GENOESE: You just cut off.

THE WITNESS: Oh, I'm sorry. I'm sorry.

A I do remember that when he had to resign his position at the fire department back years ago when he was first hired on, that it took an extreme toll on him because being a firefighter's all my brother has ever dreamed of being. Even as little as five years old, that's all I know he's always talked about. And so, to get a job, his dream job, and then be told, it would be in your best interest to resign, it really took a toll on him. And so, he did it. He had no idea that down the road, he would be able to reapply and re-go through training and do all of his schooling again and be able to get his job, his dream job, back. They were unknown to him and uncertain at the time, so, he -- I -- that's an incident that I do recall in his life that was a bit hard for him.

Q And you had mentioned that he reapplied and then was able to get the position. Do you know what fire department or what entity that was?

A It's the same exact one. He was hired on with Lynchburg City fire department. He resigned at Lynchburg City fire department. And then he was rehired back on some months/years later to Lynchburg City.

Q And when this had happened, do you know what time or what year this was?

A No, ma'am. I don't recall those specifics.

Q Any other instances of specific times that you had mentioned that he struggled with before the subject cruise?

A I do recall that he hurt his back prior to the cruise. I can't remember if the back injury was work-related or extracurricular activity-related, whether it was, you know, his own doings or at work. I can't remember how he hurt his back. But I know that when he did hurt his back, it prevented him from being able to work and do the -- do a similar job, and it -- that as well took a toll on him.

Q You know if he ever sought treatment during that period of time when he injured his back? I mean -- and then when I say treatment -- sorry -- I mean treatment for the mental toll that it took on him.

A I'm not certain. I know at some point, he has seen a counselor at least once. I don't know if that was something that had continued. I don't know if it was a one-and-done. And I cannot tell you that it was because of that incident. I'm not certain on that.

Q And that was before the cruise. Is that right?

A Yes, ma'am.

MS. GENOESE: Just taking a look over my questions one second.

Q Did Chad ever speak to you about his medical condition before the subject cruise?

A His medical condition?

Q Oh, I'm sorry. His medical status before the subject cruise.

A To my knowledge, he didn't have any medical issues. Other than his, you know, occasional -- you

know, his back going out or something like that, he didn't have any ongoing medical issues.

Q Did you ever go to any doctor's appointments with him before the cruise?

A No, ma'am.

Q Did you ever go to any doctor's appointments with him after the cruise?

A No, ma'am.

MS. GENOESE: Okay. Mrs. Bowman. I don't think I have any further questions for you at this time. The other attorney may, but if not, ma'am, I thank you for your time today.

THE WITNESS: Thank you.

MR. PADRON: I have no questions. Thank you.

THE WITNESS: Thank you.

MR. PADRON: You're good to go.

THE REPORTER: All right. Josh. You're going to want a copy?

MR. PADRON: Yes, sir.

THE REPORTER: All right. Ashley, regular

delivery?

MS. GENOESE: Yes.

(Deposition concluded at 12:39 p.m.)

State of Maryland
City of Baltimore, to wit:

I, Eric Leichter, a Notary Public of the State of Maryland, Baltimore City, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 13th day of September, 2024.

Eric Leichter
Notary Public

My Commission Expires:
January 13, 2028