**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:24-cv-21295-RAR**

CHAD REEVES,

        Plaintiff,

v.

CARNIVAL CORPORATION
a Panamanian Corporation,

        Defendant.

_____/

**DEFENDANT CARNIVAL CORPORATION'S MOTION IN LIMINE TO EXCLUDE**
**CERTAIN OPINIONS AND TESTIMONY OF DR. KIM KLANCKE, M.D.**
**PURSUANT TO DAUBERT v. MERRILL DOW PHARM, INC.**

Defendant, CARNIVAL CORPORATION (hereinafter "Defendant"), by and through its undersigned counsel, hereby files this Motion in Limine to Exclude Certain Opinions and Testimony of DR. KIM KLANCKE, MD at trial pursuant to Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993), and in support thereof would state as follows:

**I.     INTRODUCTION**

1.     This is a maritime medical malpractice matter arising from an incident that occurred aboard the *Carnival Freedom*, on July 8, 2023.  [DE 1, ¶7] Plaintiff contends that the shipboard medical staff aboard the *Freedom* deviated from acceptable care standards during their treatment of his cardiac emergency by failing to properly assess, timely diagnose, and appropriately treat his condition.  [Id. at ¶ 22].  Additionally, Plaintiff also contends the shipboard medical staff was negligent in failing to obtain consultations with appropriate specialists and immediately evacuate him from the vessel for appropriate care in a timely manner.  [Id.]  Defendant disagrees and

contends that the ship's medical staff saved Plaintiff's life with timely and prudent decision making and treatment.

2.     In support of the foregoing criticisms against Carnival, Plaintiff has called upon Dr. Kim Klancke to provide liability and causation opinions relative to the "medical standard of care." [*See* Expert Summary Report and Supplemental Report of Dr. Kim Klancke attached hereto as Composite Ex. A and B; *see also* PG. 119 LN. 19-PG. 120 LN. 5 of the deposition of Dr. Klancke dated January 7, 2025 attached as Ex. C]

3.     Although fully cognizant of his lack of expertise in the practice of medicine at sea, when offered the opportunity at his recent deposition to withdraw opinions authored in his expert summary report that clearly require sufficient qualification and experience in a maritime setting, Dr. Klancke repeatedly refused to do so.  In addition to testifying outside his scope of expertise, Dr. Klancke also improperly offered unhelpful speculative opinions concerning Plaintiff's anticipated life expectancy and/or need for an eventual heart transplant.  Accordingly, pursuant to Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993) and Federal Rules of Evidence 403 and 702, Defendant seeks to prevent the following opinions by Dr. Klancke at trial that lack a fundamental predicate for admissibility, including:

A)     Any and all opinions, testimony or reference to the suitability and/or viability of a medical evacuation at sea;

B)     Any and all opinions, testimony or reference to a "drip and ship" treatment option;

C)     Any and all opinions suggesting that the shipboard medical staff deviated from acceptable care standards in failing to obtain consultations with shoreside specialists; and

D)     Any and all speculative opinions concerning Plaintiff's life expectancy, particularly the possibility that he may eventually need a heart transplant.

## II.      LEGAL STANDARD

The district court serves as a gatekeeper to the admission of scientific testimony by ensuring that "speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (*quoting* McCorvery v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002)). In determining the admissibility of expert evidence, the court engages in a rigorous three-part inquiry pursuant to *Daubert* and its progeny. Relevant expert testimony is admissible only if the trial court finds that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Rosenfeld v. Oceania Cruises Inc., 2009 U.S. Dist. LEXIS 86714 *2-3(S.D. Fla. 2009) (*quoting* United States v. Frazier, 387 F.3d at 1260); *see also* Daubert, 509 U.S. at 589. The Eleventh Circuit has referred to these requirements as the "qualification," "reliability," and "helpfulness" prongs, and although there may inevitably be overlap, the three prongs remain distinct concepts that must be individually analyzed. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

Moreover, "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). "Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." Masferrer, 367 F.Supp.2d at 1372 (interpreting *Allison*, 184 F.3d at 1306).

