Exhibit "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  1:24-cv-21295-RAR

CHAD REEVES,

     Plaintiff,

vs.

CARNIVAL CORPORATION,
a Panamanian Corporation,

     Defendant.

_____/

REMOTE DEPOSITION OF KIM KLANCKE, M.D.

DATE:       Tuesday, January 7, 2025

TIME:       9:03 a.m. to 12:39 p.m.

PLACE:      All parties appeared
             remotely via Zoom/VTC

Stenographically Reported By:  Andrea C. Rivera
Professional Court Reporter, Notary Public

Kim Klancke, M.D.
January 07, 2025

REMOTE APPEARANCES

ON BEHALF OF THE PLAINTIFF:

BY:  TODD J. MICHAELS, ESQUIRE
THE HAGGARD LAW FIRM, P.A.
330 Alhambra Circle
Coral Gables, Florida 33134
305-446-5700
tjm@haggardlawfirm.com

ON BEHALF OF THE DEFENDANT:

BY:  MICHAEL J. DRAHOS, ESQUIRE
GRAY ROBINSON, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
561-268-5727
michael.drahos@gray-robinson.com

Kim Klancke, M.D.
January 07, 2025

INDEX OF PROCEEDINGS


DEPOSITION OF KIM KLANCKE, M.D.

Direct Examination by Mr. Drahos                    4

Cross Examination by Mr. Michaels                 115

Certificate of Oath                               150

Certificate of Reporter                           151

Witness Review Letter                             152

Errata Sheet                                      153

                          -----


                     DEFENDANT'S EXHIBITS


| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Deposition duces tecum | 5 |
| Exhibit 2 | Billing invoices | 6 |
| Exhibit 3 | Expert report | 10 |
| Exhibit 4 | Supplemental report | 12 |
| Exhibit 5 | EKG I | 29 |
| Exhibit 6 | EKG II | 40 |
| Exhibit 7 | Flow chart | 65 |
| Exhibit 8 | Carnival Freedom medical chart | 67 |
| Exhibit 9 | 3/24 TruMed medical record | 103 |
| Exhibit 10 | 3/6/24 athletic training record | 105 |

(Reporter's note:  All exhibits will be attached and

forwarded once they are received from defense counsel.)

Kim Klancke, M.D.
January 07, 2025

Proceedings taken before Andrea C. Rivera, Professional Court Reporter and Notary Public, in and for the State of Florida at Large in the above cause.

- - - - - - -

THEREUPON:

The following proceedings occurred:

KIM KLANCKE, M.D.,

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. DRAHOS:

Q Good morning. Can you please state your name for the record?

A My name is Kim Klancke.

Q Good morning, Dr. Klancke. My name is Michael Drahos. I'm counsel for Carnival. It's my understanding that you've been produced here today as an expert on behalf of the plaintiff in response to a duces tecum that my office propounded.

A Yes.

Q Okay. Have you had an opportunity to look at that in advance of the deposition today?

A Yes.

Q All right. Let me go ahead and I'm going to

Kim Klancke, M.D.
January 07, 2025

pull that up for us.  Give me a minute here.  Can you see my screen, Doctor?

A    Yes.

Q    And is this, what we're going to mark as Exhibit 1 to the deposition, a copy of the duces tecum that you reviewed?

A    Yes.

(Defendant's Exhibit 1 to be marked for identification.)

BY MR. DRAHOS:

Q    And particularly as it relates to the back two pages, pages four and five, have you had a chance to look at what we requested?

A    Yes.  I sent everything I had pertinent to that.

Q    Okay.  Where did you send it to?

A    I sent it to Mr. Michaels' office.  I think they forwarded it to you as a Dropbox link.

MR. MICHAELS:  Mike, did you not receive -- Jodie sent a Dropbox link out Friday.  I know I approved it and Dr. Klancke.  I can forward it back over to you if you did not receive it.

MR. DRAHOS:  Yeah, no, I did not see it come through.

MR. MICHAELS:  Give me one second just to

rustle it out of my e-mail. I don't know why that didn't previously go or what have you, but it should have.

(A discussion off the record was held.)

BY MR. DRAHOS:

Q While I'm waiting for that to come through, Doctor -- oh, there it is, I just got it now. What I'm most particularly interested in is did you provide, in response to the duces tecum, a copy of all billing invoices that have been generated for this case?

A I sent them. I can send them again.

MR. MICHAELS: Yeah, they're in there.

MR. DRAHOS: Okay. What we will do, Madam Court Reporter, is we are going to go ahead and attach the billing invoices, that were provided in response to the duces tecum in this link, to the deposition. I will forward them to you afterwards. I just want to move on. I don't want to waste time.

(Defendant's Exhibit 2 to be marked for identification.)

BY MR. DRAHOS:

Q Doctor, do those billing invoices indicate the date that you were retained as an expert in this case?

A Approximately. I would have been retained a

few days before the first bill.

Q   Okay.  And have all the billing invoices that you've generated as an expert in this case been provided here in response to the duces tecum, meaning there are no other pending charges?

A   No, there's probably eight hours of pending charges.

Q   And what are those eight hours of pending charges for?

A   Primarily reading all the depositions.  I think the last bill had a couple of the -- the two doctors' depositions.  Then I read depositions of Mr. and Mrs. Reeves and two nurses and the ship's captain.

Q   You said you read the depositions of two doctors.  Which doctors are you referring to?

A   Dr. Leonards and Dr. Desai.

Q   Other than reading the deposition of Mr. and Mrs. Reeves, the ship captain, the two nurses and Dr. Leonards and Dr. Desai, have you done anything else subsequent to providing your report in this case but prior to today's deposition?

A   Just another look at the ship records and some of the other records.  There were nine depositions in all.  So I've got a list here, a handwritten list that I made up.  But the depositions I've read are of the two

Kim Klancke, M.D.
January 07, 2025

doctors, and then there's Tony Arrington (ph.), Brittany Bowman (ph.) -- the three ship nurses, I'm sorry, because there's a Mr. Cagumbay.  There's the ship's captain, there's Brittany Reeves and Chad Reeves; and the three nurses are Cagumbay, Maddonda (ph.) and Thomas.

     MR. MICHAELS:  Michael, I don't mean to interrupt your deposition, but that list is also included in the materials that you were forwarded.  There are four pages of handwritten notes.

     MR. DRAHOS:  Okay.  Thank you.

BY MR. DRAHOS:

    Q   So, Dr. Klancke, let me start with this question:  Did anything you read, whether it was these depositions of doctors or nurses, the captain, whoever, anything you read change your opinions that you had previously memorialized in your reports?

    A   Only the issue with the transfer.  I couldn't get a feeling afterwards for how difficult it might actually be.  The captain seemed to think that it wasn't advisable.  The problem is they didn't consider the downside to not transferring.  So they didn't make a risk-benefit decision, they just decided this patient was not going to be offered any opportunity of timely coronary intervention.

Q    Now, we're going to get to that obviously in a little bit.  But let me go back to what you just said. So when you say that it changed you opinion as it relates to the issue of transfer, are you saying at the time you initially drafted your report in this case you did not appreciate the difficulty that would be involved in a STAT sea medevac?

A    Well, I'm not a seagoing expert.  This ship looks like Nassau's way south.  It looks like it was pretty close to Florida, you know, most of the time that he was having his heart attack.  It just seemed to me that it would be in his best interest to get him to an actual medical facility.  This is a walk-in clinic.

So ten percent of these people, for example, bleed on the fibrinolytic and need a blood transfusion. I doubt they've got a blood bank on the ship, that kind of a thing.  The ideal for this patient is to at least get him to a medical hospital with an ICU typesetting.

Q    Doctor, I appreciate your answer, but I want to make sure I understand what you're saying to me.  You would agree that at the time you issued your report on August the 20th of 2020, you did not have the benefit of Carnival's input as it relates to what their decision-making and whole process was on the night in question?

A    Correct, I didn't have any input from Carnival --

Q    All right.  And when you issued your report --

A    -- as to any decision-making, but I did not have access to Carnival's captain and records.

MR. DRAHOS:  Right.  Okay.  So why don't we do this, just so we make sure we're referring to the same thing, I'm going go ahead and mark your expert report.

(Defendant's Exhibit 3 to be marked for identification.)

BY MR. DRAHOS:

Q    Dr. Klancke, so I put up on the screen what we're going to mark as Exhibit 3 to the deposition.  Is this a copy of your initial report that you generated on August the 20th of 2024?

A    Yes.

Q    Okay.  And that contains your signature there on page three?

A    Yes.

Q    Okay.  So we are going to refer to this as your expert report.  And as I understand it, you also wrote a supplemental report thereafter?

A    Yes.

Q    Okay.  And we're going to get back to that in

Kim Klancke, M.D.
January 07, 2025

just a second.  But for the time being, this report

dated August the 20th, 2024 would have been the first

time you formalized any opinions in this case in

writing?

A    Yes.

Q    Have you made any changes to this August 20th,

2024 report since the time that you signed it?

A    Just the supplemental report.

Q    Okay.  So at the time that you wrote this

report then on August the 20th, you would agree that you

had not read the depositions of Dr. Desai and Dr.

Leonards?

A    That's true.

Q    You did not?

A    I don't know if they were available or not,

but I had not read them.

Q    You had not read the deposition of Dr. Sony

Thomas?

A    I had not read any depositions.

Q    Okay.  You had not reviewed the ship's logs?

A    I don't think so.

Q    Okay.  Nor did you review any weather reports?

A    I don't think so.

Q    How about as it relates to the supplemental

report?

Kim Klancke, M.D.
January 07, 2025

MR. DRAHOS:  Which we will mark as Exhibit 4.

(Defendant's Exhibit 4 to be marked for identification.)

BY MR. DRAHOS:

Q    I'll put it up on the screen, but I assume you have your reports in front of you.

A    I have them, yes.

Q    Okay.  So how about the supplemental report -- first of all, I noticed that that's undated.  When did you complete that report?

A    No, I just left the date off.  That was just a mis -- a mistake.  But I would go off the billing as to when I completed it.  I can look at the bills.

Q    So can you tell me then, sir, either by review of the bills or your memory when this supplemental report would have been written?

A    You know what, I can go in my computer and see when it was downloaded, but that would be the only way. I can't do it from memory.  But it looks like I wrote it November the 10th of 2024.

Q    Okay.  And at the time you wrote the supplemental report on November the 10th of 2024, had you read the depositions of either Dr. Desai or Dr. Leonards?

A    No.  I did not have those depositions at that

time.

Q    All right.  You had not read any depositions in the case at all?

A    Correct.

Q    Had you read -- had you reviewed the ship's logs at that point?

A    I don't think so, but I can't remember for sure if there was any -- I don't believe there was any ship's logs in the records I had.

Q    Have you ever reviewed the ship's logs in this case?

A    Just briefly.  They wouldn't be terribly useful to me.

Q    All right.  And that's because what, you're just not a mariner, you don't appreciate what that information even means?

A    Well, I've done a lot of bareboat sailing, but I don't consider myself a mariner.  I don't like to leave sight of land, if possible.

Q    Okay.  And as it relates to this November 10th, 2024 supplemental report, did you review any weather reports in advance of drafting this report?

A    I didn't.  I mean, I know it was windy and I know they were saying well, when the wind's from that direction, we might have this or we might have that.

The weather reports that I looked at didn't necessarily document exactly what conditions were at sea, but that's a decision that's beyond my expertise. So I can't -- I can't decide if they can bring a boat up alongside and evacuate the patient to shore.

My biggest disappointment is that they never even considered transferring him. They didn't consider the downsides to transferring him. So they made a decision medically that he was never going to be offered timely PCI; and, therefore, it places an increased emphasis on the necessity to treat him properly and aggressively aboard the ship.

Q    So --

A    Some therapeutic options away from him without, in my opinion, considering the downsides to removing those options.

Q    So if I'm understanding your testimony correctly then, what you're saying is your criticism in this case is that they did not consider medevac options; not that they didn't effectuate medevac options, you're saying you're not qualified to render that opinion?

A    My opinion is I don't know how difficult it would be to get him off the ship. There's some testimony the Coast Guard was willing to go. There's some testimony by the captain at first he wouldn't

Kim Klancke, M.D.
January 07, 2025

overrule the Coast Guard, then he would overrule the Coast Guard.  I can't tell what's involved in transferring him and the risks or the mechanics of the thing.  So I don't want to weigh in with an opinion about that, other than that somebody should have had a discussion with the captain about the value of getting him to an appropriate medical facility.  This is a walk-in clinic with a --

Q    Right.

A    -- huge inferior MI.

Q    We'll get to that in a second, too, Doctor. Thank you.  Let me just go back to some of this housekeeping stuff.

So as it relates to this November 10th, 2024 supplemental report, have you made any changes to that since the time you signed it?

A    No.  I don't change them.  I would just amend them with another report.  And I've not made an additional report, that's it.

Q    Okay.  So --

A    I believe they'll say that it's based on the information I had at the time.

Q    Thank you.

So have you spoken to anyone in support of any of your opinions in this case?  We've talked about what

Kim Klancke, M.D.
January 07, 2025

you reviewed, and I now appreciate everything that you've read.  What I'm wondering is have you spoken to anybody?

A    Well, I've spoken with Mr. Michaels.

Q    Beyond Mr. Michaels, have you spoken with anyone else?

A    No.

Q    You've not talked to Mr. or Mrs. Reeves directly?

A    No.

Q    You've not spoken to any of Mr. Reeves' treating providers?

A    No.

Q    Nor have you spoken to any of his colleagues at work?

A    No.

Q    Okay.  Are there any facts that you are relying upon in this case that were provided to you exclusively by Mr. Michaels?

A    I'm relying on the records.  They were provided by Mr. Michaels.

Q    Beyond the records, is there any information that Mr. Michaels expressed to you verbally that the only source of the information is that what you learned through that discussion with Mr. Michaels?

Kim Klancke, M.D.
January 07, 2025

A    No, I'm not aware of anything like that.

Q    All right.  So some of these questions I think are going to be obvious, but I still need to ask them anyway.  Have you ever worked as a cruise ship doctor before?

A    No.

Q    Okay.  Have you ever been asked by any cruise lines to consult on any aspect of medical care being rendered at sea?

A    No.

Q    Have you ever been hired by any cruise lines to serve as a medical expert in a litigated case?

A    No.

Q    Have you ever been aboard the Carnival Freedom?

A    I've been on Carnival Cruises.  I don't know if I've been aboard the Freedom or not.  I think the last cruise I was on was Port Canaveral to someplace in the Bahamas.  I think that was on Carnival.

Q    Do you recall the names of any of the ships of any Carnival vessels you've been on?

A    Not the individual names.

Q    How many cruises ships have you been on in total?

A    How many cruises?

Kim Klancke, M.D.
January 07, 2025

Q    Sure.

A    One, two, three -- about four.

Q    And how many of those four were Carnival Cruises?

A    I don't honestly know.  I know the one in the Baltic Sea was not Carnival.  That was an Italian cruise line.

Q    Okay.  So have you ever been inside a medical center aboard a Carnival ship?

A    Not to my knowledge, no.

Q    Have you ever been inside the medical center aboard any cruise ship?

A    Not to my knowledge.

Q    Have you ever conferred with a cruise ship doctor regarding treatment being rendered to a patient at sea for any reason?

A    I've never spoken to a cruise ship doctor, no.

Q    Does that mean that you don't have any experience coordinating medevacs from a cruise ship at sea?

A    No, my experience on coordinating transports are all land based.  I have a lot of experience with that from small outlying hospitals, but it's not at sea.

Q    Okay.  So that, just by extension, that means you've never had any involvement coordinating a medevac

Kim Klancke, M.D.
January 07, 2025

aboard any type of vessel at sea in your career?

A    Correct, I have never done anything at sea. Typically my initial involvement with transfers is to be called and to look at an EKG they send and that sort of thing.

Q    Okay.  But never from a patient who's being treated on a cruise ship?

A    No.

Q    Okay.  Have you ever had reason to communicate with the United States Coast Guard for any reason?  I think you said you were a boater, right?

A    Yeah.  I don't -- I don't think so.  I've been broken down a time or two, but typically you call the marina if you're not in trouble.  I've never been in serious trouble at sea.

Q    Okay.  Are you a member of the American College of Emergency Physicians?

A    No, I'm a member of the American College of Cardiology.

Q    Okay.  Have you ever reviewed the American College of Emergency Medicine cruise ship section guidelines?

A    No.

Q    Do you know what kind of EKG machine was used in this particular case by the ship physicians aboard

Kim Klancke, M.D.
January 07, 2025

the Carnival Freedom?

A    It looks like a Philips was likely the monitor.  It doesn't state on the EKG what machine they used.

Q    Okay.  Does that mean you don't know?

A    I don't know exactly which machine they used, no.  I know that the first three EKGs appear to be done on a standard twelve-lead EKG machine.  All the subsequent ones appear to be pulled off the monitor, which is without standardization, which is suboptimal.

Q    Did you have any trouble reading the EKG strips that were provided in this case?

A    Well, the first three are pretty standard EKGs.  The last three are out of order and they're not standardized.  I don't even think its paper speed is stated.  But they look to be done at twenty-five-millimeter paper speed and ten millivolts of standardization, just not documented.

Q    My question was whether or not you had any difficulty reading the strips.

A    Reading which?

Q    The EKG strips that were provided in this case.

A    Well, the first three are crystal clear.

Q    Okay.

Kim Klancke, M.D.
January 07, 2025

A    The last three, assuming they're done in a standard fashion, are also readable.

Q    Okay.  So going into your background a little bit, am I correct in understanding that you retired from active patient care on September 1st of 2019?

A    Yes.  I'm the medical director for the group.

Q    All right.  Does that mean that you have not treated a patient in over five years?

A    A consultant by phone on patients.  I've rendered opinions, but I've not physically treated a patient since 2019.

Q    Do you have hospital privileges anywhere?

A    I just let those lapse at the end of this year.

Q    Okay.  So that means, as we sit here today, you do not have privileges in any hospitals in this country?

