**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:24-cv-21295-RAR

CHAD REEVES,

Plaintiff,

v.

CARNIVAL CORPORATION,
a Panamanian Corporation,

Defendants.
_________________________________/

## PLAINTIFF'S *DAUBERT* MOTION

Plaintiff, CHAD REEVES, by and through undersigned counsel, hereby files his *Daubert* Motion and in support thereof states:

### I. CARNIVAL'S MEDICAL EXPERTS CANNOT "MAKE UP" NONEXISTENT FACTS TO SUPPORT THEIR SPECULATIVE OPINIONS

This is a maritime medical malpractice action which alleges, *inter alia*, failure to properly and timely treat Carnival passenger Chad Reeves, a Virginia firefighter, who was undergoing a STEMI heart attack aboard Carnival's vessel shortly after it left Port Canaveral. Time is of the essence in treating a STEMI heart attack. The medical saying is that "time is muscle," meaning that the more time it takes to diagnose and treat a STEMI heart attack, the more damage to the heart muscle, and therefore heart function.

Carnival's own medical records produced during discovery reflect that three – and only three -- EKGs were performed and printed out for Mr. Reeves. In fact, they were produced to the Plaintiff with a handwritten denotation of Roman Numerals I, II, and III. According to the time records, the first occurred at 6:47 p.m. and the second occurred at approximately 7:17 p.m. The

third occurred at 8:27 p.m. One of the ship's physicians, Dr. Desai testified that he arrived at the clinic after the second EKG, which was the EKG that confirmed Mr. Reeves was having a STEMI heart attack.

The problem for Carnival is that the timing of the EKGs it produced reflects the negligence of Carnival's physicians in failing to timely treat Mr. Reeves' STEMI heart attack. As a result, Carnival's two retained expert physicians, Dr. John Setaro and Dr. Nure Khoury, whose depositions were taken on January 8 and 10, 2025, have provided speculative opinions by providing completely undocumented, unfounded, and "made up" facts that there must have been more than three EKGs taken/printed – despite the lack of any such evidence.

During discovery Carnival disclosed three EKG printouts as part of its medical records. These are the **only** EKG printouts contained in Carnival's medical record for Mr. Reeves. When they were produced, each bore a handwritten notation for Roman Numerals I through III. The medical record confirms that the first EKG strip was printed out prior to 6:57 p.m.; the second was printed out prior to 7:17 p.m. and the third was printed out prior to 8:27 p.m. Carnival's experts concede that the second (7:17 p.m.) EKG confirms that Mr. Reeves was undergoing a STEMI heart attack. However, because the STEMI heart attack was diagnosed by 7:17 p.m., Carnival has no excuse for why a thrombolytic (clot buster) was not administered until 9:05 p.m. Accordingly, although there is absolutely no support for such speculation, Carnival has had its witnesses speculate -- without any evidence whatsoever -- that there must have been more than three EKGs printed, and that the Roman Numerals handwritten on the three EKGs in the medical chart do not necessarily correlate with the timing (7:17 p.m.) for the second (Roman Numeral II) EKG, when Carnival physicians diagnosed Mr. Reeves as undergoing a STEMI heart attack.

This "speculation" first sprang to life at Nurse Sony Thomas' deposition on December 9, 2024. Nurse Thomas is still employed by Carnival. (Exhibit A, Thomas Depo., p. 14). Crucially, Nurse Thomas testified that she had absolutely no independent recollection of this event. (Exhibit A, Depo, p. 61). Thus, she was testifying solely from the medical record. She conceded that she did not remember the EKGs and she did not review the three EKGs, contained in Carnival's medical records and disclosed to Plaintiff under Rule 26. (Exhibit A, Thomas Depo., p. 11).

During her examination by Plaintiff's counsel she refused to concede simple matters such as when she wrote that an event had been done in the chart by a certain time, the event must have occurred *before* the time it was entered into the chart. (Exhibit A, Depo., p. 29-30). She did not remember if there was a first, second or third EKG done, even though that is what the records that she entered into the medical chart reveal. (Exhibit A, Depo., p. 35). Nevertheless, on cross examination by Carnival's counsel she testified that the Roman Numerals I, II, and III do not coincide with the EKGs' timing. "It doesn't have any relationship with time." (Exhibit A, Depo., p. 65). Notwithstanding the fact that she stated that it was "like a chronology, like a Roman letter," she then stated "it doesn't mean that really its first one, second one, or third one." (Exhibit A, Depo. p. 65).

