UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-cv-21295-RAR

CHAD REEVES,

Plaintiff,

-vs-

CARNIVAL CORPORATION, a Panamanian Corporation,

Defendant.

---

VIDEOTAPED DEPOSITION OF

SONY THOMAS, RN

(Pages 1 through 74)

(VIA ZOOM VIDEOCONFERENCE)

Monday, December 9, 2024

Scheduled for 12:00 p.m.

Commencing at 12:00 p.m. to 1:27 p.m.

Reported by: Randi Ginsberg, Stenographic Reporter



REMOTE APPEARANCES:

On behalf of the Plaintiff:

THE HAGGARD LAW FIRM
330 Alhambra Circle, First Floor
Coral Gables, Florida 33134
305-446-5700
jpp@haggardlawfirm.com
BY: JOSHUA P. PADRON, ESQUIRE

On behalf of the Defendant:

GRAY, ROBINSON, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
561-268-5727
michael.drahos@gray-robinson.com
BY: MICHAEL DRAHOS, ESQUIRE

Also present: Andy Clarke, Videographer



\- - -
INDEX OF PROCEEDINGS
\- - -



| WITNESS: SONY THOMAS, RN | PAGE |
| --- | --- |
| Direct Examination by Mr. Padron | 6 |
| Cross-Examination by Mr.Drahos | 60 |
| Redirect Examination by Mr. Padron | 66 |
| Certificate of Oath | 71 |
| Reporter's Deposition Certificate | 72 |
| Witness Notification Letter | 73 |
| Errata Sheet | 74 |



\- - -
E X H I B I T S M A R K E D
\- - -

FOR THE PLAINTIFF



| O: | DESCRIPTION | PAGE |
| --- | --- | --- |
| No. 1 | Nurse Thomas' Notes | 10 |
| No. 2 | Consultation Notes | 10 |





P R O C E E D I N G S

\- - -

REPORTED REMOTELY FROM PALM BEACH COUNTY, FLORIDA

Videotaped Deposition taken before Randi Ginsberg, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- - -

THE VIDEOGRAPHER: We are on the video record, this is the beginning, the time is 12:00 p.m.

This is the video deposition of Sony Thomas, commencing today, Monday, December 9, 2024, in the case styled Chad Reeves versus Carnival Corporation, a Panamanian corporation.

We are meeting via Zoom. The court reporter is Randi Ginsberg -- I'm sorry, meeting via Teams. The court reporter is Randi Ginsberg, the videographer is Andy Clark with Champion Legal.

Will counsel still please state their appearances for the record.

MR. PADRON: Good afternoon, Joshua Padron

on behalf of the plaintiff.
MR. DRAHOS: Michael Drahos from the law firm of Gray Robinson on behalf of the defendant, Carnival Corporation, and the witness, Ms. Thomas.
THE VIDEOGRAPHER: Court Reporter, please swear in the witness.
THE STENOGRAPHIC REPORTER: Please raise your right hand.
Do you swear to tell the truth, the whole truth and nothing but the truth?
THE WITNESS: Do I need to repeat that?
THE STENOGRAPHIC REPORTER: No. You just say, yes, I do.
Let me repeat it again.
THE WITNESS: Yes, I do.
THE STENOGRAPHIC REPORTER: Okay. That's fine. Thank you.
You may proceed.
\- - -
Thereupon,
SONY THOMAS, RN,
having been first duly sworn or affirmed, was examined and testified as follows:
DIRECT EXAMINATION



BY MR. PADRON:
Q Hi, Ms. Thomas. How are you?
A I'm good, sir. How are you?
Q Good, thank you.
So as you're aware, as you just heard, I represent Chad Reeves in this matter. He's the individual that suffered from a heart attack aboard the Carnival Freedom on July 8, 2023. Do you remember that incident?
A I don't remember, no, but in the case note, I know I'm dealing with that case but I don't remember.
Q Okay. You obviously don't have a specific recollection of something that happened a year and a half ago, but you know you were involved with his treatment, right?
A Yes.
Q Okay. So I am going to turn off my video. Let me know if you have an issue hearing me or understanding me. The way this records, it just works out better if I'm off video, but if that ends up being an issue, you don't understand something I'm asking, please let me know. Okay?
A Okay.
Q Ms. Thomas, could you give us your full



name? I want to make sure I'm pronouncing it correctly, and your date of birth.
A Sony Thomas, [redacted]
Q That was [redacted]96?
A Yes.
Q Have you ever given a deposition before?
A No.
Q So this is -- essentially what a deposition is is a question-and-answer session. Ms. Ginsberg just swore you in to tell the truth, the whole truth and nothing but the truth. That's all we are looking for. Okay?
A Okay.
Q This is being video recorded. That's just in the event that for whatever reason you are unavailable for trial, portions of this could be played at trial. Okay?
A Okay.
Q Is anyone in that medical center with you right now?
A No.
Q Okay. Throughout the deposition, there's going to be times that you hear your attorney, Mr. Drahos, make objections. I ask that unless he specifically advises you not to answer my question,



that you go ahead and answer it anyways. Okay?
A Okay.
Q So it's going to sound like I -- I might ask a question, you'll hear -- you will hear him say objection, form. You don't need permission then to go ahead and answer it. Just once he's made that objection, you can go ahead and answer it anyways. Okay?
A Okay. I don't know that's how this works. This is my first time, so I don't know.
Q I think you'll get it once you hear the first one and I'll clarify it then -- then too just so we're on the same page.
Ms. Thomas, you're doing great so far with the yeses and the nos. Please keep that up.
So you met Ms. Ginsberg, she's the one that swore you in. She's writing down everything that we're saying, every yes, every no, every uh-huh or uh-uh but --
A Okay.
Q -- in order to make a clean record, I'm going to need a verbal response to everything. So I can see you shaking your head, nodding your head, and I know that you're agreeing or disagreeing, but there might be times that you hear me say, you know,

is that a yes, is that a no. Just because we need that documented for the record. Okay?
A Okay. Okay. I understand.
Q For that same reason that we want a clean record, we're going to take turns speaking. So let's try not to speak over one another. Please let me ask my full question and then go ahead and answer after.
A Okay.
Q I don't think this is going to take too long. I'm hoping to keep this under an hour, hour and a half. We've taken quite a few depositions so far, so that's, I guess, the benefit of you going later on in depositions. But if at any point you need a break, whether, you know, you need to take a call or a five-minute break, let me know. This isn't meant to be a marathon. You know, you can take a break whenever you want. Just let us know.
A Okay, sure.
Q It's not my intent to get into anything that's attorney/client privilege. If I do, I'm sure that your attorney will step in and tell you not to answer and make the appropriate objection at that point. Does that make sense?
A Okay. Yes.



Q That being said, how did you prepare for today's deposition?
A I just go through my notes. That's it.
MR. PADRON: Okay. Let me, I guess, bring up what we'll mark as Exhibit 1.
(Plaintiff's Exhibit No. 1 marked.)
BY MR. PADRON:
Q Let me know when you can see my screen.
A Yes, I can.
Q Are these the notes that you reviewed?
A Yeah, that's my note. Yeah, that's the same note.
Q Okay. It's a 40-page document. Is this what you reviewed in preparation of today's deposition?
A Yeah. I go through whatever things I wrote out on my side, my notes, yeah.
Q Okay. Anything besides your notes in this document that you reviewed?
A No.
MR. PADRON: Let me show you what we will mark as Exhibit 2.
(Plaintiff's Exhibit No. 2 marked.)
BY MR. PADRON:
Q Can you see that?



