Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:24-cv-21295-RAR

CHAD REEVES,

       Plaintiff,

-vs-

CARNIVAL CORPORATION, a
Panamanian Corporation,

       Defendant.

_____/

VIDEOTAPED AUDIO-VISUAL DEPOSITION OF
NURE KHOURY, MD

Pages 1 Through 217

Friday, January 10, 2025
9:57 a.m. - 2:21 p.m.

Nure Khoury, MD
Orleans Parrish, Louisiana

Stenographically Reported By:
Aurora C. Sloan, FPR


UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025
Pages 2..5

## Page 2

APPEARANCES:
(ALL PARTIES APPEARED VIA VIDEOCONFERENCE)

On behalf of the Plaintiff:
The Haggard Law Firm
330 Alhambra Circle
Coral Gables, Florida 33134
305-446-5700
BY:  Todd Michaels, Esquire
Tjm@haggardlawfirm.com

On behalf of the Defendant:
Gray Robinson
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
561-268-5727
BY:  Michael Drahos, Esquire
Michael.drahos@gray-robinson.com

ALSO PRESENT:
Brian Cummins, Videographer

## Page 3

INDEX OF PROCEEDINGS

TESTIMONY OF NURE KHOURY, MD                          Page
DIRECT EXAMINATION BY MR. MICHAELS                       5
CERTIFICATE OF OATH                                    213
CERTIFICATE OF REPORTER                                214

PLAINTIFF EXHIBITS

EXHIBITS:              DESCRIPTION          PAGE

DEFENSE EXHIBITS

EXHIBITS:              DESCRIPTION          PAGE

NO EXHIBITS MARKED

## Page 4

Thereupon, the following proceedings began at 9:57 a.m.:

THE VIDEOGRAPHER:  We are on the video record.  This is the beginning.  It is Friday January 10th, 2025 and the time is 9:57 a.m.

This is the video deposition of Dr. Nure Khoury regarding the matter styled Chad Reeves, Plaintiff, versus Carnival Corporation, a Panamanian, Defendants.

This is the videographer, Brian Cummins with Champion Legal.  The court reporter is Aurora Sloan with Universal Court Reporting.

Will counsel please state their appearances for the record, and will the court reporter please swear the witness.

MR. MICHAELS:  Todd Michaels on behalf of Chad Reeves.

MR. DRAHOS:  Michael Drahos on behalf of Carnival.

THE COURT STENOGRAPHER:  Raise your right hand, please.

Do you solemnly swear or affirm the testimony you are about to give in this matter will be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes, I do.

## Page 5

Thereupon,

NURE KHOURY, MD, having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MICHAELS:

Q.    Good morning, Dr. Khoury.

Could you please state your name and spell it for the record?

A.    Yes.  My name is Nure Khoury.  First name N-U-R-E, last name K-H-O-U-R-Y.

Q.    And Dr. Khoury, where are you presently located?

A.    Currently we are in New Orleans, Louisiana.

Q.    I believe that's where you live and practice?

A.    Currently, yes.

Q.    And obviously this deposition is being taken over Zoom.  I see a shoulder in the screenshot with you.

Who is that who is sitting with you in New Orleans?

A.    That is Michael Drahos.

Q.    The attorney for Carnival?

A.    Yes, sir.



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 6

Q. Now, obviously I have read your report, but before we jump in, I want to ask -- get a better understanding of what specifically you're opining to. Obviously we heard from Dr. Setaro the other day who testified to the medical standard of care.

What -- what is it that -- that you're here to testify to? Is it more evacuation procedures? Are you also opining as to the medicine?

A. To some degree of the medicine, you know, in terms of shipboard standard of care, as well as the operation standpoint.

Q. And obviously, you talk about -- about shipboard standard of care. We'll get into this a little bit.

When you say "operation standpoint," meaning the possibility of an evac either by pilot, boat, or helicopter?

A. Correct.

Q. Okay. When you talk about shipboard standard of care, I believe that -- that it's ACEP, the American College of Emergency Physicians, that -- under which the cruise line medicine falls under that umbrella? That was a horribly worded sentence. Let me try that again. Strike that.

I believe that the cruise line medicine

Page 7

generally falls under the purview of the American College of Emergency Physicians?

MR. DRAHOS: Object to the form.

THE WITNESS: Generally, yes.

BY MR. MICHAELS:

Q. Okay.

A. There's -- there's certain guidelines that are -- you know, that are under the -- under ACEP that cruise lines follow.

Q. And I know, for instance, that in terms of the American Heart Association and American Cardiology guidelines for treatment of a STEMI, in looking at the documentation, I believe that ACEP consulted on those guidelines and follows those guidelines; is that correct?

A. Generally speaking, yes.

Q. Okay. Now, I want to start off by telling the jury a little bit about who you are.

First of all, you are a neurologist; correct? A vascular neurologist?

A. Currently I'm practicing, yes, as a vascular neurologist and neurovascular surgical fellow.

Q. All right. And when we talk about vascular neurology, what is vascular neurology?

A. Diseases and conditions pertaining to the vasculature of the brain, mostly stroke.

Page 8

Q. You are not a cardiologist; is that correct?

A. No, sir.

Q. No, it is not correct, or no, you are not a cardiologist?

A. No, I'm not a cardiologist.

Q. Do you hold any board certifications?

A. Yes. I'm board certified in neurology and board eligible in vascular neurology.

Q. All right. Neurology being the area of medicine that deals with the nervous system, brain, nerves; things of that nature?

A. That's correct.

Q. Okay. And vascular neurology deals with the blood vessels that are pertinent to the nervous system.

A. Yes.

Q. Now, I notice that you -- I believe you went to a medical collage in Hungary.

Are you from Hungary? Are you from the States?

A. No. I was born and raised in the Chicago suburbs, and I went -- but I went to medical school in Budapest, Hungary.

Q. Do you speak Magyar?

Page 9

A. (Speaking in Magyar) Yes.

Q. I think all I know is that "szia" is hello; correct?

A. That's hello and goodbye.

Q. Sort of -- sort of opposite.

Now, just from looking at your resume, my understanding is that you became a doctor in 2011; correct?

A. Yes.

Q. And is the -- is the medical school process in Hungary similar to here where you go to undergrad and then you go to med school, or does it work a little differently over there?

A. It's just a little bit different.

Q. And how does that work?

A. They take the four years of undergrad and smash it into two years. So it's about 40 hours of classes per week, as opposed to the American system.

Q. And did you do your undergraduate education in the States or also in Hungary?

A. No. There -- there was no undergraduate education required.

Q. Okay. But mainly you didn't do a -- you didn't go to, whatever, DePaul in Chicago and then go over there for med school. You did your whole post high



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 10

school education in Hungary?

A. Correct.

Q. Now -- and just curious, though, because it just seems a little interesting to me. How did you end up in Hungary? What was it that -- that made you go over there? I don't know if you have family from there or --

A. Finances. Medical school was much cheaper over there than it was in the United States.

Q. And you could leave without a bunch of loans and stuff of that nature?

A. Uh-huh. Yes.

Q. Now, from review of your resume, it looks like from about 2015, you've kind of been Carnival's guy; right?

MR. DRAHOS: Object to the form.

THE WITNESS: What do you mean by "guy"?

BY MR. MICHAELS:

Q. Well, for instance, starting in 2014 or 2015 -- I think you're LinkedIn has a little different start date than your resume -- you began working as a doctor on Carnival ships; is that correct?

A. That's correct. After I finished emergency medicine in Ireland.

Q. So you went to med school -- or college med school in Hungary, you did some emergency medicine in

Page 11

Ireland for a couple of years, and then you began working as a physician on a Carnival cruise ship; correct?

A. Yes.

Q. And that's on a contract basis. You get a three or four-month contract, you work as the doctor on one ship. Then when that expires, you take a little break and then go work on another ship; correct?

A. For the most part.

Q. And that work was directly for Carnival. You work exclusively in their medical clinics during that time period?

A. Yes.

Q. Then in 2016, you actually became Carnival Cruise medical manager; correct?

A. Yes.

Q. So during that phase -- at that point, were you a direct employee or were you still a contract employee with Carnival?

A. I was still a contract employee at that time.

Q. All right. And as the medical manager, you are the medical employee within Carnival's hierarchy that oversees crew health issues; correct?

A. Yes.

Q. And the treatment given to crew is a little

Page 12

different than the -- than the treatment given to patients because there's an understanding that the medical team on the ship serves as the general practitioner for the crew members; correct?

A. We render all types of needed healthcare to -- to the crew that's emergency or primary care. But they do reside onboard for longer times than the guests, and we are responsible more so for their primary healthcare.

Q. Right.
Obviously, if they run into an emergency, they will also use the medical crew for emergencies. But as opposed to with the -- with the guests, when dealing with the crew, there also is a primary healthcare function that is served; fair?

A. Yes.

Q. All right. Then from 2018 until 2020, you actually served as the medical director for Carnival Cruise Lines; right?

A. Yes.

Q. And was that stationed at headquarters in Miami?

A. Yes, it was.

Q. And was that your primary employment or did you also have a private practice?

Page 13

A. No. That was my primary employment.

Q. Was that also under a contract basis or were you a direct employee of the cruise line?

A. That was also a contract.

Q. You know, I ask the question, sometimes we have -- we have different interpretations.
You had an office at Carnival's headquarters, you woke up in the morning and went down there to perform your job; correct?

A. Some days, yes.

Q. But there was an expectation that you weren't also moonlighting or running a private practice on your own time; correct?

A. I was not moonlighting or having my own practice.

Q. And as the medical director for Carnival Cruise Lines, you were the person ultimately in charge of all medical operations for Carnival Cruise Lines; correct?

A. For Carnival Cruise Line, yes.

Q. And I think you corrected me because I said "lines" plural, and it's actually singular; correct?

A. Well, I was making sure it's not corp.

Q. Fair enough.
The ultimate supervisor and manager of all



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 14

medical operations for Carnival Cruise Line.

A.   Yes.

Q.   And that's a 27-ship fleet, doctors, passengers on every ship, you are the -- the head of the snake in terms of hierarchy; correct?

A.   In certain areas, yes.

Q.   Okay.  When we say "in certain areas," certainly in terms of medical operations.

A.   Correct.

Q.   And that encompasses shoreside doctors, the ship bound doctors; right?

A.   Yes.

Q.   And I believe that you would have left your employment with Carnival around the time that the pandemic started; is that fair?

A.   Yeah.  Approximately.  A few months into the pandemic is when I -- is when I left.

Q.   Pandemic started, as we all remember, cruise line operations shut down, and somewhere around a couple of months into the pandemic, you left Carnival?

A.   Yes.

Q.   Obviously, you left on good terms; correct?

A.   Yes.

Q.   And one of the things that you see as a key achievement during your time with Carnival as the medical

Page 15

director was the implementation or creation of innovative approaches to mitigate medical/legal risk in the cruise industry?

A.   Yes.

Q.   Meaning innovative efforts to minimize the likelihood of being sued as a result of medical experiences that people have on ships; fair?

A.   More so in terms of, you know, decreasing risk for passengers and -- when applying any -- any medical treatment.

Q.   All right.  So as the former medical director of Carnival and one of their retained experts in this case, would you agree that any medical records or results that are generated for a patient on a Carnival cruise should be made a part of that patient's record?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Can you repeat that question, please?

BY MR. MICHAELS:

Q.   Sure.

As the former medical director of Carnival and as one of their retained experts in this case, would you agree with me that any medical records or printed results generated for a patient on a Carnival cruise should be made a part of that patient's record?

Page 16

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's dependent on, you know, what the result is, what the outcome is, what the -- what's the treatment for.

BY MR. MICHAELS:

Q.   Well, certainly from a medical standard of care, a patient's records are supposed to be retained and kept either in their electronic or their hard file; correct?

A.   Yeah.  What's part of the medical record should be retained.

Q.   So when you say it's dependant, what -- what circumstances are there where it would be appropriate to discard a record that's generated or a medical record for a patient who's treated in one of Carnival's clinics?

A.   Results that, you know, from lab equipment, et cetera, that is -- doesn't make sense, you know, there's maybe a malfunction in the machine, things like that for sure.

Also, you know, we don't document every single discussion with patients in the hospital, nor on the cruise ship.  So, you know, that would be considered part of the record.  We don't -- we don't have to document every single conversation.  You know, things of

Page 17

that nature.

Q.   All right.  So let me make sure I understand this because there are policies and procedures within Carnival's guidelines about medical recordkeeping specifically; correct?

A.   Yes.

Q.   All right.  So the question that I had initially asked you is, as Carnival's former medical director and one of their retained experts, whether you'd agree that medical records or printed results generated for a patient should be made part of their record.

You said yes, dependant.

I asked you, well, what would be a circumstance where they shouldn't be?  And I want to make sure I understood the entirety of your answer.

So one would be if there was a equipment malfunction where the record was clearly erroneous and wasn't medically significant; and two would be that there are certain conversations between a patient and doctor that simply aren't documented in the record; is that correct?

A.   Yes.

Q.   Are there any other circumstances where a medical record or an accurate medically significant medical result of a patient should not be made a part of



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 18

their permanent record?

A. Again, x-rays that don't develop correctly, you know, that's not going to become part of the record. You know, it's important to hold pertinent information in the -- in the record.

Q. Right. And I just want to reiterate that.

If there's pertinent medical information, it is important to hold that in the record; correct?

A. Correct.

Q. And it would be Carnival's policy to hold that in the record; correct?

A. It should be -- yeah. Yes.

Q. And -- and I know what you were going to say. It should be part of any medical practitioner's record to hold that in the -- or practice, to hold that in the record; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. MICHAELS:

Q. All right. So, you know, when we talked about -- about malfunction, x-rays not developing would be an example of one of those malfunctions that wouldn't be kept because they are medically insignificant; correct?

A. Correct.

Page 19

Q. Meaning, if you go take an x-ray of someone's chest, we all remember back when we used to have pictures developed, you would go to the store, and sometimes they would be double exposed, you couldn't see what was in it, and you didn't have to buy those from the -- from the Walgreens or the Eckerd's after they were developed.

That's what you're referring to with the x-rays; correct?

A. Yeah. And sometimes, you know, certain things just don't come out the way that you want. If I'm trying to get an x-ray of the chest and, you know, too much of the abdomen is in there, you repeat the x-ray, but you don't need to retain the record.

EKGs are done, sometimes they are not perfect, leads are misplaced, and then need replaced, you redo the EKG.

If a CBC result shows an elevated blood count but it's a white blood cell count and it's not really matching the clinical scenario, you repeat the blood count and you repeat it twice. And if you find that there's one abnormal result, I don't think it's really required to, you know, retain something that is -- doesn't seem to be relevant towards the case and matching it clinically.

Page 20

Q. Right.

So clearly if a -- if a printout is invalid or if it's medically irrelevant, you don't need to retain that; fair?

A. If it's medically irrelevant?

Q. Right.

Meaning, you go to take an x-ray of the chest and the way it comes out, you're looking at the abdomen and that's not where there's any issues, there's nothing you see in the abdomen. You go back and repeat it and get an actual chest X-ray, you don't have to keep the part that was taken of the wrong body part; correct?

A. Correct.

Q. Because it's not relevant to the issue that the patient is suffering.

A. Correct.

Q. Likewise, if leads are missing on an EKG, and you realize leads 2 and 7 aren't -- aren't picking anything up, you go back and repeat it with all the leads in place, you don't have to keep the first one that was incomplete or not done properly; correct?

A. For an example, yes.

Q. If, whatever, you take readings off an -- off an SPO2 monitor and it's not on their finger correctly or they are wearing dark nail polish and it

Page 21

shows 0 percent blood oxygen saturation, and then you go repeat it and see that it's 93, you obviously don't keep the one that's at 0 because they would have been dead if it was at 0 and it's obviously not accurate; fair?

A. Correct.

Q. But -- but barring a technical malfunction or something that's not accurately reflecting the client's -- or the patient's medical condition, the records should be retained?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, again, there's -- there's -- you know, there's occasions where things are -- are performed, and it -- it's not relevant.

For example, if you're going for arterial blood gas, and you accidentally draw a veinous blood gas, the veinous blood gas is not pertinent to the medical record. So you would -- you would attempt again for an arterial blood gas and don't think it's really pertinent to hold on to the veinous blood gas results.

BY MR. MICHAELS:

Q. Because it's a -- it's a mistake. It wasn't your intent to do that test in the first place.

A. Yeah. I mean, it might provide some useful



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 22

information, but the test could be repeated and a more accurate result be gotten.

Q.   And even in the example you give, if the venous blood gas, you know, gives some result, you're going to err on the side of keeping it, not discarding it, even if it wasn't your initial intent; correct?

A.   I'm sorry?  I didn't understand the question.

Q.   Sure.

If you mean to draw an arterial blood gas but you accidentally draw a veinous blood gas, even in that situation, if you go back and repeat it for the arterial, if there's anything of significance in the veinous blood gas, even just to show that the veinous blood gas were taken, you're probably going to err on the side of just including it in their record, not throwing it in the garbage can; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, it really depends on what the arterial blood gas shows because if, you know, those -- if it matches that clinical scenario, then there's no -- there's no point to retain the veinous blood gas.

BY MR. MICHAELS:

Q.   Right.

Page 23

And I know that you also said that, you know, you don't have to document every discussion, but again, it wouldn't be the standard to have a tape recorder running and to transcribe word for word into the record every discussion that you have with the patient; correct?

A.   Correct.

Q.   Or what your full thought process is.  But you're certainly going to want to make sure that medically significant information is contained in their medical record; correct?

A.   Yes.

Q.   All right.  And can we agree that it would never be appropriate for Carnival's medical staff to discard a patient's medical record or test results that is relevant to their medical care or their health condition?

MR. DRAHOS:  Object to the form.

THE WITNESS:  If it's -- if it's relevant?

BY MR. MICHAELS:

Q.   Yeah.

A.   If it's relevant, yes.

Q.   Right.

I.E., if you suspect someone might have pneumonia and you take a chest x-ray and it shows there's

Page 24

some infiltration in the left lung, you're going to -- according to protocol and procedure, it would be medically appropriate to keep that x-ray as part of their record; correct?

A.   Yes.  But if you do another repeat x-ray 30 minutes later, an hour later, I don't think it's necessary to keep, you know, two images of the same -- you know, the same doc.

Q.   If it -- if it shows something different or it shows progression, it should be kept.

A.   Yes.

Q.   Okay.  And likewise, even in that situation you described where you took another x-ray and got an absolutely identical result 30 minutes later, you're still -- you're still probably going to err on the side of just putting it in their record; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, it depends on what the result is.

BY MR. MICHAELS:

Q.   You'd agree that it's important that the patient's medical record is a complete and accurate record of that patient's health when they were in the clinic; correct?

A.   Of pertinent information.

Page 25

Q.   Sure.

Of the complete and accurate record of the pertinent information relating to that patient's health while they are in the clinic; correct?

A.   Yes.

Q.   Because obviously, what's -- what's in that record is going to be the basis of medical decisions that are made in the future; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.

BY MR. MICHAELS:

Q.   And likewise, when you're on a -- on a ship and someone is experiencing a critical medical situation or potentially emergent medical situation, there's an understanding that, at some point downstream, they are going to be seen by a successive medical staff, whether it's shoreside, whether it's back home, and you want them to be able to take a record to that downstream doctor that accurately and adequately reflects what they experienced on the ship; correct?

A.   Yes.

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.   Okay.  And likewise, would you agree that Carnival is responsible for maintaining its shipboard



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 26

medical equipment?

A. Is Carnival responsible?

Q. Yes. That's --

A. Yes.

Q. That's part of -- in any medical lab, medical office, the doctors who run that office should make sure that their equipment is accurate; correct?

A. Yes.

Q. Calibrating it, things of that nature; fair?

A. Yes.

Q. They should be making sure that automated records are accurate; fair?

A. Yes.

Q. Now, in terms of appropriate medical treatment for a STEMI heart attack, what is the guideline for the time frame -- time frame when a thrombolytic should be administered to a patient experiencing a STEMI?

MR. DRAHOS: Object to the form.

THE WITNESS: So the AHA guideline?

BY MR. MICHAELS:

Q. The guideline that is followed by the ship's medical staff. I assume that is the AHA guideline; correct?

A. I mean, that's a guideline. It's not the

Page 27

guideline.

Q. Are there any other guidelines that are utilized by the ship in the treatment of a STEMI?

A. I mean, there's --

MR. DRAHOS: Object to the form.

THE WITNESS: -- there's multiple guidelines in -- in the world, and, you know, the -- a guideline is a guideline.

BY MR. MICHAELS:

Q. Right.

A. It's a guidance. It's a reference. You can offer those treatments if they are available, but it's a -- you know, it's a unique environment. So you can't always adhere to exactly what that guideline says.

Q. And when you say "you can't always adhere to the guideline" -- "what the guideline says," you're talking about specifically on a ship because you're out at sea and don't have access to all the things you have access to on land; correct?

A. That's probably one of the major factors.

Q. Okay. But back to what I had asked you. Is there a specific guideline that is utilized by the ship for the treatment of a STEMI heart attack?

A. Again, I mean, AHA guidelines would be one

Page 28

of them, You know, they use -- they can use any resource that is science based, evidence based.

So that could be from, you know, the British guidelines, they can also be from -- UpToDate, it uses a collaboration of guidelines.

So AHA is one of the guidelines, and -- but it's not the absolute only guideline.

Q. Now, the AHA guideline is the guideline that the American College of Emergency Physicians was consulted on promulgating; correct?

A. Yes.

Q. All right. And Carnival is -- and Carnival's medical staff does -- does consider itself to be a part of the CLIA; right?

A. Carnival Cruise Line, yes.

Q. And CLIA medicine does adhere to ACEP guidelines -- or ACEP guidelines; correct?

A. I'm not aware of CLIA's policies and --

Q. Now, in terms of treatment and response times and therapeutic approaches to a STEMI heart attack, the British guidelines and the AHA guidelines are virtually identical; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I mean, I would have to review the different guidelines and -- and draw

Page 29

comparisons.

BY MR. MICHAELS:

Q. So back to what the initial question was, in terms of treatment of a STEMI --

A. Uh-huh.

Q. -- in your medical opinion, what is the time frame for when a thrombolytic should be administered to a patient experiencing a STEMI?