### A. Qualifications

"Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.' " Clena Investments, Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting Jack v. Glaxo Wellcome, Inc., 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002)). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." Clena Investments, Inc., 280 F.R.D. at 661 (citing City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562–63 (11th Cir. 1998)). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's discretion." Clena Investments, Inc., 280 F.R.D. at 661 (*citing* Berdeaux v. Gamble Alden Life Ins. Co., 528 F.2d 987, 990 (5th Cir. 1976) (footnote omitted)).

### B. Methodology

To evaluate the reliability of an expert opinion, courts consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique and (4) whether the technique is generally accepted in the scientific community. These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. *See* Farley v. Oceania Cruises, Inc., 2015 WL 1131015 (S.D. Fla. Mar. 12, 2015) (*citing* United States v. Frazier, 387 F.3d 1244, 1261-62 (11th Cir. 2004) (en banc)). It is an evidentiary requirement that expert opinions be connected to existing data by something more than the "it is so because I say it is so" of the expert. *See* Holesapple v. Barrett, 5 Fed. Appx. 177 (4th Cir. 2001); Slaughter v.

Southern Talc. Co., 919 F.2d 304, 307 (5th Cir. 1990) ("[W]ithout more than credentials and a subjective opinion, an expert's opinion that 'it is so' is not admissible."); FED. R. EVID. 702 advisory committee's note (2000 amendments) ("The trial judge in all cases of proffered must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.).

### C.  Helpfulness

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262–63 (citations omitted). Furthermore, while "[a]n expert may testify as to his opinions on an ultimate issue of fact ... he 'may not testify as to his opinion regarding ultimate legal conclusions.' " Umana–Fowler v. NCL (Bahamas) Ltd., 49 F.Supp.3d 1120, 1122 (S.D. Fla. 2014) (quoting United States v. Delatorre,308 Fed.Appx. 380, 383 (11th Cir. 2009)). The Eleventh Circuit has also made clear that "merely telling the jury what result to reach is unhelpful and inappropriate." Umana–Fowler, 49 F.Supp.3d at 1122 (citing Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990)). Legal conclusions or statements instructing what conclusion the jury should reach are impermissible to pass muster under *Daubert*. *See* Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("[C]ourts must remain vigilant against the admission of legal conclusions") (citations & quotations omitted); *see also* Montgomery, 898 F.2d at 1541 (11th Cir. 1990) ("An expert may not ... merely tell the jury what result to reach."). "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." Montgomery, 898 F.2d at 1541 (*citing* United States v. Poschwatta, 829 F.2d 1477, 1483 (9th Cir. 1987); United States v. Baskes, 649 F.2d 471, 479 (7th Cir. 1980)).

## III. ARGUMENT

### A. DR. KLANCKE IS UNQUALIFIED TO RENDER STANDARD OF CARE OPINIONS CONCERNING MARITIME MEDICAL CARE AND TREATMENT, AND HIS OPINIONS CONCERNING PLAINTIFF'S LIFE EXPECTANCY AND PURPORTED NEED FOR A HEART TRANSPLANT ARE SPECULATIVE, LACK APPROPRIATE METHODOLOGY AND ARE THUS HELPFUL TO THE JURY

#### 1. Dr. Klancke's lack of qualification to offer maritime standard of care opinions

Whether a witness is qualified is a threshold issue to be decided by the Court. FedR.Evid. 104(a). The degree and manner of knowledge and experience is directly related to the complexity of the subject matter, and the corresponding likelihood of error by one who is insufficiently familiar. Frazier, 387 F.3d at 1260-61. If experience is the basis of an expert opinion, it must be explained how experience leads to the conclusions reached, why the experience is a sufficient basis, and how the experience is reliably applied to the facts. Id. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." Id.

As a threshold matter, it is undisputed that Dr. Klancke has no personal knowledge or experience regarding maritime medical practice. [See Ex. C, PG. 17 LN. 2-PG 19 LN. 15] He has never worked as a cruise ship physician, been inside a cruise ship medical center, or conferred with a cruise ship doctor during the course of medical treatment at sea. [Id.] He has no experience coordinating medical evacuations at sea, has never had reason to ever communicate with the United States Coast Guard, and is unaware of what their capabilities are or what transport services they can offer. [Id.] In fact, Dr. Klancke readily admitted on multiple occasions that he cannot offer standard of care opinions from a maritime perspective throughout his deposition.