A    As of the last week I don't have privileges at any hospital.

Q    So when would have been the last time that you treated a patient in an urgent setting?

A    September 30th of 2019 I was on call for the group, an ER call.

Q    When you say you were on an ER call for the group, does that mean you were taking phone calls and

Kim Klancke, M.D.
January 07, 2025

providing advice over the phone; or were you physically working the floor in the emergency room?

A    Well, typically I don't see the patients while they're still in the emergency room.  I may have, 'cause it's not completely uncommon; but I can't swear that I was in the emergency room.  I know I was up most of the night.

Q    Can you tell me when the last time was that you would have physically seen a patient on the floor in the emergency room?

A    Probably September of 2019.

Q    So are you a general cardiologist or an interventional cardiologist?

A    It depends at what point in my career you're talking about.  So I sort of brought interventional cardiology to Daytona Beach and electrophysiology.  So the core of my practice for thirty years was exactly this.  We participated in GUSTO and CRUSADE and a number of these trials that look at thrombolytic strategies.  I did that until about 2014.  I had some orthopedic problems, so I stopped doing coronary interventions and stopped taking STEMI call.  And then I did general cardiology until I transitioned to being a medical director in 2019.

Q    Okay.  So if I understand your testimony then,

Kim Klancke, M.D.
January 07, 2025

what you're saying is that in 2014 you stopped being an interventional cardiologist?

A      Right.  This type of case was my bread-and-butter, night-and-day practice for about thirty years.

Q      So in 2014 you transitioned to being a general cardiologist, and you did that until September 30th of 2019?

A      I still did some cardiac caths and I still put in devices and ICDs and pacemakers, but I had some back issues and I didn't really want to get involved in a procedure that went more than about an hour.

Q      Well, that part of it I'm unclear on then, because you told me that in 2014 you had some orthopedic issues and that's the reason why you transitioned to becoming a general cardiologist.  But from the time period between 2014 and 2019 were you putting in ICDs?

A      Yes.

Q      And also pacemakers?

A      Yes.

Q      Did you do PCI treatments?

A      No, because they can become prolonged.  So typically I would do a cardiac cath if it was a diagnostic procedure.  It takes about fifteen to twenty minutes.

Kim Klancke, M.D.
January 07, 2025

Q    So when is the last time that you personally did -- or have you ever done a PCI procedure?

A    Yeah, I've done thousands of them.

Q    When was the last time you did one?

A    2014.

Q    So I noticed you did your fellowship in cardiology at Medical University of South Carolina, which you finished in 1982, but you don't have a board certification in interventional cardiology.  Why not?

A    Because I was practicing interventional cardiology actively and I had privileges.  I didn't need to go back and take a test.  There was no test for it until probably the early nineties kind of thing.  There was not a need for it.  I was already doing it.

Q    The fellowship that you did at Medical University, was that in general cardiology?

A    It was invasive cardiology.  In 1982 angioplasty was just coming out.  We had some early fixed wire balloons.  Like I said, this sort of thing encompasses my entire cardiology career.  So I spent two weeks in Kansas City just with a doctor named Jeff Hartzler to get some additional practice before I took my job in Daytona Beach.

Q    Okay.  So the fellowship program in total was a year?

A    Two years.

Q    Two years.  So of the two years how much emphasis was on the interventional side?  Is it two weeks as you're saying or more than that?

A    No, angioplasty was just coming out, so we were just getting started probably my last year.  It was brand-new, so nobody had any experience with it.  So I did probably twenty-five or thirty cases in training and wanted some additional -- Jeff Hartzler was kind of the world's best interventional cardiologist at the time.

So I spent a few weeks there just understanding how he set up his lab and watched him do the first acute MI.  They rolled somebody in from St. Joseph, Missouri and he ballooned about four lesions. We don't do that anymore.  We just do the culprit lesion.  But these were the early days of intervention. And then intervention grew, and as new changes came in, we incorporated those into the practice.

Q    So when was the last time that you personally administered tPA to a patient?

A    I don't know.  Typically I would advise somebody on how do it if it was an outlying institution and we weren't able to accept the patient or get him in a timely fashion.  But primary intervention became the first choice in the late 1990s.  So for me at a larger

Kim Klancke, M.D.
January 07, 2025

hospital to give a thrombolytic for a STEMI would be pretty unusual after about 1999 or 2000.  That's when the issue of whether primary intervention was superior to facilitated PCI argument was settled.

Q   Okay.  So does that mean that you've not personally administered a tPA to a patient since 1999 or 2000?

A   I have for pulmonary embolus.  One of our local pharmacists, you know, a few years before I transitioned to medical director, came in with a large pulmonary embolus.  So I've done it in that setting.

Q   When was that?

A   But typically, if at all possible, what you're looking for in these patients is to get normal flow. That's what gives you a good result and reduces complications.  You get that eighty percent of the time or ninety percent of the time with angioplasty versus fifty or sixty percent of the time with facilitated thrombolysis.  So the emphasis is on, if at all possible, to get the patient stented and get normal flow.  So we tended to private stent everybody at the hospitals where I was primarily practicing.

Q   I appreciate that, Doctor, thank you; but my question is much more direct.

So you told me that in the context of a

cardiac case that would have been sometime around 1999, 2000, that you personally would have administered tPA; but then you told me about this incident when somebody came in with a pulmonary embolus. So when specifically was that?

A    I would guess that was about 2017, 2018, something like that. That was in the emergency room.

Q    All right. So before we move on just to make sure I've got this clear, are you telling me that the last time a cardiac patient received tPA from you personally was 1999, 2000?

A    Sometimes you give it in the cath lab, if there is a big thrombus load and you can't appropriately do a thrombectomy. I've given it in the cath lab if there is a thrombotic problem. But the way you're talking about giving tPA as a primary therapy with a strategy of stand-alone fibrinolysis or facilitated PCI would be probably 2000, something like that. That should be true for everybody who does interventional cardiology with a lab that can provide that service.

Q    Thank you.

And as it relates to this context of providing tPA in a cath lab, when would have been the last time you would have done that?

A    I don't recall.

Kim Khancke, M.D.
January 07, 2025

Q    So by virtue of the fact that you stopped working as an interventional cardiologist in 2014, can we safely say that you haven't provided tPA in any context since 2014 for any patient?

A    I just go by my previous testimony.  I told you I've done it for situations other than STEMI, and I've advised people over the phone.  It's a set recipe of therapy that you give.  It's well laid out in multiple guidelines as to how to do it.

Q    So I'm not asking that right now.

A    If people contact me, I'll tell them how to do it.  But the last time I've given it as primary therapy for ST-segment elevation infarction is probably about 1999 or 2000.

Q    Okay.  Do you know my expert, Dr. John Setaro?

A    No.

Q    Okay.  So going through your report, one of the opinions that you've given in this case relates to the timing of the administration of tPA.  Are you critical of the amount of time it took the ship's physicians to provide that treatment?

A    Yes.

Q    Okay.  And so how many times have you reviewed cruise ship medical records before this case?

A    Once or twice.

Kim Klancke, M.D.
January 07, 2025

Q    And that would have been for the Haggard Law Firm?

A    Yes.

Q    Were those records that related to cardiac treatment similar to the case that we have here?

A    I don't recall the exact circumstances, but they weren't like this case.

Q    So would you agree, Dr. Klancke, that at the time you issued your report on August the 20th of 2024, you did not know when the EKG strips were printed up?

A    I don't think that's true.

Q    Well, tell me then, what is your understanding of --

MR. DRAHOS:  And let's go ahead and mark it as an exhibit.

(Defendant's Exhibit 5 to be marked for identification.)

BY MR. DRAHOS:

Q    So do you see on my screen there, Doctor, what will be marked as Exhibit 5, what's been previously identified in this case as EKG I?  Do you see that there?

A    Yes.

Q    All right.  And what's your understanding of what time Mr. Reeves came into the medical center for

Kim Klancke, M.D.
January 07, 2025

treatment?

A    Around 6:27 in the evening.

Q    Okay.  And you see up here in the upper corner it says 7-8-23, 9:39 a.m.  We can both agree that that's obviously not accurate, correct?

A    Yes, I think that was obviously not true at the time.

Q    So, once again, my question is on August 20th of 2024, when you wrote your report in this case, what was your understanding of what time this particular exhibit was printed out?

A    I presume they complied with national standards for an emergency room, which is testing patient to obtain an EKG within ten minutes.  So my presumption was that this EKG should have been done around 6:40, but it may have been done as late as 19:00.

Q    You said that you read the deposition of Sony Thomas?

A    I did.

Q    So you would appreciate then that Sony Thomas was the one tasked with compiling these EKG strips and putting them into the chart?

A    You know, all I remember about Sony Thomas is that she didn't know anything or remember anything.  I don't recall if she had any sound or solid opinions

Kim Klancke, M.D.
January 07, 2025

about any of the timing of these EKGs.

Q    Well, what was your understanding or impression of Sony Thomas' explanation for how many EKG strips were printed out in the ship's medical center during the treatment of Mr. Reeves?

A    To be honest with you, I didn't glean any useful information out of her deposition.  See seemed to remember and know nothing.

Q    So you presumed that this was printed out at a particular time.  But is it also your presumption that this was the first and only EKG strip that was printed when Mr. Reeves was brought to the medical center?

A    No.  There were three actual EKGs done over about an hour and a half.  So EKG number two is a little over an hour after this one.  And the serial changes go along with evolution of the acute anterior wall infarct.

Q    Okay.

A    This EKG has hyperacute T-wave changes.  This is extremely early in the process.  The second EKG, looks to be about an hour later, is fairly classic.

Q    Well, what time did Dr. Desai say that this EKG strip was printed out?

A    I think Dr. Desai was upstairs, and he said he was called after the second EKG, and he gave some orders around 8:30, I think, in the evening, something like

Kim Klancke, M.D.
January 07, 2025

that.

Q    So as you sit here today, beyond your presumption that this must have been printed out within the ten-minute national standard upon which an EKG should be done for chest pain, do you have any other understanding or appreciation for exactly when this exhibit was printed out?

A    You know, the records here are completely confusing in terms of the times.  I'm giving him the benefit of the doubt on the first EKG.  If they actually waited an hour on a patient like this to get an EKG, that's grossly negligent.  In addition, this EKG is consistent or shows -- the first one shows an ST-segment elevation, anterior wall infarct, and that's extremely early in the process of injury.  So this EKG looks like it was taken in a timely fashion, but perhaps not. Nobody could actually testify as to exactly when the EKGs took place.

Q    So let's use your premise that there was one EKG done when Mr. Reeves first came in complaining of chest pain.  How many strips were printed out from that first EKG test?

A    Well, the times were all different.  The times wouldn't change.  So the way this would typically be done, more likely than not, is they would have the

Kim Klancke, M.D.
January 07, 2025

patient attached to the EKG machine and they would print them in a serial fashion.  But the times don't magically change.  It looks like there's about an hour and four or five minutes between the first and second EKG.

Q    Are you saying that they only printed out one strip from one EKG, or are you admitting here that you don't know how many strips were printed out?

A    I'm saying that the most logical thing, and within reasonable medical probability, the first one is done early in the process.  The second one, based on the timing, is done an hour later, unless they went into the machine and changed the time for some reason.

Q    Well --

A    But the machine isn't going to just jump an hour ahead on its own, if these were all printed off the same EKG machine.  Otherwise the other explanation would be well, they used one EKG machine and then they went back and switched him to a different one.  Typically the ship would have one EKG machine.

Q    Let me offer another alternative or scenario to you, and you tell me whether or not this is realistic, reasonable, or if you have any evidence to refute it.  What if there were multiple strips printed. What if there were twenty strips printed during the time of the first EKG, do you have any evidence or

understanding here today to refute that?

A    You mean and they threw the others out, is that the idea?

Q    No.  What if they printed twenty pages off EKG I and decided to keep only one, this one?

A    Well, I'd like to know why they chose only to keep this one.  But they could hit the button twenty times and they would print twenty EKGs.  So it prints all twelve leads.  It would print -- what you're seeing on EKG I would be printed twenty times, and they'd be printed, you know, a minute or two apart.

Q    And in this particular instance could you tell the members of the jury how many EKG strips were printed out in; total?

A    Well, it look like three, unless they threw away records.

Q    Three were kept, but you don't know, as you sit here today, how many they had in total, would you agree?

A    I don't know that they didn't throw out half the records that are written.  You know, I don't know what they threw away.  But it doesn't make any sense.  Nobody does that.  I will agree that they're supposed to, if there is a question about the reading, repeat the EKG in fifteen to thirty minutes, not an hour.  So I

Kim Klancke, M.D.
January 07, 2025

would agree there should be another EKG within roughly fifteen minutes of whatever the first one was; but I don't know what they threw away. All I have are the records that they kept. They're not supposed to throw away records, but...

Q So as it relates to EKG I, and let me put up -- do you have EKG II in front of you?

A Yeah, I have EKG II.

Q All right. And so you would agree that those time stamps have at least an hour apart between the time they were printed, agreed. So Roman numeral I and Roman numeral II are at least an hour apart?

A Yes.

Q Okay. Do you know what time Dr. Desai said Roman numeral II was printed out?

A As I recall, he thought the first EKG was done somewhere between 6:45 and 7:15. And so the second one would be an hour after that time frame.

Q As you sit here today, do you have any evidence to refute Dr. Desai's testimony?

A I don't know how he arrived at his opinion. I mean, I'm not refuting it. He wasn't there.

Q Okay. So in your expert report on page one you indicate along the bottom, last paragraph, the clinic immediately obtained an EKG that was diagnostic

Kim Klancke, M.D.
January 07, 2025

for an anterior wall STEMI.  That was your opinion on August 20th of 2024?

A    Yes.

Q    Are you of the opinion that EKG I shows an anterior wall STEMI?

A    Yes.

Q    All right.  Give me a second here.  I'm going to pull that back up.  Can you see my screen with EKG I on it?

A    Yes.

Q    All right.  So there are uniform definitions that have been established for various societies.  I mean, I'll just rattle off a few, European Society of Cardiology, American College of Cardiology Foundation, the American Heart Association, the World Heart Federation Task Force.  Do you accept all of those definitions provided by those entities for what constitutes a STEMI on an EKG strip?

A    In isolation they're the criteria put forth by those societies.

Q    And would you agree that the criteria that has been recognized by those societies requires a new ST elevation at the J-point and at least two contiguous leads that are bigger than two millimeters?

A    In leads V2 and V3.  One millimeter in the

other leads.

Q    Okay.  So as it relates to -- well, what is the basis for your opinion that EKG with the Roman numeral I shows a STEMI?

A    Well, I think there's hyperacute T-wave changes and reciprocal changes in the inferior leads. And there's clearly a millimeter of ST elevation in lead aVL.  So with the ST segment it's difficult to read in the setting of hyperacute T-wave changes.  Typically you want to read the elevation and the ST segment.

It's like upholding ST segment changes.  You want to read it eighty to a hundred and twenty millimeters after the end of the QRS.  I think there's two or three millimeters of ST elevation evident in those leads.  So I've seen fifteen or twenty EKGs identical to this over my years of practice.  And it's always an anterior wall myocardial infarction, and --

Q    So the --

A    -- it's the elevation anterior wall myocardial infarction.  So I think to me this is diagnostic.  I would be comfortable giving tPA in conjunction with his history on the basis of this EKG.  But if not, I would repeat it in fifteen minutes and it would look like EKG number II or very similar EKG number II.  The hyperacute T-wave changes are very short-lived.

Q   So let me ask you specifically about EKG I, and tell me whether you agree or disagree with what I'm about ready to ask, okay.  So in EKG I are the T-waves peaked in leads V2 through V4?

A   I don't think they're peaked like you would see in hyperkalemia.  I think they have a rounded top, similar to what you would see in hyperacute T-wave changes.

Q   Are the ST segments still in baseline at V2 through V4?

A   No.

Q   Are there any ST segments greater than two millimeters in two contiguous leads?

A   Again, I believe where I would read them, which is at least eighty milliseconds after the QRS end that there's ST-segment elevation.  There's very little ST segment here.  If you look at EKG number II, there's almost no ST segments.  The ST segment is very short.  But, again, if you're confused, either send this to a cardiologist or repeat it in a timely fashion.

Q   Did either Dr. Desai or Leonards ever, at any point in time in their depositions, say that they were confused about their interpretation of these EKG strips?

A   They said they didn't -- they didn't believe that it showed an ST-segment elevation infarct.

Kim Klancke, M.D.
January 07, 2025

Q    My question was:  Did they ever say they were confused, Doctor?

A    Well, they were confused.  They couldn't read it, but they just --

Q    You could disagree with them, but did they ever say they were confused?

A    They think they saved this patient's life and they did a great job, which they did not.

Q    Okay.  My question though, Doctor, is:  Is there any testimony in this case that Drs. Desai or Leonards ever felt confused about their interpretation of these EKGs?

A    Not that I recall.  I don't think they were asked.  I don't know what their EKG reading experience is or how many EKGs they've read.  Again, I've read hundreds of thousands probably.  So I think it would be to their advantage to run this by a cardiologist.

Q    So going back to my question, I just want to make sure I have it; because you answered it rather quickly, so maybe you did and I didn't catch it.  But where specifically on this EKG strip are there ST segments greater than two millimeters in two contiguous leads?

A    I believe it's hard to identify the ST segments in leads V2 and V3.  But I think if you look at

the little notch about halfway up that T-wave, I think there's -- that's somewhere near the end of the ST segment, and I think there is evidence of ST-segment elevation there.  Again, that's my opinion based on a lot of experience.  But if there is any disagreement, then repeat this thing in fifteen minutes and you'll have a different picture.

MR. DRAHOS:  Okay.  So let's do that.  So I have on the screen now, Doctor, what we'll mark as Exhibit 6.

(Defendant's Exhibit 6 to be marked for identification.)

BY MR. DRAHOS:

Q    This is EKG with a Roman numeral II up there. Do you see that?

A    Yes.