Then, without any evidence in the record that *more* than three EKG results were *ever* printed out, Nurse Thomas agreed with her own counsel's leading question that one of the two Carnival physicians (for whose negligence Carnival is currently being sued) "went through all of the EKG strips that were printed and among the multiple pages, picked out this page, this page, and this page for whatever reason?" She responded "uh-huh." (Exhibit A, Depo., p. 66). Question: Is that accurate, is that what happened here? Answer: Yes, I **think** so. Like yeah. (Exhibit A,

Depo., p. 66) (Emphasis added). Nurse Thomas had no memory of the event. Dr. Leonards, the physician who ordered and read the EKGs, did not testify to any other possible EKGs.

Nurse Thomas' speculation is the only basis for the opinions of Carnival's experts. For instance, its emergency medicine expert Dr. Nure Khoury testified:

> Q. Now you, you had also said, I think that there were more than three EKGs first printed. What is the basis of that?
>
> A. Just that there is a STEMI occurring, or at least an evolving STEMI. If it were me treating onboard a ship, I would probably do more than three EKGs. **There's probably malfunction so the machine, etc. So I'm sure there were numerous EKGs taken**.
>
> Q. So – so you have – other than the fact that if it was you and based on the condition, you would do more than three. **You have no evidence that there were more done; correct?**
>
> A. **I don't – I don't have evidence, but I just can – yeah, I can say that there likely was.**

(Exhibit B, Khoury Depo., p. 147-148). (Emphasis added). He also responded to the following direct question:

> Q. **Do you have any evidence whatsoever that there were more EKG strips printed out which were not retained?**
>
> **A. No, I don't have any evidence to that.**

(Exhibit B, Khoury Depo., p. 149). (Emphasis added).

Likewise, Carnival's cardiology expert, Dr. John Setaro, purports to rely upon Nurse Thomas' unfounded (not based upon her own memory or the medical records) **speculation** that there must have been more than three EKGs printed:

> Q. Likewise – well, let me move past that. In the note that is entered at 7:17, we also have an indication that the second EKG was performed and reviewed by the doctor; correct?
>
> Mr. Drahos: Object to the form.

A: Yeah. And again, here's where it's not entirely clear because in her testimony, Nurse Thomas did say that not all the EKGs were saved.

So it's not entirely clear to me which EKG this refers to or if it's even one that we have the ability to look at at this time.

Q. Okay. Well, again, what I'm – want to do here is talk about not the narratives of people who are being sued, you know, not a spin by the expert who's here to defend them. But what it actually says in black and white on a paper contemporaneously.

Mr. Drahos: Object to the form. Move to strike the commentary.

A: Yeah, I'm just saying that something is listed as an EKG. I'm not – I don't have information on whether that's something we can see right now.

(Exhibit C, Setaro Depo., 76:2-25). The questioning continued:

Q. You've already told us that it would be medically inappropriate to discard EKGs strips if they were not simply copies of other strips that were already part of the record; correct?

MR. Drahos: Object to the form.

Q. Correct?

A. Yes. I mean, if they represent new data in the care of the patient, they should be preserved.

Q. And what the record says is that by 7:17, a second EKG had been performed and reviewed; correct?

A. Yes.

Q. That would be consistent with the guideline that the first is taken within 10 minutes, and if it's abnormal, it's repeated within 15 to 30 minutes; correct?

A. Yes.

(Exhibit C, Setaro Depo., 77:13-78:3). Dr. Setaro continued to rely on speculative suggestions of additional strips:

Q. And regardless of what the first EKG – and we received the three EKGs from that evening that are part of the record, regardless of what the first

EKG does or doesn't show, the second EKG very clearly shows a STEMI. Fair?

Mr. Drahos: Object to the form.

A. So the second EKG that we have available for review, but as I said before, I don't know that that – some of them were tossed away, that that represents the second EKG that was actually taken per this note. That's all I'm saying. I don't know.

Q. You don't know that a vandal didn't break into the medical record and swap out one EKG with another; correct?

Mr. Drahos: Object to the form.

A. Well, that's sort of, you know, a questionable thing for me to comment on.

But what I would say is that there is testimony by Dr. Desai that the EKG that was done around 8 p.m. was the one that became diagnostic.