A Yes.
Q Okay. Did you review this consultation form?
A I cannot see this consultation form because I'm not in that shift. I can only get the medical records, so the consultation form is not available for me.
Q I have it on the screen right now. Can you see it?
A Yes, I can see now.
Q Okay. So you did not review this in preparation of today's deposition?
A No.
Q Anything in what we're going to mark as Exhibit 2, did you review the EKGs?
A I don't remember.
Q You don't remember if you reviewed this or you don't remember seeing this?
A I don't remember this EKGs and I don't review this EKGs.
Q Okay.
A It's not that I remember for me.
Q You did not review these before today's deposition, correct?
A No. Yes.



Q What about that x-ray that we just saw?
A As I told you earlier, I can only available the medical records, so those documentation I cannot see because I'm not in that shift.
Q Okay. Then how did you review the -- your notes in Exhibit 1?
A The medical notes, I got it because I have deposition, yeah. So the other documentation, I cannot get it.
Q Okay. So besides your notes that were sent to you by Mr. Drahos or Mr. Drahos' office, were you sent any other documents to review?
A No.
Q Okay. So the only thing that Mr. Drahos sent you was this 40-page document titled "Case Summaries" that has your notes on it?
A Yes.
Q Is that correct?
A Yes, my notes, yeah.
Q Now I don't want to know what you spoke about with Mr. Drahos, but did you speak with him before today's deposition?
A Is that when I went to answer? No?
Q Yes.

MR. DRAHOS: Yes. You're allowed to tell him whether we spoke and when, but not what we talked about.
THE WITNESS: Okay.
He just helped me to go through my notes. That's it.
BY MR. PADRON:
Q Okay. So -- and again, just like he just told you, I don't want to know what you talked about. When did you meet with him?
A I don't remember the date. I think it was on December 5th, December 5th.
Q And was that on Microsoft Teams like we are right now, was it on Zoom, was it on the phone? How did the two of you speak?
A The same platform that we spoke at Microsoft Teams.
Q Okay. How long did the two of you meet for?
A I don't see the time. No, I don't know. I don't.
Q Was it more or less than 30 minutes?
A I can't tell you. Like it's not that much time. I don't --
Q And what is not that much time? For me,



that might be five minutes, for you, that could be 20 minutes. I just want to know more or less how long the two of you spoke.
A You know, I didn't check on the time, but it's not like a -- it's like just to give my notes and it's maybe ten minutes.
Q Okay. Besides that one call on December 5th that was ten minutes long, did you have any other calls with Mr. Drahos or anyone from his office?
A I -- I don't remember, but I don't remember the date, but I have received an email regarding deposition. Like I don't remember which month.
Q Okay. Ms. Thomas, you're currently aboard the Carnival Mardi Gras?
A Yes, you're right.
Q Who is your current employer?
A Employer, Carnival Corporation, Carnival Cruise Line.
Q How long have you worked for Carnival Cruise Lines?
A Two years and two months.
Q So you would have started sometime in -- in what, late 2022, October, November, 2022?



A Yes, yes.
Q What is your title with Carnival Cruise Lines?
A I'm a nurse on board.
Q Are there different levels of nurses?
A Like what does that mean? Like a different level means -- what does that mean?
Q Sure.
So like we know that for doctors, there's the senior physician and then there's just a regular physician. Is there something like that when it comes to nursing staff?
A So a medical nurse.
Q Okay. And you have been a -- the same title, it's just nurse from the time you've been hired until today; is that right?
A Yes.
Q Where did you go to school to get your nursing degree?
A Can you repeat that?
Q Where did you go to school to get your nursing degree?
A Okay. All my education I got from India. So my university is Kerala University of Health Science.



Q Okay. So what was the first one, something university?
A Sorry?
Q What was the university that you got your -- your degree to be a nurse in?
A Okay. Nursing degree, it's Kerala University and Health Science, KUHS.
Q Can you spell that for us, Kerala and KUHS?
A K-U -- okay. I would like spell it. It's Kerala -- Kerala University and Health Science.
Q How do you spell Kerala?
A K-E-R-E-L-A.
Q And how long did you attend Kerala?
A That's four year BSC nursing.
Q You said BSC? That's B as in boy, S as in Sierra, C as in Charlie?
A Yes.
Q What does that stand for?
A It's Bachelor of Nursing -- Bachelor of Science of Nursing.
Q Any additional schooling besides those four years to get your BSC?
A After my BSC, I did two-year post graduation in hospital-based course. The hospital

name is Aster DM Healthcare.
Q Can you spell that for us?
A So it's A-S-T-E-R, then capital D-M, Health -- Healthcare. DM means District Medical. It's a private medical college.
Q And what license or what degree did you get from Aster?
A So it's a -- the course name is called emergency medical service that I specialized in emergency and trauma.
Q Are you licensed to be a nurse in the United States?
A I licensed to practice in state.
Q In -- what did you say?
A Like I have Visa to like -- I am licensed to practice or in the sea, on the ship, on the cruise ship.
Q So not like if -- you wouldn't be able to practice in a hospital in Florida?
A No. I need to give an exam. So we are licensed to practice on board, not the land.
Q Do you know -- so the date of this incident was July 8, 2023, aboard the Carnival Freedom. Do you know when you first boarded the Carnival Freedom?



A I don't remember the date because it's -- I don't. It's -- that's my two years ago contract, so I don't remember the -- which date on my contract. Sorry.
Q And typically you're on a vessel for three or four months and then you switch to a different vessel; is that right?
A Yes.
Q Was that your first time on the Carnival Freedom, that -- that contract? Was that the first contract that you had aboard the Carnival Freedom?
A Yes.
Q What are your duties and responsibilities as a nurse for Carnival?
A To taking care of the patient, crew and patient, crew and passengers.
Q Had you worked with Dr. Desai before?
A I think I worked with him only on Freedom.
Q What about Dr. Leonard?
A I think same, same ship, in Freedom.
Q Right. Obviously you'd agree that the wellness of Carnival's patients is of the utmost importance to you as a nurse, correct?
A Yes.
MR. DRAHOS: Object to the form. Sorry.



BY MR. PADRON:
Q You do everything in your power to get your patients the treatment that they need?
MR. DRAHOS: Object to the form.
THE WITNESS: Sorry?
BY MR. PADRON:
Q So that's one of those -- you're going to hear Mr. Drahos make objections from time to time. That's what we were talking about earlier. Unless you hear him tell you not to answer, you can go ahead and answer anyways. Okay?
A Can you repeat that question for me again?
Q Yes.
You would do everything in your power to get your patients the treatment that they need, right?
MR. DRAHOS: Object to the form.
THE WITNESS: No. It's not my responsibility, no.
BY MR. PADRON:
Q What do you mean?
A Like it's not my complete responsibility. Of course I need to take care of the patient, but it's not fully.
Q Okay. Whose is it?