A. Well, is that land-based or is it ship-based?

Q. Well, a body that's -- either.

MR. DRAHOS: Object to the form.

THE WITNESS: Well, land-based, you know, thrombolytics, if -- you know, PCI can be administered, it should be within 30 minutes. But ship-based is a -- is a different -- it's a different animal. It's a different story.

BY MR. MICHAELS:

Q. Well, let's start with that. In terms of land-based/ship-based, in terms of timeliness of receiving medical care, there are times when on a ship a patient is actually able to get to the medical clinic faster than they would be able to get to a medical facility on land; correct?

MR. DRAHOS: Object to the form.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 30

THE WITNESS:  That they can get there faster?

BY MR. MICHAELS:

Q.   Sure.

A.   Because of their proximity to the medical center?

Q.   Because if you're in, you know, somewhere on land where you're half an hour away from a medical facility, or 15 minutes away from a medical facility, or you're going to have to drive there or call an ambulance. Where, when you're on a ship, you're on a ship with a medical center; correct?

A.   I mean, what you're saying is accurate.  I just don't think that, you know, the two compare.

Q.   You'd agree with the accuracy of the statement; correct?

MR. DRAHOS:  Form.

THE WITNESS:  That people can land 30 minutes from medical -- you know, from a hospital or acute medical care, and on the ship they are in closer proximity?  Yes, that's an --

BY MR. MICHAELS:

Q.   Now, in terms of thrombolytics, why would there be a different guideline or a different goal time on a ship in terms of the appropriateness of response

Page 31

time than there would be on land?

A.   It's -- it's not about a goal time.  It's about being more cautious.  You're out at sea and the risks associated with thrombolytics is -- you know, I'm giving thrombolytics nearly daily in my practice, and even then land-based, we're practicing caution.  And even -- even more so in some of the rural communities.

So we have to be mindful of that even more so when we are at sea just because of the limited access to healthcare.

Q.   Well, the risk of delaying treatment to a thrombolytic, whether on land or on sea, is death or heart muscle damage; correct?

A.   I mean, if not giving it in a timely manner?

Q.   Yeah.

A.   Damage to muscle, yes.

Q.   And part of -- and damage to muscle that could lead to either death or permanent heart injury.

A.   Yeah, or not.

Q.   Or not.

A.   Or not.

Q.   That is the risk of not -- of not providing thrombolytics in a timely manner?

A.   I'm saying --

Page 32

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- you know, there's -- there's a risk to not treating and there's a risk to treating.

BY MR. MICHAELS:

Q.   Anyone who comes in with a STEMI is already in an emergent situation which, if not treated, will likely lead to death or heart muscle injury; correct?

A.   Yes.  By definition for a STEMI, yes.

Q.   There's never a time when someone suffering from a STEMI where the -- where the best option is do nothing at all; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Do nothing at all?  I mean, again, it depends on the situation.

BY MR. MICHAELS:

Q.   Can you give me a situation -- obviously, for certain medications, there's contraindications that people have, certain preexisting conditions.

But can you give me a scenario where somebody comes in with a STEMI, a complete occlusion, and the best option is do nothing, just let them suffer the heart attack and deal with the consequences?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Well, again, I mean, you

Page 33

mentioned it yourself.  I mean, there's -- there's conditions that you need to be aware of, be mindful of, and that there's a real risk when administering thrombolytic medications.  It's very potent.

And if one of those risks, a bleed, an intracranial hemorrhage, a GI hemorrhage begins, you know, that's -- that's a -- that's a risk that needs to be considered.  And whether it can be administered correctly and timely in the correct dosages, et cetera, those are things that need to all be considered.

BY MR. MICHAELS:

Q.   And is there any reason on a ship why a thrombolytic could not be considered in a timely manner or in the appropriate dosage?

A.   I'm sorry?

Q.   Sure.

Is there any reason on a ship why a thrombolytic could not be given in an appropriate dosage or timely manner?

A.   I mean, it's a -- it's a complicated, you know, branch of medicine.  Maritime medicine is unique. It's -- everything needs to be considered.  Location, access to care, evacuation.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 34

Q.   And obviously the doctors who are aboard this ship did make the decision at some point that the administration of a thrombolytic was appropriate; correct?

A.   Yes.

Q.   One of the differences on land, when we -- when we talk about, you know, potential reasons to delay a thrombolytic and looking at the risk is, on land you might have immediate access to a PCI or a cath lab; correct?

A.   Or it's not always immediate, but you at least have access to some healthcare.

Q.   Right.

And generally if you have access to a -- to a PCI or cath lab within 120 minutes, the standard of care would be to take someone immediately to the cath lab; correct?

A.   That's -- on land, that's the standard of care.

Q.   And that could be -- and that could be complimented by the administration of thrombolytics as well; fair?  What they call drip and ship?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yeah.  But that's, you know, that's a specific scenario that you're -- that

Page 35

you're considering there.

BY MR. MICHAELS:

Q.   Correct.

And that's obviously not going to be a possibility on a ship that's at sea.

A.   I mean, I would -- drip and ship?

Q.   Getting someone to a cath lab within 120 minutes.

A.   It's a very rare situation.

Q.   Right.

A.   For any -- for any -- for any evacuation to occur within 120 minutes.

Q.   So back to what the initial question was, in terms of treatment for a STEMI, what would be the guideline for a time frame in which a thrombolytic should be administered to a patient at sea or a maritime patient?

A.   So in a maritime patient, as soon as it's safe.

Q.   As soon as it's safe to do so?

A.   Correct.

Q.   Okay.  And you're saying some of the considerations would be the possibility of a brain bleed or a gastrointestinal bleed -- I'm sorry -- some of the potentially risks?

Page 36

A.   Those are -- yeah, those are two risks.

Q.   Right.

And if those risks exist on a ship in a patient, they are going to exist whether you give a thrombolytic now or 20 minutes from now; correct?

A.   Yes.

Q.   What's the incidents in a sub-40, otherwise healthy male of suffering a brain bleed or a gastrointestinal bleed from the administration of thrombolytics?

A.   So administration of thrombolytics is in certain studies for -- it's not based on age.  It's as a general population.  It's approximately 3 to 6 percent for symptomatic --

Q.   From the administration of thrombolytics?

A.   Yes.

Q.   And is there any data that, in a younger patient, it is less likely than in an older patient?

A.   I don't know of any data.

Q.   What does the guidelines say is appropriate -- or proper dosage for adjunctive Lovenox in a patient that is suffering from a STEMI?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I would have to look at the guideline.

Page 37

BY MR. MICHAELS:

Q.   Okay.  You'd agree that the guideline should be followed, whatever it is?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, they are -- they are -- they are guidelines and in a unique environment.  So if it's safe to do so, it can be followed.

BY MR. MICHAELS:

Q.   All right.  And that's one thing you always have to look at with a guideline is, is it safe to follow it under these circumstances?  Is there a reason why we cannot follow it under these circumstances?  Is there something in this particular patient that would indicate that we should stray from the guideline?

Those are all considerations; correct?

A.   Yes.

Q.   But when we talk about a guideline, these are practice guidelines for medical professionals that are put together as a result of evidence-based study by doctors and other experts in the field over periods of time; fair?

A.   Yes.

Q.   All right.  And they are promulgated by different medical associations, whether it's the American



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 38

Heart Association, the American College of Emergency Physicians; correct?

A. Yes.

Q. All right. So I'd like to talk a little bit about -- about what a STEMI is. Okay? I just need a verbal answer. I know that wasn't much of a question.

A. Yes.

Q. First of all, when we use the term "STEMI," what we're referring to is an ST elevation myocardial infarction; correct?

A. Yes, sir.

Q. And when we say "myocardial infarction," what we are referring to is what's, I guess in popular parlance, called a heart attack; fair?

A. Yes.

Q. Even though we all use that term, what heart attack means scientifically is the blockage of blood flow to the heart.

A. It means infarction.

Q. Right. And infarction means?

A. Yeah.

Q. The stoppage of blood flow to the heart; correct?

A. The stop --

Q. I'm sorry. The stoppage of blood flow,

Page 39

period.

A. Stoppage of blood flow is ischemia.

Q. Okay. So what is infarction?

A. Infarction is -- yes.

Q. So what's the -- what's your definition of infarction?

A. Death of tissue.

Q. So the infarction would be the death of tissue from the lack of nourishment of blood to the heart; fair?

A. Yes.

Q. All right. Obviously someone who is suffering from a myocardial infarction, that is an emergent situation; correct?

A. Yes.

Q. Something that could lead to death or permanent bodily injury?

A. Yes.

Q. Now, the heart, as we discussed a little bit, is a muscle; correct?

A. Yes, it is.

Q. And short of death, the type of injury that we're generally concerned with in a STEMI is when blood flow gets cut off from the heart, the tissue of the heart muscle will permanently die and subsequently scar;

Page 40

correct?

A. Yes.

Q. And that will affect the heart's function into the future.

A. Yes.

Q. Even if someone survives; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: It -- it may.

BY MR. MICHAELS:

Q. "May" meaning based on the significance of it; correct?

A. Based on the extent of the injury.

Q. The extent and probably also the location within the heart; correct?

A. The location, the extent, the size, comorbidities; multiple factors.

Q. But when we are talking about a STEMI, you're usually looking at areas of the heart that are significant areas of the heart; fair?

A. Yes.

Q. Okay. And when we talk about the permanency of it, unlike some other body parts, the heart muscle, once it's damaged, does not regenerate or fix itself; correct?

MR. DRAHOS: Object to the form.

Page 41

THE WITNESS: That specific segment of tissue does not, but certain parts of the heart can recover and compensate.

BY MR. MICHAELS:

Q. Not the part of the heart that we're talking about here, though.

A. Not the specific segment of infarction, no.

Q. That you would see in accordance with a STEMI.

A. With any -- with death of any tissue.

Q. Now, usually a heart attack or one of these -- one of these infarctions is caused by a blood clot; correct?

A. Blood clot, ruptured plaque.

Q. Right.

And ruptured plaque, which goes on to cause a blood clot.

A. Yes.

Q. Blood clot is another one of those terms that we hear all the time, but what we're essentially talking about is a mass of blood components that clump together inside of the blood vessel and stop or disrupt flow; correct?

A. Yes.

Q. And generally, a blood clot is going to



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 42

consist of platelets, cells, fiber and protein, mesh, other components of the blood or of the plaque; fair?

A.   Yes.

Q.   And when we refer to an ST elevation, what we're referring to is a pattern on an EKG where, what is referred to as the ST segment, is elevated; correct?

A.   Correct.

Q.   And within that, there's some more specifics; over a millimeter, over 2 millimeters, on two contiguous leads, something the doctors are trained to look for; fair?

A.   Yes.

Q.   ST segment, we'll look at some EKGs as we go on, but we've all seen the printouts with the wavy lines.

The ST segment is just basically a portion of that reading; fair?  It goes from P, Q, R, S, T?

A.   Yes.

Q.   One of the features of a STEMI is a completely blocked coronary artery; correct?

A.   Well --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- it could be.

BY MR. MICHAELS:

Q.   Generally, when we see a STEMI in the

Page 43

raised ST waves, we are talking about a 100 percent occlusion, a 100 percent blockage; is that accurate?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Likely it's a -- it's a complete blockage.

BY MR. MICHAELS:

Q.   Or if not, pretty darn near close to complete.

A.   Correct.

Q.   We talk about -- about blood flow TIMI 3 would be full blood flow, TIMI 0 would be no blood flow.

Generally in a STEMI, you're looking at a TIMI 0 situation through that blood vessel; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yeah.  I'm -- I'm not a cardiologist, but I can assume yes.

BY MR. MICHAELS:

Q.   And TIMI is T-I-M-I.  It's an acronym; fair?

A.   Yes.

Q.   So in the range of heart attacks -- and obviously all heart attacks are serious -- a STEMI is generally a very serious heart attack; correct?

A.   A STEMI is a serious heart attack, yes.

Q.   I think it's what people refer to as a

Page 44

"widowmaker"?

A.   Yes.

Q.   As much as STEMIs are serious among heart attacks, they are also fairly common; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm sorry?

BY MR. MICHAELS:

Q.   I said, as much as STEMIs are serious, they are also fairly common; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know the specific percentage in population.

BY MR. MICHAELS:

Q.   Would you disagree if I told you that over one-third of people who present to the ER with acute coronary syndrome are experiencing a STEMI?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I couldn't tell you that statistic is accurate or not.

BY MR. MICHAELS:

Q.   You'd agree, though, that the key to treating someone with a STEMI is returning blood flow to the heart as soon as possible; correct?

A.   Yes.

Q.   Survival and better outcomes require the

Page 45

blocked artery to be opened and blood flow to be restored as soon as that's possible; correct?

A.   Yes.

Q.   Ideally that's within 90 minutes?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Ideally it would be immediately.

BY MR. MICHAELS:

Q.   Right.  But it can't always be immediate.

The medical -- the medical literature talks about the importance of 90 minutes?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.

BY MR. MICHAELS:

Q.   And the general evidence-based hypothesis or conclusion that doctors have come to is that if you can restore blood flow within 120 minutes, you can eliminate or minimize permanent heart damage to that part of the heart muscle; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know exactly what the literature says, but I assume based off the guidelines and the point of them, then that may be accurate.

BY MR. MICHAELS:



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025                    Pages 46..49

Page 46

Q.   There's -- there's a belief or a -- or a saying that, in terms of talking about cardiology and blood flow to the heart, that time equals muscle; correct?

A.   Yes.

Q.   And what that means is that the longer it takes to restore blood flow to the heart, the more damage that there will be to the heart's muscle; fair?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It -- it may.

BY MR. MICHAELS:

Q.   Expected.

A.   That it's expected that the longer --

Q.   That the longer it takes to restore blood flow, the more damage there's going to be.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Right.

But that curve is different for different types of ischemia and different people in the population, so.

BY MR. MICHAELS:

Q.   Sure.

But certainly with -- for someone who's suffering from a STEMI, there's an understanding in treating a STEMI, that the faster you are able to restore

Page 47

blood flow to the heart, the less damage there will likely be to the heart muscle.

Would you agree with that?

A.   Likely.

Q.   And nothing -- nothing in medicine, or life for that purpose, is certain; correct?  We deal in likelihoods and probabilities.

A.   Nothing is certain.  You're correct.

Q.   Other than death and taxes.

A.   That's correct.

Q.   Unless you live in Delaware, and then Dupont will pay your taxes; right?

A.   I don't live in Delaware, but --

MR. DRAHOS:  Is that a question?

BY MR. MICHAELS:

Q.   Not only are STEMIs comparatively frequent, there's also a criticality in treating them appropriately; correct?

A.   Again?  I'm sorry?

Q.   There's a criticality to treating a STEMI.  There's an understanding that the failure to treat it appropriately and in a timely manner could have serious consequences on the patient.

A.   Yes.

MR. DRAHOS:  Object to the form.

Page 48

BY MR. MICHAELS:

Q.   Okay.  And would you agree with me that a Carnival cruise ship should have the ability to provide appropriate emergency treatment for someone who is suffering from a STEMI?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Can you repeat that question?

BY MR. MICHAELS:

Q.   Sure.

Would you agree with me that a Carnival cruise ship, based on the frequency and the -- and the criticality of a STEMI heart attack, that the medical staff on a Carnival cruise ship should have the ability to provide appropriate emergency treatment for a STEMI?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I -- I think the goal of the cruise ship medical center is -- is not to treat, but to stabilize for the next step.

BY MR. MICHAELS:

Q.   Well -- right.

Certainly for certain conditions you want to be able to treat it.

If someone comes in with a bacterial infection, you want to be able to give them the antibiotics to eliminate that infection; correct?

Page 49

A.   Yes.  But again, depending on the severity, the objective is to stabilize.

Q.   Right.

You want to -- you want to stabilize someone, keep them alive, and minimize damage until you can get them to the next level of care.

A.   The next possibility, yes.

Q.   If someone comes into a land-based emergency room, the ER is going to stabilize them, but you'll have a hospitalist there, and if they need it, they can be immediately admitted.

You can't do that on a cruise ship.

A.   Yes.  Or in rural centers, you know, that can be also to stabilize and transport.

Q.   Right.

And transport at the safest and earliest point of possibility; correct?

A.   Of possibility.  Yes.

Q.   Now, in fact, I think that, from my review, the testing that is done for cruise line medical doctors actually includes a scenario where they are shown an EKG of someone suffering from a STEMI to see if they are adequately able to identify it and provide an appropriate therapy for it; is that correct?

A.   I'm not sure what the actual test is at



**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 50

this point.

Q.   As the medical director, that was something you were familiar with at the time you were there; correct?

A.   It would be -- at the time I was there, it would have been appropriate to ask somebody if they could identify conditions on an EKG.

Q.   Right.

And in fact -- I don't know if you reviewed them, but as part of Dr. Leonards' hiring process, one of the scenarios that he was given was an EKG strip that showed someone with a STEMI, and he had to identify it and describe the appropriate treatment; correct?

A.   I would have to see his test.

Q.   All right.  So you have not -- you have not reviewed those documents; is that fair?

A.   Of Dr. Leonards' exam?

Q.   Yes.

A.   I don't recall seeing it.

Q.   Would you agree with me that, as of July 2023, the medical clinic of the Carnival Freedom did have the necessary equipment to emergently diagnose a STEMI?

A.   To diagnose?  Yes.

Q.   And while there wasn't a cath lab, it

Page 51

certainly had the necessary equipment and medications to treat a STEMI per the guidelines with thrombolytics; fair?

A.   Really, again, the goal is not to treat. It's to stabilize.  That medication exists onboard.

Q.   Stabilize meaning what we -- what we discussed earlier.  You want to be able to keep them alive and minimize damage until they are able to get to the next stop.

A.   Correct.

Q.   And whether on land or on sea, if they are not able to get to a cath lab within 120 minutes, part of that is the appropriate administration of thrombolytics and the adjunctive therapies; correct?

A.   Can you repeat that, please?

Q.   Sure.

Whether on land or at sea, short of a cath lab, the way you want to stabilize someone who is suffering from a STEMI is through the appropriate use of thrombolytics and the adjunctive therapies; correct?

A.   Correct.  Though, those are different entities and should be looked at differently.

Q.   What are different entities that should be looked at differently?

A.   Land and sea.

Page 52

Q.   I want you to hold onto that thought because we're going to come back to that.

THE WITNESS:  Can we do a break?

MR. MICHAELS:  Yeah.  We can -- we can take a break.  It's 10:45.  Let's come back at 10:50 if that gives you enough time to do what you need to do?

THE WITNESS:  I'm going to need three or four more minutes because the bathroom is a little far away.

MR. MICHAELS:  We'll come back at 10:55. 10 minutes.

THE WITNESS:  Okay.  Thanks.

THE VIDEOGRAPHER:  Going off the video record.  The time is 10:45 a.m.

(Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)

THE VIDEOGRAPHER:  We're back on the video record.  The time is 10:57 a.m.

BY MR. MICHAELS:

Q.   Doctor, I think I know where we left off, and I want to make sure we get back there.  But I was just thinking about some of your answers while we were on the break, and I just wanted to -- wanted to ask.

Page 53

You had talked about evacuation as soon as possible.

What does -- what does that mean?

MR. DRAHOS:  Object to the form.

THE WITNESS:  When it's safe.

BY MR. MICHAELS:

Q.   Right.  And what would-- what would define safety?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Evacuation in a maritime setting, safety takes into consideration a lot -- a lot of things.

BY MR. MICHAELS:

Q.   What kind of things?

A.   Ship position; weather; local resources.

Q.   Now, you had -- you had talked a little bit about it in a -- with a STEMI, particularly with the administration of therapeutics, but I think you said in excess of 30 percent of the time, people can suffer -- patients can suffer a bleed, an intracranial bleed or a or a GI bleed; is that correct?

A.   No, I didn't say 30 percent of times that they can have a bleed.  I said 3 to 6 percent of patients in a -- in a stroke scenario, they can have a symptomatic intracranial hemorrhage.  3 to 6 percent, not 30 percent.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025
Pages 54..57

Page 54

Q. Okay. So -- and I misheard that. I don't know if the court reporter did as well.

So it was 3 to 6 percent of the time in a -- when suffering from a stroke, if you administer a thrombolytic, there can be a brain bleed; correct?

A. Correct.

Q. But obviously a stroke involves a situation where the clot is in the brain or affecting blood flow to the brain itself; correct?

A. Correct.

Q. Do you know what those numbers look like for an intracranial bleed when we're talking about a STEMI?

MR. DRAHOS: Object to the form.

THE WITNESS: No, I do not.

BY MR. MICHAELS:

Q. Okay. Because a stroke itself can actually cause a brain bleed; correct?

A. A stroke, of course, it can cause a brain bleed. But when we're talking about in terms of thrombolytics, the incidents is 3 to 6 percent.

Q. All right. But -- and how do we know in a stroke scenario how many of those brain bleeds are caused from the therapy as opposed to from the stroke itself?

A. Usually because of the timing of the bleed.

Page 55

Q. That the bleed would start after the administration of the thrombolytics?

A. Correct.

Q. All right. So that is based on some assumptions; correct? the 3 to 6 percent, meaning, we don't know if it was a result -- if the thrombolytics aren't working and the stroke is causing the brain bleed. There's some things we have to assume to even get up to that number of 3 to 6 percent in a stroke scenario; correct?

A. I'm not sure I understand the question.

Q. Well, we can strike it and move on.

But when we are talking about a cardiac event, you don't know what the numbers show in terms of incidents of a brain bleed from thrombolytics; correct?

A. No.

Q. All right. And when you have that kind of risk of a potential brain bleed or a situation where someone is still in the situation where they benefit from getting to a cath lab, if it's possible to safely evacuate, you're going to want to do that sooner than later; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: What -- the question again? I'm sorry?

Page 56

BY MR. MICHAELS:

Q. Sure.

When you've got a situation where, even with the administration of thrombolytics, there's some risk of a -- of a brain bleed, which cannot be treated on the ship, or you might still be in a scenario where they have been administered the thrombolytics, but there's still a benefit in getting the patient to a cath lab for a PCI, one of the considerations that the ship's doctors are going to want to consider is how soon you can safely get the patient off the ship; correct?