Recognizing his undisputed lack of knowledge or experience in maritime medicine, Plaintiff is attempting to label Dr. Klancke as an expert in the "medical" standard of care who will offer opinions from the perspective of a land-based cardiologist during the time period in question. [See Ex. C at PG 119 LN 19- PG 120 LN 5] However, even under the purported guise of a land

based "cardiac expert," Dr. Klancke still undeniably strayed outside of his area of expertise during his recent deposition by offering opinions that are uniquely maritime in nature as the following three examples demonstrate:

**a) Maritime medical evacuation**

Dr. Klancke admits on the one hand that he "can't tell what's involved in transferring him (Plaintiff) and the risks or the mechanics" of a medical evacuation at sea, yet on the other hand he suggests, "somebody should have had a discussion with the captain about the value of getting him to an appropriate medical facility." [See Ex. C PG 15 LN 2-8]. Similarly, Dr. Klancke later testified that he thought "it would have been ideal to run this situation by the captain" and that "there should be a real risk assessment in terms of keeping him on the ship and using that to weigh into their decision as to whether or not to consider a transfer." [Id. at PG 50 LN 1-6; PG 53 LN 1-5]. According to Dr. Klancke, the ship physicians were, "cavalier in just deciding they weren't going to transfer him under any circumstances." [Id. at PG 50 LN 4-6]. Although Dr. Klancke admits at one point during this deposition that he "wasn't positive whether he was opining on shipboard standard of care" because he's "not been a ship doctor," his comments suggesting that the medical staff should have inquired about medical evacuation options, conferred with the captain, and/or performed a "risk assessment" should not be permitted to be offered at trial. [Id. at PG. 119 LN. 9-18] Essentially speaking from both sides of his mouth, Dr. Klancke's readily admits in response to nearly every challenge that he is "not a seagoing expert," yet he also takes every opportunity to offer critical opinions that are clearly outside his area of expertise, as demonstrated in the following exchange during his recent deposition:

> Q:      All right. So let me move into a different territory and see whether or not we need to go into this. So you gave some opinions in your report about specific times that you felt transfer requests to shore should have been made. In particular you indicate

that that should have been done at 7:25 PM.  We've since discussed your information that you reviewed, particularly the deposition of the captain, wherein he talked about all kinds of difficulties that he believed about the capabilities of transfer.  Are you still of the opinion that a transfer should have been requested at 7:25, or are you abandoning that opinion?

A:      I don't want to argue about the transfer, **but my opinion is they didn't give the downsides to keeping him on the ship very serious consideration**.  I have no idea, after the depositions, what the risks are involved with the transfer.  So it's hard for me to make a risk-benefit decision or a risk-benefit opinion.

* * *

Q:      Sure.  Are you planning to give any opinions at trial that a transfer should have been performed at any point in time from the moment Mr. Reeves came into the medical center until ultimately the time that he left?

A:      I already told you I can't make a risk-benefit decision of the transfer because I can't tell how difficult or risky it might be.

Q:      Okay.

A:      What I'm going to tell the jury is that when you take any opportunity for any PCI out of the picture, even if you do the thrombolytic protocol perfectly, there's still about a one-third chance that he's still requiring emergency PCI and would benefit from that emergency PCI at four or six or eight or twelve hours.  So there's about a two-thirds chance that if you give the thrombolytic protocol, and specifically the Lovenox appropriately, that you can achieve TIMI 3 flow and he would be stabilized on the ship to undergo cardiac cath and intervention at twenty-four hours like he did.  But you remove the one-third chance of the potential to benefit him from a transfer.  Again, if a transfer is just impossible, if it's possible, **I think it would have been ideal just to run this situation by the captain**.

[Id. at PG. 51 LN. 7- PG. 53 LN. 5]

The foregoing exchange is just one of many examples that highlight Defendant's concern relative to Dr. Klancke's conflicting testimony regarding his ability versus his willingness to opine on issues related to medical evacuation on the night in question.  Given his admission that he has never been involved in any aspect of maritime medical practice (from treatment to medical

evacuation), has no understanding of the risk-benefit analysis Drs. Desi and Leonards needed to consider with regard to the Plaintiff, and is entirely unaware of how difficult an at sea medical evacuation would actually have been on the night in question, he should not be permitted to casually offer such criticisms like, "the ship's medical staff didn't consider the downsides to keeping the Plaintiff aboard the *Freedom*," or that it "would have been ideal" to confer with the captain on the night in question. Given his admitted lack of expertise, Dr. Klancke should not be permitted to comment on the issue of medical evacuation at all.