Q    Okay.  And this would be the one that we've talked about was printed out an hour after EKG I, correct?

A    Yes.

Q    All right.  And does EKG Roman numeral I and EKG Roman numeral II look different to you?

A    Well, yes.  The hyperacute T-wave changes have resolved.  Again, you have the issue here of almost no ST segment.  That ST complex starts right at the end of

the QRS.  But you have the same issue here with reading it, but you've lost the widened T-wave.  The QT interval isn't as long as it is on the first tracing.  It's easier to see the ST-segment elevation on EKG I.

Q     Okay.  So what do you mean by that, when you say it's easier to see?  Is there something about the printout quality or is it just more distinct?

A     No, the hyperacute T-wave changes are less obscuring of the ST-segment elevation.

Q     So do you agree that -- well, strike that.

I'm assuming you have the opinion that EKG II shows evidence of a STEMI?

A     I think it also shows evidence of a STEMI.  I think there was evidence of a STEMI on EKG I.

Q     All right.  So between EKG I and EKG II, is EKG II more distinctive for a STEMI than EKG I?

A     Not to me, but I think this might be easier to read for somebody who's inexperienced at reading EKGs.

Q     In EKG II are the ST segments greater than two millimeters in two contiguous leads?

A     Well, again, you read this similar because there's hardly any ST segment at all.  You read this by defining the end of the QRS complex.  But the J-point is elevated and there's still evidence of ST-segment elevation.

Kim Klancke, M.D.
January 07, 2025

Q    So do the ST elevations -- or ST segments in V2 and V3 look more distinctively abnormal than in EKG I?

A    Not to me.  I think EKG Iis just as diagnostic; but, again, this is what I did for thirty years.  So I will grant you I've seen a lot more abnormal EKGs.  But this is easier to read for somebody's who's inexperienced.

Q    So in your expert report you indicate that had these testings been done within fifteen to thirty minutes, so within fifteen to thirty minutes of EKG I there would have been an EKG report that would have shown a, quote, textbook STEMI.  First question is:  Are you saying that EKG I does not show a, quote, textbook STEMI?

A    Well, it has hyperacute T-wave changes, so that's not what you would necessarily picture if you looked under Wikipedia for a STEMI.  Number two is classic.

Q    All right.  So, in other words --

A    Both of them are diagnostic.

Q    It doesn't though.  Using your own terminology, you're saying that EKG I does not show a, quote, textbook STEMI, does it?

A    It does to a cardiologist who's experienced at

Kim Klancke, M.D.
January 07, 2025

reading EKGs.  It shows enough of a STEMI that I recommend that they start breaking up a tPA and repeat the EKG in fifteen minutes.

Q    So what did you mean in your report then when you said that if an EKG had been done within fifteen to thirty minutes of EKG I, it would have shown a, quote, textbook STEMI?  What did you mean by a textbook STEMI in that context?

A    I mean, it would look similar to EKG II and I would expect a medical student to be able to recognize it.

Q    What is it about EKG I that leads you to believe that in fifteen to thirty minutes it would have looked, quote, textbook to you?

A    Because there are hyperacute T-wave changes and those are very short-lived.  They typically are only there thirty minutes or so.

Q    In your supplemental report dated November 10th of 2024 you indicate on page one, paragraph three, that the diagnosis of acute coronary symptom was protracted ischemic chest pain was obvious within minutes of his presentation to this ship's clinic.  What was so obvious about it, Doctor?

A    Well, he had classic chest pain.  He was nauseated and, I mean, he had fairly classic myocardial

pain; and I think his EKG was diagnostic.

Q    Okay.  So his, we'll call it ACS for purposes of today, his ACS was obvious to you based upon his chest pain, his nausea and the EKG strips?

A    I think the STEMI was obvious based on the first EKG and his clinical presentation.  ACS encompasses unstable angina and non ST-segment elevation.  ACS is even more obvious.  EKG I's grossly abnormal.

Q    So I guess that's what I'm getting at, Doctor, is that between October (sic) 20th of 2024 and November 10th of 2024 you had, what, almost three months of time to consider this patient before you wrote this secondary supplemental report; is that fair?

A    August to November.

Q    Okay.  By the way, why did you write this supplemental report anyway?

A    They asked me to clarify some of the points I made in the first report.

Q    So during the two and a half months or so that you had an opportunity to think over this case and clarify, as you say, your opinions, you didn't put in this report that the diagnosis of a STEMI was obvious within minutes of his presentation.  You said the diagnosis of ACS.  Those were your words that you chose,

Kim Klancke, M.D.
January 07, 2025

correct?

A    Yeah, I did put ACS.

Q    And as you've said a moment ago, ACS has three different -- there are three different types of that. That's not a STEMI, it's a STEMI, it's a non-STEMI, it's angina, right?

A    No, it's three clinical entities which tend to progress, with the worst being STEMI.

Q    Okay.  And you would agree that you don't give tPA to a patient unless it's a STEMI?

A    Correct.

Q    Okay.

A    I wish I'd have put diagnosis of STEMI was evident.  But I think I chose ACS because within minutes they probably don't have an EKG.

Q    And it's your opinion in this case that if you cannot transfer a patient to a PCI-capable facility within two hours of the onset, tPA should be given, correct?

A    Yes.  I have no issues with giving a thrombolytic protocol.  So it's not just tPA, it's a combination of medicines that are used.

Q    And would you agree that there are no experts in this case, nor on this planet, who can testify that Mr. Reeves could be brought back to shore to a PCI

Kim Klancke, M.D.
January 07, 2025

facility within two hours of his presentation to the ship's medical center?

A    I would agree, I don't think they could get him to a cath lab within two hours.  I don't know that for a fact.  I don't know what experts exist, but my presumption would be that it would be difficult to get him to a cath lab within two hours.

Q    Okay.  And so does that also mean that you agree with the ship's physicians that tPA was the best treatment course for Mr. Reeves when he presented with this STEMI?

A    I believe the ship's -- I believe the guideline directed thrombolytic protocol was the best approach.

Q    And what time do you believe tPA should have been administered in this case?

A    You want a door-to-needle time of about thirty minutes.  So the ideal would be around 19:00.

Q    Is that door-to-needle time from the moment he walks into the medical center or from the moment the STEMI is confirmed?

A    The door means that he walks through the door.  So ideally you get your EKG done, make a diagnosis and get the tPA going within thirty minutes.

Q    Okay.  Forget Mr. Reeves.  Just in a

Kim Klancke, M.D.
January 07, 2025

hypothetical context of a patient who comes in, and even you, Dr. Klancke, are unclear on whether or not it's a STEMI.

A    I'm not unclear as to whether or not it was a STEMI.

Q    I'm not asking about Mr. Reeves.

A    I think in my report I intended that based on his symptoms ACS was -- consistent with ACS and protracted ischemia.  I think once he gets the EKG, the diagnosis of STEMI is pretty evident.

Q    All right.  I'm not talking about Mr. Reeves. I mean, I very specifically premised my question with that.  So let me just say it again to make sure we're on the same page.  Forget Mr. Reeves.  Just in the context of a hypothetical patient who comes in under your care with chest pain and you're unclear whether or not it's a STEMI, when does the thirty-minute time start, from the moment a STEMI is diagnosed or from the moment that patient walks through the door?

A    I'm not sure I understand your question, but the thirty-minute door-to-balloon time is exactly what it says.  You want to make the diagnosis of a STEMI within about ten or fifteen minutes and have the tPA going within thirty minutes.

Q    Well, that's in a perfect world.  What is the

Kim Klancke, M.D.
January 07, 2025

patient --

A    The goal is to get the optimal result in terms of death and complications.  If you're unable to make the diagnosis, then obviously you can only give the tPA within thirty minutes of making a diagnosis.

Q    That's what I wanted to know, okay.  So let's go back to this case in particular.  Are you of the impression that a cruise ship doctor has the same clinical considerations when determining whether to administer tPA than a shoreside physician?

A    I'm not sure that I totally understand the question, but they keep talking about their ability to manage this problem appropriately.  So my assumption is he presents at 6:30.  They certainly could have had an EKG by 6:40.  And if it's not diagnostic, repeat the EKG by 7:00 in the evening and it would be diagnostic.  And then ideally, if they know what they're doing, they would have tPA going by about 19:30, about 7:30 in the evening.

Q    Right.  But my question was a little bit different.  You would agree that there are risks associated with administering tPA?

A    Yes.

Q    Okay.  What are those risks?

A    Across the board, he's young, so his risks are

Kim Klancke, M.D.
January 07, 2025

a little bit lower, but about one percent of intracranial hemorrhage, about ten percent of major bleeding requiring transfusion.  At his age it may be a half a percent risk of intracranial hemorrhage.

Q    So whether it's one percent intracranial hemorrhage or ten percent major bleeding, would you agree that either one of those two scenarios could lead to death?

A    Yes.  And, again, I don't know if they have a blood bank; but if they don't, it's a good reason to get him off the ship as fast as possible.

Q    Okay.  So going through these risk factors as it relates to tPA for the risk of bleeding, would you agree that a shoreside facility is much more better equipped to handle the complications that may stem from giving tPA than a cruise ship medical center?

A    That would be my belief; but as you've -- as we've discussed, I've never been aboard a ship.  The doctors seem to feel that they were fully capable of managing him aboard the ship.  But my personal belief is that he's better off in a shoreside emergency room in a hospital, even if he's not in a PCA-capable hospital.

You know, I think a hospital's got a CT scanner.  I know they said they don't have that.  Like I said, I don't think they probably have a blood bank on a

Kim Klancke, M.D.
January 07, 2025

ship.  I'm not sure.  But, yes, I think there should be a real risk assessment in terms of keeping him on the ship and using that to weigh into their decision as to whether or not to consider a transfer.  I thought they were cavalier in just deciding they weren't going to transfer him under any circumstances.

Q    But my question is more in the context of whether or not to administer tPA and when.  So do you believe it to be unreasonable for a lawyer like myself to argue that a cruise ship medicine doctor must be extra cautious and more conservative when determining whether or not to give tPA than a shoreside doctor because of the differences in clinical capabilities?

A    I don't know if that's true.  I would agree that they should send the first EKG to a cardiologist and get an opinion.

Q    I didn't ask about EKG.  I asked about tPA. So let's say everyone's in agreement, whether it's a shoreside cardiologist or a cruise ship medicine doctor, everyone is in agreement that it's a STEMI.  Are you saying that it would be unreasonable for a cruise ship doctor to give pause and be extra cautious before administering tPA at sea, versus a shoreside doctor with level-one trauma capabilities?

A    I don't think for this STEMI.  If you know

Kim Klancke, M.D.
January 07, 2025

it's an anterior wall STEMI with septal involvement, this is a proximal LAD occlusion.  It's a very high-risk STEMI, probably ten percent in-hospital mortality. Under the best of circumstances I think they should be quick to give the thrombolytic protocol.  I think they should give all the drugs involved in thrombolysis.

Q    All right.  So let me move into a different territory and see whether or not we need to go into this.  So you gave some opinions in your report about specific times that you felt transfer requests to shore should have been made.  In particular you indicate that that should have been done at 7:25 p.m.  We've since discussed your information that you reviewed, particularly the deposition of the captain, wherein he talked about all kinds of difficulties that he believed about the capabilities of transfer.  Are you still of the opinion that a transfer should have been requested at 7:25, or are you abandoning that opinion?

A    I don't want to argue about the transfer, but my opinion is they didn't give the downsides to keeping him on the ship very serious consideration.  I have no idea, after the depositions, what the risks are involved with the transfer.  So it's hard for me to it make a risk-benefit decision or a risk-benefit opinion.

Q    Okay.  So, I guess I just need to be sure on

this before I move on.  Are you going to give any testimony at trial that a transfer should have been done at any particular time from the moment Mr. Reeves came into the medical center until the time he left?

A     Sir, ask that again.

Q     Sure.  Are you planning to give any opinions at trial that a transfer should have been performed at any point in time from the moment Mr. Reeves came into the medical center until ultimately the time that he left?

A     I already told you I can't make a risk-benefit decision on the transfer because I can't tell how difficult or risky it might be.

Q     Okay.

A     What I'm going to tell a jury is that when you take any opportunity for any PCI out of the picture, even if you do the thrombolytic protocol perfectly, there's still about a one-third chance that he's still requiring emergency PCI and would benefit from that emergency PCI at four or six or eight or twelve hours. So there's about a two-thirds chance that if you give the thrombolytic protocol, and specifically the Lovenox appropriately, that you can achieve TIMI 3 flow and he would be stabilized on the ship to undergo cardiac cath and intervention at twenty-four-hours like he did.  But

you remove that one-third chance of the potential to benefit him from a transfer.  Again, if a transfer is just impossible, if it's impossible, I think it would have been ideal just to run this situation by the captain.

Q    So let's talk about acute PCI versus -- there is another terminology that you used in here.  I'm looking for it -- facilitated PCI.  Are there differences between acute PCI and facilitated PCI?

A    Well, acute PCI, I presume you mean primary PCI, which means you use PCI as the primary therapy and you don't give a thrombolytic.  Facilitated PCI is giving a thrombolytic protocol that includes aspirin, clopidogrel, antithrombotic therapy and fibrinolytic therapy in a known effective combination, and then transferring the patient as quickly as you can.  Time is muscle.  So all this discussion about earlier thrombolysis, the earlier you give it in the course of an acute infarct, the more likely it is to work and the more likely it is to benefit the patient.  And then the facilitated PCI is an effort to establish some flow, get them to a facility where PCI can be offered to get better flow.

Q    All right.  So in the facilitated PCI context, you've offered this opinion in your supplemental report

Kim Klancke, M.D.
January 07, 2025

about a drip-and-ship concept. And I'm understanding that to mean that what you're saying is you provide the tPA as the primary thrombolysis, and then you ship the person to a PCI-capable facility?

A    Yes. While you're giving the Lovenox and hanging the tPA and giving the aspirin and clopidogrel, you are calling EMS to try to transport the patient.

Q    All right. Have you ever seen a medevac performed aboard a cruise ship?

A    I've never seen one, no.

Q    Do you know how they do them?

A    I'm presuming if they can't come alongside with some sort of Coast Guard ship, then they would have to put him in some kind of sling and deliver him into a helicopter, because the helicopter couldn't land.

Q    When you say sling, you mean basket?

A    That's what I'm presuming, yes.

Q    So I mean, are you suggesting to the members of the jury that Mr. Reeves could have been hoisted in a basket into a Coast Guard helicopter while tPA was being administered to him in this driven-ship context?

A    I don't know what they can attach to a basket. I don't -- I don't know how confined he is. Obviously they might have to interrupt the tPA for a brief period of time and start it later if it's being done. I'm not

Kim Klancke, M.D.
January 07, 2025

pushing that sort of transport.

What I'm going to tell a jury is that this is a type of patient, he has a huge MI.  He's a very high-risk MI.  There's lots of opportunity to get into trouble.  Do they really want to try to medevac him out when his blood pressure is seventy over fifty.  I mean, he's stable early on.  That's the time to transport him, not wait until he's on death's door to try to do something; but it may not be possible.  Again, I'm not going to suggest to a jury that any sort of transport is possible because I don't understand the exact mechanisms.  I can't personally assess the risk of that transport.

Q    Okay.  So that's what the purpose of this deposition is, is to try and filter out what you believe you can actually say and what you're just putting in a report.  And so --

A    I can't make a risk-benefit decision.  Now I've said that four or five times.  I'm not sure what you can't understand about that.

Q    Well, here's what you put in your supplemental report.  I'm going to read it directly.  At 20:00 the transfer should have been made -- should have been in progress for an hour and remains emergent.  Giving the thrombolytic does not interrupt the ongoing transfer to

Kim Khancke, M.D.
January 07, 2025

a PCI facility.  The plan remains a drip-and-ship approach, with the "ship" meaning emergency transfer, and the "drip" being appropriate IV tPA.

Are you saying -- and this is why I'm asking the question.  Are you saying that in this particular case the shipboard physicians aboard the Carnival Freedom should have put Mr. Reeves in a basket while tPA was being administered and had him hoisted up into a Coast Guard helicopter?

A    What I'm saying is that we use helicopter transport routinely, and it's routinely done by helicopter transport.  What I told you the first five minutes of the deposition is the captain's testimony changed my opinion, to some degree; and I believe that is the person who indicated the helicopter can't land and the patient would need to be in some sort of basket.  So I don't know if they can -- and, therefore, it had somewhat changed my opinions.  So --

Q    Right.

A    -- if I were to testify my opinions have somewhat changed on the transport, I still don't know medically if they can bring you up on a cot with an IV mechanism and controlled the IV mechanism.  I don't know what the logistics are; therefore, I can't assess the risk of doing it.  But routinely by helicopter they give

Kim Klancke, M.D.
January 07, 2025

tPA during transport.  That helicopter typically has landed and they load him up on the ground.

Q    Exactly.  In every instance that you're aware of where tPA and a drip-and-ship approach was done by helicopter, that helicopter landed.  There was never an instance where they hoisted the person up in a basket into a helicopter, correct?

A    I've not seen that done.  And, again, I don't know if they're medical, the helicopter, or if they have a way around it.  I told you now twenty-five times I don't know, and that the captain's deposition somewhat changed what I've written in my depositions (sic) about the transport.

Q    So does that mean that you are abandoning your opinion that a drip-and-ship approach should have been used in this case?

A    No.  If possible it should be done, because there is a huge benefit to getting him transported; but nobody took into consideration to what the benefit might be, they just --

Q    Tell me how it would be done.

A    They came up with a therapeutic plan that excluded any possibility of PCI, and now they're solely dependent on their fibrinolytic plan essentially being administered in a walk-in clinic that has a lot of risk.

Kim Klancke, M.D.
January 07, 2025

And if they're going to do solely a fibrinolytic-type approach, then they darn well better do it appropriately.

Q   So then tell me how a drip-and-ship approach could have been done in this case?