Q. Dr. Desai wasn't present at the medical clinic until he was called down after the second EKG; correct?

Mr. Drahos: Object to the form.

A. I believe he was there for – for the 8 o'clock time period.

Q. The testimony is that, upon reading the second EKG and realizing it was a STEMI, Dr. Leonards called for Dr. Desai. Yes or no?

Mr. Drahos: Object to the form.

A. That's his testimony. But again, I'm not sure which is the second EKG of what we have available to look at now.

(Exhibit C, Setaro Depo., 78:11-79:22). Nevertheless, Dr. Setaro had to concede that according to the medical record there were only three EKGs taken and printed. (Exhibit C, Setaro Depo., 83:10-18).

Q. And we know from the medical record that the second – that the second EKG had been performed and reviewed by 7:17 p.m.; correct?

A. Well, a second EKG was performed and reviewed. I don't know that is the same one that we have here marked Roman numeral II. I think that's the point I'm making.

Q. Dr. Leonards indicated that the one marked Roman numeral II was the second EKG; correct? He just didn't know what time it was taken.

Mr. Drahos: Object to the form.

A. Yes he did testify to that.

Q. What Dr. Leonards also testified to was that, after the first EKG, he was suspicious that it might be a STEMI, and after the second EKG, it was confirmed that it was a STEMI; correct.

Mr. Drahos: Object to the form.

A. That was his testimony.

(Exhibit C, Setaro Depo., 84:3-12).

Reeves' counsel further questioned Dr. Setaro on his rank speculation:

Q. Well, let me ask you a question. Why in the world – why in the world would the medical staff on a ship have thrown out or discarded some of the EKGs for a STEMI patient? Does that even sound remotely believable to you?

Mr. Drahos: Object to the form.

A. Again, as we said, if there were pure copies of one that was already done, again, sometimes the machine will put out several copies to go into different charts or to be sent to a central reader somewhere, that would be legitimate. Otherwise, I would disfavor, you know, throwing out real medical data.

Q. If they were pure copies, then we have all the data. Then it would simply be a copy, it wouldn't be a separate EKG; fair?

A. Yes, that's – that's logical reasoning. **But again, I don't have information on what happened in this case.**

(Exhibit C, Setaro Depo., 85:14-86:9).

Q. And in this case, no one ever mentioned throwing out a medical record until a year and a half later under oath at a deposition defending themselves in a medical malpractice case; correct?

Mr. Drahos: Object to the form.

A. Yeah. There's no notation in the chart about eliminating records. That is true.

Q. Because the only other logical explanation is that at 7:17 they knew it was a STEMI and waited over an hour and a half to give a thrombolytic.

Mr. Drahos: Object to the form.

A. But again, I would have to ask in turn why would they do that?

Q. Incompetence. Negligence. An emergency doctor from South Africa with minimal experience who had no ability to recognize a STEMI until the senior doctor came down and told him what was going on. I can go on. Do you want me to keep answering?

(Exhibit C, Setaro Depo., 88:10-89:6).

**MEMORANDUM OF LAW**

Speculative testimony is prohibited by Federal Rule of Evidence 701(a) which provides that if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (a) rationally based on the witness's perception. The Advisory Committee Notes for 1972 state that limitation (a) "is the familiar requirement of first-hand knowledge or observation."

The Eleventh Circuit recently noted that the Supreme Court has explained that the purpose of the expert admissibility rules is to enlist the federal courts as "gatekeepers" tasked with scrutiny of "speculative" and "unreliable expert testimony." *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 2023 WL 2733512 (11th Cir. 2023) (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). The Eleventh Circuit considers three factors in a *Daubert* analysis:

(1) Whether the expert is qualified to testify competently regarding the matters he intends to address;

(2) Whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;

> (3) Whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact at issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 150 F.3d 548, 562 (11th Cir. 1998). These inquiries are referred to as the qualification, reliability, and helpfulness requirements. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

The Plaintiff does not dispute the qualifications of Drs. Setaro and Khoury in their respective fields. However, there is no reliable "methodology" utilized by these experts as to their speculative opinions concerning additional EKGs, and therefore their testimony will not be helpful to the jury. As to the reliability prong the Eleventh Circuit holds that "rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). Here, the only discernable methodology these experts are utilizing is speculation.