MR. DRAHOS: Object to the form.
BY MR. PADRON:
Q You can answer.
A I don't -- I don't really understand the question. Like --
Q Sure. Maybe I'm misunderstanding.
I just asked if you would do everything in your power to get the patients the treatment that they need and you said no, that that's not --
A I --
MR. DRAHOS: Object to the form.
Go ahead, Nurse.
THE WITNESS: So I follow the doctor's instructions.
BY MR. PADRON:
Q So if the doctor gave instructions, you would never disregard those instructions, correct?
Is that a yes? I saw you shake your head.
A I don't really -- okay. Like the question is like I -- if whatever we need to take care of, we just follow the instruction of doctors and it comes with patient care, yeah.
Q Right. When it comes to a doctor's order regarding patient care, you're going to do as the doctor instructs you, correct?

A Yes.
Q If I pull back up Exhibit 2, so you can see my screen, let me know when you can see it.
A Yes, I can see.
Q Do you remember if you filled this out for Mr. Reeves or did you help him fill it out? Did you only give him the form?
A I don't remember, but we don't fill out the consultation form. Consultation form needs to be filled out by the passenger, so...
Q Okay. As the consultation form is -- is being filled out, what are you doing as the nurse?
MR. DRAHOS: Object to the form.
BY MR. PADRON:
Q You can answer.
A In the consultation form, like what I do in the consultation form?
Q Yeah. As -- so here, I believe that you were one of, if not the first nurse that came into contact with Mr. Reeves; is that right?
A Yeah.
MR. DRAHOS: Object to form.
BY MR. PADRON:
Q So when Mr. Reeves presents to the medical center, I'm assuming you're the one that would have



given him this guest consultation form?
A I don't remember if I'm the one give the consultation form.
Q Who else would have given it to him?
A I don't remember, sir.
Q Is it something that's part of your duties? Maybe you don't know if you did it here. Was it something that you've done in the past, where you do give them the guest consultation form when they arrive?
MR. DRAHOS: Object to form.
THE WITNESS: I don't remember.
BY MR. PADRON:
Q Have you ever given any patient the guest consultation form to fill out?
A Yes, I do.
Q And you're just saying that here, you don't remember if you gave it to Mr. Reeves or not?
A It can be -- can be anyone in the medical center. It's not particularly me. It can be anyone.
Q If we switch back to -- strike that.
Do you have anything in your notes that would show that Mr. Reeves arrived to the medical center at a time other than 6:27 p.m. on July 8,



2023?
MR. DRAHOS: Object to the form.
THE WITNESS: It's in the form like what time they print out.
BY MR. PADRON:
Q And you don't have anything that --
THE STENOGRAPHIC REPORTER: I'm sorry to interrupt. I didn't understand the answer.
THE WITNESS: So the consultation, he asked the time. So the consult time, it's on the form. He can read that.
BY MR. PADRON:
Q And my question to you, Ms. Thomas, is: Do you have anything that would either confirm or give us a different time of when Mr. Reeves arrived at the medical center?
A I don't remember the time. I don't remember.
Q Do you have any reason to disagree with the time that's written down on this guest consultation form?
MR. DRAHOS: Object to the form.
THE WITNESS: I cannot -- I cannot tell you. I don't know.



BY MR. PADRON:
Q Okay. If we go back to Exhibit 1, which is the case summaries, I would like to see if you can clarify or explain to me how these work. So here at -- on this note that we see here.
A Okay.
Q July 8, 2023 at 18:50.
A Okay.
Q It says "performed by Thomas, Sony RN". Does that mean that you --
A Yes.
Q -- put this note in?
A Yes.
Q And you put this in at this time; is that right?
A Yes.
Q So at 6:50 p.m., you connected the patient to cardiac monitor for continuous observations; is that right?
MR. DRAHOS: Object to the form.
THE WITNESS: No, no. Because, you know, we always keep -- you know, as a -- we always keep embolden to patient's sides, then comes documentation. So it doesn't mean that the time of documentation is the same time I did

the, like, medication and everything done.
It's -- you know, we always do patient side
first then comes to documentation, so, so...
BY MR. PADRON:
Q Okay. So then he would have been
connected to the cardiac monitor before 6:50 p.m.?
MR. DRAHOS: Object to the form.
THE WITNESS: He would connected -- so you
can see that I cannot tell what time. So
usually patient comes to medical center, we
connect the monitors, so I cannot tell what
time it is, so...
BY MR. PADRON:
Q Why would there be two different entries,
one at 6:49 p.m. and one at 6:50 p.m. and why is it
all not together?
A It -- I don't know -- that, I cannot
answer. It's kind of documentation, so like when we
get time, we do documentation. That's it.
Q Sure. And I get it's when you have time,
but I want to understand: So it looks like you put
one in at -- you put this note in at 6:49 p.m.?
A Uh-huh.
Q And at 6:50 p.m., you put a separate note.
I -- what I want to know is: Did you do something



in between, in that one minute that you decided to
put a different note?
A I don't remember, sir.
Q We know that at least by 6:50 p.m., that
Mr. Reeves had already been connected to the patient
cardiac monitor for continuous observations?
A I already told you that it doesn't have
any connection between like a patient's side care
and documentation. I told you that it's -- we do
patient side first and then comes to the
documentation, so...
Q Right. So following that logic, I just
want to make sure I'm -- I'm understanding this
correctly. That means that by the time you put this
note in, by 6:50 p.m., you have already connected
him to the cardiac monitor, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: You can -- you can see the
note. Like I don't remember the time, like a
documentation. I told you it comes patient
side first then the documentation, so I cannot
tell you that. Sorry.
BY MR. PADRON:
Q Okay. So you can't tell me that by the
time you put this note in, you had already hooked



him up to the cardiac monitor?
A Of course. He's a --
MR. DRAHOS: Object to the form.
THE WITNESS: -- like you can see like
a -- it's a cardiac patient, so of course he's
connected to monitor.
BY MR. PADRON:
Q Okay. And that's -- that's just what I'm
trying to make sure I understand. By the time that
you put this note in at 6:50 p.m., he had already
been connected to the cardiac monitor, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't -- I don't remember,
sir. Whatever I can tell you, that it's in the
note.
BY MR. PADRON:
Q Okay. And I need to make sure I
understand what's in the note, that's why I'm asking
you, because only you can tell me.
So tell me if I'm envisioning this
incorrectly. The way I see this -- this note
working is that you are either sitting next to
Mr. Reeves or at a computer somewhere in the medical
center typing this note in, correct?
A I don't remember, sir.



Q How does putting a note in work?
A This is the note I download that time.
Q Ms. Thomas, how do you make a medical
note?
A In the SeaCare.
Q Okay. SeaCare where?
A Computer.
Q And where is that computer located?
A Nurses' station.
Q Okay. So this note that you put in would
have been you standing or sitting at the nurses'
station; is that right?
A Yes.
Q Okay. And obviously if you're putting
this note in, then all of this has already been done
to Mr. Reeves; is that right?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. It's already like
connected to patient to cardiac monitor for
continued use observation.
BY MR. PADRON:
Q Right. So by the time you're sitting down
at the nurses' station typing this note at
6:50 p.m., Mr. Reeves has already been connected to
the cardiac monitor, correct?

MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MR. PADRON:
Q Okay. And then if we go up here to 6:57 p.m., it says here there was a -- I guess there's an update and a document saved. Can you tell me what the difference here is?
A Okay. So as the -- time and the last, it's like a -- if you click on the -- again, it shows that time.
Q Okay. So this note would have been put in at 16 -- at 6:57 p.m.?
A Yes.
Q So at 6:57 p.m., you put a note in saying that the 12-lead EKG was performed, reviewed by MD?
MR. DRAHOS: Object to the form.
BY MR. PADRON:
Q Is that right?
MR. DRAHOS: Object to the form.
THE WITNESS: That's just documentation times. It has nothing to do with like what time I did the EKG. I don't remember the time. So it's just a documentation time.
BY MR. PADRON:
Q Right. But you'd agree that since this is



the documentation time at 6:57 p.m., that sometime before 6:57 p.m., the EKG had been done and reviewed by MD, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I cannot tell, sir. I don't remember. I cannot assume. You know, I'm not comfortable to answer.
BY MR. PADRON:
Q Well, Ms. Thomas, surely you'd agree that if you're putting -- if you're sitting at the computer at 6:57 p.m. saying that the EKG was performed, reviewed by MD, that by 6:57 p.m., that's already been done, right?
MR. DRAHOS: Object to the form.
THE WITNESS: You can ask the doctor. I don't remember the time.
BY MR. PADRON:
Q Well, this isn't the doctor's note. I'm -- I'm asking about your note. And in your note --
A Yeah, sitting --
Q -- you're saying -- hold on. In your note, Ms. Thomas, you are saying that a 12-lead EKG was performed and reviewed by MD. You're saying that's been done and you're putting it on the computer at 6:57 p.m.



A Yeah. It could be done before my documentation, yes.
Q Okay. And not it could be done, it would have been done before your documentation, right?
MR. DRAHOS: Object to the form.
THE WITNESS: So it -- it's clearly since as I told you, yeah. So the documentation time is 18:57. So EKG, I cannot tell what time it's done, but in my -- this is my just documentation time.
BY MR. PADRON:
Q But you can tell me by looking at this note that would be --
A I can --
Q -- that before 18:57, the EKG had been performed and reviewed by the MD?
MR. DRAHOS: Object to the form.
BY MR. PADRON:
Q I'm -- I'm not asking you for an exact time when the EKG was done, when it was performed, I just need to know, and you can disagree, but I want to know why, but according to your note here --
A Uh-huh.
Q -- some time before 18:57, the EKG was performed, reviewed by MD, correct?



MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MR. PADRON:
Q I didn't get your answer. Was that a yes?
A Yes.
Q And then the -- so that's at 6:57, 18:57. Then if we go over here to a note that you put in at 19:17, which is 7:17 p.m., you put this note in, correct?
A Yes.
Q So here at 7:17 p.m., you are saying that the second EKG was performed, reviewed by MD; is that right?
MR. DRAHOS: Object to the form.
THE WITNESS: What is like the second EKG?
BY MR. PADRON:
Q What does that -- what do you mean by when you put that second EKG was performed, reviewed by MD?
MR. DRAHOS: Object to the form.
THE WITNESS: You can ask to the doctor, because he's the one ordering the EKG. I don't remember.
BY MR. PADRON:
Q Well, the doctor didn't put this in your

note, you put this in your note. I want to know what this means.
MR. DRAHOS: Object to the form.
THE WITNESS: It's his order, so I follow the order.
BY MR. PADRON:
Q Okay. So --
A It just means like second EKG means it's -- it's just a -- like a -- it -- it doesn't mean it's less to -- like a -- I cannot, like, tell you, like, what usually. Maybe he -- so ask me to show the, like, a screen, he's going to monitor, so -- there is no, like, a second EKG.
BY MR. PADRON:
Q Okay. So I know he's continuously monitored, but when you put "second EKG was performed, reviewed by MD", does that mean that at that point, you screen grabbed or took a printout from the EKG machine?
MR. DRAHOS: Object to the form.
THE WITNESS: Sir, I don't remember. You can ask the doctor. He's the one giving the order, so you can ask the doctor.
BY MR. PADRON:
Q Well, you're -- I'm not asking about the



doctor, I'm asking about Sony Thomas' note that says "second EKG was performed, reviewed by MD." And I want to know what that means.
MR. DRAHOS: Object to the form. That's been asked and answered, Josh.
BY MR. PADRON:
Q You can answer.
MR. DRAHOS: If you have anything different to offer.
THE WITNESS: I don't have any answer, sir. I already told you you can ask the doctor. I don't know. I don't know.
BY MR. PADRON:
Q What does -- is this your note here that you put in on July 8, 2023 at 20:27?
A Yes, that's my note.
Q Okay. So here at 8:27 p.m., it says "third EKG was performed and reviewed by MD". What does that mean?
A As I told you, I -- I cannot answer that because I don't know. Like you can ask the doctor, maybe he can answer. Like there is no second. It's just a chronological. It's like a number. There is no like -- I don't know.
Q Okay. What are you --



A I don't remember.
Q What are you --
A I don't remember.
Q What are you documenting here? What are you trying to document? What does "third EKG was performed and reviewed" mean if he's under continuous observation?
MR. DRAHOS: Object to the form.
THE WITNESS: Sir, I don't remember if there is first EKG, there is second EKG, third EKG done. I don't remember it. Like what I wrote in the note, you can also see that I don't remember this, like, what does it mean. Like it's -- it's just -- I don't know.
BY MR. PADRON:
Q You're still putting notes in today as a nurse for Carnival, right?
A Yes.
Q Are you trained on what notes, what your notes are supposed to mean?
MR. DRAHOS: Object to the form.
THE WITNESS: Is that related to answer now like?
BY MR. PADRON:
Q Yes.



A I know my documentation, but I don't remember. I don't remember to answer you. I don't remember to answer you.
Q And I'm just trying to understand, I -- I don't even know what you don't remember.
A Like what -- sorry.
MR. DRAHOS: I don't think that -- that question is possible to answer. You don't know what she remembers, she doesn't know what she remembers. You're asking her a question, she's telling you she doesn't remember and that's what she's able to do today. I don't know what the circling is accomplishing here.
MR. PADRON: Okay.
BY MR. PADRON:
Q Ms. Thomas, when you put this note in at 20:27, it says that "third EKG was performed and reviewed by MD"; you'd agree with that, right?
MR. DRAHOS: Object to the form.
THE WITNESS: As I told you, I don't -- what does mean like third EKG? I don't remember now. You can ask to the doctor. He ordered the EKG, second EKG. You can ask to the doctor. I don't remember, sir.