A. Safely, yes.

Q. Okay. And the process of evacuation would generally be carried out by the ship's captain; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: What -- what entails the process?

BY MR. MICHAELS:

Q. I don't know. You were the medical director for Carnival Cruise, not me. But my understanding is obviously at some point they either have to make a decision to divert, to speed up, to make contact with the Coast Guard, that's going to be done by the captain, not the medical team; correct?

A. The doctor identifies the need for the

Page 57

evacuation.

Q. Okay. And then they notify the ship's captain.

A. And then they notify the ship's captain.

Q. And the ship's captain is the one who basically makes the determination of whether it is, one, logistically feasible; and two, how it would be effectuated or who to contact; correct?

A. It's different in every single situation because you're looking at local resources first. The --

Q. You mean proximity to a, in this case, cath lab?

A. Proximity to a cath lab or -- yeah, what are -- what are -- what hospitals are in the -- in the area? How quickly and, you know, is it going to change management?

And again, the point is to stabilize the patient, keep them stable, and then move them back to that point.

Q. But that would be -- that would be the result of a collaborative decision between the medical staff medically, and the captain logistically. Is that accurate or inaccurate?

A. Yeah, that could be accurate.

Q. All right. Now, you know, we spent so much

 **UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025                    Pages 58..61

Page 58

time throughout this case talking about air evacuation.

Is air the only means of evacuation on a ship like the Carnival Freedom?

A.   No.

Q.   What are the other means of evacuation?

A.   Boat.

Q.   Coast Guard pilot boats?

A.   Correct.

Q.   They come out and meet the ship, and then bring people into shore if there's a place where they could go that has adequate hospital?

A.   Correct.

Q.   And what's the range of a pilot boat? How -- are they limited to within three, four miles of shore or do they have more significant range?

MR. DRAHOS:  Object to the form.

THE WITNESS:  A pilot boat?

BY MR. MICHAELS:

Q.   Or whatever boats the Coast Guard use to evacuate people.

A.   I'm not sure of the actual full range.

Q.   And how is a passenger disembarked from a ship onto a Coast Guard boat, whether it's a cutter or a pilot boat, whatever it is?

A.   They pull alongside and load the patient on

Page 59

there.

Q.   Meaning, they put him in a stretcher and wheel him from one boat to the other?

A.   Yes.

Q.   All right.  So not a situation where you would have to hoist somebody up in a basket or anything like that?

A.   Correct.

Q.   And generally, when the Coast Guard sends a team out to evacuate someone suffering a medical emergency on a ship, does that person -- does the Coast Guard send out either people with medical or people with EMT training so that they can maintain some level of care until the patient is brought to shore?

A.   Not always.

Q.   Is that something that you see sometimes, if necessary?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'd say most scenarios I have not seen that.

BY MR. MICHAELS:

Q.   Okay.  And you say "most."

Are there some scenarios where you have seen that?

MR. DRAHOS:  Object to the form.

Page 60

THE WITNESS:  To be honest, not that I can recall.

BY MR. MICHAELS:

Q.   And all I'm asking is to be -- you've been honest about everything else, too; right?

A.   Yes.

Q.   Okay.  Good.

Do you know what the -- in terms of planning evacs, obviously that was something that you had to be concerned with as the medical director; correct?

A.   Yes.

Q.   And help me understand, when we're talking about evacuation by sea, how far offshore have you seen those take place?

MR. DRAHOS:  Form.

THE WITNESS:  What kind -- yeah.  You have to be more specific on the type of evacuation. Which country is, you know, performing the evacuation?  Which type of boat?  And what's the medical condition?

BY MR. MICHAELS:

Q.   Well, let's say you're talking about a ship that's moving from the Orlando area south on the coast of Florida between Florida and the Bahamas, would that be within range for a sea evacuation?

Page 61

MR. DRAHOS:  Object to the form.

THE WITNESS:  It depends on multiple factors really.

BY MR. MICHAELS:

Q.   What are those factors?

A.   Number one is weather.

Q.   I'm not talking about weather.  I'm talking generally, whether -- if the conditions are right, whether -- whether the Coast Guard boats that perform sea evacuations would have the range to perform an evacuation in that area?

MR. DRAHOS:  Object to the form.

THE WITNESS:  They could have the range.

BY MR. MICHAELS:

Q.   Okay.  And what I'm getting at, there is -- obviously if it's a transatlantic voyage and the boat is 500 miles south of Greenland, you're not going to have a Coast Guard boat that's able to get out to that ship and evacuate somebody.

If a boat is 20 miles from Florida, would they have the ability to do so?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That -- that depends on -- on the Coast Guard, what their capabilities are, what they are willing to do.  Does the flight surgeon


UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 62

see -- see a need?  Is the patient being treated appropriately?

There's -- there's a lot of moving parts to any evacuation, and it's moving by the seconds, so.

BY MR. MICHAELS:

Q.    All right.  From your review of the materials in this case, when did the captain first become aware that there even was a medical emergency onboard?

A.    The captain was not -- was not notified.

Q.    Was never notified; correct?

A.    Correct.

Q.    And so in terms of -- and it would be the captain that would ultimately make contact with the Coast Guard or begin the process of an evacuation; correct?

A.    It would be joined with -- with the -- with the treating doctor.

Q.    But the treating doctor, part of -- when you were medical director, part of the treating doctor's responsibilities isn't to initiate a call to the Coast Guard and see if they can come meet the ship.  That's the captain that does that; correct?

A.    Correct.

Q.    Okay.  And in this case, whether it was possible or not, the captain was never even given the

Page 63

opportunity to make that call; correct?

A.    But it wasn't required.

Q.    That's not what I'm asking you.

The captain was never notified; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.  I said that before.

BY MR. MICHAELS:

Q.    So back to where I think we were before we went on break, you'd agree with me that the -- it's important that the shipboard doctors have the skill and training to quickly recognize a STEMI; correct?

A.    Yes.

Q.    And to begin to initiate therapies to stabilize the patient; correct?

A.    Yes.

Q.    For instance, you'd agree -- when we talk about the ability to recognize, you'd agree that the doctors on Carnival Freedom had access to an EKG machine?

A.    Yes.

Q.    And that is the standard, along with the review of systems for diagnosing a STEMI; correct?

A.    Yes.

Q.    Obviously, the doctors would have the ability to review a patient's symptoms.

A.    Yes.

Page 64

Q.    Okay.  Likewise, doctors on staff and onboard the Carnival Freedom in July of 2023 would have had access to shoreside cardiologists in case they had questions or issues in interpreting an EKG; correct?

A.    If they have questions, yes.

Q.    Or if they have questions about what therapy is appropriate, they can also reach out to the shoreside cardiologists for those purposes; correct?

A.    If they feel it's necessary, yes.

Q.    And that system is devised so that they can very quickly get in touch with the shoreside cardiologists, can very quickly transmit lab results or test results to the cardiologist, and have rapid conversation with them; is that fair?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yeah.  But if it's -- very rarely is it rapid.

BY MR. MICHAELS:

Q.    Whether it's rare or not rare, it exists and it's something that is available to the doctors; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yeah, but, you know, if they require it, you know, it's -- if they -- if they feel the need to really consult with a specialist,

Page 65

they have that ability.

BY MR. MICHAELS:

Q.    Right.  But like if a shipboard doctor received back an EKG and said, I know this is abnormal but I'm not a cardiologist, I would like a cardiologist to look at this, they could do that.

A.    If they felt the need to, they could.

Q.    Okay.  And how would that happen, how does that process work?

A.    They would -- I'm not sure who the current provider is for -- for their consults, but I'm certain that there's a telephone line that they could contact, let them know what specialist they would like, they would have to allocate that specialist, and then if they were available at that specific moment or not.

Q.    And when you say a number they could contact, meaning Carnival has shoreside -- a shoreside medical team, and one thing that they have is a hotline that doctors can immediately get in touch with if they need anything from the shore; correct?

A.    Again, I can't speak to the -- to the exact procedure, especially in 2023 or 2022, but I'm sure that there's a phone number that you contact.

Q.    Now, as of 2020, you were the medical director over shoreside and shipboard medical staff;

 UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 66

correct?

A.   Correct.

Q.   And as an expert in this case, you're -- you're opining in part as to the appropriateness of the medical care; correct?

A.   Correct.

Q.   And you can't tell me with any specificity how that would work, a shoreside consult?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I can tell you because the provider has -- has changed in the meantime.  So I can speak to the process in 2020.

BY MR. MICHAELS:

Q.   All right.  Well, let's start with the process of 2020, regardless of whether the actual provider has changed, how did the process work?

MR. DRAHOS:  Object to the form.

THE WITNESS:  You would -- you would contact the -- a certain hotline phone number, and then you would tell them which --

BY MR. MICHAELS:

Q.   Let me -- let me stop you there.

Is that -- the other side of that hotline, is that manned by Carnival staff?

A.   No.

Page 67

Q.   Who's it manned by?

A.   At that time, it was Larkin Hospital.

Q.   Okay.  And there's a contract that exists between Larkin and Carnival setting out the terms of that; correct?

A.   In 2020?  Yes.

Q.   And there is staff on the other -- and there's staff on the other side that's available 24/7; correct?

A.   To answer the phone, yes.

Q.   And they serve almost as a dispatch.  Hi, this is Dr. Smith.  I'm on the Carnival Allure -- I don't even know if that exists -- I need help reading an EKG.  Can you put me in touch with the cardiologist; correct?

A.   I don't think it was that intuitive at that time, you know, but yes.  Can I speak with a cardiologist?  And then you would go -- it would take some time to gather them.  If it's 2 in the morning, you have to wake them up, et cetera, and then recontact.  So it could take some time.  It's not an immediate thing.

Q.   And obviously, the initial contacts in this case did not occur at 2 in the morning; correct?

A.   I'm sorry?

Q.   The immediate contact -- the initial contact between Mr. Reeves and the medical staff on the

Page 68

Carnival Freedom did not occur at 2 o'clock in the morning; correct?

A.   No.

Q.   But similar to a hospital type situation on land, there is -- there is a doctor or some doctors who are assigned, who are on call during that period to take those calls; fair?

A.   They're -- they're assigned.  I can't speak to anybody else's process and how they dispatch their specialists.

Q.   But meaning that the dispatchers, they are not -- you know, when they get that call from a ship, they are not going and getting the yellow pages and looking up cardiologists and trying to find someone to take a phone call.

There's people for them to call; correct?

A.   I can only assume so.

Q.   Certainly, when you were the medical director, it wasn't, you know, take the call, fish out an old yellow pages, look under C for cardiology, and try to find a doctor who will take the call.

A.   No.

Q.   You had doctors that -- cardiologists, neurologists that were available as part of a contract with Carnival to be called during specific time slots.

Page 69

A.   There were specialists available, yes.

Q.   Okay.  The doctors onboard had the -- and in this case, did the shipboard medical staff ever reach out for any shoreside consults?

A.   They didn't feel it was necessary, so no.

Q.   All right.  And I understand that's your position, but I'm going to ask you to focus on answering the question I ask.

Is there any evidence in this case that the shipboard medical staff ever reached out to any shoreside consults?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  They are -- they are -- they clearly stated no, they did not.

BY MR. MICHAELS:

Q.   Okay.  The doctors onboard would have had the ability to administer an IV; correct?

A.   Administer an IV?

Q.   Sure.

They had -- they had the necessary equipment to hang an IV, they had IV bags, they had tubes, they had needles.  They could administer an IV on the ship; correct?

A.   Yes, they have medical equipment.

 **UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025                          Pages 70..73

Page 70

Q.   They had access to thrombolytics; correct? In this case, alteplase.

A.   They did.

Q.   And when we talk -- we've used the term "thrombolytics." Just for the purposes of the record and the jury, I just want to make sure that we're clear and everyone is clear what a thrombolytic is.

A thrombolytic is a medicine that's commonly known as a clot buster; fair?

A.   Yes.

Q.   And the reason it's called a clot buster is because what it does is it targets blood clots and it breaks them up; fair?

A.   Correct.

Q.   And in doing so, restores blood through that occluded vessel.

A.   Yes.

Q.   Okay. Likewise, the doctors on the ship had access to heparin or, in this case, Lovenox; correct?

A.   Correct.

Q.   And Lovenox is an anticoagulant?

A.   It's not a direct anticoagulant.

Q.   What it does is it prevents new clots from forming; correct?

A.   Yes.

Page 71

Q.   So -- and someone used this example the other day and now I've been using it throughout the depositions. If you analogize it -- analogize it to the world outside of medicine, if you're trying to get snow off a driveway, the clot buster is the shovel, shoveling the snow, the Lovenox is whatever is stopping new snow from falling; fair?

A.   To some degree, yes.

Q.   Okay. As the former medical director for Carnival and their retained expert in this case, what training do Carnival shipboard staff receive in treating a STEMI?

A.   So doctors onboard Carnival are required to have emergency medicine and critical care treatment, and, you know, therein lies your -- your treatment of a STEMI.

Q.   So they have to show that they can do ALS -- what's the basic life, BL --

A.   BLS, ACLS.

Q.   BLS, ACLS.

As part of their training, I think, they need three years in either emergency medicine or critical care medicine, and within that, they would know how to treat a STEMI?

A.   Correct.

Q.   Do they receive any specific training

Page 72

regarding STEMIs from Carnival?

A.   I would have to look at the specific training segments for Carnival in order to answer that.

Q.   All right. And how does training occur for the doctors? Is that through written materials or is there actual training sessions or videos they are supposed to watch or anything of that nature?

A.   Well, the bulk of STEMIs is taught -- you know, treatment of STEMIs, identifying STEMIs is taught in medical school.

Q.   Right.

A.   And then that's put into practice when you graduate, and in an emergency room you're seeing them quite often.

Q.   And I believe that Dr. Leonards had only been practicing medicine for a few years after going to medical school in South Africa?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes, South -- yes, South Africa, I believe.

BY MR. MICHAELS:

Q.   And among the recent work on his resume at the time he applied with Carnival was that he had worked in a call center processing payments for an English company.

Page 73

Do you know whether that's accurate?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I do not.

BY MR. MICHAELS:

Q.   What testing did Carnival's -- strike that.

Let's go back before that. I want to sort of talk about what role doctors are playing.

When you have got a Carnival Cruise -- in fact, let me pull up the specs for the Carnival Freedom.

When you have got a ship like the Carnival Freedom, do you know -- it's what's called a Conquest-class cruise ship.

Do you know what that means as the former medical director?

A.   Of the Conquest-class? Yes.

Q.   Yeah. And what does Conquest-class mean?

A.   The Conquest-class is -- is the class of the ship. It's in terms of their structure and their size.

Q.   Right.

And so looking at -- looking at the specs on Wikipedia, I have an indication that on a voyage, the ship has 1,150 crew members.

Does that sound accurate?

MR. DRAHOS:  Object to the form.



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 74

THE WITNESS:  Maybe.

BY MR. MICHAELS:

Q.   Certainly it's normal for a Conquest cruise ship to have a crew of over 1,000 crew members; correct?

A.   It could have less.

Q.   I'm -- I'm referring to this specific ship.

Do you have any reason to believe that this ship has less than 1,150 crew members?

A.   I couldn't tell you specifically, you know, the exact number of crew per class of ship.

Q.   All right.  And it looks like -- it looks like it can accommodate up to 2,974 passengers?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Okay.  That sounds about -- in the ballpark at least.

BY MR. MICHAELS:

Q.   And certainly in your -- in your experience in dealing with Carnival when you talk about these bigger ships, these bigger class of ships, there's nothing unusual about a ship having a few thousand guests and a thousand or so crew members on any particular voyage; correct?

A.   That's correct.

Q.   And in terms of the staffing for the medical clinic, what you have essentially got are a

Page 75

senior doctor, a doctor, and then a team of nurses; correct?

A.   Correct.

Q.   And the idea is that, whether these ships are three, four, seven, one-day cruises, whether they are going from Miami to Paris or whether they are around the Caribbean or in the Gulf of Mexico, that, while onboard, the medical clinic is the only place to receive medical treatment; correct?

A.   While onboard the ship?

Q.   Yes.

A.   Yes.

Q.   There's obviously -- if you're in port, there might be other options.  But once that ship disembarks and is out at sea, the only place to receive medical treatment is in the medical clinic; correct?

A.   Correct.

Q.   What testing is done before -- well, let me go back and strike that.

So during the time that the ship is at sea, the crew, the passengers, if they have any medical needs whatsoever, they have to rely on the ship's medical staff; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Can you please repeat that

Page 76

question?

BY MR. MICHAELS:

Q.   Sure.

If somebody breaks a leg, suffers a heart attack, comes down with a bacterial infection and needs antibiotics, their option on the ship is to go to the clinic; correct?

A.   Yes.

Q.   And what testing is done -- before a ship is sent out to sea with Carnival's employees on it and Carnival's customers on it, what testing is done of the doctors to make sure that they are capable to handle the types of medical incidents that they are likely to see during the voyage?

A.   There is a -- number one, you know, most of these doctors either have three to four years of experience in emergency medicine, if not more; they also have significant exposure; they have gone through medical school training; they are all licensed in their own countries; and there's an entrance exam that -- that's provided by Carnival for -- for doctors as well.

Q.   Meaning that they are all licensed in some country, they have all had three to four years of experience in some country, then when they apply with Carnival, they do take a practical exam to test them on

Page 77

things that they are like to encounter; correct?

A.   Correct.

Q.   Okay.  And again, the licensing, they don't have to be licensed in the United States; correct?

A.   They don't since the ships primarily don't operate only in the United States.

Q.   Correct.  But meaning that if a customer, a cruiser is getting onboard in Miami and they get an ingrown toenail on the dock, a doctor from South Africa or India or Botswana that is going to be treating them on the ship wouldn't even be licensed to treat them on the dock for that ingrown toenail; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Depends on which dock.  If you're a Botswanian doctor on the dock in Botswana, then yes, they are.  But depends on what country they are licensed in and what country you're at.

BY MR. MICHAELS:

Q.   And I was talking about on the dock in Miami.

But the point is, if they're not licensed in America, they couldn't treat a patient on the dock in Miami; fair?

A.   Just as much as I can't treat a patient on



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 78

the dock in Mexico.

Q.    And this test, who puts that test together? What does it consist of?  What is it based on?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know at this point.

BY MR. MICHAELS:

Q.    What about back when you were there in 2020, were you involved at all in the formulation of that test?

A.    No, I was not.

Q.    Okay.  Certainly, it's something that you have reviewed?

A.    I would have at that time, but that wouldn't have necessarily been in 2020.  I may have reviewed it in 2018 or 2019.

Q.    And can you tell me who formulated it or what the goals of the test itself were?

A.    At that time?

Q.    Yeah.

A.    I couldn't tell you.

Q.    Certainly you'd agree that the doctors on a ship, one of the things that they should be able to do is read and interpret an EKG; correct?

A.    Yes.

Q.    Are the doctors provided with any practice

Page 79

manuals or guidelines when they are working?

MR. DRAHOS:  Object to the form.

THE WITNESS:  They are provided with some access to online resources.

BY MR. MICHAELS:

Q.    Okay.  So it's not like the old days where they have a library of books, but they have access to some online resources that if they need to consult them in treating a patient, they can do so.

A.    Yes.

Q.    And as of the time that you were aware of it, what were those online resources?

A.    I believe they had access to UpToDate at that time, as well as some of the, I think, European equivalents.

Q.    All right.  And for the benefit of the ladies and gentlemen of the jury, what is UpToDate?

A.    UpToDate is an online -- online resource, probably the most common in medical literature, and it combines guidelines, studies, et cetera, in order to have an encyclopedia of -- of medical knowledge in terms of treatment, diagnostics, pathology, pathophysiology, et cetera.

Q.    Sort of like the Physicians Desk Reference combined with an encyclopedia of practice guidelines and

Page 80

manuals; fair?

A.    Yes.

Q.    And they are organized in such a way that if someone is suffering from a STEMI heart attack or someone has a question for -- about an interpretation of an EKG, they can click on a particular link and it will take them right to that section?

A.    Every doctor uses it every day.

Q.    And if I'm correct, the UpToDate guideline for the treatment of the STEMI includes the AHA guideline; fair?

A.    I would have to look at UpToDate and what its -- what its references are because it's a combination of multiple resources and guidelines.

Q.    What are the ship's policies or Carnival's policies, general policies, in treating people who present to the clinic with acute coronary syndrome --

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.    -- or symptoms which may indicate acute coronary syndrome?

A.    I would have to look at the policy.

Q.    And again, you're -- you're here in this case testifying as an expert on behalf of Carnival that the treatment was appropriate.

Page 81

Do you know, as you sit here now, what the policies are as they deal with treating people who present with acute coronary syndrome?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I would have to look at the specific policy.

BY MR. MICHAELS:

Q.    All right.  I'm going to ask you some questions to see if there's some things that you remember offhand.

Would you agree with me that part of the policy is that an EKG should be provided to the patient within 10 minutes of their presentation at the clinic?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know if that's specifically in the policy.

BY MR. MICHAELS:

Q.    You reviewed the deposition of Dr. Desai in this case?

A.    I did.

Q.    Do you recall Dr. Desai testifying that the policy is that the patient should be given an EKG within 10 minutes of presentation at the clinic?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I would have to look at his



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 82

deposition again.

BY MR. MICHAELS:

Q.   Okay.  You don't remember as you sit here now?

A.   I do not.

Q.   Would you agree with me that part of the policy is that, if that EKG is abnormal but nonspecific as to any particular diagnosis, it should be repeated within 15 to 30 minutes?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I would have to look at the policy.

BY MR. MICHAELS:

Q.   You don't know as you sit here now; correct?

A.   I do not.

Q.   Back when you were a senior physician on a ship, were those policies in place?

A.   I don't recall.

Q.   When you were the medical director, were those policies in place?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It may have been.  We were implementing a lot of policies in 2019/2020.  I was not involved in every single policy and

Page 83

procedure that was being implemented.

BY MR. MICHAELS:

Q.   If a patient is diagnosed as experiencing a STEMI, are there any policies or guidelines that the ship utilizes which dictate how long or within what time frame a doctor should initiate therapies?

A.   I would have to look at the policy.

Q.   Do you know whether there's any policies as to what guideline they should follow in determining what therapies and in what doses medication should be administered?