### b) "Drip and ship" option

In his supplemental expert report, Dr. Klancke further opines on the issue of medical evacuation by offering the suggestion that the ship's medical staff could have temporarily provided thrombolytic medication to the Plaintiff while effectuating an at sea evacuation. In particular, Dr. Klancke contends that when the ship's medical staff initiated treatment of thrombolytic medication at 9:00 PM on the night in question, an at sea medication evacuation could have also been effectuated simultaneously to enable Plaintiff to return to shore earlier than what ultimately took place in the case. According to Dr. Klancke, "giving the thrombolytic does not interrupt the ongoing transfer to a PCI facility. The plan remains a "Drip and Ship" approach with the "Ship" meaning emergency transfer and the "Drip" being appropriate IV fibrinolysis." [See Comp. Ex. B, pg. 1-2]

There are considerable problems with Dr. Klancke's novel proposal. First, even Dr. Klancke recognizes that administration of thrombolytic medication in and of itself is potentially life threatening. [See Ex. C PG 48 LN 20- PG 49 LN 11] However, more germane to the issue before the Court is that because Dr. Klancke does not have the requisite expertise in maritime medicine, he consequently has no idea whether his proposed "drip and ship" treatment method is

even possible.  Despite this, when questioned during his recent deposition he refused to abandon the opinion as outlined below:

> Q:      All right.  So in the facilitated PCI context, you've offered this opinion in your supplemental report about a drip and ship concept.  And I'm understanding that to mean that what you're saying is you provide the tPA as the primary thrombolysis, and then you ship the person to a PCI-capable facility?
>
> A:      Yes.  While you've giving the Lovenox and hanging the tPA and giving the aspirin and clopidogrel, you are calling EMS to try and transport the patient.
>
> Q:      All right.  Have you ever seen a medevac performed aboard a cruise ship?
>
> A:      I've never seen one, no.
> ***
> Q:      Okay.  So that's what the purpose of this deposition is, is to try and filter out what you believe you can actually say and what you're just putting in a report.  And so –
>
> A:      I can't make a risk-benefit decision.  Now I've said that four or five times.  I'm not sure what you can't understand about that.
>
> ***
>
> Q:      Are you saying—and this is why I'm asking the question.  Are you saying that in this particular case the shipboard physicians aboard the Carnival Freedom should have put Mr. Reeves in a basket while tPA was being administered and had him hoisted up into a Coast Guard helicopter?
>
> A:      What I'm saying is that we use helicopter transport routinely, and it's routinely done by helicopter transport.  What I told you the first five minutes of the deposition is that the captain's testimony changed my opinion, to some degree; and I believe that is the person who indicated that the helicopter can't land and the patient would need to be in some sort of basket. So I don't know if they can—and therefore, it had somewhat changed by opinions. So—
> Q:      Right.

A:      --if I were to testify my opinions have somewhat changed on the transport, I still don't know medically if they can bring you up on a cot with an IV mechanism and controlled the IV mechanism.  I don't know what the logistics are; therefore I can't assess the risk of doing it.  But routinely by helicopter they give tPA during transport.  The helicopter typically has landed and they load him up on the ground.

Q:      Exactly. In every instance that you're aware of where tPA and a drip and ship approach was done by helicopter, the helicopter landed.  There was never an instance where they hoisted the person up in a basket into a helicopter, correct?

A:      I've not seen that done.  And again, I don't know if they're medical, the helicopter, or if they have a way around it.  I told you now twenty-five times I don't know, and that the captain's deposition somewhat changed what I've written in my depositions (sic) about the transport.

**Q:      So does that mean that you are abandoning your opinion that a drip and ship approach should have been used in this case?**

**A:      No.  If possible it should have been done, because there is a huge benefit to getting him transported; but nobody took into consideration to what the benefit might be, they just--**

Q:      So then tell me how a drip and ship approach could have been done in this case?