A   I told you, I don't know what options that could have been done because nobody pursued it.  Maybe the helicopter people, if they were asked, have a type of hoist that allows IVs to run and the patient to be medevac'd.  I don't know.  I told you I can't assess the risk of the transport, and that's come up since I've read the deposition of the captain.  I don't know what's so hard to understand about this.

Q   So what you're telling me then is that you cannot give me a scenario where a drip-and-ship approach could have been used in this case?

A   I can't assess what options might be available because nobody ever looked.  If you never look, you never know.

Q   Okay.  Would that then mean that if there was no capability for the helicopter to land on the ship, that a drip-and-ship approach could not be used in this case?

A   I don't know.  It may well be they have some sort of mechanism to allow for that.  I just don't know;

Kim Klancke, M.D.
January 07, 2025

and, therefore, I can't assess the risk.  I don't know what options are available.  If you never look, you never know.

Q    Do you know what the medical capabilities are of a Coast Guard helicopter crew?

A    No.  I'd love to see a deposition of the Coast Guard helicopter crew as to what services they can provide.  I just don't know, and maybe that deposition will be forthcoming.

Q    Was Mr. Reeves clinically unstable in the Carnival medical -- in the Freedom medical center?

A    By definition with his chest pain ongoing for hours, he's clinically unstable.

Q    Are you aware of any circumstances when the U.S. Coast Guard would transfer a clinically unstable passenger through any mechanism, whether it be helicopter, rescue cutter?

A    The more unstable he is, the less likely they are to offer him transport.

Q    So are you familiar with the AHA guidelines for reperfusion therapy?

A    Which guidelines?

Q    The AHA guidelines.

A    Yes, I'm familiar with the reperfusion guidelines.

Q    Would you consider the AHA guidelines for reperfusion therapy the standard of care?

A    You know, I think guidelines are guidelines. You have to take into consideration the specific circumstances, but there are certain therapies on which there is universal agreement.

Q    So you're welcome to refer to your report if you'd like, Doctor.  But would you agree that on August 20th of 2024 on page two you indicate based upon the resolution of his chest pain for three to four hours on July the 9th of 2023, he likely had some reperfusion from --

A    Yes.  Yes, very, very late, around four, five in the morning he had a period where he reports zero chest pain.  He may have had some partial reperfusion at that time.  His EKG is not improved.

Q    So based upon the reperfusion of his -- strike that.

Based upon a reperfusion, would you agree that the tPA worked?

A    I don't know that you can say that.  He's getting very high-dose narcotics.  Typically narcotics won't eliminate your ability to sense some discomfort, but there is a period of time there where he reports no chest pain.  It looks like that starts about two thirty

Kim Klancke, M.D.
January 07, 2025

in the morning.

Q    Would you agree that per AHA guidelines, if there's evidence of reperfusion, a transfer to a PCA facility can be done up to twenty-four hours from symptom onset?

A    If it hasn't been done I think as of 2:30 in the morning you might consider not transferring him.  I think before 2:30 in the morning you should have considered transfer.

Q    That wasn't my question.  Would you agree that the AHA guidelines state that if there is evidence of reperfusion, you can transfer that patient to a PCI facility within twenty-four hours?

A    I think the AHA guidelines will say that reperfusion is typically manifested as an abrupt resolution of pain within sixty to ninety minutes of finishing the therapy.  That clinically it can be very hard to judge with true accuracy the presence or absence of reperfusion.  It will say that in the absence of EKG changes by a fifty percent reduction in ST-segment elevation in the worst lead, coupled with the lack of reperfusion arrhythmias, that there's an eighty or ninety percent chance reperfusion has not taken place.

So there's lots of criteria used to judge reperfusion.  But, again, in a setting where you've had

very slow chest discomfort relief and no significant reduction in ST-segment elevation and no reperfusion arrhythmias, it would be very hard to know that you've got reperfusion.  In addition, since you are denying him any opportunity for intervention, you have to reestablish normal flow, TIMI 3 flow.  TIMI 2 flow is not good enough in this situation.

Q   So in this particular case are you of the opinion that there is no evidence of reperfusion?

A    I don't know.  My feeling is he may have had some limited reperfusion between 2:30 and the time the chest pain recurs at about 8:00 in the morning.  So he may have had a brief period where he had some perfusion which, in conjunction with high-dose morphine, allowed pain relief.  But the pain clearly recurs in a few hours, and it recurs because he's not on Lovenox therapy.

Q   We're going to get to that in a minute, Doctor, but let me go back.  Do you agree or disagree -- because I don't know if you gave me a clear answer.  Do you agree or disagree that the AHA guidelines indicate that if there's evidence of reperfusion, the patient need not be transferred to a PCI facility up until twenty-four hours?

A    You know what, to understand that statement,

Kim Klancke, M.D.
January 07, 2025

because it seems -- it flies in the face of what is done, I would need to understand what they mean by evidence of reperfusion.  So if they mean he's got abrupt complete pain relief and his EKG normalizes, then I would think you can transfer him within twenty-four hours, as long as you've got ongoing antithrombotic therapy.  You can't stop the Lovenox.

Q   Let me pull this up for you then and we'll see if we can take a look at this together.  So I have up here on the screen -- are you able to see it?

A   Yes.

MR. MICHAELS:  We can't see most of it.

THE WITNESS:  You've got a bunch of ads in there.

MR. DRAHOS:  Oh, yeah.  How's that?

MR. MICHAELS:  No.

THE WITNESS:  No, you need to shrink it a little bit.

MR. MICHAELS:  That's good.

MR. DRAHOS:  Better there?

MR. MICHAELS:  Yep.

BY MR. DRAHOS:

Q   So, Doctor, you see that this is the AHA/ASA Journal, 2013 ACCF/AHA guidelines for management of ST elevation myocardial infarction.  Do you see that there?

Kim Klancke, M.D.
January 07, 2025

A    Yes.

Q    Let me scroll down.  I'm sorry if I'm making anybody motion sick.  Have you ever seen this flow chart before?

A    Yes.  These would be the guidelines that are applicable to this case.

Q    Okay.  So I'm particularly interested in this box right here.  Could you see where my finger pointer is?  This would be indicative of an instance when reperfusion was found following tPA.  Does it not indicate there that that patient can be transferred within three to twenty-four hours?

A    Yes.  Within the text of this document they'll describe what they mean by evidence of reperfusion.

MR. DRAHOS:  Madam Court Reporter, I will provide that --

THE WITNESS:  Some of the other things that I've told you about, this patient doesn't have much evidence of reperfusion except for a brief period early in the morning that may actually explain the benefit he got from very late PCI.

MR. DRAHOS:  I am going to mark the flow chart as Exhibit 7.

THE WITNESS:  Mark the whole document, because we can discuss that in depth.

Kim Klancke, M.D.
January 07, 2025

(Defendant's Exhibit 7 to be marked for

identification.)

BY MR. DRAHOS:

Q    Let me ask you, we can debate what reperfusion

means maybe at trial, but for purposes of my question

today --

A    If you want to be fair, why don't you just go

down and it will tell you what reperfusion means.  It's

in the text of the document.

Q    You're the cardiologist.  I assume you have

your own definition of reperfusion, but I don't want to

waste my time of doing that.

A    I have those guidelines as the definition of

what --

Q    All right.  Why don't you just answer my

questions, and if you think they are unfair, you can

take it up with your lawyer later.

A    Okay.

Q    My question is:  Why does the AHA provide up

to twenty-four hours in the context of a patient who's

been given tPA and there is evidence of reperfusion?

A    Because certain patients have evidence of

reestablishment of TIMI 3 flow when their EKG goes back

to normal ideally, but at least a fifty percent

reduction in the ST elevation and abrupt and complete

Kim Klancke, M.D.
January 07, 2025

resolution of their symptoms, in conjunction with arrhythmias that tend to occur during reperfusion. So those are the things that would put them in a group that you can have a delayed cardiac catheterization.

The protocol used here are the STREAM trial using Lovenox as the antithrombotic agent. That group of patients had cardiac cath on average of seventeen hours. So there is a group of patients that show clear evidence of normalization of flow, TIMI 3 flow clinically, where you can wait to transport them. Obviously your little box says, you know, ideally they can wait three hours. So start thinking about transport then even if they're rock stable.

Q    In this particular case, when did the IV tPA finish? When did they finish giving it to Mr. Reeves?

A    Well, they started it really late. They did give it in an appropriate fashion, it looks like. And it looks like it finished about 22:30, 22:37, so 10:37 in the evening.

Q    Okay.

A    So four hours after he arrived.

Q    So do you have any evidence that Mr. Reeves continued to complain of chest pain that evening after the tPA had been administered?

A    Yes.

Kim Klancke, M.D.
January 07, 2025

Q    What evidence do you have in that regard?

A    All the nurses' vital signs.  So the tPA is in at 22:37.  At 22:30 he's got six of ten pain.  22:58 he's got eight of ten.  23:24, an hour later, he's got five of ten pain.  Then they stop taking pain scales, for some reason.  From 23:24 until three hours later, at 2:30 in the morning, 2:26 a.m., it's zero of ten.

Q    Well, was Mr. Reeves sleeping that night?

A    He was sleeping in that time frame.  He had certainly got snowed by the Versed and ten milligrams of morphine, but it does say at one point he was resting comfortably.

Q    Okay.  So let me go to --

MR. DRAHOS:  We'll mark this as Exhibit 8. This is the medical chart from the Carnival Freedom.

(Defendant's Exhibit 8 to be marked for identification.)

THE WITNESS:  Typically they wake them up to do blood pressure and all that sort of thing.

BY MR. DRAHOS:

Q    So let me just turn your attention to -- we'll start with page thirty-five.  Do you have the chart in front of you or would you prefer I put it up on the screen?

Kim Klancke, M.D.
January 07, 2025

A    No, I have it electronic, so I don't have it in front of me.  I don't have a paper chart.

Q    Okay.  So you see here on page thirty-five of the Carnival medical chart there is an entry by the nurse here that indicates that at 1:30 in the morning Mr. Reeves was resting comfortably?

A    It says he's sleeping comfortably, yes.  That's shortly after getting morphine.  He was getting room air anesthesia.

Q    So between the time that he was sleeping at 1:30 in the morning up through 7:00 in the morning, do you have any evidence that he was complaining of chest pain?

A    Well, they didn't ask him.  They should have asked him.  It's important information, even if they have to wake him up.

Q    Did you ask him?

A    I wasn't there, no.

Q    Did you ask him at any point in time in your expert review of this case?

A    Did I ask the patient?  I did not.

Q    All right.  So as you sit here today, you would agree that from the time he was asleep at 1:30 in the morning, up through the time he woke up at 7:40 a.m., you have no evidence of him complaining of chest

Kim Klancke, M.D.
January 07, 2025

pain?

    A    There's none recorded.  Again, there are long periods of time that they should wake him up because it's important information.  They should be asking him, but --

    Q    Well, you see the nurse's note at 7:47 a.m. by Joseph Cagumbay say as it relates to whether or not Mr. Reeves was complaining of chest pain?

    A    I think he had -- I think he denied chest pain until -- he denied chest pain until 8:15 in the morning.

    Q    Do you have any evidence of him complaining of chest pain at any point it time from 1:30 until 8:15 a.m.?

    A    Yes, I think he had a five of ten chest pain at 23:24.

    Q    23:24 would be before 1:30 in the morning, correct?

    A    Right.  And then it appears that he gets morphine at 23:24 for the chest pain.  And then he gets morphine at 5:00 in the morning.  Maybe he's talking too much, but typically that would be given for chest pain.  5:03 he gets morphine, ten milligrams IV.  It's typically a dose for severe pain.  Then he gets morphine again at 9:00 a.m.  So it appears that he's having chest pain at times, they're just not recording it.  And, of

Kim Klancke, M.D.
January 07, 2025

course, his EKG at 4:00 in the morning is unimproved.

Q    So at 12:30 p.m., just before he's ready to get off the ship, was he asked whether or not he was experiencing any chest pain?

A    His chest pain was intermittent.  He had some at 8:15 in the morning.  Then he had four out of ten moderately severe chest pain at 10:00 a.m.  And then that persisted at a one to two level until he says no chest pain at 11:45 a.m.  And then the chest pain recurs and it's persistent until transfer at -- until transfer. The transfer people report one out of ten chest pain and two out of ten chest pain initially, and then a period of no chest pain, and then one out of ten chest pain. So he's having chest pain on and off throughout this period of time.

Q    At 12:30 p.m. when he got off the ship, the last question asked was whether or not he had chest pain.  What did he say?

A    12:25 he had one out of ten chest pain, and he was hypoxic on room air with a stat of ninety-two percent.

Q    At 12:30 p.m., according to the medical chart of the Carnival Freedom, what did Mr. Reeves say when he was asked whether or not he was experiencing any chest pain?  You can refer to page thirty onto page

Kim Klancke, M.D.
January 07, 2025

thirty-one, if you'd like.

A    The last note I have about chest pain is 12:25.

Q    Okay.  Well, you can look up on the screen if it would help you, Doctor.  There is an entry on page thirty at 12:31 by Sony Thomas, it says denies chest pain, correct?

A    Correct.  So he denies chest pain at that time.

Q    So have you reviewed the expert report of Dr. John Setaro?

A    Yes.

Q    Do you agree with Dr. Setaro that a cardiac cath performed within two to four hours of the STEMI is still going to result in some decreased left ventricular function?

A    Possibly some.  If you do it in the first two hours, typically there's little or no infarct; and you get some decrease through about six hours.

Q    Would you agree that -- strike that.

Would you agree with Dr. Setaro that a cardiac cath performed after four to six hours of a STEMI is expected to result in significantly lessened benefit with regard to left ventricular pumping function?

A    Within what, four hours?

Kim Klancke, M.D.
January 07, 2025

Q    Four to six hours, yes, sir.

A    Well, I think it depends on what you mean by significant.  You know, probably if you mean to say any reduction in pumping function is significant, then it's all significant.  But there's certainly an opportunity to help, and you certainly have down steam less congestive failure, less complications, better survival if you get done within four to six hours.

Q    But I think I heard you earlier say that a PCI performed after two hours is going to inevitably result in some degree of left pumping function decrease.

A    Typically there is -- time is muscle.  So the longer you go with the thing closed or abnormal flow, the more damage you have.  The guidelines that you were referencing before will most likely say -- I'm not sure, I don't have them memorized -- but will most likely say that you can do emergency angioplasty in any patient that presents within twelve hours of the STEMI.  That there's clear benefit, even if they're having no chest pain.  And you should do an intervention within twelve to twenty-four hours if there's ongoing symptomatology or ongoing evidence of ischemia.  Again, the slower you go and the longer you take, the less the benefit.  But in a patient like this, any incremental gain, because this is a lifelong problem, any incremental gain is of

huge benefit to this patient.

Q    What is Mr. Reeves' ejection fraction today?

A    Thirty to thirty-five percent.

Q    What are you basing that off of?

A    His last echocardiogram in October of 2024.

Q    And you're of the opinion that it's thirty to thirty-five percent?

A    That's what the echocardiogram shows.  It shows significant remodeling with dilatation of his ventricle.  And that's new since his MRI and some remodeling of his MRI.

Q    What did the MRI say?

A    His MRI has an ejection fraction of thirty-seven percent and some cavitary dilatation.  But over time his heart's weakening and dilating and the ejection fraction is getting worse.

Q    What was Mr. Reeves' ejection fraction before he got on the cruise ship?

A    Most likely normal.

Q    Do you know for sure?

A    Certainly within reasonable medical probability.  There is no history of any cardiac issue or damage.

Q    So what would you quantify that as, what's the percentage?  If it's thirty-seven percent on MRI, it's

Kim Klancke, M.D.
January 07, 2025

thirty to thirty-five percent in the October 2024 EKG, what would his ejection fraction have been before the cruise?

A    Fifty-five to seventy percent, most likely.

Q    You would agree that there was never any diagnostic testing done on his heart, particularly his ejection fraction before the cruise?

A    Yes, he was not known to have any cardiac issues before the cruise.

Q    So what evidence do you have in this case that if Mr. Reeves had been transferred from the ship to a PCI-capable hospital between the hours of 1:30 and 12:30 p.m. that he would have actually had a PCI done on him?

MR. MICHAELS:  12:30 p.m. or a.m.?

BY MR. DRAHOS:

Q    1:30 a.m. to 12:30 p.m. the following day.  So what evidence do you have here, Dr. Klancke, that you can tell me exists that had he been transferred off of the ship and arrived at a PCI-capable facility at 1:30 a.m. up through 12:30 p.m. the following day that he would have, indeed, received a PCI treatment?

A    Well, he had no evidence of improvement on his EKGs.  They were not done in a timely fashion.  But the one at 4:00 in the morning, 4:09, doesn't show any significant improvement after the thrombolytic therapy.

That would be an indication to go ahead with PCI.  If they asked him and he had no reperfusion arrhythmias, so the lack of EKG improvement and the no reperfusion arrhythmias, if he's symptom-free, has a very high association with complete occlusion of the artery.

Again, if he stayed completely pain-free twelve hours after the onset of the event, you would not do emergency intervention.  So if his event starts at 6:00 in the evening, you would do emergency intervention even if he's pain-free but had no EKG improvement for twelve hours.  So six through about 4:00 a.m., just on the American Heart Association recommendations you'd do it.  And then if he developed any recurring chest pain after 4:00 a.m. you would do it on that basis, evidence of reocclusion or recurrent infarction.

Q    So what you're saying then is the window for acute PCI treatment was 4:00 a.m. in this case?

A    Typically even if he's -- again, if he's got good evidence of reperfusion, you could wait.  So it's a combination of factors.  There are three things you sort of track clinically to look for reperfusion.  One is relief of pain.  Two is criteria for significant improvement in the EKG, again, preferably complete resolution of the ST elevation.  But at least a fifty percent resolution in the leads involved, seventy

Kim Klancke, M.D.
January 07, 2025

percent in the inferior leads.  And then three is evidence of reperfusion arrhythmias.  Most people will get some rhythm issues when they reopen.