As the Supreme Court explained in *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997), "trained experts commonly extrapolate from existing data." But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 146. *See also, U.S. v. Frazier,* 387 F.3d 1244 (11th Cir. 2004).

As the Eleventh Circuit noted in *Frazier,* "the importance of *Daubert's* gatekeeping requirement cannot be overstated" as its objective is "to ensure the reliability and relevancy of expert testimony" *Id.* at 1260 citing *Kuhmo Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). The goal is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in a relevant field." *Id.*

This is particularly important because an expert's opinion can be "both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. The Eleventh Circuit stressed that no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* at 1260 citing Fed.R.Evidence 703.

As previously noted, Reeves does not contend that Drs. Setaro (cardiologist) and Khoury (emergency medicine) are unqualified to offer opinion testimony in this case. But that is hardly sufficient:

> Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable "any" conceivable opinion the expert may express. . . . Quite simply under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility.

*U.S. v. Frazier*, 387 F.3d at 1261.

Where, as here, an expert's opinion is not connected to existing data, except by the *ipse dixit* of the expert, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. *See also, McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts."). Here, the pertinent facts simply do not establish that there were additional EKGs printed out. Drs. Setaro and Khoury are relying merely on their *ipse dixit* (because I say so). Indeed, their opinions could be termed *ipse speculatio* (because I speculate).

As one court put it:

> Simply stated, just because someone has a medical degree or is board-certified in emergency medicine, that does not authorize him to testify about

> a theory not based on a solid foundation. As Judge Posner explained: "A district judge asked to admit that scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculations offered by a genuine scientific." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). Here we have a genuine doctor presenting unsupported medical speculation. He cannot just make up facts to support his opinions – he cannot offer opinions that are "educated guesses dressed up in evening clothes." *Siharatha v. Sandoz Pharm. Corp.*, 131 F.Supp.2d 1347, 1373 (N.D. Ga. 2001).

*Clarke v. Schofield*, 632 F.Supp.2d 1350, 1363 (M.D. Ga. 2009). Here, Dr. Setaro and Khoury, while educated, are offering nothing more than guesses and speculation, which have no place in the courtroom.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's *Daubert* Motion to preclude speculative opinions concerning the possibility that "other" EKG strips were created and discarded.

Respectfully submitted by:

THE HAGGARD LAW FIRM
330 Alhambra Circle, First Floor
Coral Gables, Florida 33134
Telephone: (305) 446-5700
*Co-Counsel for Plaintiff*

By: /s/ *Todd J. Michaels*
**TODD J. MICHAELS, ESQUIRE**
Florida Bar No.: 568597
**ADAM C. FINKEL, ESQUIRE**
Florida Bar No.: 101505
tjm@haggardlawfirm.com
acf@haggardlawfirm.com
jbush@haggardlawfirm.com

- and -

PHILIP D. PARRISH, P.A.
7301 Southwest 57th Court, Suite 430
Miami, Florida 33143
Telephone: (305) 670-5550

*Co-Counsel for Plaintiff*

By: ___*/s/ Philip D. Parrish*_________
**PHILIP D. PARRISH**
Florida Bar No.: 541877
phil@parrishappeals.com
betty@parrishappeals.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this February 7, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties identified on the Service List below in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**SERVICE LIST**

Michael J. Drahos, Esquire
W. Cooper Jarnagin, Esquire
Ashley Genoese, Esquire
GRAYROBINSON PA
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Telephone: 561-268-5727
Facsimile: 561-268-5747
Michael.drahos@gray-robinson.com
Cooper.jarnagin@gray-robinson.com
Ashley.genoese@gray-robinson.com
***Counsel for Defendant***

Philip D. Parrish, Esquire
PHILIP D. PARRISH PA
7301 S.W. 57 Court, Suite 430
Miami, Florida 33143
Telephone: 305-670-5550
Facsimile: 305-670-5552
phil@parrishappeals.com
betty@parrishappeals.com
***Co-Counsel for Plaintiff***

Todd J. Michaels, Esquire
Adam C. Finkel, Esquire
THE HAGGARD LAW FIRM
330 Alhambra Circle
Coral Gables, Florida 33134
Tel: 305-446-5700
Fax: 305-446-1154
Primary: TJM@haggardlawfirm.com
Primary : ACF@haggardlawfirm.com
Secondary: Jbush@haggardlawfirm.com
***Counsel for Plaintiff***