BY MR. PADRON:
Q So why don't you explain to me when a doctor orders an EKG, what does that mean?
A He's the one giving order for the EKG.
Q Sure. And as a nurse --
A You can ask -- yes, I, as a nurse, I do the EKG, but in this case, I don't remember, sir. I did third EKG, what does "I" mean in my note? I don't remember now.
Q Okay. So when a doctor asks you to do an EKG, what are you -- what do you do?
A I do the EKG.
Q So how does that work when someone like Mr. Reeves is under continuous cardiac monitoring?
A I follow the doctor's instruction.
Q I understand that, but I want to know -- so the continuous cardiac monitoring is essentially a nonstop EKG; is that right?
MR. DRAHOS: Object to the form.
THE WITNESS: It's exactly --
BY MR. PADRON:
Q You can answer, Ms. Thomas.
A In his case, I don't remember anything, sir, like what I did, what I do. I don't remember.
Q Well, I'm not asking you about his case,



I'm going to ask you generally.
A Yes.
Q When someone is -- is connected to the cardiac monitor, that is essentially a continuous EKG reading; is that right?
A I cannot give you, like, that answer because each patient is different, you know. Each patient's presentation and complaints is different, so it's dependent upon they present. It's dependent upon what their condition, it's dependent upon on how the doctor want to do, so we just follow the instruction.
Q Okay. So what is cardiac monitoring? What does that mean?
MR. DRAHOS: Object to form.
BY MR. PADRON:
Q You can answer.
A Cardiac monitoring means like monitoring the patient's heart rate rhythm. So it's -- it's up to the doctor.
Q So is that monitor -- is that monitor producing this the entire time that they are hooked up to the live cardiac monitoring? And we're looking at Exhibit 2 now.
A So an EKG -- I don't -- like it's -- it's



a EKG.
Q Sure. And Ms. Thomas, what I want to understand, so is there like a, I guess, a digital monitor next to the person that's on a cardiac monitor showing this but digital?
A You can see the stripe. It's mentioned -- I don't remember what monitor he was using in the Freedom, so I cannot tell you like which monitor was this one.
Q Are there -- so I am just trying to understand the different types of monitors. Is there a monitor that someone who has chest pains can be hooked up to that would be showing what we see here on my screen in a digital format on a monitor on a screen aboard the Carnival Freedom?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know. I don't remember. I don't remember, sir. Sorry.
BY MR. PADRON:
Q Do you know what you have to do to get this EKG printout?
A Say that again, sir.
Q So as a nurse, when a doctor asks you for an EKG, what do you do to give him the EKG?
MR. DRAHOS: Object to the form.



THE WITNESS: First, I'd -- if he ordered the EKG, we do the EKG like one of our machines are available, we took the EKG and give it to him.
BY MR. PADRON:
Q Okay. And how do you take an EKG?
MR. DRAHOS: Object to the form.
BY MR. PADRON:
Q Ms. Thomas, how do you take an EKG?
MR. DRAHOS: Object to the form.
THE WITNESS: How do I take the EKG?
BY MR. PADRON:
Q Yes.
A I trained to take the EKG. Like we place the -- I don't know exactly -- I'm not going to be able to answer. Like I don't understand the question. I am not comfortable answer.
Q I'm asking you to explain how you -- how you take an EKG of a patient. I don't know how, so I'm asking you to explain it to me.
MR. DRAHOS: Object to the form.
THE WITNESS: Like you want me to, like, explain how do I take the EKG?
BY MR. PADRON:
Q Yes.

A Just the placement of leads on the patient's chest as we supervised by the doctor. So as whatever he wants, he's going to ask us to print out, so we just take the printout, doctor is the one, so we just take the printout.
Q Okay. So let me break that down to make sure I understand it correctly.
You would, if the doctor orders an EKG, you would place leads under the doctor's direction on the patient's chest; is that right?
A Yes.
Q That's connected to a cardiac monitor and then what, do you press print or what do you do to then give us the printout like what we see on the screen here?
A It's really --
MR. DRAHOS: Object to the form.
THE WITNESS: It's really dependent upon the doctor, how they want, so...
BY MR. PADRON:
Q Well, how do you get it to the doctor? How do you give this to the doctor?
MR. DRAHOS: Object to the form.
THE WITNESS: To take the print --



BY MR. PADRON:
Q How do you get the print?
A What does -- what information available that gives you print or he can directly monitoring on the cardiac monitor, so...
Q What is the cardiac monitoring showing you?
A Like I'm not -- like a -- it's doctors.
MR. DRAHOS: Object to the form.
THE WITNESS: It's doctor's scope of practice. I'm not the one, like, that is to monitor the cardiac. That's -- that's doctor's responsibility.
BY MR. PADRON:
Q Okay. That was -- I get that. That was a poorly worded question.
Does the cardiac monitor show essentially what we're seeing here on the screen?
A I don't know if I -- I don't remember if I -- with this one, I don't remember, sir. If I'm the -- I don't remember if I am the one doing this one. I don't remember.
Q Do you have any reason to believe that by the time you input this note at 8:27 p.m. on July 8th, that the third EKG had not been performed?



MR. DRAHOS: Object to the form.
THE WITNESS: I -- I don't know, sir. You can ask to the doctor. He's the one ordering the EKG. I don't remember, sir.
BY MR. PADRON:
Q Right. No, and my question is to you now, you're the one that put this note. Do you have any reason to believe that by the time you put this note, that the third EKG had not been done?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't remember, sir. I cannot -- I'm not, like, comfortable with like -- I don't know if -- I don't remember, like, when I -- this EKG, it's -- whatever documents is there that we performed, that we done, so I don't know.
BY MR. PADRON:
Q Okay. So then we can agree on -- on something here, that if you're putting this note in, you're saying that by this time on July 8, 2023, by 8:27 p.m., the third EKG had been performed and reviewed by MD?
A Okay. As I told you early, the documentation has no correlation with what we did on patient's side. The document comes second. So I



don't remember. It could be the show EKG on the monitor or we print out like the EKG, so I cannot tell you. There is no relation between that time and the action.
Q Well, you'd agree that there is a relation and the relation is that by the time you put this note in, this has all been done, correct?
MR. DRAHOS: Object to the form. I mean it's been asked and answered multiple times.
THE WITNESS: EKG, I don't -- I don't remember, sir. Like there is, like, a first, second, third EKG. For us, this is just a chronological number of something, you know. I cannot tell you. You can ask to the doctor if he ordered first EKG, second EKG, third EKG. I don't remember. So this time, you like to try telling me that I did third EKG. I cannot tell you that I did third EKG, because I don't remember. And the documentation time has no relationship with the -- like a patient side care. Documentation comes late, patient care comes first, so I cannot tell you that it means it's third EKG. For me, it's just like a number. I don't remember if I did third EKG, second EKG. I don't know. You can ask the

doctor. Sorry.
BY MR. PADRON:
Q Okay. But what I'm asking is that here, by the time you put this note in, there has been some EKG performed and reviewed by MD. Whether or not you want to agree to the third or second or first or tenth, there has been some EKG done and reviewed by the time you put your note in, correct?
MR. DRAHOS: Objection. Sorry. Object to the form.
THE WITNESS: I don't remember, sir. I cannot tell you that. I don't remember. So there are things I don't remember. I cannot, like, assume and tell you, like a -- I don't remember. I'm sorry.
BY MR. PADRON:
Q Do you have any reason to believe that your note that you put in here is incorrect?
A I don't --
MR. DRAHOS: Object to the form.
THE WITNESS: -- that my note is incorrect, but I cannot recall, like, what I done there.
BY MR. PADRON:
Q Okay. Do you recall what Mr. Reeves



looked like when he presented to the medical center?
A I'm sorry, sir, I don't remember him, so no.
Q You don't remember if he was in pain or not in pain or what level of pain other than what you documented in your medical notes?
A In my medical records, the pain scale score I wrote and it's eight by ten.
Q And what you put in your note is accurate?
A Of course.
Q And when you say that you've given medication in your medical note, that's something that's already been done; is that correct?
MR. DRAHOS: Object to the form.
THE WITNESS: The medication that -- that I had given to patient?
BY MR. PADRON:
Q Yes.
A Yeah. I follow the doctor instruction, yes.
Q So for example, if we look back here at Exhibit 1, when you put here in your note here at 7:17 p.m. that "an injection of morphine 10 MG/ML advised"; what does that mean?
A That's the doctor's order.