A.   Again, I would have to look at the policy.

Q.   Is part of the policy that if someone is suffering from an ACS, that the captain should be immediately notified in case an evac is necessary or warranted?

A.   That if someone is experiencing ACS?

Q.   Yeah, acute coronary syndrome -- or acute cardiac syndrome.

A.   Well, I would have to look at the policy, but I would be quite surprised.

Q.   Now, it's my understanding that the doctor in the clinic on the Carnival Freedom at that the time that Chad Reeves presented would have been Brent Leonards; is that correct?

Page 84

A.   Yes.

Q.   And Brent Leonards is -- he was the only doctor in the clinic when the ship was at sea, he would have been the only medical option available to Chad Reeves at that time; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  In that specific moment?  I mean, that's who was available in that specific moment.  But should they wanted another provider, I'm sure they could have requested Dr. Desai.

BY MR. MICHAELS:

Q.   Dr. Leonards, Dr. Desai, they were the two doctors available, and Dr. Leonards was the one who happened to be in the clinic; correct?

A.   Yes.

Q.   And I don't know that it makes a difference, but there's no indication that the patient, that Chad Reeves was even aware that there was another doctor on the ship; correct?

A.   You would -- you would have to speak with Mr. Reeves.

Q.   I have.  A few times.
     The -- moving -- we talked in generalities.
     Specific as to Brent Leonards, at the time that Chad Reeves presented in the medical clinic, what

Page 85

would Carnival have done to ensure that Brent Leonards would be able to adequately recognize and respond to a STEMI or to a patient who's suffering from a STEMI?

MR. DRAHOS:  Object to the form.

THE WITNESS:  They would ensure his credentials and his experience and references.

BY MR. MICHAELS:

Q.   Meaning that he was a licensed doctor somewhere in the world.  And what would the references consist of?

A.   References, I believe, from other physicians, colleagues, et cetera.

Q.   So as part of their application process, they have to put down past staff that they've worked with, and then Carnival will reach out to them?

A.   I believe so, yes.

Q.   Okay.

MR. MICHAELS:  It's 11:30.  I should have taken advantage of it when you did, but let's take a five-minute break.  11:32, we'll go to 11:37.

THE VIDEOGRAPHER:  We're going off the video record.  The time is 11:32 a.m.

(Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)

 UNIVERSAL Court Reporting

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 86

THE VIDEOGRAPHER:  We are back on the video record.  The time is 11:39 a.m.

BY MR. MICHAELS:

Q.    So Dr. Khoury, about a half an hour ago, you had said land and sea are -- land and sea are different entities which should be looked at differently, and I told you to hold onto that and we'll come back and talk about it.

What I want to know is, in terms of recognition and treatment or stabilization of a patient who's suffering from a STEMI, tell me how it would be looked at differently on -- in a land-based hospital as opposed to at sea in the circumstances that Mr. Reeves was.

A.    So in treatment of a STEMI, you know, obviously, you know, the big -- the big question here is when the treatment is -- you know, number one, an evacuation is required at sea, which is a dangerous maneuver and very rarely achievable within the window.

Where on land, there's infrastructure in place within the EMS community and hospital systems, et cetera, to get these patients in that -- in that window.

Q.    And I think what you're -- I think what you're saying there, if I could -- if I could just clarify is at sea, evacuation at sea would be mandated in

Page 87

order to get someone to a cath lab within two hours; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It's -- well, that's saying that it's possible.  It's very rare to get any --

BY MR. MICHAELS:

Q.    Not -- and I don't mean to imply that it's possible.  I'm trying to understand your answer.

A.    Correct.

Q.    Okay.  So putting -- putting the cath lab aside because I think we can all agree it's not realistic to -- that you're going to get him to a cath lab in two hours.  Tell me how treatment or stabilization of a patient with STEMI would differ at land versus at sea.

A.    So again, you know, we discussed before administration of thrombolytics takes careful consideration, considering the repercussions of that medication, and, you know, what's -- what's available in close proximity to the vessel to -- in case there is a side effect or adverse effect.

So it needs more consideration than on land.

Q.    Well, let me ask you this.  If it's your position, which I don't disagree with, that getting a patient to a PCI capable cath lab within two hours is not

Page 88

likely, if even possible on a ship, and if the choice is made not to be given therapeutics other than acute palliative care, meaning helping them die, what could be done for a patient who is suffering from a STEMI on a ship?

A.    From a STEMI, the next step would be to consider -- to consider and offer thrombolytics.

Q.    To consider what?

A.    Thrombolytics.

Q.    Right.

And what I'm saying is, if you don't do thrombolytics, what else can you do for a patient other than watching them suffer a massive heart attack and die?

A.    You can do conservative therapy.

Q.    What would conservative therapy be?

A.    Just going based off of, you know, stroke care for -- we don't always necessarily decide to give thrombolytics, even though they are on land and qualified.  We take a look at the scenario and we offer it.  And if they don't, then it's, you know, dual antiplatelet, which I believe was provided in this case, aspirin, Plavix, et cetera.

So supportive therapy for blood pressure, heart rate, that includes beta blockers, a statin, also for plaque stabilization.  Things like that.

Page 89

Q.    So now -- now you're talking about -- you mentioned, you know, going off a stroke case.

This is not a stroke case; correct?

A.    No, it's -- it's not.

Q.    All right.  And as we already talked about, when you're talking about a STEMI, you're talking about complete occlusion of a coronary artery; correct?

A.    Right.

Q.    So aspirin, Plavix, those are generally adjunctive cares or complimentary therapies to a thrombolytic in treating a STEMI patient; correct?

A.    Well, aspirin is given immediately before thrombolytics are usually even considered.

Q.    Sure.

But it is part of a therapy, but it is part of a therapy recommended along with thrombolytics; correct?

A.    It's part of that algorithm.

Q.    When you're talking about a complete occlusion, aspirin, Plavix, beta blocker, statin, there's no belief that any of those therapies are going to break up an existing clot; correct?

A.    I don't know the exact literature and -- and data on -- on that.

Q.    Is there -- is there any reason



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025                    Pages 90..93

Page 90

scientifically to believe that they could break up a clot?

A.     Well, we discussed before there was not a complete occlusion, but severe ischemia leading to a STEMI, then --

Q.     Meaning?

A.     There could be spontaneous -- the -- the clot could spontaneously dissolve along with the therapy of, you know, antiplatelets, et cetera.

Q.     But what about -- assuming in a situation like here, the occlusion is caused by a clot.  You might be able to prevent new clot from forming, you might be able to thin the blood.  But if you've got a clot which is completely occluding an artery, you want to give the medication that is going to break up that clot; correct? if you can't get them to a cath lab or perform emergency open heart surgery.

A.     Yeah, if it's safe to do so.

Q.     And so my question for you is, if it's not safe to do so, what other options do you have that are likely going to save the patient's life or prevent them from suffering massive cardiac damage?

A.     I mean, giving this supportive therapy.  But again, you have to be aware of the limitations of what's available onboard and -- and in your vicinity.

Page 91

Q.     When you talk about supportive therapy, you can agree with me that aspirin by design does not bust up a clot; correct?

A.     It's an antiplatelet.  So no, it does not bust up a clot.

Q.     Plavix by design or Lovenox by design does not bust up a clot; correct?

A.     It does not bust up a clot.

Q.     A beta blocker certainly does not bust up a clot; correct?

A.     It does not bust up a clot.

Q.     A statin does not bust up a clot; correct?

A.     It does not bust up a clot.

Q.     Okay.  So if the goal, as we talked about back at the beginning, is to open the artery, to restore blood flow to the heart, is there any belief that any of those therapies are going to do so?

A.     No.  But there's also -- we don't know if thrombolytics will also open it either.

Q.     No.  But thrombolytics -- thrombolytics are designed to open it; correct?

A.     Correct.

Q.     There might be times when they fail, but that is what they are designed to do; correct?

A.     Correct.

Page 92

Q.     And that's true of any medication.  Someone could have a bacterial infection, take an antibiotic, and it might not -- it might not end up curing the infection but that's not a reason not to prescribe it; correct?

A.     Correct.

Q.     Thrombolytics are the -- if a PCI is not available, is the frontline mechanism to bust up a clot and restore blood flow even though there is, I think, a less than 10 percent chance that it might not be successful; correct?

A.     Yes.

Q.     Okay.

A.     But again, it has limitations at sea.

Q.     Okay.  And I believe that the literature shows that the earlier you begin to administer thrombolytics to a clot, the more likelihood there is of success in breaking it up; is that correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  You would have to -- I would have to defer to a cardiologist in that sense when it comes to a cardiac thrombus.

BY MR. MICHAELS:

Q.     So as we have talked about, if you're on a ship, you can't get to a PCI capable facility, the next consideration is therapeutics and -- I'm sorry --

Page 93

thrombolytics, and if you don't give a thrombolytic, there is -- there is no other mechanism available on a ship to bust up the clot and open up blood flow in the artery; fair?

A.     That's correct.

Q.     Okay.

A.     There's limitations onboard the ship.

Q.     You'd agree with me, sir, that generally a body -- a body on a ship functions the same as a body that's on land; correct?

A.     That's correct.

Q.     Okay.  That therapies that work on a ship, you would expect to work with the same incidents as they do on land; correct?

A.     Yes.  But those adverse effects are more risky at sea than they are at land.

Q.     What's the adverse effect of not opening up a blood vessel in someone who's suffering from a STEMI with complete occlusion?

MR. DRAHOS:  Object to the form.

THE WITNESS:  A myocardial infarction.

BY MR. MICHAELS:

Q.     Either muscle -- permanent muscle damage to the heart or death; correct?

A.     I mean, I can say with certainty, you know,



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 94

myocardial infarction.  To what extent I cannot tell you.

Q.    And if you said that in a stroke patient the risk of a brain bleed is 3 to 6 percent, and we know that therapeutics work over 90 percent of the time at busting up a clot, what risk is presented by giving a therapeutic that is worse than death?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Can you repeat that again, please?

BY MR. MICHAELS:

Q.    Sure.

You talked about the risk of giving a therapeutic.  We know that the risk of not giving a therapeutic is death or myocardial infarction.

My question is -- and then -- sorry, before I ask the question, we have already established that the success rate of thrombolytics is in excess of 90 percent of the time, that --

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.    -- the risk of a brain bleed is 3 to 6 percent of the time in a stroke patient given therapeutics.

So my question for you is, we know that the risk of not giving a therapeutic is death, that's the

Page 95

ultimate risk; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, death is not -- death is not a certainty.

BY MR. MICHAELS:

Q.    Let me -- I didn't say a certainty.  I said a risk.  And so let me start the question again with the objection.

We know that the risk of not giving a thrombolytic is death; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It's -- it's a risk with any treatment that we give.

BY MR. MICHAELS:

Q.    Sure.  And yet we still give treatments on a cruise ship; correct?

A.    We're attempting to stabilize on a cruise ship, not --

Q.    Right.  You --

A.    -- not give definitive treatment.

Q.    You could give someone azithromycin for a run-of-the-mill bacterial infection and they could suffer a cardiac arrest as a result; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  There's a risk with every

Page 96

medication we give.

BY MR. MICHAELS:

Q.    Right.  But you don't not give an antibiotic on a ship because, hey, this person's got a strep throat, but if I give him an antibiotic, they may suffer cardiac arrest, so I'm not going to give him an antibiotic; right?

A.    Yeah.  But the risk -- the risk of azithromycin is -- is far different than the risk of TPA.

Q.    When did they start using thrombolytics in the treatment of a STEMI?

A.    I don't know the year.

Q.    Well, you'd agree, certainly, that mortality rates from a STEMI heart attack in the 1930s, 1940s were a lot higher than they are today; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  More than likely.

BY MR. MICHAELS:

Q.    And part of the reason when you say "more than likely," is that medical advances such as the use of thrombolytics, the use of PCI have increased people's rates of survival in a STEMI heart attack; correct?

A.    That, along with -- you know, you're looking at immediate death versus death in week secondary to complications.  So there's been a lot of advancements

Page 97

in preventative, rehab, et cetera.

So yeah, I mean, I think that, without a doubt, that the effects of TPA and PCI on mortality has -- has, you know, helped improve that, but --

Q.    So -- so we have talked about --

A.    -- but there's certainly a fact that --

Q.    So we have talked about that the risk, the ultimate risk of not administering thrombolytics to someone who is suffering a STEMI is death.

What I'm wondering is what risks of providing a thrombolytic is worse than death?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Can you please ask that again?

BY MR. MICHAELS:

Q.    I've asked it so many times.

Are you able to answer it or no?

A.    I -- I --

MR. DRAHOS:  Object to the form.  And his --

BY MR. MICHAELS:

Q.    Is there any risk of giving a thrombolytic that is more serious than death of the patient?

A.    Is there any risk more than death --

Q.    Yeah.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 98

A.  -- of giving thrombolytics?

Q.  Yeah.

MR. DRAHOS:  Object to the form.

THE WITNESS:  A severe bleed.  I mean, that's -- that's a huge -- and causing a severe disability.

BY MR. MICHAELS:

Q.  And that -- that is, to you as a doctor, a greater risk than letting your patient die from a heart attack?

A.  I think that's --

MR. DRAHOS:  Object to the form.

THE WITNESS:  I think that's subjective to the patient, and that's why we offer these medications.

BY MR. MICHAELS:

Q.  Well, at the end of day, a patient has a right to reject any treatment they want; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I have a discussion with every patient that I -- that I -- that I give thrombolytics to.

BY MR. MICHAELS:

Q.  Right.

And if they say, you know what, I want

Page 99

to -- I want to take my chances with a -- with a STEMI, I don't want to take any -- any risk of a brain bleed, you have to respect that as a doctor; correct?

A.  I do respect it.

Q.  But the indication here was that Chad Reeves was given an option and informed consent and chose to proceed with the thrombolytics; correct?

A.  Correct.

Q.  All right.  You'd agree with me that if doctors physically have the ability to follow the medical standard of care in treating a patient on a ship as they would on land, they should; correct?

A.  If they have that ability?

Q.  Yes.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, you know, you'd -- you'd have to take into consideration what your resources are around you.

BY MR. MICHAELS:

Q.  Right.

But that's what I mean when I say if they had the ability to.  You can't -- you can't send them to a PCI on a ship.

A.  Correct.

Q.  But if you do have the ability to perform

Page 100

the standard of care treatment on a ship, you should; correct?

A.  If you had the ability without any -- and there's a certainty that you could transport to a PCI capable center, then yes.

Q.  Right.

A.  That doesn't exist onboard the ship.

Q.  Right.

So my point is, if you can't do it, you can't do it.  But if you have the ability to follow the medical standard of care, you should; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  If you -- if you can, you should try, yes.

BY MR. MICHAELS:

Q.  Okay.

A.  But again, the -- the standard of care is different in maritime.

Q.  And tell me what is different about the standard of care in treating a STEMI on a ship in maritime other than access to a PCI, to a cath lab?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Access to any -- any higher level of care in the vicinity.  Access to an evacuation.  So -- and what -- what capabilities

Page 101

there are onboard the ship in order to treat any complication.

BY MR. MICHAELS:

Q.  I want to talk to you for awhile about the American College guidelines.  We put them up on the screen.

I'm sure you have -- you have reviewed these in the past; is that fair?

A.  The American College --

Q.  The STEMI guideline.

A.  Yes.  In the past, yes.

Q.  And would part of that be that you reviewed them in preparation for this deposition?

A.  These guidelines are quite extensive.  So there's -- yes, I reviewed to some degree, but --

Q.  And I appreciate the comment about their extensivity, but my question was simpler than that.

In preparation for today's deposition, you reviewed these guidelines; correct?

A.  Yes.

Q.  And was that something you did on your own or was that something that was provided to you by Mr. Drahos?

MR. DRAHOS:  Object to the form.

THE WITNESS:  So, I mean, I -- I know of



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

## Chad Reeves vs Carnival Corporation
### Khoury, Nure MD on 01/10/2025 Pages 102..105

**Page 102**

these guidelines. I have seen them in the past.

BY MR. MICHAELS:

Q. And what is the reason that you decided to review these guidelines before your deposition today?

A. This is a cardiac case.

Q. Are there any other cardiac or STEMI guidelines that you also reviewed in preparation for today's deposition?

A. I mean, I have glanced at UpToDate, I -- you know, just a simple Google search for, you know, other treatments. Yeah.

I mean, I can't tell you the exact guidelines that I looked at, but there is -- there is multiple out there.

Q. And are these the -- but these are the ones that you can say with certainty you chose to review prior to today's deposition; correct?

A. I know -- I know of these guidelines.

Q. Okay. And these -- and these guidelines are incorporated into the UpToDate guidelines; correct?

A. To some degree.

Q. Well, to what degree are they not?

A. I would have to review UpToDate and what the references are and to what they utilized.

Q. So let's take a look at what we're sharing

**Page 103**

on screen is the ACCF, which is the American College of Cardiology Foundation, and the AHA -- AHA, which is the American Heart Association practice guideline for the management of an ST elevation myocardial infarction; is that correct?

A. Yes.

Q. And we have an indication that they were developed in collaboration with the American College of Emergency Physicians and Society for Cardiovascular Angiography and Interventions; correct?

A. Right.

Q. So what that means is that these are the guidelines that are -- that are utilized by the American College of Cardiology, the American Heart Association, the American College of Emergency Physicians, as well as the Society of Cardiovascular Angiography and Interventionists; correct?

A. Yes.

Q. Okay. And the 2013 guidelines are actually still in effect today. Is that also right?

A. I believe so, yes.

Q. And were certainly still in effect back in 2023; right?

A. Correct.

Q. I want to move down to page E370, which is

**Page 104**

where we -- we started at the top of the sheet.

Is this too big on your screen?

MR. DRAHOS: We're missing the lower half.

MR. MICHAELS: Yeah, so am I, but I don't have the mental capability to figure -- oh, wait. How is -- that might be too small.

MR. DRAHOS: Yeah. The way you had before was fine. We just can't see the caption underneath. Getting worse.

THE VIDEOGRAPHER: There's a plus and a minus.

MR. MICHAELS: We'll take it -- we'll take it piecemeal.

BY MR. MICHAELS:

Q. Within these guidelines, there is a flow chart on the best practices for treatment of a STEMI treatment patient who is a candidate for reperfusion; correct?

A. On land.

Q. Well, where does it -- where does it clarify that these are solely to be used on land?

A. It doesn't clarify. These were written for hospital and land-based patients.

Q. And where is that -- where does it say that in the guidelines?

**Page 105**

A. I'm sure it doesn't, but I'm pretty certain that no one from the -- any cruise line, cruise ship sector or any maritime sector was involved in implementing or writing these guidelines.

Q. Well, the American College of Emergency Physicians was; correct?

A. Yes. But the cruise ship sector I don't think was involved.

Q. The cruise ship section is a section of the ACEP; correct?

A. Correct.

Q. Why would there be different guidelines for maritime treatment than there are for land-based?

A. Because it's a different environment with more limitations.

Q. For the same condition; correct?

A. With -- with -- with more limitations.

Q. The same treatments that would be expected to save someone's life or minimize damage on land would be the same treatments that are expected to save someone's life or minimize damage on -- at sea; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, there's -- there's limits and -- you know, at sea not everything is -- is available.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 106

BY MR. MICHAELS:

Q.    Is it -- is it your position that these guidelines do not account for those limitations at sea?

A.    Yes.

Q.    Okay.  And what is it that these guidelines do not account for in terms of what is available at sea?

A.    Risks.  And exactly what the limitations, what -- what's capable in the medical center onboard of a ship.

Q.    How are the limitations not accounted for?

A.    Well, the access to PCI, again, if that was taken into consideration on a ship, we would know that access to PCI is never within 90 minutes or 120 minutes.

Q.    Well, so let's talk -- let's talk about how the guidelines do account for that.

For instance, if we look at this flow chart, it's very clear that the bold arrows and boxes are the preferred strategies; correct?

A.    Uh-huh.

Q.    And so it sets out different scenarios.  If a patient is initially seen at a PCI capable hospital, go here.  If initially seen at a non-PCI hospital, go here.

A.    Uh-huh.

Q.    If they can be transferred, go here.  If they can't be transferred, go here.

Page 107

So certainly that would account for being in a place where you couldn't get to PCI within 120 minutes; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.

BY MR. MICHAELS:

Q.    You would agree with that; right?

A.    I -- yes.

Q.    Okay.  And then, for instance, when we talk about risk, the guideline -- as we move down -- very clearly talks about when thrombolytics shouldn't be given, when there's contraventions, when it is disfavored, that's all contained in the guideline as well; correct?

A.    In this guideline, yes.

Q.    In this guideline, yes; correct?

A.    Yes.

Q.    Okay.  So in light of the fact that this guideline gives direction for what should be done when a PCI capable facility is not available and sets out the risk of thrombolytics, how is this guideline any different in dealing with land-based patients than sea-based patients?

A.    Because it doesn't take into account certain factors that you might see in case of a STEMI.

Page 108

Hoist -- hoist lift, for example.

Q.    What is a -- you're talking about an evacuation?

A.    An evacuation.

Q.    Well, I think it does account for that.  It basically talks about what -- if PCI is possible or if PCI is not possible.  So that would be --

A.    No, not -- not post -- post thrombolytics.

Q.    So it doesn't talk about whether a patient should be hoisted off a ship by helicopter, but that's not really germane at all to the -- to the practice manual for treating a STEMI; is it?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, it's a consideration you would make while at sea.

BY MR. MICHAELS:

Q.    Well, sure.

If you can't get someone safely to a hospital, you don't transfer them to a hospital; fair?

A.    And again, the -- the goal at sea is to stabilize and bring them to the next best level of care they can get.

Q.    Right.

And when we look, for instance, at the contraindications and cautions in fibrinolytic therapies,

Page 109

it talks about absolute contradictions which are situations where you cannot under any circumstances give a thrombolytic; correct?

A.    Yes.

Q.    So that would be things like if they had had any prior -- what is that -- intracranial or intracardiac hemorrhage?  I guess intracranial hemorrhage.

A.    Intracranial.

Q.    If they had had a known structural cerebral vascular lesion and ischemic stroke within three months, things of that nature; correct?

A.    Correct.

Q.    And then there's times when there's relative contradictions.  That if they have one of these conditions, you should consider it and consider giving another form of therapy; correct?