A:      I told you, I don't know what options that could have been done because nobody pursued it.  Maybe the helicopter people, if they were asked, have a type of hoist that allows IVs to run and the patient to be medevac'd.  I don't know.  I told you I can't assess the risk of the transport, and that's come up since I've read the deposition of the captain.  I don't know what's so hard to understand about this.

[See Ex. C at PG 53 LN 24- PG 58 LN 13]

Even if the Court were to find Dr. Klancke qualified to comment on medical evacuations

at sea or the viability of a "drip and ship" concept in this instance, the process he used in forming

his expert opinion must be sufficiently reliable under Daubert and its progeny as well.  *See* Quiet

<u>Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1342 (11th Cir. 2003)(stating that "one may be considered an expert but still offer unreliable testimony").  Although Dr. Klancke attempts to rely upon his land based "drip and ship" experience to justify his refusal to abandon his opinion in this case, he has no experience with at sea evacuations and therefore has no idea what the capabilities are, let alone the risks.  Moreover, he has clearly not done anything to educate himself on the intricacies of hoist manuevers from a cruise ship to a helicopter at sea to be able to competently testify whether it was even an option on the night in question.  To the contrary, he readily admits he has no idea what the Coast Guard capabilities were in this instance.

### c) Telemedicine and/or shipboard communication process and procedure

Dr. Klancke is of the opinion in this case that an initial EKG test performed in the Freedom's medical center was indicative of a particular type of heart attack called a "STEMI" (ST elevated myocardial infarction) that should have prompted the ship's medical staff to initiate thrombolytic medication.  Although the involved ship physicians (and defense experts) dispute Dr. Klancke's interpretation that the first EKG was indicative of a STEMI, this is not the basis of Defendant's current challenge.  Instead, Defendant challenges an ancillary opinion Dr. Klancke appeared to offer during deposition questioning by Plaintiff's counsel regarding shipboard communications and procedure.  In particular, although there is no mention of it in his expert summary report or rebuttal report, Dr. Klancke suggested that the ship board physicians could/should have reached out to shoreside cardiologists for advice on the night in question as the following exchange outlines:

> Q:      Was there any indication, at any point upon receiving the initial EKG, that Dr. Leonards or any sort of the nurses at his request attempted to reach out to a shoreside cardiologist to help interpret this EKG?
>
> A:      None.

\* \*

Q:      And in your practice would it have been normal for an emergency room doctor, if they get an abnormal EKG and can't completely interpret it, to reach out to you and ask what they're looking at?

MR. DRAHOS: Object to the form.

A:      That's typically what happens with this EKG, because I have more EKG reading experience than the emergency room guy.  And if there is any question, if the patient's symptoms aren't typical, then you would just say well, repeat it in fifteen minutes and send me that.

\* \*

Q:      And do you need---would you, Dr. Klancke, need to have previously been in a cruise ship's medical center to know that a fibrinolytic regimen should be started, including the immediate administration of a thrombolytic and an intravenous bolus of Lovenox?

A:      No, if a cruise ship called me, I would be acting as an onshore advisor, similar to what they said they had available.

[See Ex. C at PG 127 LN 21-25; PG. 135 LN 2-10]

Here again, Dr. Klancke has inserted a maritime standard of care opinion through the auspices of a purported self-proclaimed land-based cardiology expert.  As repeatedly admitted to throughout his deposition, he has no experience treating patients at sea, has never been inside a cruise ship medical center, and has never conferred with a cruiseship physician before.  Thus, it stands to reason that he has never initiated or received a telemedicine call from a cruiseship.  Defendant admits that Dr. Klancke does not need such experience to disagree with the ship doctors' EKG interpretation or ultimate decision on whether/when to administer cardiac medications in this case.  However, Dr. Klancke has no basis to opine on the availability, feasibility, timing, or even capability of telemedicine

options available to the ship's medical staff on the night in question.  Clearly if he has never worked in a cruise ship medical center before, he does not know when/why/how (or even whether) a telemedicine consult was available to the ship's medical staff on the night in question and he has not offered any basis to suggest that the process he is familiar with on land is the same at sea, nor did he do anything to learn what would have been involved in order to effectuate one on the night in question.