Q    So the --

A    Unless you've got a combination of things to try to tell you if he would benefit.  But if he presented with no therapies in the STEMI that was twelve hours old and he's asymptomatic, that person still goes to the cath lab.  So -- and then after twelve hours you would typically take him to the cath lab with an established infarct only if he has recurrent symptoms or recurrent evidence of ischemia.  So it depends on his clinical course.  Why it's disappointing they don't ask him about pain for that -- you know, for big blocks of time, we just don't know.

Q    So hypothetically if Mr. Reeves had been delivered to shore by midnight, taken to a cath lab and had a PCI performed, what would his ejection fraction be today?

A    Better than it is.  Today he needs an ICD.  So I think you would improve it enough to eliminate an ICD. He actually had some -- enough benefit from the PCI that at one point shortly after his stenting procedure, his ejection fraction had increased a little bit to thirty-five to forty percent.  It's since fallen by the

Kim Klancke, M.D.
January 07, 2025

MRI and by the latest echocardiogram.

Q    Can you quantify a number from your percentage of what you believe his ejection fraction would be today had he received a PCI treatment shortly after midnight?

A    Almost certainly better than the thirty-five percent that is the maximum of what it is now, and it would be better.  He's not actually had transmural events.  His MRI shows scarring that's nearly transmural and in no viable tissue.  So the idea is to increase that.  What is viable, increase that zone of viability in terms of pumping function.

Q    But I'm asking you --

A    I don't think it would be normal, if that's what you're asking; but I think it would be in the range where he might not need an ICD.  He'd have more reserve, that type of thing.

Q    Okay.  So it wouldn't be a normal ejection fraction, which means it must be below fifty-five percent, agreed?

A    Yes.

Q    All right.  So if we were to take thirty-seven percent and fifty-five percent, can you tell me where in that spectrum Mr. Reeves' ejection fraction would be had he been delivered to shore at midnight?

A    Again, they didn't do enough evaluation on the

Kim Klancke, M.D.
January 07, 2025

ship to give us a good feeling for whether or not he definitely had reperfusion.  So if there is a period of reperfusion, you know, that helps him.  Obviously then getting it open even earlier helps him even more.  But the records are haphazard enough that it's hard to be definitive about his course.  I think he probably had a period of brief reperfusion.  I think that he then reoccludes because of an improper regimen.  But the earlier the better with heart attacks.  You just have more ongoing damage and muscle injury the longer you wait.

Q   Let me just ask the question again, because I don't think you answered it.  Can you give me a number between thirty-seven and fifty-five where you believe Mr. Reeves' ejection fraction would be had he been delivered to a hospital at midnight?

A   No, I can't make up a number.  All I can tell you is that it would be significantly better than thirty-five percent.

Q   What is significantly better?

A   You want me to give my best estimate, I'd say forty percent.  That's kind of where it wound up, but that's just a guess based on nothing.  You know, there's no information or data here.  They just didn't do the right stuff to let us have a good idea.

Kim Klancke, M.D.
January 07, 2025

Q    What time was Mr. Reeves delivered to Osceola Hospital?

A    You know, the flight record times are all goofed up.  I don't know what time zone they were on, but it looks like he got to Osceola Hospital about 3:30 in the afternoon, something like that.

Q    Okay.  If I was to represent to you 3:18 p.m., would you have any reason to dispute the accuracy of that?

A    No.

Q    Okay.  And could you look at the EKG that was taken upon his arrival to Osceola?

A    Yes, I've seen it.

Q    Okay.  Let's pull it up here and look at it together.  Can you see my screen, Doctor?

A    Yes.

Q    All right.  Would you agree that this is an EKG report that was taken by Osceola Hospital at 3:54 p.m. on July the 9th?

A    Yes.

Q    Does that show evidence of a STEMI?

A    Yes.

Q    Can you describe for me where?

A    The entire anterior septal and lateral wall.

Q    Is this EKG better, worse or the same of the

Kim Klancke, M.D.
January 07, 2025

last EKG taken aboard the Carnival Freedom?

A    Well, it's different over time.  So now he is developing Q-waves.  He's having cell muscle death at the time of this EKG.  But leads B2 and B3 there's probably -- if you use the PR segment as baseline, probably three millimeters of ST elevation.  And then there is still a millimeter and a half in leads one and aVL.  So there's ongoing transmural injury.

Q    So I guess, from a layman's perspective, if we were to review this EKG and we were to review EKG number II from the Carnival Freedom, is this EKG better or worse than EKG II?

A    They're hard to compare because as time goes on the ST segments come down as the cells die and you get this lack of forces that creates the Q-waves.  So what's happening is he is having cell muscle death and there is less electricity.  For me they just show continued evolution of his anterior wall infarct.

Q    So you would agree that if Mr. Reeves was delivered to Osceola Hospital by 3:18 p.m., he has been delivered to a PCI-capable facility within twenty-four hours?

A    6:30 to -- 6:00 p.m. to -- yes, he had been delivered within twenty-four hours.

Q    And at the time he presented to Osceola

Kim Klancke, M.D.
January 07, 2025

Hospital, you would agree that he was reporting chest pain on a scale of one to ten?

A     Yes.

Q     And would you also -- well, you've reviewed these records, right?

A     Yes.

Q     Okay.  So would you also agree then that clinicians at Osceola Hospital elected to defer his transfer to the cath lab?

A     Yes, they waited a few hours to take him to the cath lab.

Q     Do you agree with that decision?

A     I would have taken him to the cath lab on arrival.

Q     So do you believe that the physicians at Osceola Hospital deviated from the standard of care?

A     He's awfully late in the course of his infarct, and he has awfully minimal symptoms and he's lost most of his anterior wall.  I think they might wonder about the benefit in this patient.

Q     How do you know that he's lost most of his left anterior wall?

A     He is forming Q-waves.  He's lost all of his anterior forces.

Q     So if you don't agree with the decision, are

you saying they committed malpractice or not?

A    I think they made a judgment that I might have made differently, but I think it's late enough in the course of this thing that I can't be very critical.

Q    How many more hours after this decision to defer Mr. Reeves to the cath lab did he ultimately begin suffering new evidence of new chest pain?

A    Well, he's had chest pain pretty much from the time he arrived at the hospital.  He might have had a brief period of no chest discomfort, but the -- just a second.  Can I take a break for a minute here?

        MR. DRAHOS:  Absolutely.

        (A brief recess was taken.)

BY MR. DRAHOS:

Q    So something that I wanted to clarify so that I understand what your theories are in the case, are you saying that the clot that was found in the LAD, for lack of a better term, is the same clot that was present in the medical center?

A    Yes.

Q    So are you saying that that clot was masked -- the pain associated with that clot was masked by morphine, or are you saying there was some degree of reperfusion and he reclotted?

A    I'm saying the clot's in the same position.

Kim Khancke, M.D.
January 07, 2025

So I don't -- you know, my feeling is more likely than not they got some partial late reperfusion.  But it could just be -- the pain relief always corresponds to the morphine.  I mean, they give him morphine, the pain gets better, as would be expected.  These are very high doses.  But typically, even with morphine, you talk to patients, usually you do pain assessments every thirty or sixty minutes.  When you talk to patients they can still feel some sensation that isn't right.

So I don't know exactly what kind of effort they made to document pain.  So I think there may have been a little bit of, you know, late -- a little bit of reperfusion late.  And when you're not going to offer PCI, that reperfusion has to be TIMI 3, it has to be normal flow.  TIMI 2 flow, if you don't correct the problem with PCI, doesn't provide any particular benefit.  It buys you a little time.  My best estimate is they bought a little time.  It reoccluded when the pain comes back.

And, again, had he been at a PCI-capable facility when the pain comes back, or if they go ahead and do it early on, they can fix all this many hours earlier.  And that's what should be done, if it's possible.  If it's not possible, they should give him a fibrinolytic regimen that would afford him his best

chance to have a favorable outcome.

Q    I will get back to that.

A    That wasn't done.

Q    When he was taken into the cath lab at Osceola they found that the left anterior descending artery was totally occluded.  And so are you saying that he presented to Osceola Hospital with a totally occluded left anterior descending artery?

A    I believe that's the case, yes.  And I believe there is evidence of recurrent ischemic pain, like we talked about at -- certainly at 8:15 in the morning he's got two out of ten pain.  That's pretty clear-cut pain. They are giving him morphine at 5:00 in the morning.  He probably got recurrent pain somewhere around 5:00, if, indeed, he had no pain the entire time he's sleeping. Morphine will put you to sleep.  So if they didn't ask him, you know, about those other times because he was sleeping, then we just don't know.

Q    You're saying that a totally occluded left anterior descending artery, the pain associated with that can be masked with ten milligrams of morphine?

A    It can be masked in a sense it doesn't make it go away.  Morphine makes you comfortable and the pain less severe and bothersome.  Usually if you ask a patient are you having any discomfort at all, usually

they can still, even after a large dose of morphine, perceive some discomfort.  You have to ask the right question.

Q   Have you -- am I not -- did you say I'm not asking the right question or the doctors aren't asking the right question?

A   The doctors have to ask the right question.  Sorry.

MR. MICHAELS:  Yours are a little suspect, too, Mike, but we'll let that slide.

BY MR. DRAHOS:

Q   Are you aware of any studies on how quickly heart muscle begins to die when the left anterior descending artery becomes totally occluded?

A   It depends on the collaterals.  There were some collaterals to this vessel, but it varies from patient to patient.  But in general if you get them reopened in two hours, there's almost no damage.  And if you get it done in six to eight hours, the heart attack is probably seventy-five percent complete.  Maybe in some patients with no collateral, seventy-five percent at four hours.

It's the other twenty-five percent that you're -- the peri-infarct tissue that you're working on when you do a delayed reperfusion.  So obviously somebody who

Kim Klancke, M.D.
January 07, 2025

presents probably within thirty minutes of the onset of his infarct, you have a tremendous opportunity to help him by quick therapy, either thrombolytics or PCI. Either/or achieves a similarly good result.

Q    So when you say that Mr. Reeves came to Osceola Hospital, and by the time they had done an EKG he had lost most of his left anterior wall, you're basing that off of the EKG?

A    An estimate off the EKG.  He's got huge anterior Q-waves that evolved since his initial EKG.

Q    Can you tell us --

A    Now, they can represent just profound ischemia, but they represent a lack of electric activity from an area of muscle.

Q    Can you tell us exactly when he lost most of his left anterior wall in this case?

A    Between the time the onset of symptoms and the time he did the EKG at Osceola Hospital.

Q    That's not very helpful in this case.  So in this particular case can you tell me, from the time he presented to the ship's medical center until the time the EKG was done, exactly when he lost most of his left anterior wall?

A    You can't tell how much is stunned.  Obviously some of this is just stunned electrically because his

Kim Klancke, M.D.
January 07, 2025

ejection fraction improves from twenty-five to thirty percent to thirty-five to forty percent a month or so after this infarct.  So there's no exact measurement to say at that point in time he's completed.  Again, after eight hours if there's no reperfusion, he's probably at least seventy-five percent complete.  At twenty-four hours if he's got no pain, he's probably a hundred percent completed.  If he's got ongoing evidence of ischemia, like he had here twenty-four hours, he's still got muscle that can be salvaged.

Q   So the --

A   You are talking about incremental gains.  You are not talking about making the whole thing go away. You are talking about an ejection fraction to forty percent.  So he doesn't need a defibrillator and his long-term outlook is better as opposed to -- I mean, once they give him a minimized therapeutic approach in six or eight hours, he's probably seventy-five percent concluded.

Q   So I guess what we're getting at here is we can all agree that nothing the physicians did aboard the Carnival Freedom actually caused the first occlusion or the occlusion in the left anterior descending artery, right?

A   Correct, they did not cause the event.

Kim Klancke, M.D.
January 07, 2025

Q    Cause that to happen to Mr. Reeves?

A    Correct.

Q    Okay.  And so do we know, is there any way to tell what percentage of heart tissue had already died by 7:00 p.m.?

A    Yeah, his troponin is normal and his EKG has hyperacute change.  It's probably close to zero percent at 19:00 on the day he presented.

Q    How about 8:00 p.m.?

A    Again, in the first two hours you get almost complete recovery if you reperfuse -- so until 21:00 -- it'd be 19:00 -- 21:00 there would be little or no damage.

Q    Okay.  So by 9:00 p.m. there is no damage to his heart is what you're saying?

A    Very little.  His troponin around midnight is only three point four.  It's not very high.

Q    So at 10:00 p.m. what degree of damage had occurred to his heart by that point?

A    Again, you don't want me to guess and provide numbers that are not based on facts.  The chart is so limited we don't a lot of facts.

Q    Well, if I ask it the other way --

A    I'm telling you how the thing normally goes.  And if you get it reopened in the first couple of hours,

Kim Klancke, M.D.
January 07, 2025

you get almost no damage. And by six hours or so it's probably seventy-five percent complete. If there are no collaterals at all, he has some collaterals, it might be seventy percent complete or seventy-five percent complete at four or five hours.

Q How about by midnight, by midnight how complete was his heart damage?

A At midnight we've still got five out of ten chest pain. Or at least we've got -- we've got that at 11:30. He came in at, say, 19 -- or, yeah, he came in at, say, 18:30, three, three and a half hours. So at midnight he's maybe three to three and a half hours into it, three hours into it. Four hours into it he's maybe fifty percent complete.

Q I don't follow your math. He came in at 6:30, right?

A At 6:30. Midnight is three and a half hours -- sorry, six -- five and a half hours after that. So maybe he's sixty percent complete.

Q Well, you told me at six hours he's seventy-five percent complete. Didn't you say that earlier, six hours from onset?

A Yes, six to eight hours. If you can get them reopened in six hours you do a lot of benefit. But six to eight hours would be seventy-five percent, so...

Kim Klancke, M.D.
January 07, 2025

Q   So in this case at midnight what are we looking at?

A   I don't know.  I'm having trouble adding and subtracting.  If it's six hours he's probably seventy-five percent complete.

Q   Okay.  So that would mean that by 12:30 in the morning he is seventy-five percent complete, or our damage is seventy-five -- I don't know why I'm getting blurry.  So let me ask it again and make sure it's clear.

By 12:30 a.m. seventy-five percent of the heart damage that was done to Mr. Reeves was already complete, is that what you're saying?

A   Possibly.  You know, again, he's got some collaterals.  So if you allow for that, maybe it's sixty percent complete.  But there is a significant amount of irreversible damage that will be done after six hours of ongoing ischemic injury.  But that's why time is muscle and that's why you try to do everything as fast as possible.  It's not a slow-motion process.

Q   So do you think that a patient who ends up with a thirty-seven percent ejection fraction following a total occlusion of the left anterior descending artery could be considered a good outcome?

A   First of all, he doesn't have a thirty-seven

Kim Klancke, M.D.
January 07, 2025

percent ejection fraction.  You need to compare apples to apples.  Use the echos.  But, you know, I would consider that not a terrible outcome.  He doesn't have a fifteen percent ejection fraction, but it portends many years of lost life expectancy and that sort of thing.

Q    Are you saying that the EKG is more diagnostic than a cardiac MRI for determining ejection fraction?

A    I think the echo -- I think they're different techniques, so the MRI is at thirty-seven percent.  That was a year ago.  You've got serial echocardiograms that are of the same technique that says with -- a month or two ago his ejection fraction was thirty to thirty-five percent.  I think in general the echos, because it gives multiple planes, is our best look at ejection fraction.

Q    Okay.  So that was a long-winded answer, but I think you gave it to me in the end.  So what you're saying is an EKG is more diagnostic for determining ejection fraction than a cardiac MRI?

MR. MICHAELS:  ECG.

THE WITNESS:  An echocardiogram is completely different than an EKG or --

BY MR. DRAHOS:

Q    I'm sorry.  I'm excited and I misspoke.  ECG versus cardiac MRI?

A    No, I think cardiac MRI is -- ECG won't look

at ejection fraction at all.

Q   Okay.  So you're relying upon a November 2024 what to say that his ejection fraction --

A   Sonar test.  Bounce sonar off the heart muscle and see what works, what doesn't work.

Q   An echocardiogram?

A   (Nods head.)

Q   So are you saying that an echocardiogram is more diagnostic for determining an ejection fraction than a cardiac MRI?

A   Certainly have a serial basis when you're using the same technique.  The MRI, you know, is a separate technique.  That is an isolated finding.  Here you've got serial echocardiograms; and yes, the echocardiogram is sort of the standard we use.  The other standard is data blood pool study.  I don't -- the MRI certainly doesn't trump everything else.  And thirty-seven percent and thirty to thirty-five percent is within the margin of error.

Q   Okay.  But you indicated in your report on page two that any gain in his ejection fraction would avoid an ICD.  And in your report you had concluded at that time that his ejection fraction was between thirty to thirty-five percent.  So what would his ejection fraction need to be in order to avoid an ICD, in your

opinion?

A    Greater than thirty-five percent for an ischemic cardiomyopathy.  Probably an indication for primary prevention is thirty-five percent or less.

Q    So if --

A    Nonischemic cardiomyopathy is a little lower.

Q    So if his ejection fraction is thirty-seven percent, he would not need an ICD is what you're saying?

A    I'm saying if it's thirty-seven percent he wouldn't have needed it a year ago, but that's old news.  What I'm going on now is where he is today.  So the opinion is based on his present status.

Q    All right.  I understand what you're saying.  But my question is:  If his ejection fraction is thirty-seven percent, you're saying he would not need an ICD.  I understand that you've said you don't agree with he's got a thirty-seven percent; but if it was, would you agree that he would not need an ICD?

A    Yeah, if it was fifty percent he really wouldn't need it.  And if it was seventy percent, you'd wonder why it was hyperdynamic.  I mean, his ejection fraction at one point improved enough after the PCI that the ICD wasn't indicated, that's why they didn't put it in.  It went to thirty-five or forty percent, and it corresponds with that thirty-seven percent on the MRI;

Kim Khancke, M.D.
January 07, 2025

but that was a year ago or a year and a few months ago.
Now his ejection fraction is lower.  He's lost ground
over time.