Q And does this mean that this has already been done or that you are going to do this? What does "advised" mean?
MR. DRAHOS: Object to the form.
THE WITNESS: I can't see that. I don't remember, sir. I don't remember, sir. I can't, sorry. It means it was advised by MD, so yeah.
BY MR. PADRON:
Q Okay. And then we see here "medication diluted with 10 ML water injection and injection morphine MG stat given by MD."
A Yes.
Q What does that mean?
A It was administered by the doctor.
Q And that's something that's already been done by the time you put this note in?
MR. DRAHOS: Object to the form.
THE WITNESS: I already -- I already explained you that the patient side is first. I do patient care first then later comes the documentation, so...
BY MR. PADRON:
Q Okay. When -- what is your protocol as a nurse when someone presents to the medical center



with chest pains and indications of a heart attack?
MR. DRAHOS: Object to the form.
THE WITNESS: It's -- it's really -- it's really depend upons -- you know, I cannot tell you. Like it's my responsibility is to like -- I cannot tell you, like, a chest pain. It's really depend upon the situation. It's really depend upon the patient, how they present. Not every patient is same, so I cannot, like, explain, like, how I'm going to -- it's different for different patient, different patients, so...
BY MR. PADRON:
Q What would it be for someone that presented with Mr. Reeves' symptoms?
MR. DRAHOS: Object to the form.
THE WITNESS: That you can see on my triage note what I did.
BY MR. PADRON:
Q On your what note?
A In my triage note.
Q Where is that?
A I cannot remember how I receive him, how I treat him. I cannot remember, but you can see my note, how I triage him like.

Q Is that -- that's one of the notes that we reviewed already; is that right?
A Yes.
Q That's this triage note that you just mentioned?
A Yes.
Q Let's go through it. It says, "A 38-year-old male guest brought to medical center by family via wheelchair say that he's having chest pain, started today morning." Where did you get this information from?
A I don't remember who gave me the, like, patient information, if the patient or the bystander. For this case, I don't remember completely.
Q What does "denies SOB mean"?
A Shortness of breath.
Q Okay. And if the doctor wasn't already there when the patient arrives, you are supposed to get the doctor there as soon as possible, correct?
A Sorry?
MR. DRAHOS: Object to the form.
BY MR. PADRON:
Q So assuming that you're in the medical center alone without a doctor there, as soon as a



patient like Mr. Reeves arrives, you are supposed to get ahold of a doctor to get there right away?
A This case, I don't know, like, what was the situation. Like usually if there is a clinical, there should be a doctor. And after that also, there should be a doctor, so...
Q And if there's not a doctor there, you called to have one arrive right away?
A Like -- like what kind of scenario, like what -- what do you mean like?
Q So in the scenario where the medical center is closed and not open.
A Uh-huh, okay.
Q And there's not a doctor there, and a patient arrives at the medical center, the doctor would be called, whichever doctor is on call, to come to the medical center right away, correct?
A Yes.
Q Okay. Did you review any deposition transcripts before this deposition?
A No.
Q Did you speak with Dr. Leonard, Dr. Desai, any of the other nurses involved in this case before today's deposition?
A No, no. I don't have anyone contact, no.



Q The senior physician was Dr. Desai; is that right?
A Yeah. In my note, yeah. I can see his name.
Q Do you know if Dr. Desai ever reached out to the Coast Guard about coming to medically disembark Mr. Reeves?
A It's -- it's not in my scope of practice. And it's not my responsibility. And I don't know.
Q You weren't involved if that's something that he did?
A Sorry?
Q If that's something that he did do, you would not have been involved?
A I don't know, sir. You can ask Dr. Desai.
Q Have you ever seen a medical disembarkment aboard Carnival, any of the cruise lines in the last two years and two months that you've been working for them?
MR. DRAHOS: Object to the form.
THE WITNESS: No. I don't know.
BY MR. PADRON:
Q No or you don't know?
A Like medical disembarkation, it's not a word like responsibility. It's a doctor



responsibility, so...
Q Right. I'm not talking about responsibility, I'm asking if you've ever seen one done in your two years and two months while the vessel is under way?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I did.
BY MR. PADRON:
Q How many times?
A I cannot tell you. I don't remember. It's dependent upon like -- I don't know. Like I cannot tell you like a count now, but I would count like how many times.
Q But you've seen it multiple times?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know. Like...
BY MR. PADRON:
Q What reasons were they medically disembarked for?
MR. DRAHOS: Object to the form.
THE WITNESS: It's -- it's -- it's a responsibility for the doctor. It's not my, like, responsibility. I'm not the one deciding. You can ask to the doctor. He's the one deciding. It's not our responsibility.

BY MR. PADRON:
Q I understand. I'm not asking about whose responsibility. I'm asking the situations that you've seen it be done, what was wrong with the patient that was done?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm not comfortable to answer this question. I don't know, like, what I need to answer, like, you know.
BY MR. PADRON:
Q Sure. I'll clarify.
A It's --
Q Like was the person suffering from a stroke, were they having a heart attack, were they suicidal? What are the different reasons that you've seen different patients being medically disembarked while the vessel is under way?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't -- I don't remember, sir, what all of the conditions be that the disembarkation, but it's really depend upon like a doctor's decisions. It's out of our scope of work. It's different case. I cannot tell you like this case because I'm not the one that decided, so I don't know.



BY MR. PADRON:
Q Have you ever had someone come and get picked up by a helicopter?
A No.
Q What ways have you had someone be medically disembarked while the vessel was under way?
A In the past, of course I don't remember like how -- what all of the patients I see all then went out, but recently, I don't have anything, so I cannot explain you, like, how, like, they go.
Q I don't know what you mean by that.
So you've not seen by helicopter. Have you seen where the Coast Guard sent a vessel to the Carnival cruise to pick someone up?
MR. DRAHOS: Object to the form.
THE WITNESS: As I told you, it's not our responsibility. It's not -- I don't know, like, about Coast Guards. We are not the one dealing with that, so unfortunately I don't know anything about that. So it's -- if you want that, you can just ask to the doctors. Like I don't know about that part. It's not my responsibility and I never to be in that.