A.    Correct.

Q.    And so that would be things like a history of uncontrolled hypertension, a history of ischemic stroke more than three months prior, dementia, major surgery in the last three weeks, recent internal bleeding.

Regardless of the absolute contraindications and the relative contraindications, Mr.


UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 110

Reeves wasn't suffering from any of these contraindications; correct?

A.   We knew after he was questioned by doctor -- by the doctors onboard that none of these are existed.

Q.   Right.

Part of what they do in gaining consent is they read them off a list of conditions and ask them whether they have experienced them; correct?

A.   Correct.

Q.   So that takes maybe two, three minutes?

A.   Much longer than that.

Q.   They read through these different conditions and ask whether the patient has ever experienced them; correct?

A.   Correct.  And many times it takes explanations.

Q.   Do you know how long it took here?

A.   I do not.

Q.   And likewise, there's certainly nothing in here that says if there's a delay in access to a hospital, do not give thrombolytics; correct?

A.   Are you speaking in reference to ship?

Q.   To the contraindications and cautions, there's nothing that says, you know, if you're at sea or

Page 111

if you're in a place where there's no access to a hospital, do not give thrombolytics.

A.   No.  And again, this is -- this is a maritime setting, and this guideline does not take any of that into account.

Q.   Well, you told me that the circumstances in which a -- this guideline you could be in a rural area four hours from a hospital.  This is -- this is still the guideline; correct?

A.   Depending on where you are.  I mean, we can put this in Botswana, and I don't think they are going to have access to any thrombolytics.  So I'm sure they would have to alter for that unique situation to different practice.

Q.   Right.  And if in Botswana they don't have access to thrombolytics, you're going to have death rates and permanent damage rates from a STEMI that are similar to what we had in the 1920s and 1930s; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm just assuming that they had some sort of alternative therapy.

BY MR. MICHAELS:

Q.   What alternative therapy would that be, what you set out before?

A.   I don't know.  I haven't been in Botswana,

Page 112

but I'm using it as an example that there's limitations to what's available there and there's limitations to what you can provide there.  And if you did have thrombolytics, I'm sure there would be some considerations if they gave it, you know, and there's a complication.

Q.   Let's come back to the United States of America and, again, there's certainly nothing in this guideline that indicates that these guidelines should not be followed in a maritime situation.  That's not in these guidelines; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, what's not in the guidelines?  They shouldn't be followed in a maritime setting?

BY MR. MICHAELS:

Q.   Right, or these are promulgated by ACEP but not by the CLIA and do not use these guidelines on a ship.  It doesn't say any of that; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It doesn't say that, but these were -- these were not written with maritime medicine in perspective.

BY MR. MICHAELS:

Q.   Well, they are never written with every

Page 113

potential possibility in mind; right?  There's a world of possibilities; correct?

A.   I agree with you, there's a world of possibilities, and maritime would definitely be one of them.

Q.   And guidelines are set out to --

A.   Guide.

Q.   -- to guide in any time that this condition is encountered; correct?

A.   To guide.  Not dictate.  And it's not absolute.

Q.   They are based on medical evidence; correct?

A.   Guidelines are written based upon, yes, evidence.

Q.   Would you agree with me -- what are the Hess procedures?

A.   Hess procedures.  So, I mean, that's a collection of procedures and policies that are used for Carnival basically, and gives instructions and guidance on the normal duties onboard the ship.

Q.   And would you agree with me that, according to the Hess procedures, triage should occur within 10 minutes of a patient presenting at the medical center?

MR. DRAHOS:  Object to the form.


UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 114

THE WITNESS: Again, I would have to see that Hess -- the Hess policy.

BY MR. MICHAELS:

Q. Would you agree with me that, per the Hess procedures, emergent patients should be continually reassessed?

MR. DRAHOS: Object to the form.

THE WITNESS: Emergent patients?

BY MR. MICHAELS:

Q. Emergent patients. Yes.

A. I would still have to see the policy.

Q. Would you agree with me that for urgent patients, they should be reassessed at least every 30 minutes?

A. That's -- that's different for the patients and what the condition is.

Q. Urgent conditions per the guidelines.

A. I would have to see the guidelines, but --

Q. Certainly you'd agree with me that Chad Reeves was emergent; correct?

A. Chad Reeves was emergent.

Q. Yup. So you have told me when I initially asked you why these guidelines would not apply at sea, you told me they don't account for the lack of access to the PCI clinic, which they do, and they don't talk about

Page 115

the risks of the thrombolytics, which they do.

Is there any other reason why they wouldn't apply at sea?

MR. DRAHOS: Object to the form.

THE WITNESS: It doesn't -- we talked about, yeah, the evacuations, access, medical limitations onboard, treatments onboard, et cetera.

BY MR. MICHAELS:

Q. All right. So let's take a look at some of these guidelines.

For a STEMI patient who is a candidate for reperfusion, meaning a candidate for opening up their blood vessels; correct?

A. Yes.

Q. First, the bold frontline option for providing therapies applies if they are initially seen at a PCI capable hospital; correct?

A. Yes.

Q. And in that situation, a patient should be sent to a cath lab for primary PCI, and the first medical contact to device time should be less than 90 minutes; correct?

A. That's what the guideline says.

Q. And when we talk about first medical

Page 116

contact, we are literally talking about when they walk into the hospital; correct? They should have --

A. Their first contact with any medical provider.

Q. With any medical provider.

Now, when we talk about the primary PCI, we have been talking about it so much, just for the ladies and gentlemen of the jury, that would be where a cath is inserted into the blood vessel with a balloon on it, the balloon blows up to clear out the clot, and then a stint is placed to keep the blood vessel open; correct? In very broad terms.

A. There's -- there's more to it, but yes.

Q. Right. Regardless of that, that was not an option here; correct?

A. That is not an option, very rarely at sea.

Q. So initially not seen at a non PCI capable hospital, that would be the not bold, but the next option; correct?

A. That's the next option on this guideline.

Q. And what this guideline says is that first the bold strategy if they can be door in door out in less than 30 minutes and transferred for primary PCI with the expectation that they will be hooked up to the cath within 120 minutes, that is the second option; correct?

Page 117

A. According to this guideline for hospital base stations, yes.

Q. And when you say according to this guideline, that's because that would not be possible generally on a ship; correct?

A. Correct. And it says non-PCI capable hospital.

Q. Right.

A. Yeah.

Q. And a -- a ship's clinic essentially serves the same level of care as a hospital emergency room or urgent care; correct?

A. No.

Q. Tell me why not.

A. There's severe limitations to what's available, limited labs, limited treatments, limited types of staff. There's no imaging specialists.

Q. Well, there is access to imaging specialists; correct?

A. There's no access to certain types of images, CT scan, ultrasound, MRI. So there's severe limitations.

Q. I believe within the next year, ultrasounds are expected to become standard; correct?

MR. DRAHOS: Object to the form.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 118

THE WITNESS:  I don't know if they are subject to be standard or not onboard a cruise ship, but it's possible.

BY MR. MICHAELS:

Q.    Moving to the next option, if transfer for primary PCI is not available, is administer fibrinolytic, that's the thrombolytics agent, within 30 minutes of arrival when anticipated first medical contact to the device is greater than 120 minutes; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's what the guideline says, yes.

BY MR. MICHAELS:

Q.    And then the guideline after that says if there's -- there should be urgent transfer for patients if the reperfusion is failing or transfer for angiography and revascularization within 3 to 24 hours for other patients; correct?

A.    That's what it says there, yes.

Q.    So certainly within a -- within a hospital context, even if there's no access to a PCI within 120 minutes, the fibrinolytic should be administered with a goal to still get them to a cath lab within 3 to 24 hours; correct?

A.    Again, this is for a non-PCI capable

Page 119

hospital.

Q.    Sir, I appreciate that that's a point that you want to make.

My question is simply whether that is what the guideline anticipates; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  The guideline anticipates that.

BY MR. MICHAELS:

Q.    Okay.  And even if the transfer to the PCI clinic is not within that first 120 minutes but is within 3 to 24 hours after the thrombolytics are administered, there is still a general operating hypothesis that the sooner they get to the cath lab the better; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  The guideline here says 3 to 24 hours.

BY MR. MICHAELS:

Q.    Right.  So if you're able to get them within a 24-hour window, even after -- after the thrombolytic, the idea is that by getting them to the cath lab, you can prevent future damage; correct?

A.    That's the assumption.

Q.    Now, moving down, do you know what time Chad Reeves first presented to the medical clinic?

Page 120

A.    Can I open the chart?

Q.    I'm just asking if you know or if that's something you encountered.  We'll get to it if you don't.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I would have to look at the medical intake form, but I believe around 6, 6:30.

BY MR. MICHAELS:

Q.    Do you have any understanding of when the first EKG was performed on Chad Reeves?

MR. DRAHOS:  Object to the form.

THE WITNESS:  In the medical chart it states that there's an EKG performed.

BY MR. MICHAELS:

Q.    Do you have any understanding of when the second EKG was performed on Chad Reeves?

A.    A second EKG was -- was also documented in the EMR.

Q.    Okay.  When you say EMR, you're referring to the electronic medical record; correct?

A.    Yes.

Q.    The -- Dr. Leonards' testimony was that, upon reviewing the second EKG, that's when he was able to diagnose a STEMI; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's what his testimony

Page 121

stated, second EKG.  I don't think it's in specific reference to EKG Roman numeral II.

BY MR. MICHAELS:

Q.    Well, let's jump a little bit ahead of ourselves.

Why don't you think that, other than the fact that you were retained by Carnival and have to represent them in this lawsuit?

MR. DRAHOS:  Object to the form.  Move to strike counsel's comments.

THE WITNESS:  Because looking at the medical record and knowing the case, the times don't correlate.

BY MR. MICHAELS:

Q.    The times don't correlate with anything; correct?

A.    Correct.  And I think that there was probably more than three EKGs printed out.

Q.    So let's dig into a couple of questions there.

The -- first of all, the timing on the EKG machine or machines was just inaccurate.  We all know that; correct?

A.    Yeah, it seems to be.  Yes.

Q.    And those are Carnival's EKG machines;



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

## Page 122

correct?

A.   Those are Carnival's EKG machines, yes.

Q.   Carnival is responsible for maintaining and calibrating those machines; correct?

A.   Yes.

Q.   Now, do you even know as you sit here whether the multiple EKGs were taken on one machine or multiple machines?

A.   I do not.

Q.   And we know obviously there's -- there are more than one EKG machines within a medical clinic; correct?

A.   In the shipboard medical clinic?

Q.   Yes.

A.   I don't know how many medical EKG machines there are.

Q.   Two, when you talk about the time doesn't correlate, what that means is we don't know why or how, but we know that the times that are indicated on the EKG strips on the printouts were not the time that the EKG was taken because Mr. Reeves was not yet in the medical clinic at any of those times; fair?

A.   Fair.

Q.   Now, the medical record very clearly sets out when the second and when the third EKG were taken;

## Page 123

correct?

A.   It says a second.

Q.   Right.  And what time did it indicate that that second EKG was taken by?

         I'll give you a hint.  Is it 7:17 p.m.?

A.   Let me go to 7:17 p.m.  Yes, 7:17 p.m.

Q.   And the nurse could have used any language in the world; right?  She could have said 'an EKG was taken," she could have said, 'another EKG was taken,' she could have just said 'EKG was taken."

         She chose to use the words "a second EKG was taken."  Correct?

A.   Yes, but I don't believe English is her first language.

Q.   I don't care if French-Uzbekistani is her first language.  The words that she used in the medical chart, along with other words like medication diluted, water injection, injection morphine, performed, reviewed, the language that she chose to use was "second EKG was performed and reviewed by MD."  Correct?

A.   She used that -- that statement in here.

Q.   And then her third entry at 8:27 says "third EKG was performed and reviewed."  Correct?

A.   Yes.

Q.   Okay.  So whether English is her first

## Page 124

language or her 15th, she certainly seemed to know how to count and document that in her medical records; correct?

A.   She documented three EKGs in her notes.

Q.   Okay.  She documented three EKGs in her notes, and we received EKGs with Roman numeral I, II and III; correct?

A.   You did.

Q.   We did.

A.   We did.

Q.   Okay.  You don't have any others that I don't know about.

A.   I do -- I do not.

Q.   Okay.  Likewise, nurse -- Dr. Leonards very specifically testified that it was the second EKG that let him know that this was a STEMI; correct?

         MR. DRAHOS:  Object to the form.

         THE WITNESS:  I believe EKG Roman numeral II.

BY MR. MICHAELS:

Q.   The second, which he identified as being Roman numeral II; correct?

         MR. DRAHOS:  Object to the form.

         THE WITNESS:  Roman numeral II EKG is what he was referring to.

         MR. MICHAELS:  Let's take five minutes.  I

## Page 125

want to pull up a portion of his transcript and I just have to go through it.

         THE VIDEOGRAPHER:  We're going off the video record.  The time is 12:23 p.m.

         (Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)

         THE VIDEOGRAPHER:  We are back on the video record.  The time is 12:34 p.m.

BY MR. MICHAELS:

Q.   This might be a little bit easier if I was playing you the video of this deposition, but very clearly we can see on page 50 of his deposition he's asked:

         "Okay.  And the next EKG was done if we're going by these times roughly an hour later; is that right?

         "Answer:  Like we established before, the times, we don't know the exact time, but this would be the second EKG that I have done for him." And that's during the time when Roman numeral II is on the board.  But again he's asked:

         "Doctor, how long did you wait between the two EKGs?  Because here if we look at the times, one -- the second one says 10:43 a.m., that's



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 126

Roman numeral II, and the first one says 9:39, so that would be an hour, et cetera."

The witness:

"Okay, yeah, so the EKG is a snapshot, would have been connected onto the cardiac monitor, so maybe I'm seeing" --

They are very clearly talking about that 10:43 EKG, and he's referring to it as EKG 2, not -- as per the second EKG, not as Roman numeral II; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I mean, I understand what -- what he's said.

BY MR. MICHAELS:

Q. Simple question. He's shown --

MR. DRAHOS: You got to let him -- you got to let him answer --

MR. MICHAELS: I just --

MR. DRAHOS: -- follow up.

MR. MICHAELS: We've already been here two and a half hours, and I think we've got a ways to go. I'm just going to ask him to focus on answering the questions.

MR. DRAHOS: Which he was about to do, but you didn't even let him start.

MR. MICHAELS: All right.

Page 127

BY MR. MICHAELS:

Q. Go ahead, Doc.

A. So again, I understand what he's referring to or what he stated, the second EKG, but, you know -- and I've looked at the timing of the EKGs and the timing in the chart, and it doesn't -- it doesn't correlate.

Q. Sir, it's -- it's --

A. So --

Q. -- I want to be very -- the time doesn't correlate with anything; right? The time is incorrect. We don't know why. We don't know if it was one machine or two. We don't know if the clock just didn't work. We don't know any of that; right?

A. I mean, yeah, but it looks like EKG II is closer to the time for EKG III. It's just what I would assume and based on the times.

Q. But again, we don't even know if the clock --

A. And that's Roman numeral II and Roman numeral III.

Q. But what I had asked you, I had said that he said that he made the diagnosis after seeing the second EKG, and you said no, Roman numeral II. So we're going back to check his transcript very clearly when he was being shown the EKG strip that had Roman numeral II

Page 128

written on the top of it, he identified that as the second EKG; correct?

A. Right. That's what he identified.

Q. Right. And then further on --

A. But then Dr. Desai in his testimony states that the 8 o'clock.

Q. Doctor -- first of all, Dr. Desai wasn't there during any of the initial three EKGs; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I -- I --

BY MR. MICHAELS:

Q. Dr. Desai's testimony is that he was called down to the clinic after the diagnosis of the STEMI was made.

MR. DRAHOS: And --

THE WITNESS: At what time?

BY MR. MICHAELS:

Q. Answer my question.

Dr. Desai testified that he was called down after the diagnosis of the STEMI was made; correct?

A. I mean, I have to go through Dr. Desai's testimony.

Q. Take -- take your time.

A. Okay. Can we pull up Dr. Desai's?

Q. Is there any evidence that Dr. Desai was in

Page 129

the clinic prior to the diagnosis of a STEMI being made?

A. I mean, he states that it was diagnosed at 8 o'clock.

Q. That was not my question, sir. We can be here all day.

Is there any evidence that Dr. Desai was in the clinic at the time that the diagnosis of a STEMI was made?

MR. DRAHOS: Object to the form.

THE WITNESS: I mean, I'm going based off the senior doctor.

BY MR. MICHAELS:

Q. Right. And does the senior doctor -- and do you know what? Go back and -- go back and I'll sit here. You let me know when find it. Actually, I'll help you get there. Let me pull up Desai's.

What are you able to see on my screen right now? Can you see Desai's transcript?

A. No. It shows the same transcript.

Q. And there's more time to expound on this, but just for the purpose of saving time, I'm trying to get right to the heart of the conversation. And that's the wrong one also. Hold on.

What can you see now? If you look here, what's the name?



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 130

A.    Thomas.

Q.    Okay.  That's the wrong one.

Now what can you -- now it's Thomas again; isn't it?

When the screens comes up small, it's nearly impossible for me to tell which one is which.  So, sorry.  Maybe I can do it like this.  Okay.

Can you now see Dr. Desai?

A.    Yes.

Q.    So if we go down to page 33 under the word "called."

"So Doctor, do you know if when Dr. Leonards saw on the regular EKG, and I believe you said pre STEMI, did Dr. Leonards reach out to a cardiologist for course of treatment advice?"

"No.  After this one and after the second EKG, I think they called me, they involved me because of STEMI.  So we did whatever is best, like we had thrombolytics."

Do you recall seeing that?

A.    I mean, I'm seeing it now.

Q.    Okay.  Let me see if he touches on that.  Right.  So then he says, and I just want to make sure we're clear about it:

"Initial EKG -- actually I'm referring to

Page 131

the second EKG, that was -- that which was seen by me, but for the first time after I was called about 8 o'clock where I can see STEMI for sure on the second EKG."

Again, he indicates that, at the time he was called, regardless of what numerical time it was, that he was able to see STEMI on the second EKG; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's what's written there.

BY MR. MICHAELS:

Q.    Well, that's his -- that's his testimony; right?

MR. DRAHOS:  Object to the form.

THE WITNESS:  So that's -- that's what's -- that's what's -- that's his testimony, though.

Was he referring to EKG 2 or Roman numeral II?  I mean, I don't know.

BY MR. MICHAELS:

Q.    Well, he's very clearly -- he's very clear that, at the time he came down --

A.    8 o'clock.

Q.    I'm going to ask the questions and you're going to wait until I'm done asking them to answer.

He's very clear that, at the time he came down, the diagnostic EKG had already been taken; correct?

Page 132

A.    He states something, yes, like that.

Q.    Okay.  And when we talk about 8 o'clock, there's nothing in the contemporaneous medical record that indicates what time he came down to the clinic; correct?  It doesn't say -- there's not an entry at, you know, 7:25 that says 'Dr. Desai arrived in the clinic at 7:25'.  Correct?

A.    I mean, but Dr. Desai does say when he arrived at the clinic, and did he receive the phone call that there's a STEMI?  You know, I'm assuming that he came down straight away.

Q.    Are you done?  I'm going to ask my question again.

There's nothing in the contemporaneous medical record that says when Dr. Desai entered the clinic; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Is it -- is it -- does he need to say when he arrived in the medical record?

MR. MICHAELS:  We're now on nonresponsive strike two.  Let me try again.

BY MR. MICHAELS.

Q.    There's nothing in the contemporaneous medical record that says when Dr. Desai arrived in the clinic; correct?

Page 133

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.

BY MR. MICHAELS:

Q.    Okay.  Dr. Desai in his testimony calls it about 8 o'clock p.m.; correct?

A.    Correct.

Q.    And you don't know where he came up with that; right?  Was that based on a distinct memory where he wrote down on a notepad somewhere it's about 8 p.m., or is he trying to go back and piece together what time the EKGs are?  You don't know where he came up with that; correct?  Is that right?

MR. DRAHOS:  You got to let him answer.  You're firing away at him.  Give him a second.

MR. MICHAELS:  I'm just waiting for an answer.

MR. DRAHOS:  He can take all the time he needs to answer, so --

THE WITNESS:  Sorry, just reading Dr. Desai's record in the chart saying thrombolysis starting at 9.

So, yeah, no, it doesn't say exactly in the chart what time he arrived.

BY MR. MICHAELS:

Q.    And the words he used were "about



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025          Pages 134..137

Page 134

8 o'clock." Correct?

A. Correct.

Q. Now, let's talk about the context in which he used those words.

The incident happened -- the date that they are referring to is July of 2023, specifically July 8th of 2023; correct?

A. Correct.

Q. At some point, Dr. Desai, who was not on call, would have received a call from the medical clinic, gone down to the medical clinic; correct?

A. Correct.

Q. Treated the patient. It ended up being a STEMI. They get the patient off the ship at the next stop. Dr. Desai works a shift or two every day on the Carnival ship while he's working; correct?

A. Yes.

Q. At some point after that, whether it's a month later, three months later, five months later, he would have learned that there was a lawsuit that had been filed based on the medical care this patient received; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know when he received it.

Page 135

BY MR. MICHAELS:

Q. Presumably at some point after the incident but before his deposition; correct?

A. I can assume that, yes.

Q. Okay. In the interim based on having read his deposition, he's a ship's physician working -- working different ships. He would have treated who knows what, tens, hundreds, thousands of patients in the year or so after that incident?

A. So am I -- I'm just asking, am I supposed to assume that he's confusing things because --

Q. No. No. You're supposed to answer my question.

A. Okay. Can you repeat your question?

Q. Sure.

He's working as a senior doctor on a cruise ship. I think that would be two shifts a day; right? Two 3-hour shifts a day?

A. That's the clinical hours, yes.

Q. Right. And so between July of 2013, and this deposition in October of 2014, he probably would have seen hundreds, if not thousands of other patients and cases; correct?

A. Correct.

Q. There's no indication that

Page 136

contemporaneously or back in July of 2018 that he would have written down or made note of exactly what time he went to the clinic; correct?

A. That's possible.

Q. Right. There's no reason to believe based on your review of the record that that night he would have had any reason to attach a special significance to precisely what time he went down to the clinic; right?