**2.      Dr. Klancke's unreliable and speculative opinion regarding Plaintiff's life expectancy and/or eventual need for a heart transplant are ultimately unhelpful to the jury and unfairly prejudicial to the Defendant**

In his supplemental expert report, Dr. Klancke attempts to forecast Plaintiff's long-term future by suggesting that his current condition may ultimately lead to the need for a heart transplant.  However, he is conspicuously careful to premise his suggestion by admitting in his supplemental report that, "there is no data set of patients that tells us what percentage of patients with advanced ischemic cardiomyopathies and HFrEF end up with a cardiac transplant but over a 30 year span it is likely over 50%." [See Ex. B, PG 2]  Notably, neither Dr. Klancke's expert report or supplemental report provide any published articles, data sets or peer reviewed literature of any sort to support any of his opinions in the case, let alone his long term projections regarding Plaintiff's life expectancy and/or need for an eventual heart transplant. Despite this, Dr. Klancke was not as conservative during his deposition when he boldy attempted to predict Mr. Reeves' future need for a transplant with nothing more than *ipse dixit*.

> Q:      So was it your opinion in your supplemental report that there's no dataset of patients that tells us the percentage with advanced ischemic cardiomyopathy who end up with a cardiac transplant, but over a thirty-year span it's likely over fifty percent? Was that your opinion in your supplemental report?
>
> A:      Yes.  My opinion is he will become a candidate for a transplant.  Whether he gets it or not is another issue.  Some of the

considerations are financial. Some of the considerations are patient's ability to take the medical regimen follow-up afterward. It's a very individualized decision. **I've had people that I thought should be transplanted and decided not to**, and then a number of others where they go ahead and transplant them.

Q: Well, when you say there is no dataset of patients, what are you saying there in layman's terms?

A: I'm just saying there is a dataset that shows over time he is likely to become somebody who would benefit from either mechanical therapies or transplant. There's no—

Q: Your report says that there's no dataset.

A: There is no dataset that says a patient like this is likely or guaranteed to get a transplant, a group of thirty-seven-year-old patients, or thirty-eight or thirty-nine now, with advanced ischemic cardiomyopathy who are undergoing remodeling despite optimal medical therapy that end up with a transplant. **I don't know if that percentage is fifty percent or more.** But the report should say you'll reach a point in time where transplant would be a consideration or an option.

[See Ex. C at PG. 97 LN 21-PG 99 LN 2 (emphasis added)]

Dr. Klancke's opinions relative to Plaintiff's life expectancy and eventual need for a heart transplant are speculative and unreliable. *See* General Electric v. Joiner, 522 U.S. 136, 148 (1997)("noting in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert"). A court may conclude that there is simply too great an analytical gap between the data and the opinion offered. Id; *see also* Guinn v. AstraZeneca Pharmaceuticals LP, 602 F.3d 1245 (11th Cir. 2010); McDowell v. Brown, 392 F.3d 1283, 1301-02 (11th Cir. 2004). Here, Dr. Klancke readily admits that he cannot point to *any data* to indicate what Plaintiff's future need for a heart transplant might be. However, even if he could, he admits whether to proceed with a heart transplant is also "a very individualized decision." Notably, Dr. Klancke (a retired physician who has not actively treated

patients since 2019) has never examined nor even spoken to the Plaintiff.  Despite this, even if the Court were allow Dr. Klancke to offer his speculative medical forecast, he admits that he does not know "if that percentage is fifty percent or more."  Thus, his opinion does not meet Florida's more likely than not standard of causation.  *See* Gooding v. University Hospital Bldg., Inc., 445 So.2d 1015, 1018 (Fla. 1984); Allison v. McGhan Med. Corp., 184 F.3d 1300, 1322 (11th Cir. 1999); Haller v. AstraZeneca Pharmaceuticals LP., 598 F.Supp. 2d 1271 (M.D. Fla. 2009); *see also* Lengowicz v. U.S., 2006 WL 2982861 (M.D. Fla. Oct. 18, 2016)("Plaintiff's medical malpractice claims governed by Florida substantive law and Federal procedural law").  As the Florida Supreme Court held, "[a] mere possibility of causation is not enough." Id. at 1018.  Clearly, Dr. Klancke's concession that he has no data set to point to, nor ability to even opine beyond a 50/50 chance of an eventual need for transplant renders his opinion inadmissible.