Q    So --

A    He's more dilated, his ejection fraction is
lower.

Q    Why?  Why did his ejection fraction go to
forty percent and then drop to thirty to thirty-five
percent as you're saying today?

A    Because when you have a damaged pump and it
has to work harder with what's left, that's kind of the
natural history of the thing.  People tend to get worse
over time.  That's why his -- that's why his -- his
long-term outlook is not nearly as good as it would be
if he had not had a heart attack or if he had less
damage with the heart attack.

Q    So if his ejection fraction had been forty
percent, he still could have evolved to where he is
today regardless?

A    If his ejection fraction had been forty
percent or less, there's a registry that looks at young
patients with MI, patients under the age of fifty.  And
if the ejection fraction, I think it's forty percent or
less in that study, shows twenty-five percent, ten-year
mortality versus almost no mortality if it's above forty

Kim Klancke, M.D.
January 07, 2025

percent.  Actually, I take that back.  It has to improve to fifty percent in that study.  But if his ejection fraction stays under fifty percent, he has sort of eight-fold increase in mortality over the next ten years.  So it's -- everything in cardiology in terms of survival resolves around pumping function.  The better it is, the better your chances.  The worse it is, the worst your chances.  An ejection fraction of thirty to thirty-five percent is severe ventricular damage, but so is thirty-seven percent.

Q    He's currently on Eliquis and Entresto, correct?

A    Yes.

Q    And are there any studies that have been done on the long-term benefits of that drug?

A    No, because they're newer.  The Eliquis has no bearing on it.  But the Entresto, it improves outlook.  The registry data, in order to get ten years of follow-up, you've got to have -- you've got to have a drug that's been used for ten years and followed.

Q    So the goal with the Entresto would be to improve the ejection fraction?

A    To stabilize his condition.

Q    Can you state within a reasonable degree of medical probability that the Entresto would not improve

Kim Klancke, M.D.
January 07, 2025

his ejection fraction beyond thirty-five percent?

A Well, we pretty much know it doesn't. He has been on Entresto a long time. He's actually gotten worse on Entresto.

Q So are you stating here today within a reasonable degree of medical probability that the Entresto will not improve his ejection fraction?

A It can in some patients, but in others it doesn't. And it appears --

Q I'm talking about him.

A It appears he's getting worse on Entresto. He started it months ago, month prior to his echocardiogram, and he's gotten worse.

Q So the Entresto is not going to improve his prognosis?

A It might improve short-term prognosis. We know that people do better on Entresto than they do on just plain old ace inhibitors and MRAs. But it's not going to eliminate any risk of problems for the rest of his life. It's not some magic bullet.

Q So what is the basis for your opinion that he's going to need an ICD other than this ejection fraction percentage? Why is that ultimately going to reach the conclusion that he is going to need an ICD?

A Because at the time of his echocardiogram he

Kim Klancke, M.D.
January 07, 2025

needed an ICD.  His MRI shows a big area of scar, all dead, no viable tissue, involving a large portion of his heart.  That creates an arrhythmia-prone situation.  And then he has an ejection fraction in the range that multiple studies have shown he would benefit in terms of life expectancy from an ICD placement.

Q    Okay.  So you've also opined that he's eventually going to need a heart transplant, but I think you said the chances are greater than fifty percent. What are you basing that off of?

A    His age and the fact that he's a perfect candidate for it.  Obviously most people don't get heart transplants, but he's stable enough that they can follow him closely and see if he deteriorates over time.  But he's in an ejection fraction range as he continues to remodel and gets worse, they would have time to intervene.  He has congestive heart failure.  He's being treated for congestive heart failure.  That tends to be a progressive condition.  He would benefit from being followed actually at a CHF --

Q    So was it your opinion in your supplemental report that there's no dataset of patients that tells us the percentage with advanced ischemic cardiomyopathy who end up with a cardiac transplant, but over a thirty-year span it's likely over fifty percent?  Was that your

opinion in your supplemental report?

A   Yes.  My opinion is he will become a candidate for a transplant.  Whether he gets it or not is another issue.  Some of the considerations are financial.  Some of the considerations are patient's ability to take the medical regimen follow-up afterward.  It's a very individualized decision.  I've had people that I thought should be transplanted and decided not to, and then a number of others where they go ahead and transplant them.

Q   Well, when you say there is no dataset of patients, what are you saying there in layman's terms?

A   I'm just saying there is a dataset that shows over time he is likely to become somebody who would benefit from either mechanical therapies or transplant. There's no --

Q   Your report says that there's no dataset.

A   There is no dataset that says a patient like this is likely or guaranteed to get a transplant, a group of thirty-seven-year-old patients, or thirty-eight or thirty-nine now, with advanced ischemic cardiomyopathy who are undergoing remodeling despite optimal medical therapy that end up with a transplant. I don't know if that percentage is fifty percent or more.  But the report should say you'll reach a point in

Kim Klancke, M.D.
January 07, 2025

time where transplant would be a consideration or an option.

Q    When?

A    Depends on how he does over time.  He's young, so he'll tend to do better.  If you look at patients who were revascularized, at least surgically, follow them for twenty years, the life expectancy is twelve or thirteen years with this reduced ejection fraction.  Again, young patients do better.  So the YOUNG-MI registry would tell you it's a fairly linear curve, but at least at eleven years or ten years there's a twenty-five percent chance he will be deceased.

Most of those people or a great portion of those people die from progressive heart failure.  Some of the statistics are even worse if you look at stage C1 heart failure.  The twenty-year survival is certainly less than fifty percent.  So he's going to get into trouble over time, at least on a statistical basis from multiple looks.  You know, nobody could predict an absolute time course.

Q    What literature are you relying upon to render that opinion?

A    Pardon me?

Q    You talked about data statistics.  What literature can you point to to tell me that in ten to

Kim Klancke, M.D.
January 07, 2025

eleven years he has a twenty-five percent chance of decease?

A    The YOUNG-MI registry and failure to improve his ejection fraction.  Surgical data, the best is out of Emory.  Weintraub is twenty years survival after revascularization.  When they look at ejection fraction, survival is about twelve to thirteen years.  And there are datasets on just groups of patients with stage C heart failure survival.  On average for stage C group is about fifty percent.  About nine and a half years with an ICD.  So the best data is probably just look at the YOUNG-MI trial.  YOUNG --

Q    So how many years -- sorry.

A    YOUNG-MI would be my best reference for you. And Weintraub is surgical revascularization, not angioplasty; but it gives you an idea of how people who've had restored flow do when their ejection fractions are bad.

Q    How many years can Mr. Reeves go on his current heart without an ICD?

A    You follow them every six months and make that determination, but he should have had an ICD recommended in November of 2024.

Q    So in this particular case do you have an opinion as to how many more years, if any, Mr. Reeves

Kim Klancke, M.D.
January 07, 2025

can go without an ICD?

A    Zero.  He should have had an ICD implanted in November, or recommended.  It would interfere with his job.  They probably wouldn't let him be a firefighter.

Q    How many more years can Mr. Reeves live with his current heart?

A    It's groups of patients.  You can't individualize and tell you exactly how long one patient would live.  I've just given you the data.  I could paint it really grim, refer you to the Framingham study in how patients who are asymptomatic with LV dysfunction do.  They do terrible.  But those are older datasets, and his prognosis is better than those datasets would imply.

Q    So --

A    I would estimate on average he would have twenty years of life expectancy.

Q    Without a heart transplant?

A    That would allow for adding those therapies in.  Heart transplant, if his heart continues to dilate, may come up fairly quickly.

Q    So you made reference to a November 2024 report.  Did you review the clinic notes from March of 2024?

A    Yes, I read them.

Kim Klancke, M.D.
January 07, 2025

Q    Okay.  And did they paint the same type of grim picture that you are painting here for the jury?

A    I think they think he's clinically stable.  I don't know that they made any life expectancy projections.

Q    Okay.  Well, according to his cardiologist, cardiac MRI, which we've talked about, showed an ejection fraction of thirty-seven percent.  What did Mr. Reeves tell his cardiologist during his report for his visit in March of 2024?

A    He felt he was clinically well or clinically stable.

Q    Okay.  At that point he had been back at work at the fire department, correct?

A    Yes.  I don't think he -- I don't think Mr. Reeves told his doctor that he was worried that his heart was getting bigger and his ejection fraction was falling because I don't think he knew that until November of 2024.

Q    And according to this report, Mr. Reeves told his cardiologist that he is able to exercise six days a week without any chest pain or chest discomfort.  He doesn't suffer any dizziness or light-headedness or headaches.  His blood pressure is mostly one hundred over eighty.  Does any of that paint the grim picture

Kim Klancke, M.D.
January 07, 2025

that you're painting that he needs an ICD?

A    It has nothing to do with an ICD.  How he feels is not why you put the ICD in.  It's how his heart is working.  The echo is actually -- I think that we are discussing is actually October the 15th of 2024.  I've been saying November because I think there was an office follow-up in November.

Recently he's shown evidence of progressive dilatation and remodeling of his heart despite a good medical regimen and following his ejection fraction.  So he's clinically doing well; but it's the ejection fraction that determines long-term outlook, not how well he feels.  But he's clinically feeling well, but he can't continue to do his garden.  He had to give up gardening, according to his wife.  So he's able to do some things in short verse.  His rehab doesn't actually have any grade of exercise.  I can't tell how many minutes of activity he is actually doing.  I can't tell the exact activity level other than that he's able to complete areas and that sort of thing for firefighting.

MR. DRAHOS:  Madam Court Reporter, I'm going to go ahead and mark the March 24th TruMed medical record as Exhibit 9.

(Defendant's Exhibit 9 to be marked for identification.)

Kim Klancke, M.D.
January 07, 2025

BY MR. DRAHOS:

Q    Doctor, you make reference to that, let me just touch on that a little bit.  Why don't you talk at all about the training records that were generated at his fire department at any place in your report?  Are they not relevant to your findings?

A    I didn't have them until after the report is the primary reason.  The secondary reason is that they don't actually give you levels of activity.  He does things like three pull-ups.  You don't know how rapidly.  You don't know how long he rep'd.  You can't get a very good feel for his actual activity level.

Q    How about as it relates to his comparison to his colleagues, did you review anything there that talks about how he is able to perform certain function versus his colleagues?

A    I know he says he can do them as well or better than his colleagues, but we don't know how vigorous the activity is.  You know, he feels well.  There's no question about it.  But if I were your cardiologist and I said oh, you have a ninety-nine percent blockage in the artery down the front of your heart but you feel good, you're going to do fine, you know, we're talking about his cardiac damage and underlying problems and what the likelihood

Kim Khancke, M.D.
January 07, 2025

of damaged, scarred heart is -- the likelihood of progression of a damaged, scarred heart.

But at the moment he is able to fulfill the activities that he needs to do to be a firefighter. It's actually a terrible job for him because of the catecholamine stimulation that goes along with gearing up to fight a fire.  It's a very dangerous job for him without an ICD.  Nevertheless, he's cleared for it and he's doing it.

Q   Let me point your attention, we will mark as Exhibit 10, the athletic training treatment notes, particularly one -- and there's a lot of them, but I'm going to focus on this one in particular.  This is March 6th of 2024.  Did you review this, Doctor?

A   I did.  You will notice that he's off the life vest.  The life vest is just an externalized CD.  They are aware of the risk of rhythm issues.  He stopped the life vest himself because he was having technical problems with it.

(Defendant's Exhibit 10 to be marked for identification.)

BY MR. DRAHOS:

Q   Okay.

A   I've seen those, but show me one thing there where he walks on a treadmill or where you have a known

Kim Klancke, M.D.
January 07, 2025

level of exercise or activity.

Q    Let's start with --

A    But he --

Q    Do you know what a VES drill is?

A    I do not.

Q    Do you know what a limited visibility search is?

A    I do not.

Q    Do you know what a hose deployment and an attack is?

A    I do not.

Q    Do you know what a firefighter down is?

A    No, I don't know what a firefighter down is.

Q    Do you know what's involved in a multi-victim rescue?

A    I don't know exactly what he has to do. That's the problem.  I would like to know exactly what level of exercise it is.

Q    And earlier when I asked you in this case if you'd spoken to anybody, you never bothered to call the trainer or anybody at his work to see what any of these things were?

A    No, because they're not germane necessarily to my opinions about his outlook.  He feels well.  There's no question about it.  His heart's struggling to keep up

Kim Klancke, M.D.
January 07, 2025

this level of activity.  It's starting to dilate and get

bigger.  It does that so it increases stroke volume.

But he's losing ground from a structural heart

perspective.  But he does feel relatively well at

whatever this level of activity is.

Q    Okay.  So this gentleman, John Wise, do you

know who he is?

A    I don't.

Q    Do you know what his qualifications are?

A    I don't.  I think what would help me the most

with this report is duration.  Is he exercising

vigorously for thirty minutes at a time or two minutes

at a time.

Q    So Mr. Wise was of the opinion, and it appears

that he was supported by Chief Shealy and Captain

Mendel, as well as several firefighters, that Mr. Reeves

was capable of doing all these drills better than his

colleagues.  Do you have any evidence to the contrary to

Mr. Wise's opinion?

A    Mr. Wise had the opinion that he could do it

better than his colleagues?  I didn't know that Mr. Wise

had tested his colleagues.

Q    Well, Mr. Wise was there with the colleagues

as they were assessing Mr. Reeves' performance.

Mr. Wise's opinion was that he was capable of returning

Kim Klancke, M.D.
January 07, 2025

to full duty as a firefighter.

A    It says several firefighters commented on it, but what did Mr. Wise do to confirm it?  I don't want to argue about it, but he's able to do what activities he needs to do as a firefighter.  That doesn't mean it's good for him or he couldn't have a cardiac arrest out running in a burning building.  It's not a very good job for him.

Q    So do you disagree with Mr. Wise who concluded, on March of 2024, that Mr. Reeves was ready for full return to duty without restriction?

A    I think that's Mr. Wise's opinion based on his physical capability.  I don't know how much Mr. Wise considered his underlying ischemic cardiomyopathy.

Q    Just a couple of more things, Doctor.

A    No ICD.

Q    Have you ever been sued for medical malpractice before?

A    No.

Q    Have you ever had a Daubert motion filed against you?

A    You know, I've had a couple of those things where I've had to go to like a mock trial, and it's never been a problem.

Q    Where you had to go to a mock trial, what do

Kim Klancke, M.D.
January 07, 2025

you mean?

A    Well, they come and ask you questions; and then you're allowed to go ahead with your testimony.

MR. MICHAELS:  A Daubert hearing, Mike.

MR. DRAHOS:  Okay.

BY MR. DRAHOS:

Q    Do you know what a Daubert motion is?

A    I kind of know that it requires you or wants you to have a scientific basis for your opinions. That's what I know.

Q    To your knowledge, has a lawyer ever filed a motion in a courtroom challenging your ability to offer certain opinions?

MR. MICHAELS:  Form.

THE WITNESS:  I told you a couple of times I've had to send in articles or go to a Daubert trial kind of thing.

BY MR. DRAHOS:

Q    Do you know how many times that's been filed against you?

A    I think twice.  They've always let me go ahead and testify.

Q    In which cases?

A    I can't recall.  One was an out of hospital cardiac arrest in mid Florida.  They were years and

Kim Klancke, M.D.
January 07, 2025

years ago.  I don't remember.  I will be glad to provide articles on these opinions.

Q    I'm aware of -- well, time for that has passed, unfortunately.

A    Oh.

Q    But I'm aware of one other instance when you testified for the Haggard Law Firm against Carnival that was in the Kirk Arnold case, correct?

A    Yes.

Q    Other than the Kirk Arnold case, have there been any other instances where you've testified for the Haggard Law Firm?

A    I don't believe so.  I don't recall for sure, but I don't think so.  I think I just had the one case before.

Q    What percentage of your annual income is made up of doing expert work like this?

A    Of my annual income, it's about fifteen percent.

Q    How many active cases are you working on right now as an expert?  I don't need to know the names.  I just want to know the total.

A    You know, I never know what's active.  Things where they're calling and scheduling things, there's probably three or four.  One just reappeared from five

Kim Klancke, M.D.
January 07, 2025

years ago.

Q    I have your testimony list history, I can bring it up if it would help.  But what I'm interested in knowing is there are instances I've seen where you've testified for the defendant.  Can you identify for me which of those cases involved delayed administration of tPA?

A    I'd say none of them, off the top of my head; but you can bring up the list if you want.

Q    Sure.  Give me a minute.  I need to go back.

A    You do understand it's an incomplete administration of a thrombolytic protocol or a combination of medications that should be used for thrombolysis that I'm mostly discussing.

Q    All right.  Well, you are of the opinion that they gave tPA too late, they should have given it earlier, right?  We talked about that.

A    I'm of the opinion that they were slow to get the EKG done.  They were slow to repeat the EKG.  They gave inadequate sublingual nitroglycerin.  They did not provide any realistic antithrombotic therapy with Lovenox, and they were slow to give the tPA.  Those are the opinions that I have --

Q    The Lovenox --

A    -- related to this.

Kim Klancke, M.D.
January 07, 2025

Q    The Lovenox opinion that you've offered, you told me earlier that the same clot that was in the left anterior descending artery that Mr. Reeves presented to the medical center with was the same clot that he went to and was found on the PCI -- or on the cath lab at Osceola Hospital, correct?

A    I think I said the same area of clot.  It's possible they dissolved some of it away.  But what the Lovenox does is prevents more clot from forming.  So it's a two-pronged approach to the problem.  The tPA dissolves existing clots.  But in order to make it effective in terms of therapy, you have to prevent more clot from forming.

So if you get where you have existing clot, if you don't give the right amount of Lovenox, you'll simply dissolve some away but then reform it.  It's like a snowstorm, you can shovel in the middle of a snowstorm, but you never get the driveway cleared if the snow keeps falling.  You've got to prevent the clot from forming.  So that's why you give the three other drugs, the aspirin, the clopidogrel and the Lovenox.  Those all prevent more clot from forming.  That's a fundamentally important limb of the therapy.