BY MR. PADRON:
Q So you've never assisted someone either go from the -- from a Carnival cruise to another boat or to a helicopter or anything like that; is that right?
A Yes. I never -- like I didn't do, like, any helicopter operation or anything. I never witnessed and I didn't do it.
Q Do you recall any conversations that you had with Mr. Reeves' family?
A I don't remember that passenger, of course. It's -- I don't remember the family too, so I'm sorry. I cannot help you with that question.
Q Do you remember what the weather was like on July 8th at 7:00 at night?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sorry, sir, I don't remember. Of course I don't remember. Sorry.
BY MR. PADRON:
Q I -- it's silly, but I have to ask the question sometimes.
A Sir, I don't remember.
Q As a nurse, do you receive ongoing training?
A What kind of ongoing -- ongoing train? I



receive all -- completed all my training from back home India, so like what kind of ongoing training?
Q Anything specific to Carnival's policies and procedures?
MR. DRAHOS: Object to the form.
THE WITNESS: All of -- I did all my qualification at training from back home in India, so we only receive like how we -- in the sea. So life boat training, all that stuff.
BY MR. PADRON:
Q Okay. What about -- is there any -- in your two years and two months with Carnival or before you started with Carnival, have you ever had a sitdown and go through different training materials that Carnival has provided for you?
A What -- what kind of training, sir?
Q So are you familiar with the HESS manual?
A Yeah.
Q Were you trained on the HESS policies and procedures?
A They usually give us guidance how we works on the sea, but it's just a protocol that we read.
Q Okay. So they give you the HESS policy and procedures and expect you to read it; is that right?

MR. DRAHOS: Object to the form.
THE WITNESS: That's part of the -- like, I don't know, like -- what -- what like -- we have HESS. It's dependent upon like a what -- yeah, it like a guidance, like how we work on sea. That's it. It's not like a kind of policy, like a protocol or something like that.
BY MR. PADRON:
Q And how is it that -- that you -- strike that.
A Sorry?
Q Is -- that was for the record.
Is there an orientation where they go through the HESS procedures with you?
A Orientation for the HESS procedure?
Q Yes.
A No. Being guided by the lead nurse.
Q Okay. Does the lead nurse sit down and go through the HESS procedure with you?
A Yeah. That's all done in our first time on ship.
Q How so?
A Sorry?
Q How is it done your first time on ship?
A It's two years ago, sir. I cannot, like,



remember, like, how, like -- of course I'm following the protocol and procedure. If I have any doubt, I will definitely ask the lead nurse and doctor, but I don't remember, like, how I even went through -- like that is pandemic time. I don't remember.
Q Okay. But you know you went through it at some point when you were first hired?
A Yes.
Q Since then, you have not gone through it?
A Sorry?
Q Since first being brought onto Carnival, you have not -- there's no update training to make sure you're up-to-date with the HESS procedures; is that right?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know. Like what do you like mean to be like -- I'm not comfortable to answer this question, because it's really depend upon like our protocol and policy that we following on board. Of course we up to date with the policies and protocol. Our lead nurse and senior doctor will always make sure that we up to date with the new policy and protocol if we come to on board.



BY MR. PADRON:
Q How do they do that?
A We -- is that really necessary to answer all these questions to you, sir?
Q Yes.
MR. DRAHOS: Just -- Nurse, just -- just do the best you can to answer what he's asking you. If you don't understand, ask him to explain it, he'll explain it better.
THE WITNESS: Okay.
Like how we practice HESS policy, of course we have the meeting, there is some point of the doctor and lead nurse can explain or give us a new update. So there is a time that we can get all the -- like all those kind of HESS policies. Of course I can -- I can see and read HESS policy. If I have any doubt, I can go to the doctor and lead nurse and ask. That's how it works.
BY MR. PADRON:
Q Okay. When we see you put in pain score in your notes, how are you getting that information?
A So we have the pain scale score chart in the medical center, so it's like a visual with a facial expression and we definitely going to ask the



patient like what -- what is your pain scale score, how do you feel? Patient is the one giving the number. Like one to ten, it's a score, so he's the one, patient is the one answering like how bad is the pain.
MR. PADRON: All right, Ms. Thomas, I have no further questions.
MR. DRAHOS: Thank you.
CROSS-EXAMINATION
BY MR. DRAHOS:
Q Okay. So Ms. Thomas, I have just a little bit of follow up. I know you've been with us for a bit. Thank you for your time, but what I want to try to do is clarify something for everyone's benefit while we have you here.
A Uh-huh okay.
Q And so what I would like to ask you about, and I'll go ahead and share my screen here.
MR. DRAHOS: Can everyone see my screen?
MR. PADRON: Yes.
THE WITNESS: Yes.
BY MR. DRAHOS:
Q Thank you.
So what I would like to ask you about, Ms. Thomas, relates to these EKG strips down here on

the bottom that are in pink. Do you see those there?
A Yes.
Q They were marked for purposes of identification. They were marked as Plaintiff's Composite Exhibit No. 2. And what I would like to ask you, Ms. Thomas, is for some clarity as to how these EKG strips made it into Mr. Reeves' chart, okay?
A Okay.
Q So earlier, you told us you don't remember anything about Mr. Reeves unfortunately; is that correct?
A Yes.
Q Okay. So when a doctor performs an EKG study --
A Uh-huh.
Q -- is every single one of those EKG studies done exactly the same for every single patient or does it differ from time to time?
A It's different from time to time, yeah.
Q Does that -- does that include, Ms. Thomas, the total number of EKG strips that are printed out when an EKG test is done?
A Yes.



Q So -- so does that mean --
A Uh-huh.
Q -- that a doctor could choose to print out multiple EKG strips for one study?
A Yes, exactly. He will decide which one is like a better one, yeah. So he use to print multiple.
Q Okay. And so you told us that your role, when an EKG study is ordered, is to help connect the nodules to the patient and then to await further instruction from the doctor; is that accurate?
A Yes.
Q All right. And then is it the doctor who makes the decision about whether or not to print out an EKG strip from what he's seeing on the monitor?
A Yes. It's his decision which one he want to print it out, yes.
Q All right. And so in your experience, can a doctor print out multiple EKG strips for one study?
A Yes, they do.
Q Okay. And so when these multiple EKG strips are printed out, who's the one -- who's the one who decides which of those strips make it into the chart?



A Doctor is the one deciding.
Q Okay. And so in this particular case, you were asked a lot of questions about EKG 1, EKG 2, EKG 3. Do you recall that line of questioning that my colleague was asking you about?
A Yes, I do.
Q All right. And so to try and make this simple, do you know how many EKG strips -- let's just assume for the sake of the question that there were three different EKG tests done on Mr. Reeves, okay?
A Uh-huh.
Q Do you know how many EKG strips would have been printed out for EKG 1?
A Like how many EKG I would have printed out?
Q Yeah. As you sit here today, do you recall how many EKG strips would have been printed out for EKG 1?
A I -- I don't -- of course I don't remember, but...
Q Okay. So the doctor, in other words, could have printed out one page from EKG 1 or he could have printed out 50 pages. As you sit here today, you do not know that; is that accurate?



A Yes.
Q Okay. And then let's just say for EKG 2, which was referenced here in your notes, do you know whether or not -- there it is right there. Let's say EKG 2 was done at 7:17, do you know whether or not the doctor printed out one page or 50 pages from EKG 2?
A I'm not sure, but it doesn't have any relationship at the time. You know, it could be some time, you know, I can tell you with my experience, sometimes he printer -- just to make sure that --
Q Okay. So --
A Sometime the doctor will read the monitor.
Q Okay. Here's the bigger point, Ms. Thomas: As it relates to these specific EKGs, sorry I'm going so fast, but I just want to get to it here, as it relates to these three specific EKG strips, there's one here that has a Roman Numeral I, one that has a Roman Numeral II, and there's one that has a Roman Numeral III. Do you have any idea when these strips were printed?
A I don't have any idea like what time it's printed, but from this Roman letter, like a chronology to number I and II, I usually dot like

a -- for the easy documentation. So it doesn't mean that it's EKG number one, two. It doesn't have any relationship with time.