A. I don't believe that's true. I don't know what's significant for Dr. Desai or not.

Q. Well, if Dr. Desai was eating dinner or lying watching TV or taking a walk around a ship and got a call, hey, I need you to come down to the medical clinic, is there any incident that he received any more -- or we have a STEMI or I need you to run an EKG, is there any reason to believe that he received any more information than that?

MR. DRAHOS: Object to the form.

THE WITNESS: At what point?

BY MR. MICHAELS:

Q. At the point that he would have received that call.

A. I'm not sure I understand your question.

Q. Okay. Then let's move past it.

At the time that he gave his deposition, it

Page 137

would have been a year and three months after the incident; correct?

A. Correct.

Q. And, at that point, he would have still been one of Carnival's doctors; correct?

A. Correct.

Q. He would have had the understanding that Carnival was being sued based on the medical care that this patient received; correct?

A. That's correct.

Q. He would have understood that one of the issues was the timely administration of the thrombolytic; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Any thrombolytic, yes.

BY MR. MICHAELS:

Q. And that, at that point, his testimony was it would have been around 8 o'clock. Correct?

A. That was his testimony, around 8 o'clock, yes.

Q. As far as where he came up with 8 o'clock or why he thought 8, you can't answer that. You don't know; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Dr. Desai says 8 o'clock. He



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 138

means 8 o'clock.  I can still recall sometimes from cases I've even had onboard as of 2015.

BY MR. MICHAELS:

Q.    He said around 8 o'clock a year and three months later as the defendant in a lawsuit; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's what Dr. Desai stated.

BY MR. MICHAELS:

Q.    How did you come to be retained in this case?

A.    I'm sorry?

Q.    How did you come to be retained as an expert in this case?

A.    I was requested to be an expert.

Q.    You got a phone call from Mr. Drahos, from Carnival?  How did that work?

A.    No.  From Mr. Drahos.

Q.    Okay.  And what was the date that you received that call?

A.    I don't recall.

Q.    I'm not even asking you a specific time. You can't tell me the date that you received that call?

A.    But that's one phone call.  It's not a STEMI.

Q.    What time of day was that phone call?

Page 139

A.    Again, this is -- it's not a phone call. We're talking about a STEMI on a specific ship.

Q.    I'm just asking you a simple question.  Do you recall what time of day that phone call was?

A.    I do not.

Q.    Did you meet Mr. Drahos last night to get together, either have dinner or meet and talk about the case?

A.    I met with Mr. Drahos last night.

Q.    Where did you meet?

A.    At the JW Marriott.

Q.    What time?

A.    7 p.m.

Q.    Seven or around 7?

A.    Around 7.

Q.    All right.  Do you know what time you got there specifically?

A.    I do not.

Q.    How about your conversation previous to that with Mr. Drahos, what time was that?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't recall.

BY MR. MICHAELS:

Q.    Okay.  So getting back to -- to what we know for certain.  The only contemporaneous record we

Page 140

have with accurate times is the EMR; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  With accurate time?  I can't speak to what's accurate.

BY MR. MICHAELS:

Q.    Well, there's no indication in this case that the entries in the electronic medical record were inaccurate; correct?

A.    Those are the times of entries.

Q.    Right.  So let's get to that.  So they are accurate -- as far as we know, they are accurate as to the time of input into the system; correct?

A.    Yes.

Q.    And the way that works in Carnival's computers, they're medical records, those times are calibrated to the time of day and they are adjusted for time zone through UTC minus or plus; correct?

A.    Yes.

Q.    And if someone is treated at different intervals, doctors, nurses can access that code and enter things into it; correct?

A.    They can access the EMR and enter information into it, yes.

Q.    Yeah.  And that EMR at the time it's entered will make a timestamp of what time that entry

Page 141

was; correct?

A.    I believe when it's clicked enter, yes.

Q.    So when enter is clicked, it makes a timestamp.  And while that doesn't necessarily tell us exactly what time the things described happened, medical records are always retrospective, whether it's a minute or 10 minutes or 20 minutes; correct?

A.    Yes.

Q.    So we know at the very least, when enter is hit, there's an accurate timestamp put on that medical record, and it talks about things that happened previously, whether a minute or more; fair? or a second or more.

A.    Yes.

Q.    Okay.  And so what we know here in terms of contemporaneous records, the only record we have of the time of the second EKG that is contemporaneous to when it happened is that at 7:17, Nurse Thomas entered that the second EKG had been performed and reviewed by the doctor; correct?

A.    That a second EKG.

Q.    She called -- she chose to use second.  She described it as second.  Correct?  Correct?

A.    She described it as second, yes.

Q.    Okay.  And she didn't say it will be



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 142

performed, it's to be performed. She used the past tense ED, was reviewed and performed; correct? or performed and reviewed; correct?

A.   That's what she wrote.

Q.   Okay. Doctor -- and I think this is what got us started down this path, so I just want to make sure we finish this thought, and of course I have shared the wrong one again. I'm not very good at sharing. I apologize for that. I seem to be having trouble. Okay. And looking to Dr. Leonards, let's go through some of his other testimony. Page 111. I just want to make sure we find the clearest instances. Okay, again he's asked at page 116:

"Sure. After confirming that Mr. Reeves was suffering from a STEMI at the second EKG.

"Answer: Yeah."

That was part of his testimony; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Which portion?

BY MR. MICHAELS:

Q.   The part I just left.

A.   Yes.

Q.   "Sure, after" -- right here on line 13:

"Sure, after confirming Mr. Reeves was suffering from a STEMI at the second EKG."

Page 143

He said "yeah."

Correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes. But is he referring to Roman numeral II or the second EKG?

BY MR. MICHAELS:

Q.   Well, we -- when we started this, we looked back and he clarified that the one that's marked 10:43 is the one -- was the second EKG; correct? That was also part of his testimony on page 60; right?

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.   Page 50. I'm sorry.

A.   I mean, I don't know the pages here.

Q.   It was the first thing I showed you. We could go back and do it again, but then your attorney will start objecting and saying it's asked and answered.

A.   Okay. Say the question again then?

Q.   Okay. Let me actually go to 118. Let's look at 118, line 20:

"Question: Sure. Second EKG confirmed STEMI; right?

"Answer: Yes, correct."

That was Dr. Leonards' testimony; correct? or part of it.

Page 144

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.   Correct?

A.   That's what he wrote. That's --

Q.   Dr. Leonards also, as we talked about back on page 50, the first thing I showed you when asked referred to the Roman numeral II EKG, which was being shown as the screen as the second EKG; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  So that's -- that's what's testified, but --

BY MR. MICHAELS:

Q.   Right.

A.   -- after I reviewed these -- you know, the EKGs and the timestamps, they -- they do not correlate. So if you're asking my interpretation of testimony and the chart and -- and what actually occurred, I've given that.

Q.   Sir, you are -- you are many things. You're a doctor, you're a vascular neurologist. You're not a mind reader; correct?

A.   I am not.

Q.   You're not an expert in clock malfunctions; correct?

A.   I am not.

Page 145

Q.   You do not even know how many EKG machines were on the ship; correct?

A.   I know there's at least one.

Q.   You know there's at least one; right?

A.   Correct.

Q.   You don't know -- you don't know why the clock that's displayed on the strips was not accurate as to what time it actually was; correct?

A.   I do not.

Q.   You don't even -- you don't even know if the different times are consistent as to each other; correct?

A.   No. But what I do know is Dr. Desai states -- stated 8 o'clock. So that's what I'm basing my -- my reasoning behind.

Q.   So -- so Dr. Desai who wasn't there testified a year and three months after the incident that it was around 8 o'clock when he got the call, and you're going to take that testimony as being crucial as to time and ignore the fact that contemporaneously it was entered into the chart at 7:17 p.m. Am I understanding that correct?

MR. DRAHOS:  Object to the form. It's argumentative at this point.

MR. MICHAELS:  It's a question. It's a



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 146

question.

THE WITNESS:  Yeah, I mean --

MR. DRAHOS:  No, it's an argument.

MR. MICHAELS:  It's a question, Michael.

MR. DRAHOS:  It's an argument.

MR. MICHAELS:  It's a question.  Now, you and I are arguing, but I simply want an answer to the question.

MR. DRAHOS:  We'll see what the judge thinks.

MR. MICHAELS:  Let's do it.

THE WITNESS:  You told me I don't know how to work clocks, et cetera, and I'm not a timing expert, but I'm being asked to make, you know, assumptions based on timing here.  But I'm telling you how I have come to my conclusion; and yes, the senior doctor who was under me when I worked at Carnival and I know and I trust, I believe if he says 8 o'clock, and yeah, after he reviewed -- after he reviews the chart, of course he's going to know exactly what happened.

BY MR. MICHAELS:

Q.   Well, Dr. Desai testified it was about 8 o'clock when he got the call; correct?

A.   Correct.

Page 147

Q.   Is there any evidence that he got the call contemporaneous with the EKG being printed out?

A.   No, but I don't think there's any evidence against it either.

Q.   The point is there's no evidence at all; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  There's -- there's a medical chart, there's -- there's records and there's people's recollections, and Dr. Desai said 8 o'clock.

BY MR. MICHAELS:

Q.   And the medical record says -- the contemporaneous medical record says 7:17.

MR. DRAHOS:  Object to the form.

THE WITNESS:  That says second EKG.

BY MR. MICHAELS:

Q.   Correct.

Now, you had also said, I think there were more than three EKGs first printed.

What is the basis of that?

A.   Just that there's a STEMI occurring, or at least an evolving STEMI.  If it were me treating onboard a ship, I would probably do more than three EKGs.  There's probably malfunctions of the machine, et cetera.

Page 148

So I'm sure there were numerous EKGs taken.

Q.   So -- so you have -- other than the fact that if it was you and based on the condition, you would do more than three.  You have no evidence that there were more done; correct?

A.   I don't -- I don't have evidence, but I just can -- yeah, I can say that there likely was.

Q.   Likely based on what?  The fact that it would be poor practice for there not to be?

MR. DRAHOS:  Object to the form.

THE WITNESS:  No.  Just that that's -- that's management.  You probably check more than three in evolving infarcts.

BY MR. MICHAELS:

Q.   And you've got three notated in the chart and three that you have seen; correct?

A.   Correct.

Q.   And you've got Dr. Thomas who doesn't remember anything, correct?  She has no memory of any accounts with the patient -- I'm sorry, Nurse Thomas.  Right?  That was her testimony; right?

A.   From what I can gather, yes.

Q.   You don't have to gather.  She said I don't remember anything about this encounter; correct?

A.   I suppose so.

Page 149

Q.   Okay.  And you'd agree, as we talked about at the beginning, if there were any EKGs or test printouts that were pertinent to his medical care, they should have been retained; correct?  They should be part of his record; correct?

A.   Correct.

Q.   And they were not; correct?

A.   Well, I mean, I think one showing no STEMI, and one that is STEMI, you know, that shows that there's an acute process there.

Q.   Do you have any evidence whatsoever that there were more EKG strips printed out which were not retained?

A.   No, I don't have any evidence to that.

Q.   Now, Dr. Desai also testified -- Dr. Desai, who you worked with and know and trust -- that Carnival's policy is that if someone comes in showing the type of symptoms that Mr. Reeves is, potentially acute cardiac, that the first EKG should be done within 10 minutes; correct?

A.   Correct.

Q.   That if it's abnormal, there should be followup within 15 to 30 minutes; correct?

A.   I'm not sure if that was part of his testimony, but --



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 150

Q.   Dr. Leonards agreed that it would be the priority to get the EKG taken; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I believe he was hooked up to a cardiac monitor.

BY MR. MICHAELS:

Q.   Wasn't my question.

Dr. Leonards, whether he was or not, we know that there were three 12-lead EKGs done; correct? Printed.

A.   We know there was at least three, yes.

Q.   And you're going to get a clearer picture from the printed 12-lead EKG; correct?

A.   You're going to get a more clear picture.

Q.   And you'd agree with me that, once the determination was made that it was a STEMI, that the thrombolytic should have been initiated within 30 minutes; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  So I -- I think that once that there was a STEMI diagnosed, I mean, again, this is a maritime environment, safety needs to be considered, evacuation needs to be considered, and it should be offered in a timely manner, but that doesn't necessarily mean that 30 minutes it lies

Page 151

in this scenario that I see.

BY MR. MICHAELS:

Q.   Certainly from a medical standard of care for giving him the best opportunity to avoid death or long-term damage to his heart, thrombolytics should have been initiated within 30 minutes; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  In a land -- in a land-based hospital, but again --

BY MR. MICHAELS:

Q.   So is it your answer that --

A.   -- at maritime and at sea --

MR. DRAHOS:  You got to let his finish his answer.

BY MR. MICHAELS:

Q.   Is it your answer that at sea providing the thrombolytics within 30 minutes would not give him the best chance to avoid death or permanent damage to his heart?

A.   I think other things need to be considered prior to administration of thrombolytics.

Q.   My question for you was from a medical perspective in terms of giving him the best chance to avoid death or damage to his heart, whether at land or at sea, should thrombolytics have been initiated within

Page 152

30 minutes?

A.   On -- on land I can say without a doubt yes, but at sea, I think other things need to be considered.

Q.   And I know you think that there are other things that should be considered in determining whether to administer thrombolytics.  But my question was not that.

My question was from a medical perspective, from avoiding damage to his heart, would you agree that that 30-minute window would give him the best chance of avoiding death or further complication?

A.   I mean, I think that his safety needed to be considered.

Q.   Okay.  What part of his safety?

A.   Again, whether there was going to be an adverse effect or not.

Q.   Now, the reason why there's a window, why it doesn't say provide thrombolytics immediately is because that allows the doctors time to do the necessary investigations; right?  Other contraindications, get the -- get the IV set up, make sure that you get informed consent.  That's what that 30-minute window is for; correct?

A.   Yes.

Page 153

Q.   And that 30-minute window can be used for the same thing whether on land or at sea; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  But more consideration needs to be put at sea than there is at land.

BY MR. MICHAELS:

Q.   So let me ask you a question.  I'm going to assume that the medical chart is accurate, contemporaneous medical chart, that that diagnostic second EKG was performed and reviewed by 7:17 p.m., and we know -- am I correct that we know that the time that the thrombolytic was administered to him onboard was 9:05 p.m.?

A.   That's what his charted thrombolus started at about 9 p.m.

Q.   Not -- no.  According to his record, the push was at 9:05 p.m.; correct?  It was prescribed at 9, it was pushed at 9:05; correct?

A.   I can see -- I'm just reading from the -- hold on -- note from Dr. Desai that about 9 o'clock -- finding at 9:05, but that's about 9 o'clock.

Q.   Do you dispute that the contemporaneous record, the precise contemporaneous record indicates that the push was at 9:05?

A.   I agree that that's what's indicated


UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 154

record, but I don't -- I believe Dr. Desai's testimony at 8 o'clock.

Q.   So let me ask you a question.  In considering his safety, in considering the risk, tell me what they were not able to do between 7:17 when that second EKG was read and reviewed, and 7:47, which would be 30 minutes, that they were then able to do between 7:47 and 9:05?

A.   Again, I think 8 p.m. is Dr. Desai's testimony, which I'm basing my opinion off of.  There's plenty -- there's discussion with the family, there's discussion with the patient, there's -- was there an IV access that was usable for an infusion, or did they just draw blood initially?  There's multiple things to consider.

Q.   So, first of all, I just want to make sure I'm understanding this right.  Are you using Dr. Desai's testimony a year and three months later as the defendant in the lawsuit that it was about 8 p.m. that he received the call as being determinative that the STEMI was diagnosed at 8 o'clock p.m. to the exclusion of what we see in the contemporaneous medical record?  Are you considering that as well?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It was the testimony of the

Page 155

senior physician, yes.

BY MR. MICHAELS:

Q.   The senior physician who was not there by his own testimony when the second EKG was taken; correct?

MR. DRAHOS:  Object to the form.  How many times you going to ask him?

THE WITNESS:  Again --

BY MR. MICHAELS:

Q.   I'm a little confused, because unless you're just really trying to make the testimony as good as possible for Carnival, that doesn't make sense, but I'm trying to --

MR. DRAHOS:  I don't see how that doesn't make sense.  So it seems like you're arguing with him.

MR. MICHAELS:  I'm trying to figure out. I'm trying to understand this expert who's here to testify that the way they treated my client was okay.

THE WITNESS:  Right.  I mean, so what's the last question?

BY MR. MICHAELS:

Q.   Sure.  The question was, help me understand if I'm getting this correct, that you're using the testimony of Dr. Desai, a year and three months after the

Page 156

incident, while sitting as a -- as a defendant or representative of a defendant in a lawsuit --

A.   Yes.

Q.   -- that he received a phone call at 8 o'clock a.m. that a patient was suffering from a STEMI, tell me why you're interpreting that to mean that the determinative EKG was not taken until 8 a.m. to the exclusion of the contemporaneous medical record which indicates that the second EKG, which has been identified as Roman numeral II by Dr. Leonards, was entered at 7:17 p.m.?

MR. DRAHOS:  Object to the form.

THE WITNESS:  So because all the timings are completely off and nobody is able to say anything based on the timing of the EKGs, and I have to go off of the senior physician.

BY MR. MICHAELS:

Q.   All the timings on the printed EKGs are off; correct?

A.   And do not correlate with any timings that are in the contemporary medical chart.

Q.   Right.  The timings in the contemporary medical chart, there's no reason to believe that those are off at all; correct?

A.   I mean, that's when those notes were input.

Page 157

Q.   So in terms of trying to figure out timing, you're choosing to use the testimony of the senior doctor who was not present when that second EKG was done over the contemporaneous medical record; is that correct?

A.   Yes.

Q.   Okay.  Now, what my question -- so let's assume that -- let's follow your lead.  Let's say that Dr. Desai's testimony can be interpreted to mean that the shipboard doctors did not know that it was a STEMI until 8 o'clock p.m., and you said, well, now they have to consider the risks.

What risks do they consider between 8:30 and 9:05 that they weren't able to consider between 8 and 8:30?  And I don't want conjecture, things that could or should have would have been.  The evidence in this case. Why did it take them more than a half an hour to consider those -- those risks?

A.   Why it took longer than a half hour?

Q.   Yeah.

A.   But it wasn't only just consideration and the risks.  Other things could have occurred in that time.

Q.   What things?

A.   For example, IV access.

Q.   Was there an issue with IV access?  Have



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 158

you read that anywhere in the record?

A. No, but I'm -- you asked me what could have happened and I'm telling you.

Q. No. I'm asking you just the opposite. I don't want to know what could have -- I mean, anything could have happened. They could have ended up in a tsunami and they were unable to stay on the ship, but there's no record of that.

My question is based on the evidence you have reviewed, the testimony you have reviewed, what happened that they were not able -- at 8 o'clock was the time that they determined it was a STEMI based on your interpretation, why were they not able to begin the thrombolytic until 9:05? What happened?

A. There's nothing suggested in the medical chart, but I think one hour onboard a ship is good time. It's not -- it's not a land-based hospital, it's not an emergency room.

Q. What difficulties would there be on a ship that you don't have in an ER? Your -- your medications are kept in the ER; correct?

A. You don't have 50 staff.

Q. But you have an emergency patient who is suffering a STEMI who's being treated by at least two nurses and now two doctors; correct?

Page 159

A. Yes. And they will do their absolute best. But it cannot be the same expectation as a hospital-based emergency room.

Q. Well, tell me in a hospital, when do you get that kind of primary care that a patient has two nurses and two doctors attending to them?

A. I mean, I can see in multiple stroke activations more than two nurses.

Q. And you certainly wouldn't expect that in dealing with someone who's suffering from an acute STEMI that they would say, Mr. Reeves, wait right here. We've had someone come in who just twisted their ankle. We've got to go tend to that. We'll be back in a half an hour; correct?

A. No, but I'm not saying that that's what happened. But I have seen multiple nurses and stroke activations, and I have initiated thrombolytics, yet it wasn't given for one, two hours later sometimes.

Q. In a clinic on a ship, you've got the medications, the equipment and the personnel all contained within one small medical center; correct?

A. Everybody is in one medical center, yes.

Q. Right. We don't have to have a runner go to where the medications are kept, and someone else bring in an IV and paging. Everyone is right there; correct?

Page 160

A. Yes. But they don't have pharmacy and it's two nurses, two doctors on at one time.

Q. The --

A. In fact, it's not supposed to be two doctors always.

Q. It was one until Dr. Desai was called down; correct?

A. Correct.

Q. And do you know if Dr. Desai was called down because Dr. Leonards was unsure of how to interpret the EKG or how to treat it?

A. I do not.

Q. All right. Getting back to the guideline, which we have strayed way far away from, one of the time to treatment goals is the performance of a 12 lead in the guideline -- which ACEP consulted on -- was the performance of a 12-lead ECG by EMS personnel at the site of the first medical contact is recommended in a patient with symptoms consistent with STEMI; correct?

A. That's what the guideline states, yes.

Q. And certainly there were symptoms consistent with STEMI; right? He had the Levine maneuver, central chest pain, sweating, nausea. Fair?

MR. DRAHOS: Object to the form.

BY MR. MICHAELS:

Page 161

Q. Is that all part of what he presented with?

A. That was his presentation, yes.

Q. Okay. This whole issue with him having felt a chest pain or a pang earlier in the morning, do you know whether that was connected or whether retrospectively he was just informing the doctors that he had felt something earlier?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know. But yeah, I mean, it could be very much cardiac cause.

BY MR. MICHAELS:

Q. Obviously we know from the troponin level and from the high T waves in the first EKG taken that, at the time he presented at 6:27 p.m., he would have been in the acute stage of the STEMI; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Right. But that might not have been infarct. But again, you know, this I would defer to experts on that.

BY MR. MICHAELS:

Q. I forgot what the question was, but we can move forward -- oh, I know what the question was.

The question was, based on the high T waves and the troponin, we know that when he presented at 6:27, that he was in the very acute stages of the STEMI;



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Chad Reeves vs Carnival Corporation
Khoury, Nure MD on 01/10/2025              Pages 162..165

## Page 162

correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes, I'm going to defer to the cardiac experts.