Similarly, Dr. Klancke also estimated (for the first time during his deposition) that Plaintiff "on average" would have a twenty-year life expectancy. [See Ex. C at PG 101 LN 16-17].  Notably, Dr. Klancke did not offer any life expectancy opinions in either his expert summary report or supplemental report and as a consequence, Defendant did not have an opportunity to confer with experts beforehand in order to prepare questioning in this regard.  Regardless, even during his deposition Dr. Klancke failed to cite to any authority to support his life expectancy claim, beyond vague references to "statistics" and "linear curves" purportedly offered in the YOUNG-MI registry.

It is axiomatic that the district courts "have broad authority over the management of trials." Tran v. Toyota Motor Corp., 420 F.3d 1310, 1315 (11th Cir. 2005).  Such authority includes the power to exclude evidence which is unfairly prejudicial or could serve to mislead/confuse the jury. See Fed.R.Evid. 403 (providing that "[t]he court may exclude relevant evidence if its probative

value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). As the Eleventh Circuit explained in U.S. v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004), "[b]ecause of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403," noting that "[e]xclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury…"(citations omitted); *see also* Hull v. Merck & Co., Inc., 758 F.2d 1474, 1477 (11 th Cir. 1985)(finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702"); United States v. Stevens, 935 F.2d 1380, 1399 (3d Cir. 1991). Given the significance jury's place upon expert testimony, Dr. Klancke should not be permitted to offer speculative transplant or life expectancy opinions that are not supported by anything beyond his personal opinion and a few vague references to statistics and linear curves. See e.g. Noon v. Carnival Corp., 2019 WL 5784689 (S.D. Fla. Nov. 16, 2019). Accordingly, Dr. Klancke's future forecast opinions regarding heart transplant and life expectancy are unreliable and ultimately unhelpful to a jury and should be excluded under Rule 701 and *Daubert* standards.

## CONCLUSION

Pursuant to Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993) and Federal Rules of Evidence 403 and 702, Defendant, CARNIVAL CORPORATION, respectfully requests the Court enter an Order excluding Dr. Kim Klancke from rendering maritime medicine standard of care opinions in the case, including but not limited to his proposed testimony concerning medical evacuation at sea and telemedicine/shipboard communication and procedure. Additionally,

Defendant would respectfully request entry of an Order excluding Dr. Klancke from rendering a life expectancy opinion or forecasting the likelihood Plaintiff will ultimately require a heart transplant.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(A)(3)

In accordance with Local Rule 7.1(A)(3), undersigned counsel hereby certifies that he conferred with Plaintiff's counsel in a good faith effort to resolve the issues raised herein and has been advised that Plaintiff objects to the relief sought in this Motion.

Respectfully submitted,

GrayRobinson, P.A.
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747

By: */s/ Michael Drahos*
Michael J. Drahos
Florida Bar No. 0617059
michael.drahos@gray-robinson.com
W. Cooper Jarnagin
Florida Bar No. 117767
cooper.jarnagin@gray-robinson.com
Ashley Genoese
Florida Bar No. 1019357
ashley.genoese@gray-robinson.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some

other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

*/s/Michael Drahos*

**SERVICE LIST**
**CASE NO. 1:24-cv-21295-RAR**

Todd J. Michaels, Esq.
Florida Bar No. 568597
tjm@haggardlawfirm.com
Joshua P. Padron, Esq.
Florida Bar No. 1018674
jpp@haggardlawfirm.com
THE HAGGARD LAW FIRM
330 Alhambra Circle
Coral Gables, FL 33134
Telephone: (305) 446-5700
Facsimile: (305) 446-1154

Philip D. Parrish, Esq.
Florida Bar No. 541877
phil@parrishappeals.com
7301 S.W. 57th Court, Suite 430
South Miami, FL 33143
Telephone: (305) 670-5550
Facsimile: (305) 775-5155

*Attorneys for Plaintiff*