Q    But in how many instances -- strike that.

Isn't it so that a patient can be given

Kim Klancke, M.D.
January 07, 2025

Lovenox and still reclot anyway?

A    And still what?

Q    Isn't it so that a patient can be administered the proper dose of Lovenox, as you're stating, and they could still reclot anyway?  In other words, Heparin is not a one hundred percent guarantee of reclotting?

A    No, but giving the Heparin makes it more likely -- appropriately makes it more likely than not it would be successful, versus not giving it which makes it more likely than not you will fail.

Q    In this particular case is there anything that you can point to anatomically to show that the reason why Mr. Reeves had a total occlusion in the left anterior descending artery is because he wasn't given an adequate dose of Lovenox?

A    I could just tell you that more likely than not all the data shows that had he been given appropriate Lovenox, he probably got a two-thirds chance of success versus less than a thirty percent chance of success by giving a tiny dose of subcutaneous --

Q    So there is nothing that you can --

A    -- thrombolytic.

Q    There's nothing you can point to in any diagnostic testing, whether it be films, EKG strips or whatever, that definitively proves that because

Kim Klancke, M.D.
January 07, 2025

Mr. Reeves was not given an adequate dose of Lovenox, in your opinion, he reclotted?

MR. MICHAELS: Form, as to definitively it's not the standard.

THE WITNESS: Yeah, I'm testifying within reasonable medical probability based on his presentation and what typically happens. But the STREAM trial, which is the most recent trial using Lovenox in a thrombolytic, will probably tell you there's probably as much as a two-thirds chance that you'll be successful if you follow the proper protocol versus we know from the ancient GISSI trials and ISIS-3 that not giving an intravenous antithrombolytic even more likely than not you will fail.

BY MR. DRAHOS:

Q Right.

A GUSTO shows less than a thirty percent TIMI 3 flow rate at ninety minutes if you give the thrombolytic and subcutaneous Heparin. So it's a combination of things that make it more likely that you'll be successful. They just give this in a way where most likely they will be unsuccessful and they need to try to be successful. Successfully reperfusion them is good.

Q When Mr. Reeves presented to Osceola Regional

Kim Klancke, M.D.
January 07, 2025

Hospital he was complaining of chest pain on a scale of one to ten.  We talked about that already, you agree?

A     Yes.

Q     He was given Lovenox at Osceola Hospital, correct?

A     I believe so, yes.

Q     He reclotted subsequent to the Lovenox?

A     He probably reclotted when he arrives at Osceola Hospital.

Q     So you're saying he came in with a totally occluded left anterior descending artery?

A     Yes, that's what I believe.  He had recurrent chest pain way before he ever got to Osceola Hospital. I think he came in with a totally occluded vessel when he got to Osceola.

          MR. DRAHOS:  Okay.  Doctor, those are all the questions I have.  Thank you.

          MR. MICHAELS:  I've got some brief follow-up questions.

                    CROSS EXAMINATION

BY MR. MICHAELS:

Q     Doctor, medically the condition of Mr. Reeves' heart currently, does he have chronic congestive heart failure?

A     Yes, he's stage C heart failure.

Kim Klancke, M.D.
January 07, 2025

Q    Is his ejection fraction somewhere between thirty and thirty-five percent?

A    Yes, that's what he is most recently.

Q    And is that true regardless of whether he can do pull-ups?

A    Absolutely.

Q    Is that true regardless of whether his fellow firefighters have said that hey, he did a good job on these drills?

A    Absolutely.  The ejection fraction is not a -- it's not an excellent predictor of physical activity. Some people can do remarkably well with a low ejection fraction.  Other people have just minimally impaired left ventricular function and be terribly symptomatic. There's not a strong correlation.  The ejection fraction is a reflection of the amount of damage he has to his engine.

Q    Is there any indication that Mr. Wise or his fellow firefighters reviewed or examined -- reviewed his medical records or examined his heart in any way?

A    No, I don't think they're aware of the specifics of his cardiology condition.

Q    Is there any evidence in the record, from the depositions you've read or employment records that you've read that, let's say, a week or two prior to this

Kim Klancke, M.D.
January 07, 2025

event on the cruise that he was handicapped or limited in performing his job in any way?

A     No.  My understanding is he had a history of hypertension that was intermittently treated and some obesity, but he was on a minimal medical regimen and first time he ever had these symptoms was a brief warning episode on July the 8th of 2023.

Q     And despite him being able to perform his job in the weeks or months leading up to the heart attack, his heart was obviously a ticking time bomb at that point, fair?

A     Actually, that's a really good point that didn't come up in the deposition.  The answer to that is probably not.  The heart attack occurs from a thing called plaque rupture.  In this age group the plaque that was existing is usually minimal, less than fifty percent.  That's true in about seventy or eighty percent of patients.

So the reason this comes up so suddenly is there is a sudden change in the plaque where it cracks and exposes material that causes a clot to form on top of it.  So the norm is for these people to be well and asymptomatic with no flow-restricting heart artery blockage and then to suddenly have a change in condition.  That's why I say I think he was probably

Kim Klancke, M.D.
January 07, 2025

pretty normal until he had an episode of plaque rupture that possibly started in the morning that he was getting ready to get on the ship, with a brief episode of angina, no duration, and then a complete occlusion with a STEMI around six o'clock or so in the evening when he was on the ship.

Q   Now, we've spent a good deal of time throughout the course of your deposition talking about disembarkation and not as much time talking about your opinions.  And I want to go back and touch on that. First of all, do you have any experience with the Coast Guard?

A   I don't.  You know, I don't know what they're capable of doing and what services they can offer.

Q   Do you have any experience at flying a helicopter?

A   Oh, no, I don't have any experience at helicopter piloting.

Q   Do you know whether the Coast Guard has the ability to get a cutter to the ship or not?

A   I don't know exactly what their capabilities are.  I know there was testimony that they were willing to try and told the family they were willing to try, but I don't know what they can actually do.

Q   Now, you would agree that medically, if

possible, the front line treatment for someone who presents in Mr. Reeves' condition would be PCI at a cath lab, correct?

A    Yes.  This is a risk-benefit decision on the transfer.  You have to weigh the benefits, which are substantial, of getting him to any hospital, but specifically a PCI hospital versus the risk of doing that.  I know the benefit.  I don't know the risk.

Q    You are not testifying in this case that the doctors aboard the ship failed to meet the standard of care by administering fibrinolytics as opposed to evacuation, correct?

A    Correct.  I wasn't positive I'm even testifying about their standard of care because I've not been a ship doctor.  What I'm testifying to is what a cardiologist would have done had he been contacted.  I can tell him how to do this over the telephone at three in the morning.

Q    You're here to testify as to what the medical standard of care is, correct?

A    The cardiac standard of care.  They practiced as cardiologists.  They didn't bother to even call or involve a cardiologist, so they are putting themselves out as capable of practicing cardiology.  I'm just telling you what the practice of cardiology, even based

Kim Klancke, M.D.
January 07, 2025

on those guidelines that we discussed earlier from 2013, would do.  This is something I've done hundreds of times over the telephone to give people guidance at an outlying hospital as to what they should go ahead and start and what we should be trying to do.

Q   Now, would you agree that if it was possible to get him to a cath lab within a reasonable amount of time, that that should have been explored?

A   Yes.  I think people like this have a ten percent short-term mortality with this size infarct. There is a ten percent chance he might need a blood transfusion.  There is an eight percent chance or ten percent chance of primary ventricular fibrillation.  I don't know how good they are at stopping a patient like this.

But he should definitely, if at all possible, be at a place that can provide a higher level of service.  And I think the possibility of getting him to that place could be pursued.  You know, if he had called the captain and the captain would have said, you know, no way Jose, you know, that's a different scenario.  But they should at least understand the pros and cons of what can be done.

Q   Is there any indication that the captain was made aware of this event during any of its acute stages?

Kim Klancke, M.D.
January 07, 2025

A     None.

Q     Now, you said if the captain said we can't get him off, you know, no way Jose -- strike that.

Would you agree with me though that regardless of whether they could have gotten him off or not, fibrinolytics should have been administered if they were not able to get him to a PCI lab within a hundred and twenty minutes?

A     Yes, with the idea, since they are not transferring him, that they have to reestablish TIMI 3 flow.  So the only way to get that on any kind of likely basis on a sixty or sixty-five percent basis is to be very aggressive with the medical therapy and give it properly.  We know from studies from the 1980s and 1990s that giving a thrombolytic alone does not achieve a fifty percent rate of TIMI 3 flow.

Q     Now, using guideline-directed therapies for a thrombolytic protocol, when should the tPA have been initiated?

A     As soon as possible.  So the goal is a thirty-minute door-to-needle time.  Typically you get an EKG in ten minutes.  If it's nondiagnostic, you repeat it in fifteen minutes.  But as long as the pain is ongoing, as soon as there is ongoing chest pain it will pretty quickly become evident as to what the problem is.

But you've got to be aggressive about repeating the EKGs.

Q    Now, you had given the comparison to a snowstorm, and I just want to ask to make things real simple for a jury.  If you are out in a snowstorm and your hope is to get snow off the driveway, by way of analogy my understanding is the thrombolytic would be actually shoveling the snow from the driveway, getting the snow, removing it?

A    Correct, dissolving the clot, getting rid of the obstructing problem.

Q    The Heparin, or the Lovenox in this case, would be the process of stopping other snow from falling; is that correct?

A    Yes.  Along with the aspirin and the clopidogrel.  But you've got to stop clot from reforming, otherwise it just reforms clot and just reoccludes.  It's a small percentage of patients.  I mean, there are no studies that just don't give thrombolytics these days.  Those studies went out in the 1980s.  They practiced medicine from thirty-five years ago.

Q    So you're talking on the ship?

A    Yeah.

Q    So you talked about the goal time of thirty

minutes door, that means door of the medical clinic, to needle, which means administration of the tPA, correct?

A    Yes.

Q    And with that being the goal, a thirty-minute goal based on your review of the records, how long did it take door to needle in Mr. Reeves's treatment for the thrombolytic to be started?

A    I think it was about an hour and a half.  He came in at 18:30.

Q    He came in at 6:30?

A    Yes, and he got bolused at 21:05.  So 19:30, 20 -- two and a half hours.

Q    So the goal being thirty minutes, it took them two and a half hours or in excess of two and a half hours to start the thrombolytics on Mr. Reeves, fair?

A    So all this adding and subtracting, but yeah, 18:27, so 19:27, 20:27, 21:05 is another half hour.  It took two and a half hours from the time he got to the clinic for a medical consultation to the time they got the thrombolytic going.

Q    Two hours and thirty-eight minutes?

A    Something like that.

Q    And what would be -- now, they had actually started the Heparin before they began to administer the thrombolytic, correct?

Kim Klancke, M.D.
January 07, 2025

A    They did.  They gave that at 19:29; but they didn't give any IV, so it won't start working.  It will never really work.  It will only reach fifty percent of steady stated levels, but it takes three or four hours before it hits peak activity.

Q    And we'll talk about the Lovenox in a minute.  I just want to --

A    I'm just saying they gave it -- they may have given it in a way we don't know how it works.  It says they gave to intramuscularly.  That's contraindicated.  But they gave it in a way that it won't be working for quite a while.

Q    And we'll come back to that.  I just wanted to clarify.  I want to get back to our snow analogy.  Giving the Heparin without giving the thrombolytic, if your goal is to clean the driveway, is like making the snow stop without actually shoveling the snow off the -- making the snow from the sky stop without actually shoveling the snow from the driveway, correct?

A    Correct, or suddenly it just stopped snowing on its own and then the driveway is clear.

Q    Now, what is the reason why there is a thirty-minute door-to-needle time on the beginning of the administration of the thrombolytic?

A    Because time is muscle.  We discussed that at

Kim Klancke, M.D.
January 07, 2025

length.  But if you can get this thing kind of opened up in a couple of hours, there's almost no damage.  So when he comes in this early, you know, there is an opportunity, if you get the thrombolytic going by 19:00, to have him opened up by 20:00.  A lot of people -- average reperfusion time is about forty-five to sixty minutes.  The studies that are done to look at TIMI flow after a thrombolytic are usually done at ninety minutes.  That's from GUSTO, the angiographic sub trial.  But the bottom line is there is a potential if you are Johnny-on-the-spot to have him opened up by, say, 8:00 in the evening.

Q   So what would be the impact of the delay, of the delay from a half-hour goal to two and a half hours on Mr. Reeves of delaying the administration of thrombolytics?

A   More damage, but possibly even more important is a lower likelihood of success.  So the earlier you get therapy, the thrombolytic going, the softer, the less organized the clot is, the less better your results are.  So it's a little hard to compare studies because some of them look at, you know, getting it within six hours or twelve hours.  But the idea is the earlier you give it, the more likely you are to succeed.

Q   And do we have an indication from the initial

troponin that was given, the initial EKG, that at the time Mr. Reeves presented to the clinic he was in the very acute stages of this STEMI heart attack?

A    Yes.  I think that first EKG is what are called hyperacute T-wave changes, and I believe there's ST elevation when you look at the end of the ST segment. I mean, to me it's a diagnostic EKG.  I've had lots of patients where I say send them to the cath lab based on that; or if it's an outlying hospital, tell them to start a fibrinolytic treatment.  Nevertheless, if you are not able to read the EKG, then I think the second EKG, had they done it in fifteen minutes or so, would be easier to read.

Q    All right.  And that would be based on the amount of time that the T-wave changes generally remain?

A    They're very short.  That's a very transient EKG finding.

Q    Now, you are a cardiologist, correct?

A    Yes.

Q    And you said that with your background you had the ability to look at that first EKG and determine that it was a STEMI heart attack?

A    Yes.  I would be comfortable calling that a STEMI.

Q    What was it, if you could explain to us, in

Kim Klancke, M.D.
January 07, 2025

that first EKG that you observed?  And I'm not

necessarily -- you know what, I'll put it on the screen.

(A discussion off the record was held.)

BY MR. MICHAELS:

Q    The first EKG, Dr. Klancke, you were asked

some questions.  I forget the exact wording, but do you

recall the testimony of Dr. Leonards that he found that

first EKG to be suspicious for a STEMI?

A    I believe that's what he said, yes.

Q    Okay.  And certainly it appeared as abnormal,

fair?

A    Oh, it's grossly abnormal for a

thirty-seven-year-old patient.

Q    Dr. Leonards said it was suspicious for a

STEMI?

A    Yes.

Q    These shipboard doctors testified that they

had access to shoreside cardiologists if they had any

questions or needed help; is that fair?

A    Yes.

Q    Was there any indication, at any point upon

receiving this initial EKG, that Dr. Leonards or any of

the nurses at his request attempted to reach out to a

shoreside cardiologist to help interpret this EKG?

A    None.

Kim Klancke, M.D.
January 07, 2025

Q    Now, as a cardiologist, tell us what you see in this EKG that tells you that this is more likely than not a STEMI?

A    Well, first of all, you've got pretty clear ST elevation in lead aVL.

Q    So where are we looking at?  That would be here?

A    You know, this little baseline wanders, so it's not a perfect EKG.  But I think it suggests ST elevation that you don't really see in one.  So it's not diagnostic.  But what's striking is the reciprocal ST-segment depression.  That's a finding in the -- inferiorly it's three and AVF that go along with large anterior wall infarct.

So that EKG pattern in the limb leads already suggest the possibility of an ST-segment elevation myocardial infarction.  And the problem you have with the B leads is clearly defined in the ST segment.  But if you look at the end of the QRS and use eight or a hundred and twenty milliseconds, that MV-1, MV-2, that clearly intersects the ST-T-wave complex two or three millimeters above baseline, plus I've seen a bunch of EKGs like this before.  They all turn out to be STEMIs.

Q    And in your practice would it have been normal for an emergency room doctor, if they get an abnormal

EKG and can't completely interpret it, to reach out to you and ask what they're looking at?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's typically what happens with this EKG, because I have more EKG reading experience than the emergency room guy.  And if there is any question, if the patient's symptoms aren't typical, then you would just say well, repeat it in fifteen minutes and send me that.

BY MR. MICHAELS:

Q    Now, you had also talked about the Lovenox.

A    Yes.

Q    Do you also -- in terms of the Lovenox that was provided, was that in accordance with the medical standard of care or guideline-directed therapy?

A    No.  It's not in accordance with anything, including the package insert.

Q    All right.  So let's start first, the medical record from the ship indicates that one hundred milligrams of Lovenox was provided intramuscularly, correct?

A    Yes.

Q    And that would mean that a syringe with a hundred milligrams was injected into the muscle of Mr. Reeves?

Kim Klancke, M.D.
January 07, 2025

A     Yes.

Q     Now, you had indicated that intramuscularly would be contraindicated, correct?

A     Yes.  It tends to -- muscles are vascular. You tend to get hematomas, and the absorption I don't think has been studied.  You have no idea what that dose is.

Q     Now, Dr. Leonards testified at his deposition, after this lawsuit had been initiated, that that was a typo and it was actually subcutaneous, correct?

A     Yes.  It's another correction they made in the records.

Q     Okay.  For a STEMI, an acute STEMI, what is the guideline-directed dose and method of administration for Lovenox?

A     So you want to get immediate anticoagulation, so you give -- it's really point three milligrams per kilogram.  He's a big guy, so you give a maximum of thirty milligrams as an IV bolus.  That creates instantaneous anticoagulation for a period of hours until your subcutaneous dose can work.  So you give the thirty milligrams IV, and at the same time you give the subcutaneous dose, and that gets you to almost steady state within a few minutes.

Q     And the IV bolus means that you intravenously

Kim Klancke, M.D.
January 07, 2025

inject the initial thirty milligrams directly into his blood vessels, correct?

A    Yes.

Q    And therapeutically that will start acting within a matter of minutes?

A    Yes.  The IV bolus starts within minutes.

Q    And when it is injected subcutaneous, how long does it take to start having therapeutic impact?

A    Well, it has to be absorbed, and then you have to absorb enough to get efficacy.  I think it takes about three to four hours to reach sort of maximum therapeutic level, and then it takes multiple doses to get to a therapy steady state level.