Q In other words, because there's multiple strips that are printed out for each EKG test, you can't tell us as you sit here today which of these EKG -- EKG strips would have been printed for EKG test I, EKG test II or EKG test III and so on and so forth?

MR. PADRON: Form.

THE WITNESS: No. It's just -- it's just like a chronology, like a Roman letter. It's just a number that help us with the documentation. It doesn't mean that really it's first one, second one or third one.

BY MR. PADRON:

Q Okay. So in other words, this one here in particular, EKG II, you don't know whether or not this is a printout from what's referenced in the chart EKG I, EKG II or EKG III?

A No. I'm sure that it's not -- it's the same like -- I don't know. It could be like a printout from back to back. I don't know.

Q So this very well could have been a printout from an EKG done at 8:20 p.m. in other



words?

MR. PADRON: Form.

THE WITNESS: I cannot remember the time, but this is something we usually do. Like I can just tell that it's -- it could be a letter, a Roman letter, just a chronological number that help us to -- just to documents.

BY MR. DRAHOS:

Q All right. So does that mean that afterwards, when the chart was being created in this case, that one of the doctors, whether it was Dr. Desai or Dr. Leonard, went through all of the EKG strips that were printed and among the multiple pages, picked out this page, this page, and this page for whatever reason?

A Uh-huh.

MR. PADRON: Form.

BY MR. DRAHOS:

Q Is that accurate? Is that what happened here?

A Yes, I think so. Like yeah.

Q Okay.

A For me, that's just a number, like chronological number.

Q Well, these -- well, what these Roman



numerals are meant to depict then is that this printout was printed at some point in time, that this printout was printed out at some point in time thereafter, and that this printout was printed out at sometime after that, correct?

MR. PADRON: Form.

THE WITNESS: Yes, yes.

MR. DRAHOS: Those are all the questions I have. Thank you very much.

REDIRECT EXAMINATION

BY MR. PADRON:

Q Ms. Thomas?

A Yes, sir.

Q Do you know -- let me bring that back up just so we can look at it.

We're looking back at Composite Exhibit 2. Is this your handwriting?

A No.

Q And you -- you don't know if you put the Roman Numeral II, III?

A I don't -- I don't remember.

Q Is this your handwriting here that says "Reeves, Chad"?

A That's my handwriting, yes.

Q Okay. Did you put the one?



A I'm not sure if I am the one, like I cannot understand it's my handwriting, but that is my handwriting, the one written there.

Q Is this your handwriting?

A No, I don't know whose handwriting that one, but this is my handwriting, the name.

Q Why did you write his name and cabin number on this EKG?

A For the identification purpose.

Q Why is it not on this one with the Roman Numeral II?

A I don't know. I -- I don't know. Like I'm not sure. Like it could be done by me or like it's continuous back-to-back print, so I don't know.

Q It could what? I didn't catch that.

A You know, sometimes the doctor like to print out multiples like at one time. So maybe that's the reason the one. I don't know, like, why I didn't put name on other EKG.

Q Okay. And then you're saying that the Roman numerals used to organize -- well, I didn't understand the purpose of the Roman numeral.

A It's just, you know, I -- in this -- you know, the usual process that we do, if you have multiple documents to upload. So if the doctor is

the one, like, choosing which document goes to patient, the document side, so they're going to keep this, so we just put for the documentation purpose we just mark this, just for chronology, just to help us with the document.

Q Does it -- is it chronological from the time that this is the first one, this is the second one and this is the third one or is it just you grab these sheets in random order and put one, two and three?

MR. DRAHOS: Object to form.

THE WITNESS: No, no, it's not like -- I cannot -- it's just like a number that help us to document that, sir.

BY MR. PADRON:

Q Does it help you document which one came first, which one came second and which one came third?

MR. DRAHOS: Object to the form.

THE WITNESS: No, no. It's for usually like when you get the form, you know, you don't have to upload the same thing multiple times. So it's just for the identification, we just put a one, two, three. That's it, but I usually do, I think that's the same I did here



too.

BY MR. PADRON:

Q Do you normally document it in chronological order?

A If there is like an EKG and we have multiple strips for anything, so just to like make sure you don't upload the same document, so that's it.

MR. PADRON: All right. I have no further questions.

MR. DRAHOS: Thank you. We will read the transcript please, Madam Court Reporter.

THE VIDEOGRAPHER: This concludes the deposition. The time is 1:27 p.m.

MR. PADRON: Ms. Thomas, thank you for your time.

THE STENOGRAPHIC REPORTER: Mr. Padron, are you ordering?

MR. PADRON: Yes, please.

THE STENOGRAPHIC REPORTER: Mr. Drahos, do you want a copy?

MR. DRAHOS: Yes, please.

(The deposition concluded at 1:27 p.m. and reading and signing was not waived.)



CERTIFICATE OF OATH

STATE OF QUINTANA ROO
COZUMEL ISLAND, MEXICO

I, the undersigned authority, certify that SONY THOMAS, RN, appeared before me via remote videoconference and was duly sworn on the 9th day of December, 2024.

WITNESS my hand and official seal this 19th day of December, 2024.



Randi Ginsberg
Notary Public - State of Florida
My Commission Expires: 3/19/2026
My Commission No.: HH 241036



REPORTER'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, Randi Ginsberg, Court Reporter and Notary Public in and for the State of Florida at large, do hereby certify that I was authorized to and did stenographically report the deposition of Sony Thomas, RN, pages 1 to 74; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of December, 2024.



Randi Ginsberg, Court Reporter

FERNANDEZ & ASSOCIATES
COURT REPORTERS
444 BRICKELL AVENUE, SUITE 714
MIAMI FLORIDA 33131
(305)374-8868

RE: SONY THOMAS, RN
c/o MICHAEL DRAHOS, ESQUIRE
GRAY, ROBINSON, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401

December 9, 2024
RE: REEVES VS. CARNIVAL
CASE NO. 1:24-cv-21295-RAR
DEPOSITION OF: SONY THOMAS, RN

Michael Drahos, Esquire
michael.drahos@gray-robinson.com

Dear Mr. Drahos:

With reference to the deposition of Sony Thomas, RN, taken in connection with the above-captioned case, please find enclosed the transcript of said deposition.

Please make arrangements to have the witness read your copy of the transcript, denoting any corrections by page and line number on the enclosed errata sheet. This errata sheet must be signed by the witness and the original forwarded to Joshua Padron, Esquire.

If this has not been taken care of, however, in 30 days or by the time of trial, whichever comes first, it shall then be concluded that the reading, subscribing and notice of filing have been waived.

Very truly yours,

_______________________________________

Randi Ginsberg, Stenographic Reporter
Fernandez & Associates Court Reporters



ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

Reeves VS. Carnival
Deponent: Sony Thomas, RN
Date of Deposition: December 9, 2024

PAGE LINE REMARKS

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Signature of Witness _________________________

Dated this 19th day of December, 2024