BY MR. MICHAELS:

Q.    Right.  Likewise with the time to treatment goals, reperfusion therapy should be administered to all eligible patients with STEMI with symptom onset within the prior 12 hours; correct?

A.    Yes.  That's what the guideline says.

Q.    And obviously Mr. Reeves was in the clinic let's say within a half an hour of the onset of symptoms; correct?

A.    He was -- approximately, yes.

Q.    I'm going to skip over some of this stuff because we talked about it in the flowchart.

In the absence of contraindications, fibrolytic therapy should be administered to patients with STEMI at non-PCI capable hospitals when the anticipated first medical contact to device time in a PCI capable hospital exceeds 120 minutes because of unavoidable delays.

That is part of the guideline as well; correct?

MR. DRAHOS:  Object to the form.

## Page 163

THE WITNESS:  Yes, for non-PCI capable hospitals.

BY MR. MICHAELS:

Q.    Right.  And you keep pointing out this non-PCI, that it's hospitals and there's other risks on a ship.

So what I want to know is, assuming that your time is right, that your time is right, that it was 8 o'clock when they figured out the STEMI, 9:05 when they gave the push.  What risks were they able to eliminate between 8:30 and 9:05 that they couldn't eliminate between 8 and 8:30 or 7:17 and 8:30?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  Again, I mean, look at the testimony of Dr. Desai and discuss with him.

BY MR. MICHAELS:

Q.    Okay.  The guidelines also indicate that when fibrinolytic therapy is indicated or chosen as the primary strategy, it should be administered within 30 minutes of hospital arrival; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Hospital arrival, yes.

BY MR. MICHAELS:

Q.    And in this case from the presentation at

## Page 164

the clinic at 6:27 until the fibrinolytic at 9:05, that's a time period of two hours and 38 minutes; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Two hours and -- no.  Can you repeat that question again?

BY MR. MICHAELS:

Q.    Sure.  6:27 p.m. until 9:05 p.m. is two hours and 38 minutes; correct?

A.    Correct.

Q.    Okay.

A.    But there was no -- there was no STEMI on EKG 1 or Roman numeral I.

Q.    You as a vascular neurologist were not able to determine that that was a STEMI upon reading that first EKG; correct?

A.    Me as a physician was not able to determine that was -- that was not a STEMI.

Q.    You pointed out -- well, it obviously was the acute stages of a STEMI; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I would say it's not a STEMI.

BY MR. MICHAELS:

Q.    You as a vascular neurologist were not able to interpret that; correct?

MR. DRAHOS:  Object to the form.

## Page 165

THE WITNESS:  With three years of emergency room experience.

BY MR. MICHAELS:

Q.    You pointed out to me many times you're not a cardiologist.

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.    Right?

And Doctor --

MR. DRAHOS:  Wait.  Wait.  Wait.  Did you answer the question?  You were taking a drink of water and he's moving on.  So make sure you answer the question.

BY MR. MICHAELS:

Q.    I heard -- I heard a m-hm.  I should clarify, what is your answer?

MR. DRAHOS:  Thank you.

THE WITNESS:  With three years of emergency medicine experience.

BY MR. MICHAELS:

Q.    Okay.  So you as a vascular neurologist with three years of emergency medicine experience were not able to determine that that was a STEMI; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I was able to interpret the


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 166

EKG, and it did not show a STEMI.

BY MR. MICHAELS:

Q.   Did Dr. Leonards reach out to any of the shoreside cardiologists upon receiving that?

A.   No, he did not.

Q.   It was certainly abnormal; correct?  It says that right on its face.  It has the high T waves; correct?

A.   Yeah, it was abnormal, but he still interpreted it as abnormal and the patient was hooked up to a cardiac monitor and he was -- was monitored.

Q.   High T waves tend to indicate an acute cardiac event and generally resolve quickly; correct?

A.   It can also indicate hyperkalemia.

Q.   They tend -- I'm not asking about which specific cardiac issue.  I asked you a very simple question.

The high T waves tend to indicate the acute stages of a cardiac event and they tend to resolve quickly; correct?

MR. DRAHOS:  Object to the form.  If you think that's a simple question, I'm impressed.

THE WITNESS:  So it may indicate multiple diagnoses.

BY MR. MICHAELS:

Page 167

Q.   And when you receive an abnormal but unclear EKG, it should be repeated within a half hour; correct?

A.   Patient should be monitored.

Q.   It should be repeated within a half hour; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It should be repeated.

BY MR. MICHAELS:

Q.   Within a half hour; correct?

A.   I think it should be repeated.  I'm not saying as to exactly which time.

Q.   When, the next day?

A.   I'm saying it should be repeated.

Q.   Obviously there's an urgency to figuring out what was causing it; correct?

A.   There's an urgency; but again, it was -- it did not show a STEMI, and the troponins were negative.

Q.   And the cardiac guidelines were 15 to 30 minutes; correct?

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.   For the repeat.

A.   That's the AHA guidelines, yes.

Q.   The American Association for Justice?  Did

Page 168

you say AAJ?

A.   No.  I said AHA.

Q.   Okay.  AHA.  The AHA guidelines which we're looking at now; correct?

A.   Correct.

Q.   And if we look, if he entered the clinic around 6:30, 10 minutes after would have been 6:40, a half hour after that would have been about 7:10, and then that second EKG could have been retrospectively entered into the medical chart at 7:17; fair?

A.   The medical record says 7:17 another EKG was performed.

Q.   Another EKG had been performed and reviewed.

A.   Yes.

Q.   And not just another.  A second.

A.   A second.

Q.   Okay.  I want to move on.  We'll jump down two pages to talk about whether on land or on sea what some of the potential issues could be if this therapy is not promptly started.

System delays to reperfuse are correlated with higher rates of mortality and morbidity.  Would you agree that that's true on land or on sea?

A.   Yes.  I mean, it would correlate to any --

Page 169

any patient.

Q.   The greatest emphasis is to be placed on the delivery of reperfusion therapy to the individual patient as rapidly as possible.

Would you agree that that would be true on land and at sea?

MR. DRAHOS:  Object to the form.

THE WITNESS:  For that I would defer to the cardiac experts.

BY MR. MICHAELS:

Q.   Okay.  But no reason to think that that would be different just because you're on a boat; correct?

A.   I'm not speaking as to a boat.  I'm just speaking as to what was stated there, and I defer to the cardiac expert.

Q.   Moving down to page E 379.  In the absence of contraindications, fibrinolytics therapy should be given to patients with a STEMI and onset of ischemic symptoms within the previous 12 hours when it is anticipated that primary PCI can't be performed within 120 minutes.

I didn't ask a question.  You don't have to answer that because I think we have touched on that 4,000 times.  I did not mean to read you that portion.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 170

Moving down to 5.11, timing of fibrinolytic therapy. The benefits of fibrinolytic therapy are well established with a time dependent reduction in both mortality and morbidity during the initial 12 hours after symptom onset.

That is part of the guideline as well; correct?

A.   That's stated in the guideline.

MR. DRAHOS:  Object to the form.

BY MR. MICHAELS:

Q.   To the -- I'm sorry.  There may be advantages to the immediate delivery of fibrinolytic therapy versus any delay to primary PCI for patients with STEMI and low bleeding risks who present within the first one to two hours of symptom onset; correct?

A.   That's what's stated there.

Q.   All right.  And we can agree that Mr. Reeves would have presented within one to two hours; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Within one to two hours of --

BY MR. MICHAELS:

Q.   Of symptom onset.

A.   Yes, but he was not a STEMI.

Q.   The -- certainly if it's from symptom onset

Page 171

and he -- and he wasn't even showing the determinative symptoms yet, he would have presented very early in the STEMI process; correct?

A.   Can you repeat that question, please?

Q.   Sure.  If he was at a point where the troponin was still showing negative and the EKG waves hadn't even resolved to the fact where it was identifiable as a STEMI, he was obviously very early in the STEMI process; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's the -- that's a -- probably better answered by the cardiac expert.

BY MR. MICHAELS:

Q.   And certainly by the time that second EKG was done based on the testimony, they were able to identify as a STEMI; right?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Please repeat?

BY MR. MICHAELS:

Q.   We can move on.

The guidelines also indicate that adjunctive antiplatelet and/or anticoagulant therapies are indicated regardless of the choice of fibrinolytic agent; correct?

MR. DRAHOS:  Object to the form.

Page 172

THE WITNESS:  That's what is stated there.

BY MR. MICHAELS:

Q.   And in terms of anticoagulants, what is the recommendation for anticoagulants when someone is being administered a thrombolytic in a STEMI?

A.   According to the guidelines, I would have to review the guidelines.

Q.   Okay.  You'd agree they should be followed; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I defer to the experts.

BY MR. MICHAELS:

Q.   You are the expert.

A.   The cardiac expert.

Q.   Well, you're here to say that he received appropriate medical treatment; correct?

A.   For patients at sea.

Q.   Okay.  So for a patient at sea, of which you are testifying as to what is the appropriate and adequate medical treatment, what should be provided in terms of an adjunctive anticoagulant?

A.   I think it's a unique situation, and he received thrombolysis.

Q.   What is unique about it?  A thrombolysis is part of the algorithm; correct?

Page 173

A.   What's unique is everything that we've discussed thus far, maritime medicine.  And he received thrombolytics, it's one of the definitive pathways that you pointed up above.  So adjunctive therapy, again, I would have to defer to the experts on it, but it poses further risk or not.

Q.   But part of the treatment that you're here to provide -- or part of the opinion is that the therapy or the treatment that he received was appropriate; correct?

A.   Appropriate for patients at sea.

Q.   Whether they are at sea, on Mars or on earth, there are guidelines from a medical standpoint which dictate the type of therapy, the type of medication they are supposed to receive; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.  But does that put him at a higher bleed risk or not?

BY MR. MICHAELS:

Q.   At sea for the treatment of a STEMI heart attack, is someone just supposed to be given a thrombolytic alone or are they also supposed to receive the adjunctive therapies?

A.   I think risks need to be assessed at sea.

Q.   Had the doctor --

 UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

## Page 174

MR. DRAHOS: Wait. Wait. Wait. Please let him finish.

Go ahead.

THE WITNESS: Considerations need to be taken whether you're giving additional anticoagulant, blood thinning medication, there should be further considerations at sea.

BY MR. MICHAELS:

Q. Well, first of all, Doctor, you as a doctor should be aware, an anticoagulant does not thin the blood; is that correct? It keeps the blood from coagulating. Is that right?

A. Can I ask you the difference?

Q. Can you -- will you answer my question or are you going to answer it with a question?

MR. DRAHOS: If you can answer the way it's been worded. If you need him to clarify --

BY MR. MICHAELS:

Q. Is it your understanding that an anticoagulant and a blood thinner are synonymous? You're the doctor.

A. No, I don't think they are synonymous, and I'm aware of what's an anticoagulant, antithrombotic and antiplatelet.

Q. Okay. So I asked you what the difference

## Page 175

is, and you asked me what the difference is. Since you're aware that they're different, what is the difference between a blood thinner and an anticoagulant?

A. Should I pull out a pathophysiology book and explain to you the exact difference?

Q. You should rely on your training, experience and background as a doctor, as an expert in this case to tell me the very simple answer of what is the difference?

MR. DRAHOS: Object to the form. It's not a very simple answer.

MR. MICHAELS: Thank you for your input, Mr. Drahos.

BY MR. MICHAELS:

Q. Doctor, would you answer the question of what the difference is?

MR. DRAHOS: It's your commentary that's the problem.

THE WITNESS: I can't explain it now, sir.

BY MR. MICHAELS:

Q. Okay. Are you -- are you unable to explain to me what the difference is between a blood thinner and an anticoagulant?

MR. DRAHOS: Object to the form.

THE WITNESS: So blood thinner really is

## Page 176

not any specific medication. It's a general term that we use for all those medications.

BY MR. MICHAELS:

Q. All what medications?

A. Patients come in and they will say, I'm on blood thinners, I'm on aspirin. It's not a blood thinner. It's an antiplatelet; right?

Q. An anticoagulant keeps clots from reforming; correct?

A. Yes. Correct.

Q. And we talked about at sea, but at sea Dr. Leonards made a decision to provide an anticoagulant; didn't he? Enoxaparin or Lovenox.

A. That's antithrombolytic.

Q. They are -- they are synonymous. They prevent thromboses from forming.

MR. DRAHOS: Object to the form.

BY MR. MICHAELS:

Q. He did make a decision to provide that; correct? to administer that.

A. He -- he administered Lovenox, yes.

Q. All right. So whatever concerns there were about if you give Lovenox, it might cause further blood thinning, the doctor felt it was appropriate. Can we agree to that?

## Page 177

A. Yes.

Q. So my question for you was, based on the guideline, what is the appropriate dose of Lovenox, also known as enoxaparin, to provide to someone undergoing a STEMI who's receiving a thrombolytic regiment?

MR. DRAHOS: Object to the form.

THE WITNESS: I would have to defer to the experts.

BY MR. MICHAELS:

Q. Okay. You're -- you're here as the expert who is saying that he received medically appropriate care. What is -- what is your take?

A. What is my opinion?

Q. Yes.

A. My opinion is he received great care, the team did an excellent job, he survived, and he was evacuated from the ship.

Q. As part of that care, was -- was part of the great care he received receiving Lovenox?

A. I believe that Dr. Leonards felt it was appropriate, and what he gave was an appropriate amount. But as to specifics, I would have to defer to the cardiac experts.

Q. What is the -- well, you're -- you're here to testify the care he received is appropriate.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 178

So what do the guidelines indicate is the appropriate dose of enoxaparin, which again is another name for Lovenox, that should be administered to a patient -- you can look on the screen, it's right there -- to a patient who's receiving thrombolytics for a STEMI?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Can you point out to where it is exactly?

BY MR. MICHAELS:

Q.   Sure.  Enoxaparin administered according to age, weight and creatinine clearance given as an intravenous bolus followed in 15 minutes by subcutaneous injection for the duration of the index hospitalization, up to eight days or until revascularization, and in terms of the -- so that's the duration.

And in terms of the dose, enoxaparin if under 75, 30-milligram IV bolus followed in 15 minutes by 1 milligram per kilogram subcutaneously every 12 hours.

So now let me ask you again.  What is the appropriate dose according to guidelines of enoxaparin that a STEMI patient undergoing thrombolytics is supposed to receive?

A.   In a hospital based patient, I can tell you according to these guidelines -- would you like me to

Page 179

read the exact line again?

Q.   Did I just read it correctly?

A.   Yes, you did, sir.

Q.   Okay.  What was provided in terms of enoxaparin to Chad Reeves?

A.   I believe 100 milligrams.

Q.   100 milligrams intramuscularly prior to the start of the thrombolytic; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It was -- I did see the intramuscularly.  I think that's just a typo.

BY MR. MICHAELS:

Q.   Well, he certainly didn't receive an IV bolus; correct?

A.   Probably subcutaneous was my assumption here.

Q.   He did not -- the evidence is that he did not receive an IV bolus; correct?

A.   I mean, I have to review the chart and see if he gave a subcutaneous or if there's any mention.

Q.   You've read -- you've read the chart and Dr. Leonards' testimony as part of preparing for today; correct?

A.   Yes.  And I said that the subcutaneous earlier, and you asked me about intravenous, so.

Page 180

Q.   Well, the chart says intramuscular.  The testimony said, oops, I think that was a mistake, it was intravenous.  But there's agreement everywhere that he -- I'm sorry, that that was subcutaneous, but there's agreement everywhere that he never received an intravenous dose; is that correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I agree.

BY MR. MICHAELS:

Q.   Okay.  And we also have an indication that there was no secondary dose given 12 hours later or at any time after the event; correct?

A.   Correct.

Q.   Now, the importance, of course, of the enoxaparin or the heparin or the Lovenox, or whatever we want to refer to it to, is that if the thrombolytic busts up the clot that's there, the Lovenox prevents new clots from forming; correct?

A.   Again, this -- this is better answered by the cardiac experts.

Q.   Well, you're here to testify that the medical care he received was appropriate.  So I want to ask you, was the -- either the -- providing a dose that was less than the amount that's recommended or the failure to give a followup dose the reason why he likely

Page 181

reoccluded prior to receiving the angiogram at Osceola Hospital?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yeah, I don't have an opinion.

BY MR. MICHAELS:

Q.   Do you believe that it was appropriate not to give a secondary dose 12 hours later?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I don't have an opinion.

BY MR. MICHAELS:

Q.   Do you believe that it was appropriate to give the 100 milligrams, let's say it was subcutaneously, without also giving the 30-milligram IV bolus?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't have an opinion on that either.

BY MR. MICHAELS:

Q.   Okay.  Would you agree with me moving down that restoring TIMI 3 flow or full flow after fibrolytic therapy predicts subsequent short and long-term survival?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I know that's what's stated there.

 UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 182

BY MR. MICHAELS:

Q.   I want to move on to the next document, which is --

MR. DRAHOS:  Can we take another quick break before we do that?

MR. MICHAELS:  Sure.

MR. DRAHOS:  Great.  Thanks.  Five minutes?

THE WITNESS:  Yeah.

THE VIDEOGRAPHER:  Going off the video record.  The time is 1:37 p.m.

(Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)

THE VIDEOGRAPHER:  We are back on the video record.  The time is 1:45 p.m.

BY MR. MICHAELS:

Q.   Dr. Khoury, I just wanted to -- I know based on something you said today and something in your report, I just want to clarify.  The time that Chad signed into the medical clinic was 6:27 p.m.?

A.   That's what is written there, yes.  Medical intake form.

Q.   Have you ever reviewed the package insert of Lovenox?

A.   No, I don't believe I have.

Page 183

Q.   The recommendations and package insert as to dosage and frequency that should be followed?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's what's advised by the FDA would be on that insert, yes.

BY MR. MICHAELS:

Q.   I want to move to your report.  You did draft a report in this case; correct?

A.   I did.

Q.   Was it just one report or --

A.   No.  Just one report.

Q.   Maybe we can be relatively quick in getting through this.

It's a -- it's a two-page report; correct?

A.   Yes.

Q.   Do you have a copy in front of you?  Can you get a copy in front of you?

MR. DRAHOS:  He's got it here.

THE WITNESS:  Yes.

BY MR. MICHAELS:

Q.   So the two-page document I have on the screen, that is your report; correct?

A.   Yes.

Q.   What was the date that you wrote your report?

Page 184

A.   I don't recall the exact date.

Q.   Do you know what time you started writing the report?

A.   I do not.

Q.   Now, at the time that you wrote your report, per your request, I've reviewed the following materials related to Chad Reeves.

One, plaintiff's complaint; two, Carnival medical chart; three, deposition of Reddy Desai; four, deposition of Captain Mario Imbimbo; five, medical records from JetICU; six, medical records from HCA Florida Osceola Hospital.

Is that the sum total of what you have -- what you had reviewed at the time that you drafted this report?

A.   I believe so, yes.

Q.   Now, is there a record somewhere else that exists of what you have received and reviewed since?

A.   No.

Q.   Can you tell me what you have reviewed and received since?

A.   So the depositions of --

Q.   Which?

A.   Dr. Desai, Leonards, the expert reports.

Q.   So when you say the expert reports, meaning

Page 185

the reports drafted by different experts in this case?

A.   Yes.

Q.   And then you also reviewed the deposition of Dr. Leonards?

A.   Yes.

Q.   Is that the sum total of what additional you have reviewed?

A.   As well as the -- in the deposition of Nurse Thomas as well.

Q.   You reviewed Sony Thomas's as well?

A.   Yes.

Q.   How about any of the other depositions taken?

A.   I don't think so.

Q.   I know that Dr. Klancke was deposed two days ago and Mr. Drahos ordered a rough copy of his deposition.  Was that shared with you?

A.   Yes.

Q.   And did you have a chance to read or review that?

A.   Very briefly.

Q.   Skimmed it essentially; correct?

A.   Yes.

Q.   Anything in there that you disagree with that you wrote?



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 186

MR. DRAHOS: Object to the form.

THE WITNESS: You know, I do agree with some things that she stated because she's --

MR. DRAHOS: He.

THE WITNESS: Or he, sorry. He's aware of some of the limitations of treating patients at sea.

BY MR. MICHAELS:

Q. What do you mean? Meaning that I think what we all agree on is that the likelihood of getting him to a cath lab within two hours would have been very unlikely; correct?

A. I mean, that's definitely for sure, yes. Yeah. That's one of the things that he -- just appreciated that he respected that, so -- but I don't recall a lot of the specifics from the report.

Q. All right. Moving -- moving through your report, I just want to clarify a few things.

Obviously we know that he presented to the medical center at 6:30 -- 6:27 p.m.; correct?

A. 6:27, yes.

Q. Okay. Now, you stated he had -- first had chest pain earlier in the morning that was associated with sweating and nausea and had taken three tablets of baby aspirin.

Page 187

It's my understanding that the sweating and nausea and baby aspirin occurred at 6 o'clock p.m. Is that also your understanding?

A. There was -- there was some symptom in the morning.

Q. Some -- some chest pain. But do you have an understanding that that was accompanied by sweating or nausea or that he took aspirin in response to that?

A. So patient reported around 10:00 a.m. this morning he had chest pain that was associated with sweating and nausea.

Q. Okay. My -- my understanding of that's a little different, but that's all right.

Moving on, you indicated EKG showed ST elevation in leads V2, V3 and V4 and AVL.

What time do you believe that EKG was taken, and based on what?

A. So ST elevations, I mean, based off of Dr. Desai that would be the second what -- Roman numeral II, but it was based on 8 o'clock.

Q. So you believe that that occurred -- on the EKG that we have marked as Roman numeral II, and that it occurred at 8 o'clock?

A. Correct.

Q. And I think we spent a lot of time talking

Page 188

about the basis of that.

Now, you noted Dr. Desai to have administered alteplase. Dr. Desai, again, was not the doctor in the clinic at the time of the EKG.

Why didn't -- why didn't Leonards make that decision?

A. Because he was not having a STEMI initially.

Q. So it's your belief that Dr. Desai was already in the clinic at the time it was discovered that he was having a STEMI?

A. I don't -- I don't think that the timeline exactly clear, but what I can say, he's the senior doctor, he made the decision.

Q. Right. And I'm not asking about whether the timeline was clear.

I'm asking if, based on your review of the facts, if you believe that Dr. Desai was already present in the clinic, let's say at the time that EKG Roman numeral II was taken.