Q    And how many doses were provided on the ship to Mr. --

A    One dose.

Q    -- Reeves?  One dose.

A    Recommendation is a minimum of two days.

Q    Now, you've said time is muscle when there's a heart attack.

A    Yes.

Q    What is the impact of delaying the initiation -- the therapeutic initiation of Lovenox from a matter of minutes to a matter of hours?

MR. DRAHOS:  Objection to form.

Kim Klancke, M.D.
January 07, 2025

THE WITNESS: The implication is -- see, you essentially get no therapeutic Lovenox, so the implication is a much higher rate of reocclusion and a lower success rate of getting the thing open to a normal level of flow, to TIMI 3 flow.

BY MR. MICHAELS:

Q Now, we've talked about how the Lovenox or the Heparin is preventing new clots from forming, but it's not busting the clot that is already there, fair?

A Correct.

Q So by starting the Lovenox an hour, an hour and a half prior to the administration of the thrombolytic, is that doing anything to open the occlusion?

A No. I think Lovenox, again, is a little different than Heparin. It might be a tiny bit of clot-dissolving capability; but for practical purposes, it just prevents more clots from forming.

Q Now, you were asked a question, you later went back and clarified. I think there was a misunderstanding. Mr. Drahos asked you was the clot in Osceola the next day the same clot. And at first you said yes, then you clarified the same area of clot.

A It's on the same ruptured plaque. So the plaque ruptures, that's the cholesterol material. It

Kim Klancke, M.D.
January 07, 2025

exposes collagen to the blood vessel.  The body thinks

it's a cut, like you cut your skin, and it lays a clot

down on top of the ruptured plaque.  It's not the same

cells from the clot, but it's the same area of exposed

interstitial tissue or connective tissue that propagates

recurrent or ongoing clot formation.

Q    Just to be clear, you're not saying it was the

same actual material making up the clot, you are saying

it was in the same place?

A    The cells are likely different.  So if you got

some flow back, if you think there was partial

reperfusion late, it's probably not TIMI 3 flow.  Based

on the EKGs, there's ongoing EKG evidence of injury.

But it would likely be some of the original cells broken

down or fibrin strands broken down, but then more form

because you're not giving them medication to prevent

clot formation.

Q    Now, assuming that there was an opportunity to

evacuate Mr. Reeves from the ship after the fibrinolytic

regimen had been started, would there be an increased

benefit to getting him to a cath lab, let's say, eight

hours after the event as opposed to twelve hours after

the event?

A    Yes.  If he's not in the group where the pain

promptly goes away and the EKG normalizes, that group

you will sometimes cath more electively.  But in the group where there are persistent EKG changes and evidence of either no reperfusion or inadequate reperfusion, that group would go right to the cath lag at eight hours.

Q    Would there be a benefit to getting him to a cath lab, let's say, four hours post the acute phase, as opposed to eight hours post the acute phase?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes, the earlier the better.

BY MR. MICHAELS:

Q    Time is muscle.

A    That's why this little algorithm says three to twenty-four.  The three hours is the idea that sometimes patients go back or they don't all stay stable.

Q    Now, Dr. Klancke, Mr. Drahos asked you a number of questions about whether you had ever worked on a cruise ship or been in a cruise ship's medical clinic.  Does the body work the same at sea as it does on land?

A    I presume so.

Q    All right.  The heart and heart treatments don't start functioning differently if you are on a boat as opposed to on dry land?

A    I'm not aware of any indication to amend the thrombolytic protocol because you are at a

walk-in-clinic-type situation.

Q    And do you need to be -- would you, Dr. Klancke, need to have previously been in a cruise ship's medical center to know that a fibrinolytic regimen should be started, including the immediate administration of a thrombolytic and an intravenous bolus of Lovenox?

A    No, if a cruise ship called me, I would be acting as an onshore advisor, similar to what they said they had available.

Q    All the things that you would have recommended for an appropriate fibrinolytic treatment, an EKG, a second EKG, an IV bolus of the thrombolytic, Lovenox at the appropriate doses, did they have the ability to do that on a cruise ship?

MR. DRAHOS:  Object to form.

THE WITNESS:  Yes, they did a lot of it.  They gave the tPA appropriately.  I think the aspirin and Plavix were done with a three-hundred-milligram Plavix load.  The only thing they did is they only gave half of the thrombolytic cocktail.

BY MR. MICHAELS:

Q    And your opinion is that the amount of time it took to provide the thrombolytic failed to meet the medical standard of care in the amount of time -- or I'm

sorry, and the dosage of the Heparin failed to meet the standard of care, those opinions remain the same whether or not they could have disembarked him within two or three or four hours, fair?

A    My standard of care as a cardiologist, so as a cardiologist if I've been contacted, I would have recommended they do those things differently.

Q    A cardiological standard of care?

A    Yes.

Q    And you were asked some questions about, you know, there's risks to a tPA, one percent hemorrhage, ten percent major bleeding.  Those risks are secondary to saving someone's life and heart function, correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.  He has an eight to ten percent chance of cardiac arrest with a ventricular arrhythmia with this problem.  He has an in-hospital mortality with this extensive infarct.  It's a high-risk infarct of maybe ten percent.  The best way you can help him is to reestablish flow and interrupt this event.

So he's young, so his bleeding risk is less. Like I said, it may be a half a percent for intracranial bleeding and eight percent for bleeding requiring transfusion.  But those things

Kim Klancke, M.D.
January 07, 2025

pale somewhat in comparison to death or cardiac arrest, I would think, in a ship clinic would be a significant problem for them.

BY MR. MICHAELS:

Q    And, of course, the simple fact is regardless of those risks and regardless of whether they were done in a timely fashion or at the right dosage, the Lovenox and the thrombolytic were decided to be the proper course of action by the ship's doctors, fair?

A    Yes.  And assuming the therapy to fail more likely than not.

Q    Looking at the success rates, had the thrombolytic been administered in a timely fashion and the Lovenox been administered in an appropriate dose, what type of success rates are we looking at at minimizing heart muscle damage and saving his life?

A    We know from earlier trials like GUSTO, there's over a fifty percent likelihood of reestablishing TIMI 3 flow at ninety minutes.  And then more recent trials using Lovenox seem to have a better result with about two-thirds of patients, patients having enough clinical reperfusion that you can do cardiac catheterization in a more leisurely fashion.  So if you do it properly with the intravenous Lovenox, I would say there's probably a two-thirds chance of him

Kim Klancke, M.D.
January 07, 2025

being successful in early reperfusion versus a one-third chance if you do it properly.  And if you do it improperly like this, the chances of reperfusing to TIMI 3 flow are -- at least in the GUSTO trial, are twenty-eight or twenty-nine percent.

Q    Now, you were asked if you know what type of EKG was used.  You'd agree with me that regardless of what type it is, they should have an EKG that works on the ship?

A    Well, they should have a standard EKG machine. They are all about the same.  There is a thing on there where you can calibrate them, that up and down square wave.  On the first three EKGs it is useful to a cardiologist because it establishes that the boxes are one-millimeter boxes and you can make sure they're -- you know, they're the right number under the square wave.

The problem with the subsequent EKGs is there is no standardization.  The rate in the width of the QRS complex was appropriate, so I'm assuming it's a twenty-five-millimeter paper speed.  But they're not really EKGs.  They are taken off of -- I believe they're taken off of a full disclosure telemetry unit.  I don't know why they didn't just do real EKGs.  It's better and easier for the doctors to use.  But assuming it's a ten-

Kim Klancke, M.D.
January 07, 2025

millivolt standard on the subsequent EKGs, there's five millimeters of ST depression -- or ST elevation, rather, persistent through about 4:00 a.m.

Q    And regardless of what type of machine was used, you have the ability to read and interpret it?

A    Yes.

Q    Now, how long is it that you treated patients for?  You were asked questions about when you stopped treating patients.  How long were you a treating cardiologist and/or interventional cardiologist?

A    Thirty-seven years, but this has been a lifelong interest.  So all of this therapy evolved during the course or the heyday of my career.  So it's kind of what I did and brought to Daytona Beach.  So it's just an interesting case to me because it spans thirty-five years of medicine in terms of the various treatments that you can provide.  But giving a thrombolytic without an antithrombotic agent, that's 1988, 1990 medicine.

Q    And you said --

MR. DRAHOS:  Todd, I'm sorry, I got to go or else I'm going to miss my flight.

MR. MICHAELS:  I got to finish my cross.  I don't have that much more.

MR. DRAHOS:  No, I'm saying I'm going to miss

Kim Klancke, M.D.
January 07, 2025

the flight, so I don't have a choice.  I waited literally to the last second.  If you need to reopen this and ask him the rest of your cross, I have no objection.

MR. MICHAELS:  I don't know if you could switch over to a cell or something, Mike; but it's not really fair for you to go three hours when I've done twenty-five minutes of cross and say I've got to stop now and make him come back at another time and have to remember what my trend of thoughts were.  I can get through this.  If you can switch to a cell, or if there's a later flight, you can just --

MR. DRAHOS:  How much more time do you think you have, because I'm literally going to race to the airport now?

MR. MICHAELS:  I can be done in ten minutes if we can just get to it.

MR. DRAHOS:  I'm sorry, Todd, I can't agree. I have to run to the airport.  I'll reopen it at my cost if there are other questions that need to be asked of him.

MR. MICHAELS:  Mike, you can't just leave in the middle of a depo.  I'm going to ask my questions.  I think I have a right to if you choose

Kim Klancke, M.D.
January 07, 2025

to leave.

MR. DRAHOS:  Well, I'll going to object then, Todd.  I mean, you know, it's professional courtesy, I told you I had a flight.  I've waited until the last second.  I got to go, man, and I can't be in a car listening to you asking questions.  That's just not a proper environment for me doing that either.  You can do whatever, motions you need to file with the Court.  I will explain to the Judge later, but I can't agree to continue.  I have to suspend the depo.

MR. MICHAELS:  All right.  I am going to, for record purposes so that I don't lose my train of thought, continue with my questioning.  We can deal with this with the Judge.  If he wants us to come back and do it again, we will.

MR. DRAHOS:  Okay.  Very good.  But it's at my objection, and anything that you elicit from him I'm going to object at trial later, so...

MR. MICHAELS:  I understand.

MR. DRAHOS:  All right.  Thank you, guys.

MR. MICHAELS:  Thank you.  Have a safe flight.

(Mr. Drahos exited the Zoom deposition.)

MR. MICHAELS:  Just for the record, Mr. Drahos has left to go to the airport.

Kim Klancke, M.D.
January 07, 2025

BY MR. MICHAELS:

Q    You've testified that since 2019 you've been the medical director for your practice.  What does that consist of?

A    It consists of policy and procedure and fielding phone calls from doctors who are unhappy with something that our practice has done or disagreed with some of our therapies.  I give some lectures to medical groups.  The practice was sold a year ago, so it's been much less active.  Over the last year I helped them with value-based contracting and that sort of thing.

Q    As the medical director do you stay up to date with the latest trends and cardiac treatments and therapies?

A    Even more up to date than when you're practicing sixty or seventy hours a week.

Q    Whether medical treatment is provided on a ship or on land, is it important that the recordkeeping is accurate?

A    Yes.

Q    Is it important, for instance, that times on an EKG are accurate?

A    Absolutely, because it's useful to the downstream treaters.  It's important for medical records to be accurate, particularly when you are transferring

Kim Klancke, M.D.
January 07, 2025

patients.

Q    And if the time on the EKGs was inaccurate, whose EKGs were they?

A    They were on the -- the ones on the ship.  The first three look to be inaccurate.  I think the ones they're pulling off the monitor probably are the correct times.

Q    So fair to say that you were relying on Carnival for that timekeeping?

A    Yes.

Q    You don't have the ability to be in their clinic?

A    I don't have the ability to be in their clinic.  And, again, I'm doing some of it relying on them to practice emergency work in a sort of standard fashion, obtaining an EKG, I'd say, within ten or -- ten minutes of arrival, that type thing.

Q    You were also asked whether it would have been possible that twenty EKG strips were printed but nineteen were discarded.  Would that be medically appropriate to discard nineteen of a patient's twenty EKG strips?

A    It would be medically inappropriate and it just would be ludicrous.  I've never seen it done.  They would have to hit the button -- you know, it takes

Kim Klancke, M.D.
January 07, 2025

twenty or thirty seconds to run one.  They would have to hit the button, the print button so the EKGs spit out from the machine every minute.  I don't know why they would do that.  It just doesn't make any sense to do twenty EKGs.

Q   We've talked a little bit about Mr. Reeves' current medical condition.  What of his current medical condition, his heart's current medical condition do you attribute, more likely than not, to the delay in providing the thrombolytic or the dosage of the Heparin -- or of the Lovenox?

A   One would be his need for an ICD.  If he were even a little bit better you might be able to get by without it, but he meets criteria for ICD implant now. Number two is that everything in cardiology revolves around ejection fraction.  So the better your ejection fraction, the better your outlook long term.  So incremental gains in ejection fraction become important for reasons that you might not expect.

Young patients have an incidence because of a long time frame of recurrent events.  His ejection fraction is just barely compatible with normal function in life.  So another heart attack, he's got a very high chance of being fatal.  You've taken away all of his reserve.  Your heart has a certain amount of reserve.

So you can lose forty percent of it and still have enough left to function.  But say he's lost, you know, thirty-five or thirty-eight percent, you take away another ten percent; and now it's no longer compatible with life.  So he lives life with a gun to his head from a recurrent ischemic event type.

Q    What future complications or damages is he more likely than not to experience as a result of the delay in the dosage?

A    In most people over time -- he developed frank congestive heart failure, probably on the ship.  I think his chest x-ray showed some congestive failure; and at points in his therapy he was hypoxic, even on supplemental oxygen.  So I think he had enough of an injury to develop congestive heart failure on the ship.

If you can reopen and even keep him out of congestive heart failure, that improves his outlook.  He may be able to get by on a lessened medical regimen.  But it depends on how quickly -- because time is muscle, how quickly you jump on the problem, make a diagnosis and make an effort to get this thing re -- get his artery reopened.

Q    And are you opining more likely than not that had he been provided proper dosage of Lovenox and timely administration of the thrombolytic, that they would have

been able to reperfuse him within that ninety-minute or two-hour period?

A    I believe so.  I mean, had they made this diagnosis, you know, by 17:00 -- I'm sorry, by 7:00, is 19:00, and they got the thrombolytic in, they got a good chance to reperfuse him in the sixty-minute time frame.

Q    And what is the basis of that opinion?

A    Just the normal times to reperfusion.  Again, the average for a thrombolytic is in the range of forty-five to sixty-minute average time for reperfusion. So you start the thrombolytic shortly after 19:00, you would have certainly the opportunity to get it in over an hour and a half.  I hate this math.  At 20:30, give him sixty minutes, is 21:30.  I think you've got a very reasonable chance to have him open by 21:30, which is going to be -- it comes in at 18:00 -- about three and a half hours after the onset of his symptoms.  He may have some degree of myocardial infarction; but if those things had transpired, it would be significantly less.

Q    Do you expect the damages that he suffered as a result of the dosage and the delay to impact his life expectancy?

A    Yes.

Q    Now, we had talked about -- and are you able to -- I think you did quantify that.  When you were

shown the AHA guidelines, you had asked -- you had asked

Mr. Drahos to scroll down.  What are the guidelines for

reperfusion?  What do you look for?

     A    Oh, I can't remember how the guidelines are

laid out, but there's -- there will be a discussion of

how you judge reperfusion clinically.  Keep scrolling.

Stop.  Go back.  It looks like it's about six or seven.

Stop.  Six point four is the adjunctive therapy.

     Q    Would it be five point two?

     A    That would be the transfer recommendations.

As I recall, there's a discussion of how to judge

clinically the --

     Q    Well, let me ask you.  You said the three

things you generally look for, relief of pain,

significant improvement in the EKG and reperfusion

arrhythmias.

     A    Yes.

     Q    Did we see any evidence of reperfusion

arrhythmias?

     A    No.

     Q    Did we see any significant improvement in the

EKG?

     A    Maybe at 8:00 in the morning, but not at the

4:00 a.m., 4:09 EKG.

     Q    And with the intravenous Lovenox -- I'm sorry,

with the subcutaneous Lovenox, is that about when we would expect his therapeutic ability to be peaking, eight in the morning, twelve hours later?

A   It's gone in twelve hours.  So you would expect -- if you gave it at 19:29, you'd expect it to peak around midnight.  Three and a half, and then eight and a half.  You'd expect it to be gone by 8:30 in the morning, but you would expect it to be -- have little or no activity by 4:00 a.m.

When you're doing a stenting procedure, if they've not had any Lovenox in the previous four to eight hours, I believe, you give an adjunct dose IV in the cath lab.  So if it's been more than eight hours since the previous dose, you give another IV dose in the cath lab as it starts wearing off.  It peaks at about three or four hours so that the dose is peaking around midnight to 1:00 a.m., and then it's going down and wearing off after that.

Q   Dr. Klancke, are all the opinions that you provided today within a reasonable degree of medical or cardiological probability?

A   Yes.

MR. MICHAELS:  I have no further questions.

Dr. Drahos, is there any redirect?  Just kidding, Mr. Drahos isn't here.

Kim Klancke, M.D.
January 07, 2025

We'll read, Andrea.  And I assume that Mr. Drahos is going to order; but regardless, I'm going to order a standard and an e-tran copy.

(The proceeding was concluded at 12:39 p.m., and reading and signing of the deposition was not waived by the witness and all parties.)

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

I, Andrea C. Rivera, Professional Court Reporter and Notary Public, State of Florida, certify that the witness, KIM KLANCKE, M.D., remotely appeared before me on this 7th day of January, 2025 and was duly sworn or affirmed.

Signed this 16th day of January, 2025.


_____
Andrea C. Rivera, Court Reporter
Notary Public, State of Florida
Commission Number:  HH185694
Expires:  January 20, 2026