A. More than likely, yes.

Q. Okay. And again, that's not a more than likely. That's not an opinion. He either was or was not; correct?

A. I'm saying more than likely he was. And

Page 189

he's referenced a Roman numeral II, and that that was at 8 p.m.

Q. Why would you say more than likely he was when his direct testimony and Dr. Leonards' testimony is that he was called after EKG 2 revealed that it was a STEMI?

A. Because I don't believe EKG 2 and Roman numeral II are the exact same.

Q. Right. When we've got three EKG printouts and the record indicates that three EKGs were taken, and every doctor has verified that EKG 2 was Roman numeral II, what is the basis of your belief that that is not accurate?

MR. DRAHOS: Object to the form. That assumes facts not in evidence, and it's extraordinarily argumentative at this point.

MR. MICHAELS: It's not remotely argumentative and it doesn't assume facts not in evidence, but I'll ask it another way for your pleasure, Mr. Drahos.

MR. DRAHOS: You can't -- you can't say you haven't asked him that question already. So it's argumentative.

BY MR. MICHAELS:

Q. Doctor, what -- what is the basis of your



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 190

belief that Roman numeral II is not EKG 2?

A.   Because none of -- none of the timings correlate.

Q.   And when you say none of the timings correlate, meaning the times that we know are worthless on the EKG and are not accurate don't correlate with what?

MR. DRAHOS:   Object to the form.

THE WITNESS:   With timings in the report.

BY MR. MICHAELS:

Q.   And so your interpretation of that is that the report must be wrong?

MR. DRAHOS:   Object to the form.

THE WITNESS:   I believe that they do not correlate --

BY MR. MICHAELS:

Q.   Well, they don't correlate.

A.   -- so, they do not.

Q.   You then pointed out that Dr. Desai chose to administer alteplase after receiving informed consent from the patient.

How long did he wait to -- to administer the alteplase after he received, in your estimation, the confirmation of a STEMI?

A.   One hour.

Page 191

Q.   One hour and 5 minutes?

A.   One hour and 5 minutes.

Q.   You also don't mention anything about the administration of the Lovenox.  Why not?

A.   I didn't mention it.  I didn't mention the Lovenox.

Q.   Now, am I correct that he actually received morphine 10 milligrams IV on four different occasions?

A.   Let me look to be sure.

There was one push at 9:15 a.m.  So morphine 4 milligrams initially, plus 4 milligrams after a few minutes, and later 2 milligrams.

Q.   And that's the total morphine that he received?

A.   Yes.

Q.   Okay.  Did he also receive an antianxiety; midazolam or something like that?

A.   Midazolam, yes.

Q.   Okay.  And obviously the purpose of the morphine would be to reduce his sensation of pain, and the antianxiety would be to reduce his anxiety and help him rest?

A.   It's for comfort, yes.

Q.   Do you know whether the -- any reduction in his chest discomfort was because of a cessation of the

Page 192

occlusion or if it was because the morphine or some combination of the two?

MR. DRAHOS:   Object to the form.

THE WITNESS:   I mean, it's supposed to provide a comfort, but 10 milligrams of morphine is not an extensive amount, especially 4 milligram injections, it's not an extensive amount.  For cardiac pain, that would be -- cardiac pain is very severe, obviously, and 4 milligrams would, again, provide some comfort, but would not eliminate the pain completely.

BY MR. MICHAELS:

Q.   We know that the next day at Seminole Hospital his -- his artery was completely occluded again; correct?

A.   Yes, I'm aware of that.

Q.   Okay.  So we have one of two options. Either the therapy was successful and the vessel was opened and then reoccluded, or they were never able to get the vessel open.

Do you have any opinion one way or the other as to what occurred here?

A.   No.  I defer to the cardiac expert on that.

Q.   When you indicate that his EKG showed improvements with loss of reciprocal depression, is that

Page 193

the 12 o'clock, the 4 a.m. or the 8 a.m. EKG?

A.   I believe it's based on the cardiac strip, the strips.

Q.   At 12, 4 or 8?

A.   I have to review the strips.

Q.   Go ahead.

And those are -- those are -- when you said the strips, you're talking about the snapshots taken off the constant monitor?

A.   Correct.

Yeah, leads 2, 3 and aVF at 8 a.m. were reduced, and also at 4 a.m.

Q.   At 4 a.m. he's still in a STEMI; correct?

MR. DRAHOS:   Object to the form.

THE WITNESS:   Yes, but there is an improvement.

BY MR. MICHAELS:

Q.   If the improvement was because --

A.   And at noon, he was nearly back to baseline.

Q.   And if his return to baseline was because they had gotten him to reperfuse, do you know if the subsequent reocclusion was because of the inadequate dose of Lovenox that was provided?

A.   I would defer to the cardiac expert on


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 194

that.

Q.   Let's move down to -- what do you see on the screen right now?  Still your report?

A.   Still my report, yes.

Q.   All right.  Let's move down to your opinions.

"The medical staff aboard the Carnival Freedom met the standard of care at all times during the care and treatment of Mr. Reeves."

What is the basis of that opinion?

A.   My experience at sea in medical operations and how the patient was handled.

Q.   How the patient was what?

A.   How the patient was treated.

Q.   Right.  So what I'm asking is what in that treatment do you believe met the standard of care?

A.   I believe he was -- his symptoms were improved; his ST elevations increased; he was stable throughout the entire journey and was transported safely.

Q.   Do you have any understanding of what his current care or condition is?

A.   I do not.

Q.   Okay.  Do you know the extent of heart muscle damage that he suffered as a result of this STEMI?

MR. DRAHOS:  Object to the form.

Page 195

THE WITNESS:  I do not.

BY MR. MICHAELS:

Q.   Do you know whether the time that passed before the thrombolytic was administered or the dosage or frequency of heparin provided caused any further damage?  Do you have any opinions as to that?

A.   I would defer to the cardiac expert.

Q.   Okay.  So -- so when you say -- so you do not have an opinion as to whether any of that was appropriate or as to whether any of that contributed to his current status?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I -- again, I defer to the expert, the cardiac expert on that.

BY MR. MICHAELS:

Q.   Okay.  So if you're deferring to the cardiac expert on that, what are you saying was done appropriately?

A.   Treatment at sea, stabilization and evacuation.

Q.   What part of his treatment at sea do you believe was appropriate?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  Again, his condition

Page 196

improved, he was pain-free, and he remained stable throughout the journey and was evacuated safely to a higher level of care.

BY MR. MICHAELS:

Q.   Do you know if it improved to the extent that it would have had he received the thrombolytic within a half an hour of the diagnosis, and had he received the full dose of heparin with the secondary dose at 12 hours?

A.   Again, I defer to the cardiac experts on that.

Q.   Okay.  Do you know if the reocclusion or the fact that he was still occluded when he got to the hospital was based on the failure to provide a second dose of heparin?

A.   Again, I defer to the --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- to the cardiac experts on that.

BY MR. MICHAELS:

Q.   Your next bullet point is:

"Mr. Reeves was timely and appropriately examined and evaluated by Dr. Leonards and Desai."

So assuming your timeline that the second EKG occurred at 8 o'clock after he arrived at 6:27 p.m.,

Page 197

you believe that the second EKG not occurring until 8 o'clock was appropriate?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's when the STEMI appeared.

BY MR. MICHAELS:

Q.   So you think up until that point there was no STEMI.

A.   I believe so.

Q.   Okay.  And you have no explanation for why the contemporaneous medical record says that that second EKG occurred by 7:17?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  Yeah.  Again, I don't think that the -- that correlates with Roman numeral II.

BY MR. MICHAELS:

Q.   We talked about the basis for that belief.

Where it says "all diagnostic testing and all medications ordered and given were timely and appropriately administered," you would defer to the cardiologist as to whether the timeliness and appropriateness of the thrombolytic or whether the administration -- strike that.

A.   No, I think --


UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 198

MR. DRAHOS: Hold on. Let him ask the question.

BY MR. MICHAELS:

Q.   You would defer to the cardiologist as to whether the timeliness and administration of the thrombolytic was appropriate?

MR. DRAHOS: Object to the form.

THE WITNESS: I think basically in a land-based setting. In a sea-based setting, I believe that this was given timely and appropriately.

BY MR. MICHAELS:

Q.   Would that also be true if the STEMI was identified by 7:17 p.m.?

MR. DRAHOS: Object to the form.

THE WITNESS: So if -- that's not what I have.

BY MR. MICHAELS:

Q.   Sir, I'm asking you -- as an expert, I can ask you a hypothetical and, frankly, I believe that's a hypothetical that's supported by the evidence.

If the STEMI was identified --

MR. DRAHOS: I disagree.

MR. MICHAELS: You say you disagree, Mr. Drahos?

Page 199

MR. DRAHOS: Well, you're going ahead and injecting your personal thoughts of what you believe the evidence shows. So I'm going to interrupt you and tell you I don't think it's an appropriate question and he's not going to answer a question like that.

MR. MICHAELS: Well, even if it's a hypothetical, he -- he has an obligation to answer, but --

MR. DRAHOS: But your personal commentary is what makes it inappropriate.

MR. MICHAELS: Regardless of my personal opinion, Mr. Drahos, you have a medical record created by your staff on your ship that shows that the second EKG was done by 7:17 and testimony of your doctors that the second EKG was determinative. So --

MR. DRAHOS: And respectfully, we just --

MR. MICHAELS: -- if you want to -- if you think you got the skill to make the jury think that doesn't matter, that's fine.

MR. DRAHOS: And you can go ahead and advance your case, but you don't need to inject your personal commentary into what you believe the evidence shows. That's inappropriate.

Page 200

MR. MICHAELS: It's not a belief. That's black and white fact.

MR. DRAHOS: Well, that's according to your interpretation and the way that you --

MR. MICHAELS: You don't -- you don't need an interpretation to read 7:17 and know that that means 7:17.

MR. DRAHOS: I'm sorry that we don't agree, but it doesn't matter.

MR. MICHAELS: You don't need an interpretation to decide that 7:17 means 8; but again, the jury will figure that out.

I'd like to get back to asking questions --

MR. DRAHOS: So don't inject your personal thoughts.

MR. MICHAELS: I'd like to get back to asking questions of the witness if you'd allow me to do so.

MR. DRAHOS: As long as you don't interject your personal thoughts, go ahead.

BY MR. MICHAELS:

Q.   Dr. Khoury, assuming that the doctors had made the diagnosis of a STEMI by 7:17 p.m., would you still be of the opinion that the administration of the thrombolytic at 9:05 p.m. was timely?

Page 201

MR. DRAHOS: Object to the form.

THE WITNESS: I think that's, you know, depending on, you know, the factors in the case.

BY MR. MICHAELS:

Q.   Well, based on the factors that we have here, would that have been -- would that have been timely in your expert opinion?

MR. DRAHOS: Object to the form.

THE WITNESS: It's possible.

BY MR. MICHAELS:

Q.   Under what circumstances would it be possible?

A.   Would which part be possible?

Q.   Would it be possible that that would be timely?

A.   Again, depending on other factors that present.

Q.   Have you identified any factors in your review of the evidence in this case that would -- that would make that timely in your opinion?

A.   Can you please repeat that?

Q.   Sure.

In your review of the case as an expert who's here to provide testimony that the medical care was timely and appropriate, have you identified any factors



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 202

that would make it appropriate in this case with these circumstances, if a STEMI was diagnosed by 7:17, to wait until 9:05 to administer a thrombolytic?

MR. DRAHOS:  Object to the form.

THE WITNESS:  No.

BY MR. MICHAELS:

Q.   Okay.  And how about the dosage of the heparin, was the dosage of the heparin appropriate?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  Yeah, I'm going to defer to the experts on that.

BY MR. MICHAELS:

Q.   No, it -- it -- so -- so part of your -- part of your opinion that you intend to tell the jury in this case is that the administration of medications was timely and appropriate.

My question for you is very simple.  Does that include the dosage and the frequency of the heparin or does your opinion not extend to that?

A.   I defer to the experts on the -- on the dosage, though this is treatment at sea, and I believe Dr. Leonards gave the medication that he thought was appropriate, and I do not see it as inappropriate.

Q.   So my -- so my question for you, because

Page 203

you're the one who's come here and sworn as an expert and written a report that it was appropriate, is, is part of your opinion that the -- that all medications ordered and given was -- were timely and appropriately administered, does that include the Lovenox or are you saying on the Lovenox, I defer to the cardiology experts?

A.   I'm -- I'm -- the -- so the initial dosage, I mean, this was based upon a pre-STEMI, and I believe that was an appropriate amount.

Q.   And what is the basis of your belief that when a 30 milligram IV followed 15 minutes later by 100 milligram subcutaneous dose is what is recommended in the guidelines and the package insert, what is the basis of your belief that, in a gentleman that has been identified as obese, that 100 milligrams subcutaneous alone one time would be appropriate?

A.   That was -- that's based on the STEMI, that dosage.

Q.   Right.  He was suffering from a STEMI.

A.   Not initially.

Q.   Well, when they -- when they identified a STEMI, should he have been given an additional dose through an IV bolus?

A.   That I will defer to the cardiac experts on.

Page 204

Q.   Okay.  Let's get back to your report.  Just about this, you agree that he was not a candidate for emergent at sea evacuation.

What about a nonemergent evacuation?  Once the thrombolytic was started, should they have been looking for a way to get him off the ship sooner or was it appropriate to wait until the next day when they got to Nassau?

A.   He was -- he was stable and responding to treatment.

Q.   At what point?

A.   He started to become pain-free, or at least decreased pain.

Q.   Under 10 milligrams of morphine.

A.   Which is a very light dose.

MR. DRAHOS:  Object to the form.

THE WITNESS:  4 milligrams, 4 milligrams and 2 milligrams is not a high dose.

BY MR. MICHAELS:

Q.   So while I appreciate the commentary, I want to get you back to what the question was.

When you say he was not a candidate for an emergent at sea medical evacuation, do you have an opinion as to whether they should have been trying to get him off the ship prior to arriving at Nassau the next day

Page 205

once they had stabilized him?

MR. DRAHOS:  Object to the form.  Asked and answered.

MR. MICHAELS:  It wasn't asked.

THE WITNESS:  No, he was -- he was -- he was stable.

BY MR. MICHAELS:

Q.   So you believe that -- you believe that, once the thrombolytic was provided, he was stable and, therefore, there was no more urgency or no more need to get him to a shoreside hospital?

A.   There's a need, but within 24 hours.

Q.   Okay.  Is there -- looking at the guidelines behind a STEMI, even though you are still advised to get him to a hospital within 24 hours if you can, is there a benefit to getting him to the hospital sooner?

A.   I defer to the cardiac experts on that.

Q.   Okay.  Let's take a look at your -- I thought I saved your invoices.  Give me a second.

Do you know when you were retained in this case?  I know I asked you that question.  I don't think I got an answer.

A.   I don't recall.

Q.   I have a fee schedule dated July 1st, 2024.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 206

Is this -- does this fee schedule accurately indicate your rates?

A.   Yes.

Q.   Okay.  So you don't charge for initial consult.  After that for document reviews or writing your report, it's $350 per hour.  Then for sworn testimony, like we are taking your deposition today, you charge $1,000 per hour for a three-hour minimum; correct?

A.   Correct.

Q.   Why do you charge me roughly three times to take your deposition what you charge Mr. Drahos?

A.   I have to take time off of work to do this.

Q.   All right.  So obviously today we started your deposition at 10, we'll be done by about 2:30, that's four and a half hours.  So I'm going to owe you $4,500 for the privilege of taking your deposition today?

A.   That's correct, sir.

Q.   And in terms of travel time, you charge for nonbusiness hours but not during business hours.  Why is that?

A.   I had that listed.  I don't really charge for travel.

Q.   Now, how much do you charge for appearing at trial?

A.   It would be the same.

Page 207

Q.   You charge 350 or charge them 1,000?

A.   It would be 1,000.

Q.   And is that portal to portal?

A.   I'm sorry?

Q.   Is that portal to portal?  Meaning from the second you leave your home until you're back?

A.   No.

Q.   Well, tell me.

A.   No.  I believe from -- yeah, from my arrival for the sworn testimony itself.

Q.   So only -- only while you're testifying.

A.   Correct.

Q.   All right.  Now, looking to your invoice, I have one invoice from you that is dated November 13, 2024.  Obviously since that time you received further information and review, you had to get ready for your deposition.

How many more hours do you have into the case since that time?

A.   Maybe five or six.

Q.   And then despite what it says in your fee schedule, it looks like you charged at a rate of $375 an hour, not 350?

A.   Yeah, I guess I did.

Q.   All right.  So you have already billed them

Page 208

$2,437.50.  I've had to pay you $5,000 for you -- or 4,500 for your testimony today, and then it looks like you got an additional 2,250 in billable hours into the case.  Am I reading that correctly?

A.   Approximately.

Q.   Okay.  Now, I served expert discovery on you.  I'm not casting aspersions, it's not due yet, but since I have you here, I would like to ask you some of these questions.

For the preceding three years, what percentage has your expert testimony or work been done on behalf of plaintiffs?

A.   I've never been called to testify for a plaintiff.

Q.   And how about on behalf of defendants, 100 percent?

A.   It's been 100 percent.

Q.   I know about three times you have testified.  Once you were retained by Royal Caribbean Cruise Lines, once by Royal Caribbean Cruise Lines, and then this third time by Carnival Cruise Lines.

Other than those three retentions, do you have any other retentions as an expert witness?

A.   Not that I recall.

Q.   It's not the kind of thing you forget;

Page 209

right?

A.   No.

Q.   So -- so three times you've been retained to testify as an expert witness, and all three times was on behalf of cruise lines?

A.   Correct.

Q.   All three times it would have been a medical malpractice case; correct?

A.   Yeah.  Correct.  Yes.

Q.   Have you ever testified at trial?

A.   No.

Q.   Are you looking forward to the experience?

MR. DRAHOS:  Yes.  I'll answer that.

BY MR. MICHAELS:

Q.   Obviously you were retained in this case by the defendants, by the lawyer for Carnival Cruise Lines?

A.   Yes.

Q.   And the lawyer who retained you you told us was Mr. Drahos?

A.   Yes.

Q.   How long did you meet with him last night?

A.   About two hours.

Q.   Have you ever been previously retained by Mr. Drahos?

A.   Yes.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 210

MR. DRAHOS: Object to the form.

BY MR. MICHAELS:

Q. And was that in those two Royal Caribbean cases?

A. Yes.

Q. All right. So all three times that you have testified as an expert, it has been Mr. Drahos who has been the lawyer who retained you.

A. Yes.

Q. You have never been retained by another lawyer to work as an expert?

A. I have never been asked.

Q. Other than by Mr. Drahos.

A. Correct.

Q. All right. Other than what we've talked about, have you relied on any literature, studies, clinical guidelines in formulating your opinions in this case?

A. No.

Q. Since the time of your -- well, let me ask this a different way.

Other than the opinions we have talked about today and the opinions contained in your report, do you have any other opinions that you intend to offer to the jury in this case?

Page 211

A. Only that I truly believe, as the former medical director of Carnival and somebody who knows maritime medicine, that these -- they did an excellent job.

Q. So meaning that you really believe the opinions that you have already shared with me?

A. I truly do.

Q. Okay. And you're the former medical director for the defendant?

A. Correct.

Q. Left on good terms?

A. Left on good terms.

Q. They have retained you in this case to tell us whether you think that their medical care was good or not good?

A. Mr. Drahos did.

Q. And lo' and behold, the former medical director retained as their expert thinks it was not only good, but truly, truly thinks it was good?

A. I know -- I know how cruise ship physicians and nurses are, and I was one, and I know that they stayed up all night trying to save this guy, and that's exactly what they did.

Q. Yeah. No one is saying that they quit on him or went out dancing. We are just saying that the

Page 212

medical care that they provided was appropriate -- inappropriate.

Anything else that you did in preparing your opinions that we have not yet discussed?

A. No.

MR. MICHAELS: I got no further questions. Thank you, Doc.

MR. DRAHOS: We're good.

Madam Court Reporter, we will read the transcript.

MR. MICHAELS: Aurora, I think you have most of the exhibits. I'll send you the supplemental ones that are specific to him.

THE VIDEOGRAPHER: Going off the video record. The time is 2:21 p.m.

MR. MICHAELS: Order an ASCII or etran, and Brian, an unsynced MP4.

MR. DRAHOS: I'll take a copy. As it relates to the video, I'll let you guys know. Thank you.

(Thereupon, the proceedings concluded at 2:21 p.m.)

Page 213

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF MANATEE )

I, the undersigned authority, certify that NURE KHOURY, MD appeared before me and was duly sworn on the 10th day of January, 2025.

Signed this 12th day of January, 2025. Deponent produced driver's license.

_____

Aurora C. Sloan, FPR

Notary Public - State of Florida

My Commission No. HH-128670

My Commission Expires: May 23, 2025

 UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

**Chad Reeves vs Carnival Corporation**
**Khoury, Nure MD on 01/10/2025**          **Pages 214..217**

Page 214

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )

COUNTY OF MANATEE )

I, Aurora C. Sloan, Florida Professional Reporter, certify that I was authorized to and did stenographically report the deposition of NURE KHOURY, MD, pages 1 through 217; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 12th day of January, 2025.

_____
Aurora C. Sloan, FPR

Page 215

Michael Drahos, Esquire
Michael.drahos@gray-robinson.com

January 12, 2025

RE:   Reeves vs. Carnival
      1/10/25 Nure Khoury, MD  Job No. 815577

The above-referenced transcript is available for review.
The witness should read the testimony to verify its accuracy. If there are any changes, The witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Universal Court Reporting at production@ucrinc.com and copies will be emailed to all ordering parties.
It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,

Universal Court Reporting

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

Page 216

Reeves vs. Carnival
1/10/25 Nure Khoury, MD  Job No. 815577

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

Under penalties of perjury, I declare that I have Read the foregoing document and that the facts Stated in it are true.

_____   _____
         NURE KHOURY, MD                DATE

Page 217

ACKNOWLEDGEMENT OF DEPONENT

I, NURE KHOURY, MD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____
NURE KHOURY, MD

*IF NOTARY IS REQUIRED:
SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.

_____
NOTARY PUBLIC


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com