UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:24-cv-21295-RAR

CHAD REEVES,

Plaintiff,

-vs-

CARNIVAL CORPORATION, a
Panamanian Corporation,

Defendant.
_______________________________________/

VIDEOTAPED AUDIO-VISUAL DEPOSITION OF
JOHN SETARO, MD

Pages 1 Through 179

Wednesday, January 8, 2025
10:12 a.m. - 1:45 p.m.

John Setaro, MD
New Haven, Connecticut

Stenographically Reported By:
Aurora C. Sloan, FPR

APPEARANCES:
(ALL PARTIES APPEARED VIA VIDEOCONFERENCE)

On behalf of the Plaintiff:
The Haggard Law Firm
330 Alhambra Circle
Coral Gables, Florida 33134
305-446-5700
BY: Todd Michaels, Esquire
Tjm@haggardlawfirm.com

On behalf of the Defendant:
Gray Robinson
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
561-268-5727
BY: Michael Drahos, Esquire
Michael.drahos@gray-robinson.com

ALSO PRESENT:
Andy Clarke, Videographer



INDEX OF PROCEEDINGS


| TESTIMONY OF JOHN SETARO, MD | Page |
|---|---|
| DIRECT EXAMINATION BY MR. MICHAELS | 5 |
| CROSS EXAMINATION BY MR. DRAHOS | 164 |
| REDIRECT EXAMINATION BY MR. MICHAELS | 168 |
| CERTIFICATE OF OATH | 175 |
| CERTIFICATE OF REPORTER | 176 |

PLAINTIFF EXHIBITS

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|

DEFENSE EXHIBITS

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|

NO EXHIBITS MARKED




Thereupon, the following proceedings began at 10:12 a.m.:

THE VIDEOGRAPHER: We are on the video record. This is the beginning. The time is 10:12 a.m.

This is the video deposition of Dr. John Setaro commencing today, Wednesday, January 8, 2025 in the case styled Chad Reeves versus Carnival Corporation, a Panamanian corporation.

We're meeting via Zoom. The court reporter is Aurora Sloan. The videographer is Andy Clarke with Champion Legal.

Will counsel please state their appearances for the record?

MR. MICHAELS: Todd Michaels on behalf of Mr. Reeves.

MR. DRAHOS: Michael Drahos on behalf of Carnival.

THE VIDEOGRAPHER: Court Reporter, please swear in the witness.

THE COURT STENOGRAPHER: Raise your right hand, please.

Do you solemnly swear or affirm the testimony you are about to give in this matter will be the truth, the whole truth and nothing but the truth?



THE WITNESS: Yes, I do.

Thereupon,

JOHN SETARO, MD,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MICHAELS:

**Q. Good morning, Dr. Setaro.**

A. Good morning, Mr. Michaels. How are you?

**Q. Good.**
**Could you please state your name?**

A. John Francis, F-R-A-N-C-I-S, Setaro. S as in Sam, E-T as in Thomas, A-R-O.

**Q. And it's good to see you again. I believe I previously took your deposition a few years back.**

A. Yeah, it was a -- it was I think a snowy day back in December '21.

**Q. The case -- that was a case called Arnold versus Carnival Cruise Lines?**

A. That's correct.

**Q. Do you remember that case at all?**

A. I do remember some -- some basic details. It had to do with diagnosis or not of a pulmonary embolism in a shipboard passenger.

**Q. Correct. And you in that case were**

**retained by the Defendant, Carnival Cruise Lines; correct?**

A. That's correct.

**Q. Just as you are in this case; fair?**

A. That's correct.

**Q. Now, when we discussed guideline directed therapy for a STEMI, what is the guideline for the time frame when a thrombolytic should be administered to a patient who's experiencing a STEMI?**

A. So a STEMI is very strictly defined by not only chest discomfort, but very specific EKG changes. And at the time that the patient comes in, if the EKG is abnormal immediately or when the EKG does turn diagnostic, the guideline directed recommendations are what we call door-to-needle in 30 minutes, and the needle being the thrombolytic therapy being administered through a vein.

**Q. And when we say "door-to-needle," what the idea is that within that 30-minute window, a diagnosis is supposed to be made, if possible, consents are supposed to be received, the breath is supposed to be done, and the idea is you want to push the medicine into the body within 30 minutes of their entry into the clinic; correct?**

A. That's the ideal, or the appearance of



diagnostic changes. Some patients come in with EKGs that are normal or are abnormal but don't satisfy STEMI criteria. So the clock would start at the time of the diagnosis.

**Q. And the idea is essentially that within -- well, when somebody comes in presenting with symptoms that are indicative of acute coronary syndrome, you want to have an EKG within 10 minutes -- first let's answer that question -- you want to have an initial EKG within 10 minutes; correct?**

A. Yes. That -- that -- that is the standard. But somebody could have an acute coronary syndrome that is not a STEMI.

And in that case, lesser therapies are indicated because thrombolytic therapy does not -- does have significant risks of adverse effects, potentially life threatening side effects. So you don't want to give it frivolously or promiscuously. You want to have pretty strict EKG criteria, in addition to characteristic symptoms before making that decision.

**Q. Sure. And if the EKG is abnormal but not determinative, you want to have a followup EKG within 15 to 30 minutes; correct? That would be the guidelines?**

A. Yes, I believe that's the guideline. And I would also say that there are adjunctive therapies to



thrombolytic therapy that also appear as primary therapies for an acute coronary syndrome that is not a STEMI, and that's two forms of antiplatelet therapy, aspirin and Plavix, P-L-A-V-I-X. The generic name is clopidogrel, C-L-O-P-I-D-O-G-R-E-L, and also a form of therapeutic heparin which can be given intravenously or subcutaneously as an adjunct.

So those things should be given as soon as an acute coronary syndrome is suspected.

And then if an EKG turns diagnostic for a STEMI, one would add on the thrombolytic therapy knowing that there are benefits and also significant risks.

**Q. Sure. And I appreciate the answer, but it wasn't my question.**

**The question was if the EKG is abnormal but nondeterminative for a STEMI, it should be repeated within 15 to 30 minutes; correct?**

A. Yes, I believe so, because there is a propensity for evolution there.

**Q. Now, you talked a little bit about the adjunctive therapy. And in terms of adjunctive therapy, what does the guideline say is the proper dosage for adjunctive Lovenox in a STEMI patient?**

A. So -- well, first you have to start in this case with what is the appropriate dose for an acute



coronary syndrome because that was identified --

**Q. No, that's not my question. You can't -- if I ask you a question, you can't change the question and then answer your question.**

A. Well, I'm setting a predicate for the answer, but I'll answer it any way you like.

**Q. My question -- I just want you to answer the question that I asked, all I ask.**

**My question for you was, what does the guidelines say -- guideline directed therapy say is the proper dosage for adjunctive Lovenox in a STEMI patient?**

A. So --

MR. DRAHOS: Object to the form.

THE WITNESS: So if the patient comes in and a STEMI is diagnosed and they have not received any therapy at all, and one determines that it is a STEMI that's going to be treated with thrombolytic therapy, the initial dose is 100 milligrams per kilogram weight based of subcutaneous Lovenox; and because that takes a while to absorb, there's immediate loading doses given intravenously that is calculated at 0.3 milligrams per kilogram.

And so for a 100-kilogram man, that would be 30 milligrams intravenously, that's to get it

started, because otherwise something that's given
as an injection takes a while to absorb.
BY MR. MICHAELS:
**Q. Right. So the idea is, if a STEMI is diagnosed in terms of the injunctive therapy if we're using Lovenox, the dose that is supposed to be received is .3 milligrams per kilograms intravenously. And the reason that's given intravenously is because that way it goes directly into the bloodstream; correct?**
A. Correct. But there is one exception.
**Q. And what is that exception?**
A. The exception is if Lovenox has already been given any time within 8 to 12 hours prior to the thrombolytic therapy, then it is considered already to be in the system. And in this particular case, Mr. Reeves got the Lovenox, according to the notes as I read them, at 1925, which is about an hour and a half before the thrombolytic therapy.
So for those criteria, the Lovenox is already in the system, so the loading dose is not necessary. And the reason it happened that way was because it was initially seen to be an acute coronary syndrome that was not yet diagnosed as a STEMI.
So I think that the criteria per the guidelines were honored in this case.



**Q. If at 1925 there had already been a -- either a strong suspicion or a confirmation of the diagnosis of STEMI, then it should have been given, the intravenous bolus, along with the subcutaneous dosage; correct?**
A. Correct. If everything was diagnosed simultaneously, but there were two stages of diagnosis here is what the point is.
**Q. Now, the medical records actually indicate that the Lovenox that was given was not given subcutaneously but was given intramuscularly; correct?**
A. I believe -- (video froze).
MR. MICHAELS: Is it me or is it him?
THE VIDEOGRAPHER: It's him.
Do we want to go off?
MR. MICHAELS: I'm going to text Drahos.
THE VIDEOGRAPHER: Going off the video record. The time is 10:21 a.m.
(Off the record.)
THE VIDEOGRAPHER: We're back on the video record. The time is 10:22 a.m. You may proceed.
MR. MICHAELS: I'll reask the question.
BY MR. MICHAELS:
**Q. The medical record, the only contemporaneous record of the administration of the**



**Lovenox indicates that the 100-milligram dose of Lovenox was given intramuscularly, not subcutaneously; correct?**
A. That's what is listed. I believe it is a typographical error because people -- in my entire experience over the past 30 years, nobody would give Lovenox intramuscularly in the setting where you're giving other blood thinners or thrombolytic therapy certainly because there's a proclivity to injure blood vessels. The muscle is highly vascular. Whereas if it's given intravenously, it goes right into the vein, there's no issue of injury to muscle or arteries and subcutaneously it's right under the skin where there are blood vessels, but they are microscopic, and it's not going to lead to any bleeding. So I believe that is a typo.
**Q. So when you say you believe it's a typo, you're saying you believe it's a typo because that would be improper; correct?**
A. It would be improper and it's not something that's done, and I think every, you know, reasonable physician would know that that would be a hazardous thing to do, to give a blood thinner intramuscularly, because you're almost certain to create a very severe bleeding reaction within the muscle.
**Q. Right. And you understand that's what this**



**whole case is about, whether the medical staff treated this condition appropriately; correct?**
A. Yes, that is correct. Even if it were given intramuscularly, it would be absorbed, but I don't believe it was given intramuscularly in this case.
**Q. So -- but just to be clear, the sole contemporaneous record indicates that it was given intramuscularly.**
MR. DRAHOS: Object to the form.
THE WITNESS: That is what's written.
Again, my opinion would be that's a typographical error.
BY MR. MICHAELS:
**Q. Okay. And I don't know that an expert is allowed to have an opinion about a fact.**
**So my question -- I'm going to ask you just to answer my question without supposition. The only contemporaneous record of that injection indicates that it was given intramuscularly; correct?**
A. That is what's written.
**Q. Okay.**
**Now, when heparin is given subcutaneously, roughly -- or Lovenox in this case -- roughly how long does it take to start having the therapeutic impact?**
A. Probably within an hour or so; and thus the

loading intravenous dose when there has been no prior heparin given.

**Q. Now, I'd like to start just to orient everyone to what we're talking about here by talking a little bit about what a STEMI is when we use the word STEMI.**

**First and foremost, when we use the term "STEMI," what we're referring to is what's called an ST-elevation myocardial infarction. Is that fair?**

A. That's correct.

**Q. And my myofardical -- myocardial -- strike that. I'm tripping over my own tongue.**

**Myocardial infarction is just the medical term for a heart attack; is that correct?**

A. Right. And if you want to use the medical term that's much shorter but totally accurate, you can just simply say MI, which is what we say.

**Q. Now, we all use the term heart attack all the time colloquially, but when we use the word heart attack scientifically, what we are talking about is a blockage of blood flow to the heart; correct?**

A. Yes. It's an imprecise term. It's like a psychiatrist talking about a nervous breakdown. There's really -- really no such thing.

But myocardial infarction, which is a



specific medical or scientific term, indicates damage to the heart muscle that is arising from an occlusion, a blockage to the artery nourishing the heart muscle with oxygen, glucose and other nutrients.

**Q. And obviously when somebody is suffering from a myocardial infarction, that is an emergent situation; correct?**

A. Yes, it is. It's a medical emergency.

**Q. It can result in death?**

A. It can result in heart muscle damage, heart failure, very serious possible lethal rhythm disturbances, and of course following from that death, yes. So it's a medical emergency.

**Q. And I was going to kind of take this from the top down. But the heart is a muscle; is that fair?**

A. That is correct.

**Q. And it's a muscle that keeps you alive by pumping blood throughout your body, which takes oxygen to nourish your organs; fair?**

A. That's correct. And helps to draw venous blood back in to receive more oxygen for the purpose of satisfying circulation and perfusing all the tissues and all the organs.

**Q. Short of death, as you alluded to, the risk of blood flow being cut off from the heart is that**



**without blood flow, the tissue of the heart muscle dies; fair?**

A. That's correct. Without adequate nourishment of the nutrients we talked about and oxygen, eventually the heart muscle cells are damaged and they die and they turn into scar tissue.

**Q. And that death and that scarring, that is permanent; right? It doesn't regenerate or fix itself generally.**

A. No. Science hasn't figured out a way to regenerate heart muscle that's already dead.

**Q. So even in a situation where somebody survives a myocardial infarction, there's the risk that as a result of the lack of oxygen flow to the heart, that there's permanent damage to the heart muscle; correct?**

A. Yes. And there can be -- that can be a regional issue; in other words, some arteries may be open and the heart muscle fit into those arteries is fine, but the area where the MI occurs can be damaged and is no longer recruited as well to function in the pumping actions of the heart.

**Q. Now, usually a -- I mean almost always a myocardial infarction is caused by a blood clot; is that fair?**

A. Most of the time. There's some other



exceptions where it can happen because of a spasm or a breakdown in the wall of the artery. But the large majority of the cases have to do with a cholesterol plaque that ruptures and exposes toxic contents to the bloodstream. And the natural reaction to a vascular injury is to send a clot as per external trauma.

But this is a form of internal trauma where the clot becomes not life saving to prevent external bleeding, but rather life threatening because it impedes the blood flow to the heart muscle.

**Q. Right. So essentially someone suffers that type of injury to a blood vessel, and what the blood clot is the massive blood components that clump together inside the blood vessel to try to stop the bleeding essentially, but end up impeding the blood flow.**

A. Correct. It's a maladaption response that normally would be helpful were the injury due to external trauma.

**Q. And generally a blood clot consists of platelets and cells and fiber and protein mesh and other blood components; fair?**

A. That is correct.

**Q. Now, when we refer to ST-elevation, we're referring to a pattern on an EKG reading where what's called the ST segment is elevated; fair?**

A. That's correct.

**Q. And the segments as they appear on an EKG, you've got P, Q, R, S, T, and they are supposed to be in a particular way. But when the ST is elevated, that's a sign of a STEMI; correct?**

A. Right. The segment between the S wave and the T wave is supposed to be at what we call the isoelectric baseline that is flat right on the line. And when it is elevated, that's considered an ST segment elevation. And there can be other causes for it, but the primary cause we'd be concerned with would be a complete occlusion of the coronary artery.

**Q. And one of the features of a STEMI is a completely blocked coronary artery; correct?**

A. Yes.

**Q. Generally when you're talking about a STEMI, you're talking about 100 percentage blockage; fair?**

A. That's fair in most cases.

**Q. STEMI is generally a very serious heart attack; right?**

A. Well, I mean, it's serious in the sense that there is a risk of heart damage from the time that the artery initially gets blocked. There is some survivability of heart muscle without oxygen for a period



of time, but ultimately a complete blockage that is not resolved does result in reduced heart function in the area that we're irrigating through that vessel.

**Q. And that's assuming that the person survives.**

A. Yes.

**Q. And as much as a STEMI is serious, but also fairly common; right? 25 to 40 percent of heart attacks I believe are STEMI heart attacks; is that correct?**

A. That is correct. There are a large number of these cardiac events.

**Q. Now, the key to treating someone with a STEMI is returning blood flow to the heart as soon as possible. Would you agree with that?**

A. Yes.

**Q. Survival, better outcome, things of that nature require that the blocked artery be opened and blood flow be restored as soon as it feasibly can.**

A. Yes. That would optimize the outcome for the patient.

**Q. And ideally, you want that to happen within 90 minutes; correct?**

A. So --

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sorry?



MR. DRAHOS: Sorry. I'm objecting, but you can go ahead.

BY MR. MICHAELS:

**Q. When we're looking at the guideline directed therapies, the guideline is you want to restore blood flow within 90 minutes; fair?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah, that -- that is the goal. That was demonstrated in the earlier studies to result in better outcomes.

BY MR. MICHAELS:

**Q. And as you work up that 90 minutes, beyond it there's a belief or a saying among cardiologists that time equals muscle. Have you heard that saying before?**

A. Yes.

**Q. The idea being that the longer it takes to restore blood flow to the heart, the more damage there will likely be to the heart muscle; fair?**

A. In general, that's true.

**Q. Conversely, the quicker the blood flow is restored to the heart, the less damage there will be to the heart muscle; fair?**

A. In general, that's true.

**Q. Now, not only are STEMIs comparatively frequent, but there's also a criticality to treating them**



**appropriately; correct?**

A. Can you define criticality?

**Q. Sure. Meaning that the consequences of not treating them appropriately and efficiently and quickly could be very serious for the patient.**

A. Yes, I think there's a general appreciation of that. And all emergency facilities are equipped with ways of diagnosing and treating a STEMI.

**Q. Sure. And when you talk about all emergency facilities, would you agree with me that a Carnival Cruise ship should have the ability to provide appropriate emergency treatment for a STEMI?**

MR. DRAHOS: Object to the form.

THE WITNESS: So that's a -- that's a broad question because we haven't yet talked about different therapeutic options -- options yet for treating a STEMI. There may be some technological interventions that are not possible in many settings, not only on a ship, but also throughout most of the world.

A cardiac catheterization may not be easily available. So throughout the world thrombolytic therapy is still for most patients who have STEMIs the standard of care.

BY MR. MICHAELS:

Q. Yeah. And I appreciate that and we'll get to all of that, but that wasn't really my question.
Just to be clear, we're talking about -- when we're talking about a ship like the Carnival Freedom, you're basically talking about a -- essentially a temporary floating city; is that fair?
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah, I'm not an expert on ships to the -- other than I know what a ship is. There are a lot of people on it.
If there are medical emergencies, I think it's reasonable that a ship has facilities to address them.
BY MR. MICHAELS:
Q. Right. You got, between passengers and crew, about 5,000 people that those of us hear the commercials know are getting onboard for a 3, 4 or 7-day cruise on Carnival, and within that ship there's a medical clinic; correct?
A. Yes, which I believe is appropriate.
Q. And obviously you're not going to expect the ship to have a cath lab, but short of that, you'd agree that, based on the criticality, based on the frequency of STEMI heart attacks, you would agree with me that a Carnival Cruise ship should have the ability to



provide appropriate emergency treatment if a patient is suffering from a STEMI; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: As in this case.
BY MR. MICHAELS:
Q. And you'd agree with me with that exactly; right? That as of July 2023, the medical clinic of the Carnival Freedom did have the necessary equipment and personnel to emergently diagnose and treat a STEMI; correct?
A. Yes, they did.
Q. And obviously if somebody is not able to be immediately debarked from the ship or disembarked from the ship, the clinic ends up serving as more than an emergency room; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah, it's really the only -- it's really the only setting in which the patient can be treated.
BY MR. MICHAELS:
Q. Right. Meaning in a hospital environment, someone might come into the emergency room, they might receive initial therapies, and then be admitted to the hospital. And on a cruise ship, if they need to be admitted, there's nowhere else to go other than that



clinic; correct?
A. In general that is true.
Q. And you'd expect the doctors to continue to treat them to the best of their ability until they are able to get them to another facility; fair? or resolve the issue.
A. As in this case, yes.
MR. MICHAELS: All right. And again, move to strike the commentary because it wasn't responsive to my question.
BY MR. MICHAELS:
Q. You'd expect that on a ship, they'd be able to treat --
MR. MICHAELS: Can you -- can you read the question back, Ms. Court Reporter?
(Thereupon, a portion of the record was read by the court reporter:
"Question: And you'd expect the doctors to continue to treat them to the best of their ability until they are able to get them to another facility; fair? or resolve the issue.")
BY MR. MICHAELS:
Q. And I'd ask the question again, I'm not asking you specific to this case. I'm simply asking that you'd expect that that is the case; correct?



MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I believe so. I think there would be or should be a commitment that if you have 5,000 people onboard for X number of days, that there should be a medical facility where good treatment is available.
BY MR. MICHAELS:
Q. It's important, for instance, that the shipboard doctors have the skill and training to quickly recognize and begin initiation of appropriate therapies in the event of a STEMI; fair?
MR. DRAHOS: Object to the form.
THE WITNESS: That is correct.
BY MR. MICHAELS:
Q. And in this case, you'd agree that the doctors on the Carnival Freedom had access to an EKG machine; correct?
A. They did. There were a number of EKGs.
Q. Right. And that would be a -- the standard in diagnosing a STEMI; fair?
A. Yes. Other than the symptoms, that's really the only way to diagnose it clinically.
Q. Right. Symptoms, EKG, and then at some point there's going to be the release of biomarkers like troponin which could help confirm your diagnosis;

correct?
A. That's correct.
Q. But that's going to take some time before the troponin is released and identifiable.
A. Yeah, that's a secondary criteria in a case like this.
Q. Likewise, the doctors on the ship are primarily, or certainly the ones that were on this ship are not cardiologists; correct?
A. That is correct.
Q. In fact, I think Dr. Leonards was a South African ER doctor; is that correct?
A. Yes. I believe that was his training.
Q. But one of the things that they do have on the ship is access to shoreside cardiologists in case they have questions or issues reading an EKG; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sorry.
Yes, I think most of the cruise ships are set up that way where there's shoreside medical advice as needed or as requested.
BY MR. MICHAELS:
Q. The ship had the ability to administer the IV medication; correct?
A. That's correct.



Q. They had access to thrombolytics; correct?
A. They did.
Q. And I know there were some discrepancy in the record, but I believe that what they used in this case or what they had access to was alteplase?
A. That's correct.
Q. Okay. And when we talk about a thrombolytic, just for the benefit of the ladies and gentlemen of the jury, we're talking about a drug that's commonly referred to as a clot buster; is that fair?
A. Yes, because that's what it does, it breaks up a blood clot or thrombus that's in an artery with the objective of restoring blood flow.
Q. The purpose of a thrombolytic when you administer it is that, if there's a clot, it will break up that clot.
A. Yes.
Q. Okay. Doctors on the ship also had access to heparin or, in this case, Lovenox; correct?
A. That is correct.
Q. And heparin or Lovenox, those are anticoagulants; right?
A. They are anticoagulants, yes.
Q. And so what they do is they -- by anticoagulants, meaning they stop the blood from



coagulating.
A. That's correct.
Q. Or in laymen's terms, they stop clots from reforming; correct?
A. From reforming or propagating.
Q. Meaning from either reforming or from forming in the first place.
A. Yes.
Q. All right.
So when we talk about the fibrinolytic and the adjunctive therapy, the essential idea is when somebody comes in, they have a clot that's blocking their blood flow, the thrombolytic breaks up the clot, the heparin or the Lovenox prevents new clots from forming, and that's how blood flow is restored or supposed to be restored through the therapy; fair?
A. Yes, that's correct.
Q. Now, you'd agree with me, sir, that generally a body, a human being on a ship, functions similarly, if not identically, to a body that's on land; correct?
A. I can't think of any reason why not.
Q. Right. Somebody happens to be standing on the deck of a boat, you don't expect them to have different responses to treatment than if that person is



standing in a hospital on land; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: That's correct.
BY MR. MICHAELS:
Q. Treatments tend to be equally effective on a ship or on land; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Again, I don't know -- I don't have any reason to doubt that specifically. It sounds fair. I don't have a lot of experience treating people on ships. But I wouldn't think the physiology is any different.
BY MR. MICHAELS:
Q. Never in all your years of practicing medicine and studying and teaching at very well-recognized institutions did you read a journal article or come across a class that told you that a body is going to respond differently to treatment if it's on a boat as opposed to in a hospital?
A. No. But I'm talking about personal experience. I've, unfortunately, treated a lot of people on airplanes where there is different physiology. But on ships at sea level, I don't believe there would be.
Q. Different airplanes, you have different air pressure, different altitudes, that could have a

different impact on body; fair?
A. That's correct.
Q. And likewise, if doctors have the -- physically have the ability, and what I mean by that is have access to the equipment they need, the medicines they need, if doctors physically have the ability to follow the medical standard of care in treating a patient on a ship as they would on land, they should do so; correct?
A. That's correct.
Q. If the doctor on the ship has the ability to follow guideline directed treatment, then they should; fair?
MR. DRAHOS: Object to the form.
THE WITNESS: That's fair.
BY MR. MICHAELS:
Q. Now, sometimes obviously that's not possible; correct?
A. Well, I would -- I mean, you're asking a hypothetical question. Under what circumstances would you think it's not possible?
Q. Well, sure. Let's go to the extreme. Let's say instead of this being a Caribbean Carnival cruise, this is a transatlantic voyage. And somewhere in the middle of the Atlantic Ocean, somebody starts



suffering from a STEMI. We know in that situation it is going to be physically impossible under any circumstances to get them to a cath lab within two hours; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: In that case, certainly.
BY MR. MICHAELS:
Q. Okay. And when we talk about a cath lab, just again, to make sure that the jury has all the information, the frontline treatment, if it is possible, for a STEMI is to perform what's called a PCI, or a percutaneous coronary intervention, within 90 minutes to 2 hours; fair?
A. Yes, if the technology is available.
Q. Right. And that's a procedure that generally occurs in a cath lab; correct?
A. That's the only place it could happen.
Q. And in very broad terms, what it consists of is inserting a balloon into the blocked blood vessel and expanding it to allow the clot to come free; fair?
A. Yes, and then typically placing a stint, which is a cylinder shaped metallic mesh to help keep the vessel open to prevent it from collapsing again.
Q. Right.
A. And that remains permanently.
Q. Now, the American College of Cardiology and



the American Heart Association jointly have created guidelines for the treatment of a STEMI; correct?
A. They have.
Q. And when you talk about guideline directed therapy, those are the guidelines that you're referring to. Is that fair?
A. In general, yes.
Q. These are guidelines that were compiled by groups of doctors and experts who review and evaluate all of the available evidence and develop recommendations for clinical practice; correct?
A. Yes. That's what a guideline consensus document would consist of.
Q. And you recognize the guidelines that we have referred to, the ACA -- or I'm sorry, ACC, AHA guidelines as authoritative in the treatment of a STEMI heart attack; correct?
A. Well, I don't use the word --
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sorry. I don't use the word authoritative because that suggests that there's no interpretive factor there.
The guidelines are often very useful in helping to provide input into management of certain situations. But I think physician



judgment, as well as the taking into account of specific patient factors in the setting where you are, are important ingredients as well.
So the guidelines are advisories, but they can't be ironclad rules because every clinical situation is a little bit different, and our job as physicians is to interpret those guidelines with respect to what's going on with an individually patient.
BY MR. MICHAELS:
Q. You certainly in your report talk about the importance of guideline directed therapy; correct?
A. Yes.
Q. And you follow those guidelines in your own practice; correct?
A. Yes. Again, it's advisories.
Q. It doesn't mean there's not a time in the course of treating a specific patient where something arises that you need to stray from the guidelines based on your best medical judgment; correct?
A. Of course. We would always retain that option.
Q. But if you do stray from the guidelines, it's generally because you have identified a reason for that or reason why the guidelines wouldn't be effective

and have acted accordingly; correct?
A. That would be correct.
Q. For instance, if somebody is suffering from massive hypertension, that might be a reason not to provide a thrombolytic; correct?
A. Well, yes. Although in the -- in the guidelines, that would be considered a contraindication. I mean, that is still part of the guidelines. That would not necessarily be an exception.
Q. Maybe that was a bad example. But the idea being there could always be a circumstance that -- that informs you as the doctor who has the knowledge of what's going on, how to treat it, that, for whatever reason, in this particular instance I need to stray from the guideline.
A. Correct.
Q. Now, have you personally ever cathed a patient?
A. Have I? My career is in interventional cardiology. So I'm sure I have to my credit thousands of heart catheterizations over the past 30 or so years.
Q. Okay. So the answer is yes?
A. Yes.
Q. Okay. The purpose of the guidelines obviously is to ensure the patients are given the care



that will maximize their chance at surviving a STEMI?
A. That would be the general goal, yes.
Q. And to minimize the damage done to someone's heart muscle if they suffer a STEMI; correct?
A. That's the best case scenario, yes.
Q. All right.
MR. MICHAELS: Let's take three minutes. I just want to go run and get a glass of water. I usually bring one in and forgot to. So if we can just go off for three minutes, we'll come right back.
THE VIDEOGRAPHER: Off the record. The time is 10:46 a.m.
(Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)
THE VIDEOGRAPHER: Back on the video record. The time is 10:49 a.m. You may proceed.
BY MR. MICHAELS:
Q. Dr. Setaro, I want to go back and ask you, we touched a little bit on the administration of Lovenox, and you had said that if an initial dose of Lovenox is given subcutaneously, the 100 milligram dose, before the determination is made that it's a STEMI, you don't go back and give the intravenous bolus because it's already



in the system, and that's just for a push; correct?
A. That is correct. That's the way that we would approach it. That also is in the guidelines. And again, by my reading of the chart, the Lovenox had been onboard for more than an hour.
Q. Lovenox does not last in perpetuity; correct?
MR. DRAHOS: Object to the form.
BY MR. MICHAELS:
Q. That was a horrible question. Let me strike that and go back and try that again.
Lovenox does not retain a therapeutic effect in the body for -- in perpetuity; correct?
A. I don't know that there's any drug that does.
Q. And so if Lovenox is a drug and you don't know of any drug that does, you would agree that Lovenox does not retain a therapeutic effect in the body for perpetuity; correct?
A. Correct.
Q. And in fact in the guidelines, even when Lovenox is given appropriately with the initial IV bolus and then 100 milligrams subcutaneously, it's supposed to be given again in 12 hours; is that correct?
MR. DRAHOS: Object to the form.



THE WITNESS: That's the usual dosing, yes.
BY MR. MICHAELS:
Q. But usual dosing following the guidelines; correct?
A. Yes.
Q. And the reason for that is, as it starts to wear off, you have the risk again of clots reforming; fair?
A. Yes.
MR. DRAHOS: Object to the form.
THE WITNESS: That's true.
BY MR. MICHAELS:
Q. Now, in this case, can we agree that if the initial dose of Lovenox was given at 7:25 in the evening, that's what the records indicate; correct?
A. Yes.
Q. At 7:25 the next morning, Mr. Reeves is still in the care of the Carnival medical clinic; correct?
A. That's correct.
Q. And he never received a second dose of Lovenox within the clinic; is that fair?
A. That's correct. He didn't receive any form of heparin until he was at Osceola later that afternoon.
Q. Right. And what time that afternoon did he

**get to Osceola if you recall?**
A. So the initial intake notes are listed as 1518, or 18 minutes after 3 p.m., and he got a 5,000-unit bolus of intravenous heparin, and then a continuous IV heparin infusion, which is another way of giving it, and that got started at -- I believe at 1616, 16 minutes after 4 o'clock.
**Q. And that was started in Osceola Hospital in the Orlando, Florida area; correct?**
A. Yes, that is correct.
**Q. So back to what my initial question was, at 7:25 the next morning, or at any other time while he was still in the care of the ship, Mr. Reeves never received a second dose of Lovenox; correct?**
A. That is correct.
**Q. Okay. Let's get to some exhibits. If you can give me a second.**
**We talked about the ACCF, AHA guidelines, and I want to share it on the screen and walk through it with you and ask you some questions about it.**
**Do you recognize what's on the screen? It's a 64-page document of the 2013 guideline for the management of ST-elevation myocardial infarction that was developed in collaboration with the American College of Emergency Physicians, Society for Cardiovascular**



**Angiography and Interventions, and was a report that was actually put out by the American College of Cardiology Foundation and the American Heart Association task force on practice guidelines.**
A. Yes. And I think this was published in both the Journal of -- the American College of Cardiology Journal, and I think it was also published in the American Heart Association journal, which is called Circulation. I'm not sure which one you have up here.
**Q. Okay. But this is actually the one from ACCF.**
A. Okay. I mean, if you could go down under the authors, we'll be able to tell which it is.
**Q. Sure.**
A. All right. So this one is the circulation document. Okay. So this is the one that's from the American Heart Association. But if you see, it says near the bottom:
"This article has been co-published in the Journal of the American College of Cardiology."
So that's the same document. Okay.
**Q. Same document regardless of where it's published; correct?**
A. Just -- just making sure. Sure.
**Q. And these are recognized as the guidelines**



**for treatment of a STEMI; fair?**
A. Yes. Correct.
**Q. Likewise, we also have a note that ACEP, which is the American Collage of Emergency Physicians, was part of the development collaboration of these guidelines; correct?**
A. Yes. And also the Society for Cardiovascular Angiography and Interventions, which is a society that are basically interventionalists or cath lab doctors.
**Q. And I'm asking about ACEP, American Collage of Emergency Physicians, specifically because I believe that they are the specialty that has -- or the area of practice that has the subspecialty of cruise medicine; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: That's -- that's correct. Again, you know, in the -- in this particular document, as these documents are put together, they often seek input from a number of different societies.
BY MR. MICHAELS:
**Q. Okay. So what I'd like to do is skip down, I want to use the chart that Mr. Drahos went through yesterday with Dr. Klancke, and we can start there and**



**sort of walk through it from that point.**
**Are you able to see what's on the screen?**
A. I am. Yes.
**Q. All right. Do you recognize the chart that -- the graph, I guess you could call it, as the preferred strategies for treatment of people with a STEMI heart attack?**
A. Yeah. This represents the standard of care for what we would -- how we would manage a patient like this, and I believe it's -- you know, this is from 2013.
I think that since most of the hospitals and facilities throughout the world are still working with thrombolytic therapy, that these guideline would still apply as they would have in 2023 in July.
**Q. It has not been updated since 2013, and they are still recognized as best practices and guidelines; fair?**
A. Correct. There may have been some small or derivative articles, but I don't think -- I don't think I have seen any major changes in this approach.
**Q. All right. And this -- this figure is supposed to be a flowchart which guides the treatment, the reperfusion therapy for patients with STEMI; fair?**
A. Correct.
**Q. Reperfusion meaning the goal of getting the**

blood vessel open and getting blood flow back to the heart; correct?
A. Correct.
Q. Now, I believe that the way the flowchart works is that the preferred therapy is the bold line, and the secondary therapy is the less bold line, the thin line. Is that -- is that your understanding of it?
A. Yeah. I'm not -- I'm not sure to make much out of the boldness or the non-boldness of the lines. I think it's more the decision tree based on the course and findings.
Q. Okay. So following -- following the first bold line, I think if you look right in the description for figure two, the bold arrows and boxes are the preferred strategies. Is that --
A. If -- if it's possible to put them in place. That's why there's the decision tree because it's not --
Q. That's why they are preferred and not mandated.
A. Correct.
Q. So, for instance, if a STEMI patient is a candidate for reperfusion, if they are initially seen at a PCI capable hospital, they should be immediately sent to the cath lab; correct?



A. Yes. And that's the current practice at PCI capable hospitals.
Q. Obviously a clinic on a Carnival Cruise ship does not have a PCI or a cath lab; fair?
A. That's correct.
Q. The idea, though, is that they should be sent to the cath lab for primary PCI, and from FMC to device time, you want that to be less than 90 minutes; is that correct?
A. That is correct.
Q. What that means, FMC, is first medical contact?
A. Yes.
Q. Or what we refer to as the door.
A. Door. We call this door to balloon time, because often the first real therapy is the balloon opening up the artery.
Q. Meaning that if somebody shows up at a hospital but has a cath lab and they're suffering from a STEMI, they should be sent to the cath lab. And from the time they enter the door to the hospital until the time when they've got the catheterization occurring should be less than 90 minutes; fair?
A. Yes. Again, that's the ideal. There are frequently many factors that slow down the process, but



that would be the ideal way of doing it.
Q. Okay. Obviously, in many parts of the world, including on a cruise ship, a hospital is not going to be PCI capable; correct?
A. That's correct.
Q. And if that's the case and they are seen at a non-PCI capable hospital, the first consideration is can you transfer them or PCI within 100 -- less than 120 minutes; correct?
A. Yes. This comes up frequently because shoreside there are a number of small hospitals that feed into major medical centers. And so, depending on transport, which can be by ambulance or sometimes helicopter, if it's within that 2-hour time frame, it's considered best to get the patient on the road to the major center from the smaller facility.
Q. Now, what is DIDO?
A. I'm sorry?
Q. DIDO. DIDO time less than 30 minutes, looking here.
A. Yeah, I'm not -- I'm not sure what that is. Maybe we can look down into the legend and then I can kind of explain it.
Q. Here. Door --
A. Door in door out. In other words, don't,



you know, fiddle around with a lot of delays and so forth. Once you're identified as the STEMI and you can't treat it there with PCI, get the patient back out the door and into the ambulance or helicopter within 30 minutes.
In other words, make a diagnosis and arrange the transfer to a tertiary center that has PCI within 30 minutes.
Q. So in terms of the guidelines for immediate transfer as the frontline therapy, you're going to want to be able to have that patient out the door and on the way to the PCI capable clinic within 30 minutes, you're going to want to start PCI within less than 120 minutes.
A. That's correct.
Q. If you don't have the ability to do that, what the guideline tells you to do -- and let me strike that and go back.
We can agree that, in this case, on a ship in the Caribbean, the likelihood of being able to have him either in a helicopter, on a cutter, get the ship into port within 30 minutes was unlikely, if not impossible?
MR. DRAHOS: Object to the form.
THE WITNESS: Well again, I'm not an expert on shipboard medicine, but it would strike me,

whether it's involving small fast boats, helicopters, sailing to a different location, and getting the patient processed through the door of a hospital and into the cath lab, that it would be highly unlikely to get that vessel open within a 120 minutes given the scenario that we have in front of us.
BY MR. MICHAELS:
**Q. And you can -- for instance, I know there's a recommendation that even there's some benefit of immediately starting the administration of a fibrinolytic. Even if it's in an ambulance on the way to a cath lab, you can perform those in conjunction with each other; correct?**
A. You can, but again, there may be some special circumstances here where transferring a patient on the high seas could involve injuries. And if you're administering thrombolytic therapy as a patient as being injured, that could result in life threatening bleeding. So that would be potentially a fairly -- fairly risky undertaking.
**Q. And I'm not referring to here. I'm just talking about in general.**
A. Yeah, that is correct. There are some -- there are some situations where if the patient is really



sick and is greater than 120 minutes where one would do a strategy called drip and ship, meaning start the thrombolytic therapy, but also mobilize the ambulance simultaneously.
**Q. Right. I'm sorry. Go ahead.**
A. No, please. Continue.
**Q. No. I -- I want to hear the rest of your thought.**
A. Yes, so that -- but I don't think that would have been practical in this situation, again, within the confines of my general knowledge, not specifically being a practicing shipboard physician.
**Q. Now -- I lost my train of thought. Give me a second.**
**Assuming that there not the possibility of the likelihood of getting the patient to a cath lab within 120 minutes, what the guidelines direct the medical personnel to do is to administer fibrinolytic agent, that would be the thrombolytic, within 30 minutes of arrival; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. So here's -- here's a -- I would agree with that, but I would also add that this is an example where you're departing a little bit from the guidelines because, in this



case, it wasn't specifically the patient's arrival, but a second EKG that was done later that confirmed the criteria for a STEMI.
BY MR. MICHAELS:
**Q. Yeah, we'll -- we'll talk about all of that. But right now I still want to focus on what the guideline is.**
**If you don't have the capacity to get someone in a cath lab and hooked up to a machine within 120 minutes, a fibrinolytic should be administered within 30 minutes of arrival; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: Assuming the patient as they arrive simultaneously is diagnosed with a STEMI, meaning that the very first ECG is -- fulfills the diagnostic criteria. I think -- I think I have to say that whether it's about this patient or patients in general.
BY MR. MICHAELS:
**Q. Now, when we talk about 30 minutes of arrival, that's essentially what they call 30 minutes door-to-needle; correct? You want them to be -- from 30 minutes from when they walk in that door, you want them to be receiving that treatment.**
A. That is correct.



**Q. And again, I think we might have touched on this earlier, what that 30 minutes allows for is diagnosis, consents, preparation, et cetera; correct?**
A. Yeah. Maybe even taking some time to get an IV line in. It's not always an instantaneously successful procedure.
**Q. And I think that would be part of preparation. But the idea as we discussed earlier is that time equals muscle. The quicker you get somebody opened up, the more likelihood there is that you're able to avoid damage to that heart muscle and/or death. Fair?**
A. Yes, I would support that statement.
**Q. Now, generally when somebody appears at a clinic suffering a STEMI, they might -- they might have been suffering from this STEMI for a period of an hour, two hours, three hours, four hours or more; correct?**
A. Yeah, that's the part that we can't really control. People come in at different times from the original onset of symptoms.
The only thing we can quantify is when they came through the door first; and second, when they have a diagnostic EKG, if those two times are different.
**Q. Right. And by all accounts in this case, it looks like Mr. Reeves presented to the clinic very soon after he started suffering from this STEMI; correct?**

MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I believe so.
BY MR. MICHAELS:
**Q. And there's a few different indications that we have with that. One is that, at the time they took that first troponin, it was still reading within normal ranges; correct?**
A. That is correct.
**Q. A second is that on the first EKG, there were changes to the T wave which indicate he's in a very acute stage; fair?**
A. Yes, but not fulfilling yet criteria for STEMI, as we've said.
**Q. My question was, when he had that first EKG, that first EKG showed significant changes to the T wave which would indicate that he was in an acute stage; correct?**
A. Yes, an acute coronary syndrome.
**Q. Acute meaning new essentially.**
A. New and a medical emergency.
**Q. Right.**
**Now, we have talked a little bit about -- about time equalling muscle and all that, but what is the risk of delay? What is the reason why these time segments are in the guideline?**



MR. DRAHOS: Object to the form.
THE WITNESS: So the time segments are in the guideline to give the clinicians adequate time to settle any questions that are important, other bleeding issues, out of control hypertension, permission, consent, ruling out other diagnoses.
If a patient has an acute aortic dissection or an acute duodenal hemorrhage to account for symptoms, giving thrombolytic therapy will be lethal. So they want to give people enough time to really sort out what's going on and do the correct thing.
But on the other side of the ledger, you don't want to delay so long that you lose heart muscle in the process because, as we've established, the sooner the vessel is open, better outlook in terms of survival and preservation, quality of heart function. And conversely, the longer we take to get the artery open, the lesser chance for survival and preservation of heart function.
BY MR. MICHAELS:
**Q. And it was sort of that second side of the ledger that I was getting at.**
**If you're able to initiate treatment early,**



**not only are you -- are you -- is there a greater likelihood that you are able to resolve the issue with less damage to the patient, but it's also easier to resolve; correct?**
A. I'm not sure what you mean by easier to resolve.
**Q. Sure. Meaning -- meaning a newer clot, a smaller clot is probably going to respond quicker or at least be easier to deal with than a clot that's been forming over a period of hours and has started to really take root within the blood vessel.**
MR. DRAHOS: Form.
THE WITNESS: I think that's probably true, which is why we probably wouldn't give thrombolytic therapy to somebody who came in after 24 hours of discomfort because, at that point, the chance of getting rid of the clot is much less because it solidifies the other side of the question. There's probably heart damage that's not going to be reversible, but at least in the early hours, it's certainly worth making an attempt to reperfuse the heart muscle, whether it's by thrombolytic therapy or, if available, by PCI.
BY MR. MICHAELS:



**Q. And we can agree that, as a general rule, the sooner the treatment starts, the better for the patient.**
A. Yes, in general, provided that the safety considerations have been honored prior to giving a very serious medication.
**Q. And that 30 minutes is -- has been determined to be a sufficient amount of time to perform the preliminary investigations; correct? generally.**
A. Generally it is. You know, there are some situations where, for instance, if a patient is simultaneously having cerebral symptoms, you have to make sure they are not having a bleeding stroke or bleeding somewhere else in the body. It might take a little bit longer to get the thrombolytic going.
But in general, the overall principle is the sooner the better, provided it can be done safely.
**Q. And then even after the fibrinolytic is administered, the guidelines still discuss transfer for angiography or catheterization and revascularization within 3 to 24 hours, for other patients part of an evasive strategy or urgent transfer for PCI for patients who have evidence of failed reperfusion or reocclusion; correct?**
A. Yeah, so that's important because most of

the time patients who receive thrombolytic therapy will require an ultimate PCI.

For instance, in many cases -- and, you know, my practice goes all the way back to a time before we were doing PCI for MIs, so in my residency, fellowship and early years as an attending, we were still in the thrombolytic era, if it's successful often the clot is gone, but there's still a cholesterol blockage that's severe.

So at some point within 24 hours, most of the patients should go to the cath lab to see if there's a significant residual blockage that requires a balloon and a stint, which would then limit the proclivity toward a recurrent -- recurrent event.

**Q. So even if -- go ahead.**

A. So that's -- that's -- so that's where you get the sort of almost obligatory, unless there are extenuating factors, heart catheterization.

On the other hand, if a patient is showing signs that they are not getting better, you know, acutely after the thrombolytic therapy, then you have to condense that time frame and act sooner suggesting that the vessel isn't open and that mechanical therapy, specifically PCI, is going to be needed sooner than the 3 to 24-hour time frame.



**Q. So if the thrombolytics -- if there's evidence that the thrombolytics either aren't working, meaning there is no reperfusion, or evidence of reocclusion, meaning that the clot is starting to block up the blood vessel again, then we urgently want to get them to a PCI clinic if possible; correct?**

A. Yes and, you know, related to that would be if the patient is doing poorly hemodynamically. In other words, they are going into shock, if they have low blood pressure, congestive heart failure, hazardous ventricular arrhythmias, that would be a sign that the patient needs to get to a higher level of care with PCI and potentially mechanical circulatory support sooner rather than later.

**Q. And in fact, there was evidence in this case that, as a result of the STEMI, Mr. Reeves developed congestive heart -- acute congestive heart failure; correct?**

A. Well, in his -- his initial chest film did not show that, and his vital signs were stable throughout the period after the thrombolytic therapy and throughout the night. And, in fact, his chest discomfort did resolve.

So I think he would fall into the golden box on the right there, which is that it was legitimate in his case to get him transferred in that 24-hour period



to a higher level center.

**Q. And my question was a lot simpler than that.**

**Did you find evidence that, as a result of the STEMI, he went into a stage of acute congestive heart failure?**

MR. DRAHOS: Object to the form.

THE WITNESS: I -- I don't believe so. I believe the first chest film was interpreted as normal basically, and his oxygen saturations ended up being fairly normal, and I don't believe he complained of any dyspnea, or shortness of breath, during that evening. And in fact, I believe he slept for most of the evening after midnight.

BY MR. MICHAELS:

**Q. So is the answer no, you did not find any evidence of congestive heart failure?**

A. No, not -- not to the point that would require urgent transfer that couldn't be treated with simple medications, you know, aboard the ship.

**Q. Yeah, you still haven't answered the question. You said "not to the point."**

**So if it's not to the point, that means you did find some evidence of congestive heart failure?**

MR. DRAHOS: Form.



THE WITNESS: No, I don't believe so. I believe he was hemodynamically stable throughout.

BY MR. MICHAELS:

**Q. So your answer is no, you did not find evidence of congestive heart failure; fair?**

A. Correct, yes.

**Q. Getting back to the box on the right that discusses even when the fibrinolytic is administered appropriately at the appropriate dose, you still want to get someone to a cath lab within 3 to 24 hours; correct?**

A. That is correct. Again, because what I described before as residual disease, the thrombolytic therapy gets rid of the clot, but it doesn't get rid of the underlying cholesterol blockage that formed the foundation for the acute coronary syndrome event.

**Q. And there's still therapeutic benefit to getting there sooner rather than later; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: In general, yes. Although if the vessel is open, the heart muscle is not being acutely damaged.

So whether somebody got to the cath lab in 12 hours or 16 hours, if the vessel is open, it wouldn't really make any difference.

As long as they are stable, at least what

the guidelines are telling us is that you have up to 24 hours to execute that, you know, transfer and the catheterization procedure with the PCI.

BY MR. MICHAELS:

**Q. What time do you believe that the first EKG happened?**

A. So as we know, the time stamps are incorrect. But the -- by the testimony of the clinicians, including Dr. Desai, I believe the first EKG was done some time around 1915 or 7:15 in the evening on 8 July 2023.

**Q. And, you know, it's funny, oftentimes we ask experts whether they have opinions about things that really aren't opinion at all. They are fact; right? It happened at a time, whatever that time is.**

**Would you agree with that?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah, I'm not sure what I'm agreeing to. That was -- that was the first -- that was the first EKG. He got clocked into the medical center I think at 1857, which is three minutes before 7 o'clock.

So I think, you know, that -- that's sort of a fair time frame that the EKG was done within 15 minutes or so.



BY MR. MICHAELS:

**Q. What's the basis that he was clocked into the medical center at 1857?**

A. I think that was the original nurse's note. We could look it up if necessary. I didn't memorize that. I think that was when he got there.

**Q. That was the initial -- the initial entry into the medical record. But isn't the evidence that they actually arrived at the clinic at 6:27?**

MR. DRAHOS: Object to the form.

THE WITNESS: That may be. We would have to -- we would have to look that up.

BY MR. MICHAELS:

**Q. All right. And --**

A. You know, I think in terms of the EKG, I think it was done some time after 7.

**Q. When you talk about -- and when do you believe the second EKG happened?**

A. So again, according to the testimony of the physicians, I believe that was done about a half hour after the first one, half hour, 45 minutes.

**Q. You've talked about testimony of the physicians and you specifically mentioned Dr. Desai.**

**We can agree that Dr. Desai was not in the clinic for the first or second EKG; correct?**



MR. DRAHOS: Object to the form.

THE WITNESS: Yes, but I believe your associate questioned him on that.

And even though the timestamps are wrong, I'm assuming, hopefully correctly, that the time difference between those two times, even though they are incorrect, is accurate.

BY MR. MICHAELS:

**Q. But again, you don't know that that machine has never been inspected; correct?**

A. Right. I mean, the machine could be speeding up or slowing down. But I think if the machine is still counting the minutes accurately, even though the overall setting is wrong, we can still talk about the time Delta, the time difference between the two EKGs.

**Q. Do you know with any certainty whether the EKGs were performed on the same machine?**

A. They appear -- they appear to be relatively identical, but I don't have specific knowledge of that.

**Q. Do you know, for instance, on the ship if they've got, you know, one EKG machine that they use in triage and another one once a patient is admitted?**

A. That I don't know.

**Q. The only thing we know for certain is that the timestamps on -- that print out automatically on the**



**EKGs are incorrect; correct?**

A. That is correct, because they were listed as being earlier that morning when he hadn't yet presented for medical attention.

**Q. Right. But as far as with any certainty, we don't know that they were taken on the same machine; correct?**

A. I don't have information on that.

**Q. We don't have a record on the EKG strip of what time the EKG occurred; correct?**

A. That is correct, but we do have by testimony the sequence of the EKGs.

**Q. Well, the testimony of Dr. Desai is testimony of a doctor who wasn't present for the first or the second EKG; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Correct. But we do have the time differences between the EKGs.

So if you take the first one as time 0, we can still count the minutes, even though they are incorrect with regard to the universe --

BY MR. MICHAELS:

**Q. And in that -- but that is --**

A. -- the change with respect to each other is what I'm saying.

**Q. That presumes, one, that they were taken on the same machine; two, that there wasn't some other malfunction with the clock. It's a hope; correct?**
A. Again --
MR. DRAHOS: Object to the form.
THE WITNESS: -- I don't have information on the specificity of their EKG machines, but I will -- I will mention that the progression from peaked T waves to a STEMI is something that is often seen. So it makes sense to me physiologically, if not in terms of the, you know, the accounting of time.
BY MR. MICHAELS:
**Q. Right. And when you talk about peaked T waves, something that you generally see in a STEMI before the STEMI is visible in an EKG is that the T waves are peaked; correct?**
A. Sometimes. In other cases, the patient will come in with symptoms and peaked T waves, and they will respond to a form of heparin and aspirin, and not really sure what's going on in the vessel, but the peaked T waves can resolve, and the patient feels better, and then later on, angiography may show a blockage there but with blood flow.
So it's not -- it's not always absolutely



the progression, but it's a progression often enough that it's believable in this case.
**Q. And one that is evidence, one that the coronary syndrome is new; fair?**
A. Yes, but I think his general symptoms would support that as well.
**Q. But also the -- also the T waves tend to resolve relatively quickly; correct? 15, 30 minutes, generally you'll have a clear picture of what's going on.**
A. Yeah, they will either resolve and normalize if the patient is doing better or they will progress into something more serious, which is the STEMI.
**Q. But generally in a situation like this where you've got the symptoms, where you've got sweating, where you've got someone clutching his chest and complaining of 8 out of 10 chest pain, it's generally going to not just be something that resolves and everything is fine. Fair?**
A. In some cases yes, in some cases no. I mean, it's impossible to say just from the first one what the course of the next 30 minutes will be. They did provide the appropriate therapy. But in this case, it did progress onward to a STEMI.
**Q. The testimony of the doctors obviously is testimony that they provided about a year and five months**



**after the incident; correct?**
A. Yes.
**Q. In the context that the cruise line that they were working for was being sued as a result of their medical care; correct?**
A. Yeah. If you're asking about their credibility, I suppose that's going to be something that a jury would decide.
**Q. But in terms of contemporaneous and accurate timekeeping, the only thing we know for certain is that the entries that were actually made into the medical record were accurate as to when they were entered; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, that is the general standard with regard to medical documentation.
BY MR. MICHAELS:
**Q. Right. And speaking of a standard regarding medical documentation, would it be a standard in terms of keeping medical documentation for a medical provider to throw out or discard parts of someone's medical record?**
MR. DRAHOS: Object to the form.
THE WITNESS: That -- that would generally be discouraged.



BY MR. MICHAELS:
**Q. Right. For instance, if someone printed out, you know, ten different EKG strips, they shouldn't maintain only three of those as part of the medical record; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: Unless -- unless they are utterly identical. Sometimes the machine will print out five copies of the same EKG, in which case there's no real value in preserving all of them. But if they are -- if they're done at different times, they would potentially be, you know, very useful for all the reasons the medical record is useful, colleagues being able to confer with each other, historical documentation, the medical record is part of the medical/legal record, as we all know.
So unless the copies were utterly identical, in general you would want to preserve data.
BY MR. MICHAELS:
**Q. Right. Unless it's two copies of the same exact document.**
A. Right. And I -- I don't have any information as to whether anything was discarded or

whether they were identical copies or not.
Q. And likewise, medical records should be accurate, timekeeping devices should be calibrated because not only are they going to be important for diagnostic decisions, but they're going to be looked at by people downstream; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. And sometimes we have machines that have incorrect timestamps, but there's always an option to overwrite, you know, by hand, and to cancel out an incorrect time and put in the actual correct time.
BY MR. MICHAELS:
Q. Well, certainly we know on these EKG strips that the times were incorrect. Fair?
A. Yes, I believe that's true.
Q. And there was no accurate time that was written onto them; correct?
A. Not that I could see.
Q. Okay. And in trying to figure out the time, we are all in a position of having to rely on Carnival's medical staff and Carnival's medical center because none of the rest of us were there; correct?
A. Yes, I think that's correct.
Q. You wouldn't expect a patient to be keeping



a time log of what they are doing to him while he's suffering from a STEMI.
A. Most of the time not. Sometimes we'll have family members who act as self-appointed scribes, but I don't think it happened in this case.
Q. Right. And certainly that may happen, but it wouldn't be standard or something that a medical center should be relying on to happen; correct?
A. Correct.
Q. Getting back to the timing issue. So the one thing that you said we know for certain in terms of contemporaneous timekeeping is that the medical record is accurate as to when things were entered into the medical record. Fair?
A. That's correct. And I believe that the medication administration part of the record is accurate as well.
Q. But we already talked about how the heparin shows as being administered intramuscularly, which you said you believe that that is inaccurate or a typo; correct?
A. Right, but we're talking about time here.
Q. And likewise, with the entry of something into the medical chart, it doesn't necessarily tell when the event happened. It tells when it was entered;



correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Right. I mean, by definition, every medical chart entry represents an accounting of the past, whether it's a few seconds, a few minutes, an hour, a day, but within reason one seeks to enter things into the medical record as soon as possible.
BY MR. MICHAELS:
Q. Meaning when something is entered in the medical record, the medical record will make a timestamp of when that entry is made; correct?
A. That's correct.
Q. And generally it will be referring to something that happened before that was entered and documented at the time it was entered; correct?
A. Yes. And sometimes informs part of the text. For instance, if I enter a note at noon, it's perfectly legitimate for me to write "patient began experiencing chest discomfort at 11:45."
Q. Right.
A. You know, closer than noon, but I'm trying to accurately portray when something occurred.
Q. Now, looking down the guideline, 3.4.1 refers to regional systems of STEMI care, reperfusion



therapy and time to treatment goals and recommendations.
Skipping down to No. 2, performance of a 12-lead ECG by EMS personnel at the site of first medical contact is recommended in patients with symptoms consistent with STEMI. That is part of what the guideline says; correct?
A. Yes, that's fair.
Q. Generally the rule is from first medical contact, you want the first EKG to occur within 10 minutes; right?
MR. DRAHOS: Object to the form.
THE WITNESS: That would be the -- I'm sorry.
MR. DRAHOS: Go ahead.
THE WITNESS: That would be the standard if possible.
BY MR. MICHAELS:
Q. And if there's an abnormality, a repeat EKG within 15 to 30 minutes.
A. I believe that would be the standard.
Q. Now, Dr. Desai, who is the senior doctor on the ship, testified that the standard on the ship that they try to abide by is that, in a patient with these types of symptoms or symptoms that could be consistent with a coronary syndrome, that an EKG should occur within

10 minutes; correct?
A. Yes.
Q. And Dr. Leonards agreed that that EKG is a priority; correct?
A. Yes, it is.
Q. Okay. So we've talked a little bit about time, and I want to come off this document for a second and go to another part of the medical record.
MR. DRAHOS: Before we do that, can we take a bathroom break at some point? Whenever there's a good stopping point.
MR. MICHAELS: Now is absolutely fine.
MR. DRAHOS: Okay, great. Thank you. Shouldn't be more than two minutes, just got to run down the hall.
THE VIDEOGRAPHER: The time is 11:28 a.m.
(Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)
THE VIDEOGRAPHER: We are back on the video record. The time is 11:35 a.m. You may proceed.
BY MR. MICHAELS:
Q. Doctor, you've had a chance to review the medical record from the ship; correct? for Mr. Reeves?
A. That's correct.



Q. And it's a 40-page record?
A. I believe it's about that length, yes.
Q. And as we have discussed, it's the only contemporaneous document we have where we can rely on the timestamps at least as being accurate as to the point that something is entered into the record; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MR. MICHAELS:
Q. Okay. And just to get back, I think you had previously talked about 6:57 as the time that you believe he arrived at the clinic. We can see obviously that by 6:50, there was already a note that the doctor had seen Mr. Reeves, and Mr. Reeves had already been connected to a cardiac monitor for continuous observations; correct?
A. Right. The first note is listed as 1857.
Q. Right. At 1850, we can see a note here that the case had already been seen by the doctor and he had already been connected to cardiac monitoring; correct?
A. Right. But I'm talking about the first full progress note. And you can look at it on page --
Q. It's on the first page. I know what you're referring to --



A. Yeah.
Q. -- but that wasn't my question.
A. No, I agree, he was there before 1857.
Q. Right. By 1850, he had already been seen by the doctor and connected to a cardiac monitor, had medication prescribed; correct?
A. Yeah, he's getting appropriate meds.
Q. And at that point, the enoxaparin, which is the Lovenox, had already been prescribed by 6:50; correct?
A. That is correct.
Q. Regardless of whether it was administered, it was already prescribed by then; correct?
A. Yeah. And I think I saw on the medication administration record that it was given at 1925. Yeah, I think that's correct.
Q. Right. Moving up the notes, we have another note, and trying to piece together when the different EKGs occurred, we have a note at 7:01 in the evening --
A. Yes.
Q. -- by Dr. Leonards which includes patient reported -- let's start down.
He said that pain disappeared after a few minutes. 30 minutes ago the central chest pain started



again, but no radiation to jaw or left arm. He reports the pain is only central and was associated with profuse sweating and nausea. Patient came into the medical center with Levine sign, said he had severe chest pain, gave it a rating of 8 out of 10. Immediately took patient to ICU and started ACS protocol.
So I want to ask you a couple of questions about that sort of before we jump into it.
A. Now, this is a note by Dr. Leonards.
Q. This is a note by Dr. Leonards at 7:01.
When we talk about the Levine sign, that's the -- sort of the classic clutching of the chest?
A. Yeah, it's when the person with their dominant hand has a closed fist, like they are trying to crush a tennis ball right in front of their chest.
An old time cardiologist in Boston early 20th century named Samuel Levine identified that as being pretty significant for an acute coronary syndrome. So every medical student knows that.
Q. And we know Dr. Desai had talked about the importance of getting that first EKG within 10 minutes of presentation; we know that Dr. Leonards had said that it's a priority. But also ACS protocol involves a 12-lead EKG if available; correct?
A. Yes.

Q. Okay. So by 7:01, there was already a note -- a retrospective note that ACS protocol had been begun; is that fair?
A. Yes, it appears so.
Q. Okay. Moving to the next note, these go bottom to top in terms of chronology. So I'm scrolling sort of the opposite way.
At 7:17 in the evening, we have a note that was entered by the nurse, Sony Thomas; is that correct?
A. Yes.
Q. And 7:17 in the evening would be eight minutes before the Lovenox was administered; correct?
A. According to the chart, yes.
Q. You have read Ms. Thomas's testimony?
A. That's correct.
Q. And Ms. Thomas has no memory of any of this; correct?
A. That is correct.
Q. She's relying solely on what's in her notes.
A. Yes.
Q. She indicated in her note entered at 7:17 -- and again, this is not relying on the testimony of people who are now defendants two years later, this is a contemporaneous record -- she had entered that the



guest was experiencing severe pain; correct?
A. Yes.
Q. That he received an injection of morphine 10 milligrams; correct?
A. Yes.
Q. And also, you know, we have talked a little bit about the cessation of pain at different times during the night. I believe on four different occasions Mr. Reeves was injected with morphine; correct?
A. Yes.
Q. And what morphine is going to do is relieve pain; fair?
A. Yeah. I mean, it's -- it's classically given in a setting of an MI to sort of blunt the pain. But by itself, it doesn't eliminate it. The chest discomfort associated with an MI is pretty severe. But morphine is given to sort of minimize it. But I have not ever really seen it eliminate pain.
Q. Again, by 7:17, Ms. Thomas also had entered into the medical record that the cardiac troponin was performed and the report was reviewed by the doctor; correct?
A. Yes.
Q. And we know that that cardiac troponin was performed after the first EKG; correct?



A. Yes.
Q. Likewise -- well, let me move past that.
In the note that is entered at 7:17, we also have an indication that the second EKG was performed and reviewed by the doctor; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah. And again, here's where it's not entirely clear because in her testimony, Nurse Thomas did say that not all the EKGs were saved.
So it's not entirely clear to me which EKG this refers to or if it's even one that we have the ability to look at at this time.
BY MR. MICHAELS:
Q. Okay. Well, again, what I'm -- want to do here is talk about not the narratives of people who are being sued, you know, not a spin by the expert who's here to defend them, but what it actually says in black and white on a paper contemporaneously.
MR. DRAHOS: Object to the form. Move to strike the commentary.
THE WITNESS: Yeah, I'm just saying that something is listed as an EKG. I'm not -- I don't have information on whether that's something we can see right now.



BY MR. MICHAELS:
Q. Nurse Thomas still works for Carnival; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: That --
BY MR. MICHAELS:
Q. Correct?
A. -- that is true, yes.
Q. Nurse Thomas testified that she has no recollection of her interactions with this patient; correct?
A. That's her testimony.
Q. You've already told us that it would be medically inappropriate to discard EKG strips if they were not simply copies of other strips that were already part of the record; correct?
MR. DRAHOS: Object to the form.
BY MR. MICHAELS:
Q. Correct?
A. Yes. I mean, if they represent new data in the care of the patient, they should be preserved.
Q. And what the record says is that by 7:17, a second EKG had been performed and reviewed; correct?
A. Yes.
Q. That would be consistent with the guideline

that the first is taken within 10 minutes, and if it's abnormal, it's repeated within 15 to 30 minutes; correct?

A. Yes.

Q. It would be consistent with Dr. Desai's testimony that you want that first EKG done within 10 minutes of presentation at the clinic?

A. Yes.

Q. It would be consistent with Dr. Leonards' testimony that that EKG is a priority; correct?

A. Yes.

Q. And regardless of what the first EKG -- and we received the three EKGs from that evening that are part of the record, regardless of what the first EKG does or doesn't show, the second EKG very clearly shows a STEMI. Fair?

MR. DRAHOS: Object to the form.

THE WITNESS: So the second EKG that we have available for review, but as I said before, I don't know that that -- some of them were tossed away, that that represents the second EKG that was actually taken per this note. That's all I'm saying. I don't know.

BY MR. MICHAELS:

Q. You don't know that a vandal didn't break into the medical record and swap out one EKG with



another; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, that's sort of, you know, a questionable thing for me to comment on.

But what I would say is that there is testimony by Dr. Desai that the EKG that was done around 8 p.m. was the one that became diagnostic.

BY MR. MICHAELS:

Q. Dr. Desai wasn't present in the medical clinic until he was called down after the second EKG; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I believe he was there for -- for the 8 o'clock time period.

BY MR. MICHAELS:

Q. The testimony is that, upon reading the second EKG and realizing it was a STEMI, Dr. Leonards called for Dr. Desai. Yes or no?

MR. DRAHOS: Object to the form.

THE WITNESS: That's his testimony. But again, I'm not sure which is the second EKG of what we have available to look at now.

BY MR. MICHAELS:

Q. And Dr. Desai was the senior doctor on this cruise ship who is now getting sued for medical



malpractice, in his deposition tried to retrospectively piece together time for events that he was not present for; is that right?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sorry. Can you ask that again?

BY MR. MICHAELS:

Q. Sure.

Dr. Desai, who is the senior doctor on the ship who is now being sued for medical malpractice, at his deposition tried to retrospectively piece together a timeline for events that he was not present for. Is that correct or incorrect?

MR. DRAHOS: Object to the form.

THE WITNESS: That was his testimony. And again, his credibility is something that a jury will have to evaluate, but he was there, I was not there. And he, in his testimony, stated that the ECG became -- or the EKG became diagnostic at 8 o'clock. And even if it were done before he specifically arrived at that moment, he would have the ability to look at the sequence of EKGs.

BY MR. MICHAELS:

Q. The medical record is the one thing that credibility does not have to be assessed; correct? What



it says in black and white, it says in black and white; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. I mean, we believe that the timestamp on the medical record is accurate.

BY MR. MICHAELS:

Q. And it has said that since the night that this all happened; right?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know that there's any way to alter it.

BY MR. MICHAELS:

Q. And the medical record clearly indicates that there were three EKGs that were taken prior to the one at 4 o'clock in the morning; correct?

A. Well, again, we have testimony that there were more taken, but not all were preserved.

Q. That testimony comes from Dr. Thomas -- I'm sorry, from Nurse Thomas who has no memory of the incident; correct?

MR. DRAHOS: Object to the form. Asked and answered.

BY MR. MICHAELS:

Q. Correct?

A. Yes. Again I -- you know, I can't comment

on the credibility of different individuals. That's going to be a different question.

**Q. So again, putting aside the testimony of people who are now trying to defend their actions, looking to the medical record, which is what the question was, the medical record indicates that three EKGs were taken; correct?**

A. Yes.

**Q. And the medical record indicates that three EKG strips exist; true?**

A. Yes. But the sequence that we have of the three EKGs that were done that evening, there's a 1-hour difference, even though the time is incorrect as a delta or a time change of almost one hour between the one marked Roman numeral I and the one marked Roman numeral II.

So, according to testimony, there were other EKGs that were done within that time frame.

**Q. You have no explanation for or understanding of what was going on with the time on that EKG machine or machines; fair?**

MR. DRAHOS: Object to the form.

THE WITNESS: I think no one does. But I think that we can say that, unless the machine was speeding up in time or slowing down in time, that



one time with respect to the other is believable; but again we're talking about that before.

BY MR. MICHAELS:

**Q. The machines or the clock was just broken or any other number of explanations because we are all just guessing now.**

A. Well, you know, that's true. There could be many other factors, unknown factors of which we are unaware. But this is the data that we have to work with.

**Q. For what -- and part of the data we have to work with is the fact that the actual medical record indicates that there were three EKGs taken; correct?**

MR. DRAHOS: Object to the form. Asked and answered.

BY MR. MICHAELS:

**Q. Correct?**

A. Yes, according to the medical record.

**Q. Okay.**

A. But again, there's the testimony that there were more and some were eliminated.

**Q. And we know from the medical record that the second -- that the second EKG had been performed and reviewed by 7:17 p.m.; correct?**

A. Well, a second EKG was performed and reviewed. I don't know that is the same one that we have



here marked Roman numeral II. I think that's the point I'm making.

**Q. Dr. Leonards indicated that the one marked Roman numeral II was the second EKG; correct? He just didn't know what time it was taken.**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes, he did testify to that.

BY MR. MICHAELS:

**Q. And what Dr. Leonards also testified to was that, after the first EKG, he was suspicious that it might be a STEMI, and after the second EKG, it was confirmed that it was a STEMI; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: That was his testimony.

BY MR. MICHAELS:

**Q. Okay. Now, you'd agree that if it was confirmed that it was a STEMI, the fibrinolytics should be administered as soon as possible; correct?**

A. Yes. Again, within limitations of safety factors, acquisition of informed consent, and the other things we talked about.

**Q. The goal is 30 minutes door-to-needle; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: 30 minutes from diagnostic



EKG to needle.

BY MR. MICHAELS:

**Q. Okay. And the EKG that Dr. Leonards testified was diagnostic was entered into the medical chart at 7:17, and the fibrinolytic, the thrombolytic was not administered until 9:05 p.m.; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Again, the first part of your statement I don't necessarily agree with. I don't know that we have information that what we are looking at as Roman numeral II is the same one done at 7:17.

BY MR. MICHAELS:

**Q. Well, let me ask you a question. Why in the world -- why in the world would the medical staff on ship have thrown out or discarded some of the EKGs for a STEMI patient? Does that even sound remotely believable to you?**

MR. DRAHOS: Object to the form.

THE WITNESS: Again, as we said, if they were pure copies of one that was already done, again, sometimes the machine will put out several copies to go into different charts or to be sent to a central reader somewhere, that would be legitimate.

Otherwise, I would disfavor, you know, throwing out real medical data.

BY MR. MICHAELS:

**Q. If they were pure copies, then we have all the data. Then it would simply be a copy, it wouldn't be a separate EKG; fair?**

A. Yes, that's -- that's logical reasoning. But again, I don't have information on what happened in this case.

**Q. So my question for you, why would the people that you are here defending receive an EKG strip for a STEMI patient, and instead of putting it in his medical chart, instead of passing it on to the air ICU that he went with, instead of making sure that the hospital had it, discard an EKG record? Why would that happen?**

MR. DRAHOS: Object to the form. That's been asked and answered. I would appreciate it if you tone it down a little bit, please. Save these arguments for your closing arguments, but not for the Doctor's deposition. He's already answered it.

BY MR. MICHAELS:

**Q. Doctor, why -- you haven't answered it. Why would it happen? What explanation is there for it?**



MR. DRAHOS: Object to the form. He just answered it.

THE WITNESS: Again, I think, you know, if they are not direct copies, then it would reflect suboptimal recordkeeping, and it would be something that I would not favor. And I think it's a -- you know, potentially something that should not have been done, because I can't think of a good reason for getting rid of data that is fresh information in regard to a patient's care.

BY MR. MICHAELS:

**Q. Well, forget about not favoring it.**

**If one of your nurses had an EKG and, instead of putting it in the file, threw it in the garbage can, you would fire them; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: I would be critical of it, yes.

BY MR. MICHAELS:

**Q. You would fire them. That would be an abdication of your responsibility; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: It would be a serious incident.

BY MR. MICHAELS:



**Q. Right. You would report them to the department of health.**

MR. DRAHOS: Object to the form.

THE WITNESS: Again, I would have to consider how I would approach it, but it certainly would be something that I would subject to some form of criticism or remediation. We can't be eliminating medical records.

BY MR. MICHAELS:

**Q. And, in this case, no one ever mentioned throwing out a medical record until a year and a half later under oath at a deposition defending themselves in a medical malpractice case; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. There's no notation in the chart about eliminating records. That is true.

BY MR. MICHAELS:

**Q. Because the only other logical explanation is that at 7:17 they knew it was a STEMI and waited over an hour and a half to give a thrombolytic.**

MR. DRAHOS: Object to the form.

THE WITNESS: But again, I would have to ask in turn why would they do that?

BY MR. MICHAELS:



**Q. Incompetence. Negligence. An emergency doctor from South Africa with minimal experience who had no ability to recognize a STEMI until the senior doctor came down and told him what was going on.**

**I can go on. Do you want me to keep answering?**

MR. DRAHOS: No. No. Hold on a second, Doctor. You're not going to respond to his commentary, which is highly inappropriate.

I'm going to move to strike.

Mr. Michaels, if you could just ask him questions, this will be a lot more productive. I'd rather not get into an argument with you or have the Doctor argue with you about issues that really are more appropriate for closing argument.

MR. MICHAELS: I think it's been very productive. He asked me a question, I gave him the courtesy of answering.

I'll move on and ask my next question.

MR. DRAHOS: Thank you.

BY MR. MICHAELS:

**Q. Obviously when a patient comes in and gives a history, we want them to be as inclusive as possible; fair?**

A. Inclusive of information, are you asking?

Q. Yeah. Of anything that might be relevant; fair?

A. Yes.

Q. Sometimes patients tell you things that they think might be significant that actually have no significance at all; correct?

A. Frequently.

Q. When in the medical clinic and suffering from a heart attack, Mr. Reeves mentioned that earlier in the day he had felt some chest pain; correct?

A. Yes. That's something that frequently happens. We call it a sentinel event. That may be the time when the cholesterol plaque initially ruptures, if they had a sense associated with it, but a clot doesn't yet form. So it doesn't represent a sustained syndrome. They get better, they go about their business. But a day or sometimes even several days or a week later, they will come back with a STEMI. It's fairly common.

Q. And obviously people all the time in life, whether because of a muscular issue, gas, this and that, will feel the chest pain sometimes, feel a stab, and it turns out to be nothing; correct?

A. Yes. Even if it is something, many people will be dismissive of it or denial oriented.

Q. Do you have any criticism of -- of Mr.



Reeves based on your understanding of what happened earlier in the day for not seeking medical attention when he felt that initial chest tightness or chest pain?

A. No. I think that many patients will have those types of symptoms. As you pointed out, they may not be particularly important in any way. He apparently went about his normal activities. And I do think that he came in in a timely manner that evening because his troponin was documented as essentially being 0 at that point.

You know, if it had been highly elevated, we could say that, you know, whatever his decisionmaking process at 9 in the morning, he harmed himself by not coming in; but in fact, the initial troponin was essentially 0.

Q. And when he came back at 6:27 and had that first EKG, the troponin was 0, you had the peaking T waves, it indicates that he was undergoing acute changes; correct?

A. I believe so, yes.

Q. Do you know what happened earlier in the morning, whether it was actually related or whether it was something that, you know, retrospectively he thought might have been attributable?

A. I don't think we can ever know other than



my citing the very common experience of this sentinel event where, again, hours or a day, or sometimes even a week before a patient will recall when they are having a STEMI, I did feel a little symptom, you know, some time ago, but then it went away. It's fairly common.

Q. Give me one second. Figure out what I did with something. All right.

You'd agree with me, though, that once the STEMI is identified, the fibrinolytics should be administered as soon as possible; correct?

A. Yes.

Q. And that it shouldn't just be the thrombolytic alone, but also the adjunctive therapy in proper dosage; correct?

A. If not yet given. But as we've seen, those other three agents, the aspirin, the Plavix and Lovenox had already been administered prior to the diagnosis of the STEMI.

Q. We know that --

A. So they were already onboard.

Q. We know here that the medical record indicates that the second EKG was entered into the system eight minutes before the Lovenox was given; correct?

A. Again, this comes back to the issue that we have been somewhat fruitlessly talking about as to what



that second EKG represents.

Q. Yeah, I don't think it's fruitless. I actually think it's very relevant.

So without the commentary, I'm going to ask the question again and ask for an answer.

The Lovenox was not given until eight minutes after the second EKG is logged into the medical record; correct?

MR. DRAHOS: Object to the form. Asked and answered.

THE WITNESS: Yeah, the Lovenox was given at 1725, and an ECG was done at 7:17.

BY MR. MICHAELS:

Q. The -- an ECG that is logged into the medical record is the second EKG; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Per the -- per the record, yes.

BY MR. MICHAELS:

Q. Okay. And the record is the only contemporaneous record we have.

MR. DRAHOS: Object to the form.

How many times we going to do this?

MR. MICHAELS: As many times as we need to.

MR. DRAHOS: No, we can't. We can only do

it once. After that it becomes harassing.
MR. MICHAELS: This is -- this is a discovery deposition. It's not trial testimony. It might become --
MR. DRAHOS: Yeah, but you can't harass the witness either.
BY MR. MICHAELS:
**Q. ECG and EKG are synonymous terms; correct?**
A. Yes, that's correct.
**Q. Okay. Moving up, we then have another entry at 8:27, which is an hour and 10 minutes after that second EKG, that indicates that the third EKG was performed and referred by MD; correct?**
A. Yes, that's the notation.
**Q. Okay. And, you know, I want to clarify. The nurse could have written anything she wanted in the medical record; fair?**
MR. DRAHOS: Object to the form.
THE WITNESS: Well, I would hope that she would report what is consistent with what's actually going on.
BY MR. MICHAELS:
**Q. Right. But she can describe that any way she wants; fair?**
A. I suppose there's some latitude.



**Q. Right. And she didn't write 'an EKG was performed' or 'one EKG was performed' or 'a EKG was performed.' She specified, the second was performed, the third was performed; correct?**
A. Yes.
**Q. And Dr. Thomas who was there during that initial part of the visit never indicates that a fourth was performed; correct?**
A. Who's Dr. Thomas?
**Q. I'm sorry. Nurse Thomas.**
A. Nurse Thomas. Okay.
**Q. Right?**
A. Yes.
**Q. And certainly if the abnormal EKG, the one that's listed as the second EKG, if that was actually the first EKG and was abnormal, it would be inappropriate to wait over an hour and 10 minutes to do a followup; correct?**
A. Well, we talked about what the appropriate time intervals were for the EKGs. And I don't think I would say any different than what I agreed to earlier.
**Q. 15 to 30 minutes; correct?**
A. Yes.
**Q. And that hour and 10 minutes or so from 7:17 to 8:27, there were no fibrinolytics administered;**



**correct?**
A. The fibrinolytics weren't administered or the thrombolytics weren't administered until 9 o'clock.
**Q. 9:05.**
A. Yes.
**Q. So, in fact, the fibrinolytics weren't even administered within a half hour of that third EKG; correct?**
A. According to the chart, not.
**Q. Do you know whether -- whether Dr. Leonards had the ability to interpret an EKG?**
MR. DRAHOS: Object to the form.
THE WITNESS: His training was in emergency medicine. And one of the major parts of emergency medicine is acute care cardiology. So I think he should have been educated on that or experienced on that.
BY MR. MICHAELS:
**Q. Do you know whether Dr. Leonards was familiar with the guideline directed therapies for STEMI?**
MR. DRAHOS: Object to the form.
THE WITNESS: You know, his training was in South Africa, but there's a worldwide standard, European Society of Cardiology, British societies all have similar guidelines. So he would have had



all of those available to him.
BY MR. MICHAELS:
**Q. Never reached out to a cardiologist for help in interpreting or guiding his therapy?**
A. That I don't have any information.
**Q. He testified that he did not do so; correct?**
A. Oh, this evening? I wasn't sure what you're asking --
**Q. Yes. On the evening of --**
A. -- had to consult a cardiologist or if this evening he consulted a cardiologist?
**Q. The evening of the incident.**
A. No, they did not.
**Q. Getting back to the STEMI guideline, I think we've talked about a lot of this other stuff in here.**
**Again, fibrinolytic therapy is indicated or chosen the primary reperfusion strategy and should be administered within 30 minutes of the hospital route. That's directly in the guideline; correct?**
A. Yes, or again, I would add the proviso of the timing to the achievement of STEMI criteria by EKG --
**Q. And it's not --**
A. -- which is not always coincident with

hospital arrival.
Q. In this case, of course we know 9:05 was the push on the fibrinolytic.
A. That's accurate, yes.
Q. All right. Now, generally if we have reperfusion within two hours, we can avoid most, if not all, cardiac damage; correct?
A. Not all, but most. There generally should be a good outcome.
Q. And again, as we move forward in the guideline, they just reiterate over and over again how important timing is; right? System delays to reperfusion are correlated with higher rates of mortality and morbidity?
A. Yes.
Q. You'd agree with that?
A. Yes, I do.
Q. Okay. Greatest emphasis to be placed on the delivery of reperfusion therapy to the individual patient as rapidly as possible. You'd agree with that?
A. Yes, I agree with it, and I have been living with it for years off shift trying to get into the hospital as soon as possible to get sick patients to the cath lab, it's absolutely been a thrust of all therapies, whether it's a thrombolytic therapy or PCI, pretty much



worldwide it's been a major emphasis for decades at this point.
Q. And if fibrinolytics are appropriately and timely administered in terms of -- and when I say "appropriately," meaning in terms of dosage and methodology of method of delivery, we generally see a success rate of about 60 percent in avoiding death or serious heart damage; fair?
A. Yes. They are not absolutely successful in every case, but I think the number we keep in mind is somewhere between 50 and 70 percent effectiveness in getting a vessel open.
Q. And obviously, 50 percent plus would be probability.
A. Yes.
Q. Moving down to page 379 of the guidelines, I should have probably just copied and scanned the pages I wanted to use, but we'll scroll together.
I want to touch on a couple of things here, reperfusion at a non-PCI capable hospital; fibrolytic therapy when there's anticipated delay.
The initiation of the fibrinolytic is recommended as long as the onset of symptoms was within the previous 12 hours; correct?
A. Yes.



Q. So even though time matters, and the longer things go on, the more damage there's likely to be, there's still therapeutic value in initiating treatment even if it's not immediate; fair?
A. Yeah, there's diminishing returns, but there still are some good returns even with late administration.
Q. The goal is to preserve as much of the heart function as possible. So whenever we can reasonably believe that we are going to be able to reperfuse, we should do so. Fair?
A. Yes.
Q. I'm trying to read my own handwriting. I apologize.
All right. Moving down to the choice of the fibrinolytic agent. Fibrolytic specific agents are appropriate when available, adjunctive antiplatelet and/or anticoagulant therapies are indicated regardless of the choice.
In this case, we had -- the anticoagulant therapy that was used was the Lovenox?
A. Yes, that's correct. Yes.
Q. And that is the enoxaparin? E-N-O-X-A-P-A-R-I-N?
A. Yeah, that's the chemical name. The



Lovenox is the commercial or brand name.
Q. And in terms of the fibrinolytic agent, again, I just want to make sure we're absolutely clear. Part of the record says "reteplase." It was actually alteplase. Fair?
A. Alteplase. Correct. It was TPA.
And it -- it -- you had talked about correctly administered. I believe it was, according to the notes, correctly administered. An initial bolus followed by a slower infusion over 30, and then 60 minutes, which concludes the entire process over about an hour and a half.
Q. I think we agree that it was properly administered. I think in terms of the fibrinolytic, the question is whether it was timely administered.
Now, looking at the contraindications that would caution against using a fibrinolytic, there was no indication that Mr. Reeves was suffering from any of these contraindications; correct?
A. Well, there's two parts. If you go above, there's absolute contraindications where under no circumstances can they be used. Then there's relative contraindications where there's going to be risks and benefits, and there should be a discussion. But I did not see among the absolute or the relative

contraindications, which, again, these are things we all keep in our heads, that there was anything that applied to this patient.

**Q. Okay. So I think the answer was no, we did not have any contraindications which would have either given caution or forbidden providing the fibrinolytic; correct?**

A. Right, that's a good to put it, way caution versus prohibition.

**Q. Moving down to adjunctive antithrombolytic therapy, and I want to move specifically to the relevant parts. So I'm going to jump ahead to 1B:**

**"Patients with STEMI undergoing reperfusion with thrombolytic therapy should receive anticoagulant therapy for a minimum of 48 hours, preferably for the duration of the index hospitalization up to eight days or until revascularized are performed. Enoxaparin administered to age, weight and creatinine clearance given as an intravenous bolus followed in 15 minutes by a subcutaneous injection for the duration of the index hospitalization, up to eight hours or until revascularization."**

**That is what the guideline says; correct?**

A. Up to eight days.



**Q. Correct.**

A. Yes.

**Q. And I believe that it's supposed to be given subcutaneously every 12 hours; fair?**

A. Yes.

**Q. Here obviously we have some discrepancy because, again, the only contemporaneous record indicates that it was given intramuscularly. The doctor thinks he actually gave it subcutaneously; correct?**

A. Yes.

**Q. We know that there was no IV bolus that was provided on the ship to Mr. Reeves; correct?**

A. Yes. Again, he had gotten the subcutaneous dose well before the thrombolytic therapy. So the Lovenox was already in his system. So the ramp-up dose wasn't needed.

**Q. And again, the Lovenox was given eight minutes after the second EKG was entered onto the medical record.**

MR. DRAHOS: Object to the form.

THE WITNESS: Right. But what I was referring to was when the thrombolytic therapy was given. That we agree was at 9:05.

BY MR. MICHAELS:

**Q. And I might have just asked you this**



**question or I might have been thinking I wanted to ask you. If I already asked you, I'm sorry. We agree no followup dose was ever given on the ship; correct?**

A. We did agree. There was intravenous heparin given full bolus and infusion at Osceola.

**Q. Right. Osceola was well more than 12 hours after the initial dose; correct?**

A. Yes, it was.

**Q. I think it was actually 23 hours after the initial dose; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Not exactly. I think the initial dose we said was given at about 7:30 or so the evening before. And the dose at Osceola was given a little bit after 4 p.m. on the following day.

BY MR. MICHAELS:

**Q. Right. We see evidence still on the ship of reocclusion around 7, 8 o'clock the next morning; correct? that starts again?**

MR. DRAHOS: Object to form.

THE WITNESS: I don't know that we can know that. I mean, the -- you know, the question of whether somebody is reperfused by clinical criteria is -- is often difficult.



If the patient becomes completely and permanently pain-free with ST segments that come back to normal, they've in all likelihood reperfused.

If they continue with high level of pain and no resolution of ST segments, they probably have not reperfused. But in this case where the patient feels better and actually goes to sleep over the whole night, and then has a recurrence in a much milder form the following day, that's potentially associated with reocclusion, but one can't say with certainty until there is an angiogram.

By the next -- by the next morning, the ST segments had come down, and that secondary episode of chest discomfort was treated with morphine, such that by the time he got to Osceola, he's listed in their entry notes as having maybe a one out of ten chest discomfort.

BY MR. MICHAELS:

**Q. By the time he went to sleep, he had been loaded up with morphine and antianxiety medication; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Correct.

Again, but if you have ever seen someone suffering a STEMI, myocardial infarction is very painful, it's a severe acute event, and people don't sleep through it in spite of any degree of medical therapy.

You would have to treat somebody with opiates and sedatives to the point where they would stop breathing to eliminate the symptom if it were still an active ongoing event.

So I believe from the record, the fact that he was comfortable and asleep did, at that point, indicate reperfusion.

BY MR. MICHAELS:

**Q. When the angiogram was done at the hospital, he had complete occlusion of the artery; correct?**

A. He did. And it's not clear from the symptom pattern and the findings exactly when that happened.

**Q. So --**

A. But -- but I would note that when he first got to Osceola, he was seen by general and interventional cardiology. And while they recommended observing in the ICU on nitroglycerin and heparin, they did not recommend an immediate trip to the cath lab.



That strategy was developed somewhat later when his symptoms went up from a one to a two about 7 o'clock the evening of 9 July, 2023. And at that point, that's the first time we have absolute confirmation of the state of the vessel when he went to angiography and it was found to be occluded.

**Q. So the question was, when the angiogram was done at the Osceola Hospital, he had complete occlusion of his LAD; fair?**

A. Yes, that we agree. That's objective.

**Q. LAD is his left anterior descending artery?**

A. Yes. That's the artery that feeds the front wall of the heart. That would be consistent with the EKG findings.

**Q. So we know one of two things. Either he reoccluded or they never resolved the initial occlusion; fair?**

A. That's correct. But again, the idea or the observation that the ST segments came down, not completely to normal but improved, and he was symptom free for many hours suggested that he did initially receive reperfusion, but that he reoccluded later. But again, we can't know with absolute certainty in the absence of angiography.

**Q. What time was he taken off the ship?**



A. I think he -- I think the EMS people arrived and took him off the ship at about 12 or 12:30 on 9, July 2023.

**Q. All right. And that was about five hours after he was supposed to get the second dose of heparin, which he never got?**

A. Yeah. I mean, I think we agreed that that should have happened at 7:30 or 8 the morning of the 9th.

**Q. How much of the reocclusion was a result of not receiving that second dose of heparin?**

A. Again, it's unclear because he was relatively symptom free after the initial episode on the 9th. And even the full bolus of intravenous heparin that was given at 4 p.m. at Osceola did not act to achieve opening of the vessel at that stage.

**Q. Well --**

A. So, at some point, the vessel reoccluded. But again, we can't say with any certainty exactly when.

**Q. There's extreme risk in giving a second dose of the thrombolytic; correct?**

A. Yes. Sometimes it's done, but the patient would have to be incredibly ill, going into shock, with no alternative to not even surviving so as to embrace a risk like that.

**Q. Right. So the reason --**



A. And I don't think that anything -- anything I see here that would have ordained a second dose of thrombolytic.

**Q. The reason why the followup dose of Lovenox was so important is because the thrombolytic will bust up the clot, but it's the Lovenox that stops a second clot from forming; fair?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes, that -- that was the early experience with thrombolytic therapy. When it was not followed up by some form of heparin, that there was a higher rate of reocclusion, although not in all cases, but it was shown that by administering -- by co-administering some form of heparin, you could minimize the chance of reocclusion. But it wasn't an iron clad issue one way or the other such that in all cases there was no reocclusion with heparin, and in no case was there patency without heparin.

BY MR. MICHAELS:

**Q. And if the clot had started to reform as a result of the failure to give heparin, simply starting heparin again is not going to bust up that new clot. That would require a thrombolytic or a cath; correct?**

A. Again, a clot can be a dynamic thing. It

can be partial, it can be forming, reforming in breaking up. The body has some thrombolytic entities that are natively produced, mostly they're not strong enough to really open up the vessel. But it's -- again, it's not entirely clear whether that second dose of heparin in the afternoon at Osceola could have helped or should have helped. But it's not the same degree of potency as thrombolytic therapy would have.

**Q. Lovenox is not a clot buster.**

A. Generally not.

**Q. The way we described it yesterday is if you're trying to clear snow off a driveway, the thrombolytic is the shovel on the snow, the Lovenox stops the new snow from falling; fair?**

MR. DRAHOS: Object to the form.

THE WITNESS: That would be one way to characterize it. There's other complexities in addition. The antiplatelet therapy, the aspirin, the Plavix would also act to prevent new clots from forming. And again, I think those were administered to a degree that was within the standard of care.

BY MR. MICHAELS:

**Q. But that's not an either or. You're supposed to give the aspirin and the heparin.**



A. Yes, that's correct. But again, we shouldn't discount the value of aspirin.

In some of the early thrombolytic trials where aspirin was put against thrombolytics, almost as many people achieved reperfusion with aspirin as with the thrombolytics. So at least that part of it was covered and yet still he reoccluded.

**Q. Now, when we talk about reperfusion, are you talking about TIMI 3 flow or TIMI 2, TIMI --**

A. Well, again, that's something that can only be determined, you know, in the cath lab. But generally reperfusion is considered, you know, the achievement of some flow.

But once -- once patients were routinely taken to the cath lab, then there was an ability to characterize various grades of flow. TIMI 3 flow being normal flow; TIMI 0 flow being no flow; TIMI 2 flow being complete but delayed; and TIMI 1 being incomplete and delayed. So there was -- there were four gradations that were later on perceived, but it's very difficult to tell clinically what the TIMI flow is.

And TIMI is all in capitals, T-I-M-I. It stands for thrombolysis in myocardial infarction, which were the original group of studies back in the 1980s and 1990s that defined the value of thrombolytic therapy in



STEMI.

**Q. Is there any indication either in the records or in testimony that reperfusion or arrhythmias were ever observed?**

A. No. And in fact, there was another element that was handled correctly here, which was that the patient was started on statin therapy, as well as beta blocker therapy.

So I did not see any evidence of any malignant arrhythmias. You mentioned reperfusion arrhythmias. Sometimes there are what looks like slow tachycardia once a vessel opens up. And often it's a good sign, but we've seen many cases where the vessel reperfuses or opens, and there is not any evidence of reperfusion arrhythmias.

So it's sort of a -- sometimes it's seen, but there's not a 1-to-1 relationship with the state of the vessel.

**Q. All right. Have you -- have you reviewed at all the Lovenox package insert?**

A. Not recently. But there is a section in the guidelines that you wrote up before that discusses the use of Lovenox, if you want to look at that, but is there a question?

**Q. I was just wondering if that's something --**



**we can come back to that. Don't worry about that for now.**

**I want to -- having trouble what I'm trying to find.**

**This is something that we had touched on because I think there was some discrepancy or some question. You've obviously had a chance to review the Carnival Freedom medical center document?**

A. Yes.

**Q. Okay. And clearly that document indicates that Mr. Reeves presented at the medical department at 6:27 p.m.?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. That's across the top line there.

BY MR. MICHAELS:

**Q. And so when we talk about door-to-needle, the door time is 6:27 p.m.; correct?**

A. No. Again, I have to qualify that yet again and say that the time starts when the STEMI criteria are identified by ECG.

Now, sometimes that's utterly coincident with the moment the patient comes in the door, often it is, but sometimes there's an evolution of the ECG. And the ECG, or EKG, that shows the PT waves did not yet

satisfy the criterion.

**Q. So the term is door-to-needle. And the reason for that 30 minutes, part of it is because it's believed to be adequate time to diagnose; correct?**

A. Yes. Unless -- unless the EKG is not yet diagnostic, and that's part of the natural evolution of the natural history of the disease, and nobody controls that.

As we said earlier, there's some people who would come in with PT waves and they resolve with simple therapies like aspirin and heparin, and then there are others who move onward to a STEMI. And at that point, you would start the clock on the administration of a thrombolytic therapy.

**Q. And we can quibble about all of that, but certainly we can agree that by 6:27 p.m., Mr. Reeves had entered the door of the medical clinic; fair?**

A. That is correct.

**Q. Okay. Looking to the EKG that is marked with a Roman numeral I, are you, as a cardiologist, able to identify this as likely being a STEMI or something that will develop into a STEMI?**

MR. DRAHOS: Object to the form.

THE WITNESS: So -- so again, this one shows the peaked T waves in the early precordial



leads, that is lead V, as in Victor, 2, and V, as in Victor, 3. And as such with a patient coming in with chest discomfort, there is a reasonable possibility that it will eventuate in a STEMI. Again, not necessarily, but obviously you would not send this patient back to his cabin or back to his home, if he were shoreside. This is someone to watch over. And with the symptom and the changes in the EKG, there's certainly a legitimate justification for giving heparin and aspirin and the Plavix, as the emergency ACS guidelines have ordained for many years, I think since about 2007 or so.

BY MR. MICHAELS:

**Q. When you talk about the T waves, you're talking about basically this second rise in the group of two; correct?**

A. Correct. It's almost as tall as the main complex in those -- in those couple of leads.

**Q. So getting back to what my question was, you. As a cardiologist, if you saw this EKG, would it be sufficient for you to make a diagnosis of STEMI?**

A. No, not right at this point.

And what would follow from that is that I would not yet give the thrombolytic therapy, because if



this resolved with simpler therapy, you would be exposing the patient to the high risk of, let's say, cerebral bleeding with the thrombolytic therapy; whereas it may not have been necessary at all.

**Q. When you say --**

A. For instance, if this resolved with a, you know, with aspirin and heparin and beta blockers and other simple agents that don't really carry risks of cerebral bleeding.

**Q. When you say high risk, what's the incidents of cerebral bleeding?**

A. So a thrombolytic therapy in -- you know, across all age groups, it's about 1 percent, which is the main reason why PCI supplanted it in the 1990s because PCI had a higher success rate compared to 50 to 70 percent. If you're in there with actual equipment, you can most often achieve reperfusion almost 100 percent, number one; and number two, to do a PCI doesn't require thrombolytic therapy. It only requires aspirin and Plavix and heparin. And the stroke risk for those agents, since they are far less potent, is almost, almost 0.

So with PCI, you could get the vessel open with almost complete certainty, and with equally complete certainty avoid a hemorrhagic stroke. And I remember



from the early days some very sad cases of young -- fairly young patients who would have a fatal cerebral hemorrhage through the use of thrombolytic therapy.

And to take it one step further, that's why so many hospitals in the United States and around the world trained interventional cardiologists developed teams and protocols and built cath labs wherever they could because of the findings and the studies in the 1990s that PCI for STEMI was so greatly superior. But as we've said on ships or in smaller communities, thrombolytic therapy is still the standard of care.

**Q. I appreciate all of the vast majority of what was wholly nonresponsive to my question.**

**My question was, what is the incidents of a brain bleed?**

A. It's about --

MR. DRAHOS: Object to the form.

THE WITNESS: It's about 1 percent. And you earlier quoted how frequently STEMIs occur. So we multiple that out. That's quite a lot of victims.

BY MR. MICHAELS:

**Q. You said 1 percent across all age groups.**

**How about in an otherwise healthy 37-year old male?**

A. Maybe a bit less, but considering that it tends to be a fatal complication, it certainly in this setting it would be, there's no way that you could get him to a neurosurgeon to, you know, relieve a brain bleed aboard ship, that the decision to give thrombolytic therapy has to be made carefully with criteria present and with the acquisition of real informed consent from patient and relatives.

**Q. And if John Setaro saw an EKG like this, what you would do is follow it up in 15 minutes; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes, I would. And I would, you know, be giving the adjunctive therapies, as we talked about, aspirin, Plavix, heparin, and also statin and beta blocker. All things that don't carry bleeding stroke risk, but which may well resolve the situation; or if not, would create a foundation for successful thrombolysis if, indeed, thrombolytic therapy were needed.

If we saw this scenario shoreside, we would get the next EKG in the 15-minute time frame, and then, documenting the STEMI, would take the patient to the cath lab.

BY MR. MICHAELS:

**Q. I appreciate that but, again, very little**



**of it was responsive to my question, but I'll follow up with where you were.**

**And if Dr. John Setaro was to do all that 12 hours after, Dr. John Setaro would give a second dose of 100 milligrams of heparin; correct?**

MR. DRAHOS: Object to the form.

MR. MICHAELS: Strike the predicate to the question. Let me ask the question clean.

BY MR. MICHAELS:

**Q. If John Setaro were to do all that, 12 hours later John Setaro would give a second dose 100 milligrams of heparin; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: So I will agree that that is the recommended standard that the Lovenox should be given on a -- subcutaneously on an every 12-hour basis.

BY MR. MICHAELS:

**Q. Now, back to what the original question was, because I was just simply asking about the timing of a followup EKG. You agree that if Dr. John Setaro received a reading like this in a patient with symptoms like Mr. Reeves, with an abnormal ECG and the T waves, you would follow up within 15 minutes; correct?**

MR. DRAHOS: Object to the form.



THE WITNESS: Yes, that would be advisable.

BY MR. MICHAELS:

**Q. Okay. Not advisable. That would be what the guideline would dictate.**

A. That's what I would do.

**Q. All right. So assuming that this theory is correct that the timestamps, although incorrect, are consistent, certainly you would not wait an hour and four minutes to do a subsequent second EKG; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Well, you know, you can't really have it both ways.

Earlier you said that we really can't trust the time difference here because maybe the machines are slowing down or speeding up or using different machines. But you're basing the question on the idea that these times are accurate.

Which assumption would you like me to honor?

MR. MICHAELS: I'm going to move to strike the narrative.

BY MR. MICHAELS:

**Q. And I think that the first is accurate, that you can't rely on them, but I want you to presume**



**for the purpose of this question that your theory is correct, that those times, while incorrect, are consistent.**

**You would agree with me that receiving a first EKG that looked like the one marked Roman numeral I, it would be inappropriate to wait one hour and 4 minutes to perform a followup EKG; correct?**

A. Yes. As we said earlier, if this really is the second one that was actually done, that's too long a time frame. If one was done earlier and no strip is available, then we can't comment on it.

**Q. So you'd agree yes, waiting an hour and four minutes would be inappropriate?**

A. If that's actually what occurred.

**Q. You'd agree that it would be inappropriate; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. As I said, it's too long a time frame for this situation.

BY MR. MICHAELS:

**Q. Okay. And at the very least, whenever this EKG marked Roman numeral II was received, the process for administering thrombolytics should start immediately; correct?**

A. Yes. As soon as the criteria is -- as soon

as the criteria is satisfied for a STEMI, thrombolytic therapy should immediately proceed.

**Q. Dr. Leonards testified that this was the second EKG, and that it was after the second EKG that he was able to confirm STEMI; correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: Again, that was his testimony.

BY MR. MICHAELS:

**Q. So the thrombolytics should have been administered within 30 minutes of receiving this EKG back. Fair?**

A. Again, if this is -- if this is the first one that shows a STEMI, depending on, you know, the order of the EKGs and which ones were deleted, but I'll agree to the general principle that, as soon as an EKG shows a STEMI, thrombolytic therapy needs to get going within 30 minutes.

**Q. I'm going to look through the package insert real quick and see if there's anything that we haven't already gone through.**

**I think we hit most of the things in there.**

**Let's look at your report. Actually, let me -- I think we might have covered a lot of the ground I wanted to hit here. Let me just --**



MR. MICHAELS: Let's go off the record for a minute and I'll look through this report and see if there's anything that we haven't already covered in terms of ground.

MR. DRAHOS: Okay. I'm going to run to the restroom while you're doing that. Thanks.

THE VIDEOGRAPHER: Going off the video record. The time is 12:36 p.m.

(Whereupon, a short break was taken and, upon reconvening, the following proceedings were had:)

THE VIDEOGRAPHER: We're on the video record. The time is 12:46 p.m. You may proceed.

BY MR. MICHAELS:

**Q. The good news is I had a ton of substantive highlights I wanted to talk to you about from your depo, but I think we've -- I'm sorry, from your report, but I think we've covered the majority of them. I do want to just ask you a couple of questions.**

A. All right.

**Q. First of all, I can see from the top of the paper that you couldn't get into Michigan. You were stuck at Yale?**

A. That's right.

MR. DRAHOS: Object to the form.



THE WITNESS: Stuck here. Although I'm not sure it's much warmer out there today than here. We're about 22 degrees.

BY MR. MICHAELS:

**Q. No, it's definitely not.**

**The report that I have dated November 12th, 2024, is that the sole report that you have authored in this case?**

A. That is correct.

**Q. Is there anything else that you have created or put together, notes that I should know about?**

A. No, I haven't.

**Q. How about notes that I shouldn't know about? Nothing?**

A. Well, there -- there was a couple of references to literature, mostly things that you have also brought up, that I provided to Mr. Drahos prior to this deposition of your cardiology expert. It was just basically the STEMI guidelines that you asked me about earlier.

**Q. Anything besides the STEMI guidelines?**

A. No, nothing of any substance.

**Q. Okay. So the guidelines that we used here were the same ones that you provided to Mr. Drahos?**

A. Correct. That's why I wanted to make sure



it was the same document in circulation versus the American College.

**Q. You said nothing of any substance.**

**Is there anything else that you provided to him, the Stream (phonetic) trial, anything of that nature that we haven't discussed?**

A. No, no trials. Just a reproduction of the -- of the EKG showing what the PT wave looked like, but that I think we already discussed.

**Q. Okay. The report is obviously dated 12 November, 2024.**

**When were you retained?**

A. I'm not really sure. I can look back at billing records. I think maybe some time over the summer of 2024 because the first conversation and actual invoice was dated 25 October, 2024. So probably over the summer. And then I reviewed the documents for, you know, a month or two, and then we spoke in October of this past year.

**Q. When I asked who were you retained, you were retained obviously by Mr. Drahos who is the attorney for Carnival Cruise Lines?**

A. That is correct.

**Q. Now, I know that at least on one occasion in the past, you've been retained on behalf of Carnival Cruise Lines. That was the Arnold versus Carnival Cruise**

case.
Do you have any --
A. Yes, that was a different attorney, though, I think.
Q. That was George Kuntz from Fowler White?
A. Yes.
Q. But the same defendant.
A. Yes.
Q. Do you have any -- are there any other times, regardless of who the attorney was who retained you, when you were retained to testify on behalf of Carnival?
A. I think I may have reviewed one or two cases with Mr. Kuntz, but did not provide any reports or testimony.
Q. Because you felt that you couldn't be helpful to them?
A. Yes, or that he really needed a standard of care expert rather than causation; that I wasn't an appropriate fit for what he was trying to do in terms of the defense.
Q. Are there -- I know Mr. Drahos is currently with Gray Robinson, previously was with Goldberg Segalla.
Have you ever been retained previously by either Mr. Drahos or one of those two firms other than



this case?
A. I don't -- I don't believe so or don't recall it. There may have been a case I looked at with Mr. Drahos and one of his co-counsel. But it was nothing that eventuated in a report or certainly no testimony.
Q. Is this your first time working with Mr. Drahos?
A. Yes, working with him directly and exclusively that has led to a report and testimony.
Q. How about indirectly or nonexclusively?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, as I mentioned, I don't recall the specific caption on the case, but I think there was something a couple of years ago where one of his associates asked me to review a matter, and he may have been in on the phone call, but I don't think anything ever came of it.
BY MR. MICHAELS:
Q. How about the law firm of Grey Robinson, do you have any previous experience --
A. Not that I recall. I don't think so, no.
Q. Obviously Mr. Drahos is there in the room with you in New Haven?
A. Yes.
Q. I know yesterday he was in Florida. He



would have flown up to meet with you?
A. Yes.
Q. Did you guys meet in person prior to this deposition either yesterday or today?
A. So -- so we met for about two hours last evening.
Q. Okay. And obviously you've had previous conversations; correct?
A. Yes. So we had conversations in October, we had conversations around the creation of the report in November, and then we had two conversations in late December, again, in preparation for the deposition of your cardiology expert.
Q. Now, you told me roughly when you were retained.
What is it that you were asked to do?
A. To review the case and to look at the question from -- the question of the case from the point of view of causation, not so much standard of care, because I think these were, you know, general medical and emergency physicians, but from the point of view of causation with regard to the cardiovascular course of this individual.
Q. At least after the initial part of the visit, they -- whether they were emergency physicians or



not, they were functioning as Mr. Reeves' cardiologists until the time that he was disembarked from the ship; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: No, I wouldn't agree to that. There are plenty of small hospitals where the emergency doctors, the hospitalists oversee the administration of thrombolytic therapy where there might not even be a cardiologist on staff.
So I don't -- I don't -- I wouldn't agree to the idea that they are functioning as cardiologists. I think thrombolytic therapy is given for peripheral clots, for pulmonary emboli, lots of different things. It's not purely a province of cardiologists.
BY MR. MICHAELS:
Q. And if emergency physicians are providing thrombolytic care, you would expect them to do it within the thrombolytic guidelines; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, the guideline document we looked at is -- was composed by cardiologists, but as you pointed out correctly, was adopted with the assent of the emergency physicians society as well. So yes, they are part of it.

BY MR. MICHAELS:
**Q. Now, scrolling down to page 2 of your report where it says "documents reviewed," is this the sum total of the documents reviewed at the time that you authored your report?**
A. Yes, because there was some things that happened afterward. For instance, the -- I believe -- I believe that the deposition -- I don't have it in front of me, but I believe the deposition of Nurse Thomas and Dr. Leonards took place after I wrote my report, but I did look at those in the last week.
**Q. And I'm not being critical of it. I think that --**
A. Yeah, no. I'm just telling you the facts. If something happened before something else, then, you know, it couldn't have been done with that knowledge.
**Q. All right. So -- and certainly when we get into things like a doctor or a nurse saying, hey, I think maybe there were more strips that weren't saved, you hadn't read any of that stuff at the time that you wrote this report; correct?**
A. That's correct. That emerged from testimony.
**Q. So I don't see any depositions having been reviewed at the time this report was written; correct?**



A. That's correct. And again, we can look up the dates, but I think they may have been done afterward.
**Q. Did you --**
A. I don't see how I could have requested them.
**Q. Again, not criticizing, just pointing out.**
A. Okay.
**Q. Did you talk to any of the shipboard doctors or nurses?**
A. I did not.
**Q. And you have never worked on a ship; correct?**
A. That's correct.
**Q. Just a few of the questions -- and again, we really did talk about most of the substantive stuff in here, I just want to understand some of your thought process.**
**When you say that Mr. Reeves was swiftly diagnosed by medical staff as having anterior wall ST segment elevation myocardial infarction, when do you believe he was diagnosed?**
A. Again, I believe he was diagnosed about 8 p.m. the night of 8 July, 2023 when the EKG turned, when it went from peaked T waves to ST elevation.
**Q. And that 8 p.m. is based on?**



A. Again, the -- it's -- it's -- well, it's based on the review of the record, and I think later on corroborated by the testimony of Dr. Desai.
**Q. What in the record leads you to believe it was at 8 p.m.?**
A. Again, the sequence of EKGs, which I think, you know, whether the timestamps are correct or not, the difference between number one and number two and number three over the time course suggests to me that it was about 8 p.m.
**Q. So if it was 8 p.m., that would be an hour and 33 minutes after his entry into the medical clinic; correct?**
A. Yeah. Again, that's maybe when the natural history of the disease caused the ST segments to go up.
**Q. And that would also rely on an assumption that the doctor chose to wait an hour and four minutes after an abnormal EKG to do a second EKG.**
A. Again, that would -- that would be a concern, as we said earlier. If that's the case, that time frame should have been more condensed, let's say.
**Q. And then if the diagnosis was made at 8 o'clock, that would mean that there was an hour and five minutes that passed from the time of diagnosis until the administration of the thrombolytic; correct?**



A. Yes. And we talked earlier about the ideal being 30 minutes.
**Q. And time is muscle.**
MR. DRAHOS: Object to the form.
THE WITNESS: That would be the -- that would be the proverb.
BY MR. MICHAELS:
**Q. Did you believe that upon -- whenever it was upon coming to the diagnosis of a STEMI, that regardless of whether they were subsequently able to evacuate him or not, the doctors on ship should have started to investigate whether it was possible to get him to a PCI either by Coast Guard cutter, helicopter or whatever other form?**
MR. DRAHOS: Object to the form.
THE WITNESS: Again, I'm going to decline that one because that's a standard of care for shipboard doctors, and I really, you know, don't have any experience or education or expertise on the question of whom to call when.
I know there's discussions about notifying the captain versus Coast Guard versus shoreside medical support.
I'm going to, sort of, defer or deflect that question to experts that work in this area.

BY MR. MICHAELS:
Q. That's fair. Moving down to page 6, you indicate:
"Inspection of the 2024 medical records and athletic training records show that he is doing well on guideline directed medical therapy, has a moderately reduced left ventricular ejection fraction, 37 percent, a measure of the efficiency of the pumping function of the left ventricle. "
Have you reviewed the results of the echocardiogram that he underwent in October of 2024?
A. Yes.
Q. And that echo revealed that his ejection fraction as of that date was between 30 and 35 percent?
MR. DRAHOS: Object to the form.
THE WITNESS: That was the interpretation. Now, the 37 percent number comes from cardiac MRI which, contrary to the statement of your expert as it was explained to me, is a better, more accurate technique for evaluating ejection fraction in comparison to echocardiography.
Cardiac MRI has the disadvantage that it's more -- it's less accessible, not all centers have it, and it's much more expensive. But it's pretty



much the gold standard technique for assessment of ejection fraction.
So I'm going to favor the 37 percent.
BY MR. MICHAELS:
Q. Well, the -- the -- generally when you're looking to assess heart damage after a STEMI, you want to look about 15 months post incident; correct?
A. Well, you could -- you could conduct serial studies, you know, any time from a month afterward going forward.
Q. Wasn't my question.
In order to try to determine final long-term status, you're going to want to look about 15 months post STEMI; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I think -- and I think that -- that that would be reasonable time frame to judge the benefit or not of treatment that was given.
BY MR. MICHAELS:
Q. The MRI was performed in November of 2023, within a few months of the incident?
A. Yes. And if it's as good as that at that point, that's a favorable finding. It tends not to get worse over time.



Q. The record -- the echo records showed significant remodeling had occurred --
A. Yes.
Q. -- November of 2023 and October of 2024?
A. Yes, that can happen.
Q. And the most recent echo showed an ejection fraction of 30 to 35 percent; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. Again, I think for the gold standard, they may wish to repeat cardiac MRI at some point.
BY MR. MICHAELS:
Q. And regardless of any of that or the interpretation, my very simple question was, the October 2024 echo showed ejection fraction between 30 and 35 percent; yes or no?
A. That is a fact of that interpretation.
Q. That is a fact.
You'd agree that under 35 percent ejection fraction makes him a candidate for an ICD?
A. Yes.
MR. DRAHOS: Object to the form.
THE WITNESS: The general literature suggests that, you know, in a patient who's had myocardial ischemia or infarction a reduced



ejection fraction below 35 percent would make him a candidate for an implantable cardioverter-defibrillator, or ICD, and that's why I think it might be of some value to repeat the cardiac MRI to come up with a better number because he's close to the boundary line here.
BY MR. MICHAELS:
Q. When did you become aware of that October echo?
A. In October, I think, I requested -- I said I'd like to see, you know, whatever the most recent data is. And I think it was done October 15th, and counsel was able to acquire it at some time -- some time thereafter.
Q. You didn't just see it for the first time yesterday?
MR. DRAHOS: Object to the form.
THE WITNESS: No, I didn't.
BY MR. MICHAELS:
Q. Certainly it's obviously something that you and Mr. Drahos discussed last night in light of you knowing what my expert testified to?
MR. DRAHOS: Object to the form. He's not going to talk about what we discussed. That's work product with counsel.

MR. MICHAELS: Let's make this a lot simpler.
BY MR. MICHAELS:
**Q. You understand that Dr. Klancke was deposed yesterday; correct?**
A. That's correct.
**Q. And you obviously have not seen a transcript of his testimony yet because one does not exist; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know, but I haven't seen it.
BY MR. MICHAELS:
**Q. You told me today that you don't agree with what my expert testified to regarding the MRI versus the echo; correct?**
A. Yes. And I don't think I violated privilege by saying earlier that Mr. Drahos quoted your expert. And I said to him last night and I said to you again today that I disagreed with the concept that echocardiography is the gold standard versus cardiac MRI; rather it's the opposite.
**Q. I'm not accusing you of anything. I think you made it pretty clear that that was something that you and Mr. Drahos discussed last night and I was just**



**clarifying that that was true. But you don't have to --**
A. Yes.
**Q. -- say more about it to the extent that Mr. Drahos is concerned about privilege.**
**You talk about inspection of the 2024 athletic training records.**
**In the week or two prior to this incident, this STEMI, do you know if there was anything deficient in Mr. Reeves' athletic training records?**
A. That I don't know. He had some lower back surgery somewhat earlier, but I didn't see anything that was prejudicial against his condition.
**Q. The STEMI is not a lower back issue; correct?**
A. That's correct.
**Q. Moving down to page 8, I want to ask, you put something about:**
**"It is not entirely clear, nor can it ever be stated within reasonable probability whether the thrombolytic therapy given aboard the ship worked initially and the vessel rethrombosed, as it sometimes happens in the first couple of days post STEMI, or whether it never really opened at all."**
**Would you agree that you don't have an**



**opinion to any degree of probability regarding whether reperfusion occurred on the ship?**
MR. DRAHOS: Object to the form.
THE WITNESS: Well, again, let's make a distinction here, in knowing with absolute clarity the fact of the state of the vessel cannot come about until there's angiography. And the expert on either side that says they absolutely know whether it was open or not at any one point or another is mistaken because the criterion is angiography.
But having said that, there are favorable versus unfavorable indicators that make it more or less likely that there has been reperfusion. And as we said, the fact that his symptoms resolved largely, and that the ST segments improved, are indicators that are favorable, but I can't say absolutely what the state of the vessel was at any point.
BY MR. MICHAELS:
**Q. There's a difference between absolutely and probability, and I just want to -- I appreciate the explanation, I didn't really need it. I just wanted to confirm that you agree with what you wrote in your report that you cannot state within reasonable probability**



**whether his vessel was opened and then reoccluded or whether it never opened. Agreed?**
MR. DRAHOS: Object to the form. Asked and answered.
THE WITNESS: Yeah, I'll stand by what I said and what I wrote.
BY MR. MICHAELS:
**Q. All right. You talk about resolution of symptoms, and I just want to make sure I'm clear.**
**Over a 10-hour period from 11 p.m. to 9:00 a.m., which is when the pain went down, Mr. Reeves received four doses of 10 milligrams of morphine; correct?**
A. Yes. Let's remember, he's a pretty big man, too. He's 280 pounds. And morphine has an action that lasts for several minutes, half hour, maybe an hour. And that a real significant myocardial infarction, such as this one, is attended not only by discomfort in the chest, but also by feelings of anxiety, even terror. If you have seen a patient who's suffered with an MI like this, there's no way that they are going to go to sleep through it. And agents such as morphine can blunt or dull the pain to some extent. But it will only really be resolved once the state of the vessel improves.
And that's why I said that's an indicator

that there was successful reperfusion, and that he really did sleep, I think, throughout most of the night, and there was no recurrence of symptoms until about 9 o'clock the next morning.
**Q. So the question that I had asked was, you would agree with me that over a 10-hour period, he received four 10 milligrams doses of morphine; yes or no?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, that is -- that is -- that is factual. But I was trying to place it in context.
BY MR. MICHAELS:
**Q. You also -- it talked about how patients usually suffer terrors. He was also administered 5 milligrams of midazolam; correct? Versed.**
A. Yes.
**Q. Which is similar to Valium, right? It's an antianxiety common drug.**
A. Yes. And again, relatively short acting. And particularly for a man his size over a protracted coarse, that dose is relatively de minimis.
**Q. The recommended dose -- usual dose is 1 to 2 milligrams. He received 5 intravenously; correct?**
A. Yes. But again, he's in a dire situation, anxious, symptomatic, and also a very big man. So that's



not a surprising dose in my view. And I use that agent virtually everyday in the cath lab and in the cardiac intensive care unit.
**Q. Do you have any opinion as to whether Osceola Medical Center was negligent?**
A. No, I don't believe so. I think they had the emergency and internal medicine, general cardiology, interventional cardiology people meet him and greet him and evaluate him as soon as he arrived. They gave him intravenous heparin, intravenous nitroglycerin, got him into the ICU for observation. And then within a few hours concluded that his symptoms were not acceptable to leave him with the invasive procedure the next day, but rather moved it forward in time and did it about 7 o'clock on the evening of 9 July, 2023.
I think they complied with the cardiac standard of care in this situation.
**Q. Have you seen his transfer documentation?**
A. Yes.
**Q. Do you know whether they were made aware that he had never been given the followup dose of Lovenox 12 hours later?**
A. That I would have to refresh myself.
**Q. What is your understanding of the damage -- the current damage to Chad Reeves' heart?**



MR. DRAHOS: Object to the form.
THE WITNESS: So the current level of his heart function is ejection fraction by the cardiac MRI of 37 percent. And again, we said the normal numbers, you know, are in the 50's or above.
So he does have some decrease in heart function. The areas of the heart wall that don't contract as vigorously as they should are entirely referable to the vessel that was occluded in July of 2023. That is the left anterior descending artery that irrigates the anterior wall of the heart.
Having said that, he is on guideline directed medical therapy, and is working again in a physical job as a firefighter, all of which are favorable prognostic indicators. Functional class is an extremely important forward marker in cardiac patients.
BY MR. MICHAELS:
**Q. And you'd agree that, had they begun the thrombolytic at, say, 7:30 or 8 or 8:30, they likely would have been able to get the vessel opened before there was significant damage to the heart muscle; correct?**
MR. DRAHOS: Object to the form.



THE WITNESS: Again, it's not entirely clear. That's a relatively modest time frame in the overall scheme of things. And as you had us go through in the guideline documents, thrombolytic therapy can be given at any time up until 12 hours.
So again, it's not completely clear to me that, had it been given, you know, 20 minutes or 30 minutes earlier, that there would have been a material difference in his ultimate outcome. It may have been, but I don't know that there's any direct way of knowing that.
BY MR. MICHAELS:
**Q. When you say it can be within 12 hours, meaning if somebody comes to the hospital six hours into a STEMI, you don't not given thrombolytic therapy because it's been six hours, but that doesn't mean it's going to have the same impact as it does if you start it within a half an hour of the STEMI; fair?**
MR. DRAHOS: Object to the form.
THE WITNESS: Correct. But again, that's a relatively elongated time frame. Nobody is saying that it's not worth giving after two hours or after one hour. They are saying it's not worth giving after 12 hours.

Page 146

So upfront, if there were to be -- and I'm not necessarily agreeing to this -- but if there had been a delay of 30 minutes or 45 minutes, it's difficult to say how a relatively modest time delay translates into ejection fraction points far down the line or not.
BY MR. MICHAELS:
**Q. But even if there's improvement is improvement.**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. Again, I just don't know that I or any expert can -- can quantify it.
BY MR. MICHAELS:
**Q. Yeah. And I'm going to ask you to keep your opinions to you, because other experts might have different opinions, and it's up to the jury to really decide whether they can or can't.**
**Getting back to the idea that heart is -- that time is muscle, minutes and certainly tens of minutes or 20 minutes or a half an hour are critical when someone is undergoing a STEMI; fair?**
A. They can be critical, yes.
**Q. Okay. Do you have any opinions as to the future complications that Mr. Reeves will likely encounter as a result of the damage that his heart**

Page 147

**sustained?**
MR. DRAHOS: Object to the form.
THE WITNESS: No. I think his functional status is excellent and he's on guideline directed medical therapy. He doesn't smoke, he's going to physical therapy, and now he's on a cholesterol medication which should inhibit the accumulation of any sort of blockages and other vessels that were not affected, such as diagonal arteries, the right coronary artery, the left circumplex artery.
So -- and beyond that, he's now, you know, on the radar scope of good medical and cardiac care. So I think his outlook is good going forward.
I would say that if he continues as well as he is, not going to require any additional heart surgery or a heart transplant or a mechanical heart. That it would be highly unlikely for somebody to deteriorate into that state, who's now working as a firefighter a year and a half out from a myocardial infarction.
BY MR. MICHAELS:
**Q. And you believe that a 30 to 35 percent ejection fraction is excellent?**
MR. DRAHOS: Object to the form.

Page 148

THE WITNESS: No. I said his functional status is excellent. I didn't say the ejection fraction is excellent.
It's subnormal, even if we accept those numbers or the number that I find more valuable here is the 37 percent by cardiac MRI or in the future, if cardiac MRI is repeated, whatever number that would give us. I think his functional status is excellent, and that's, in part, because he received good care at the time of the initial incident, number one; and number two, that he's on guideline directed medical therapy.
So I think those aspects of his care are excellent and compensate for the reduced ejection fraction.
BY MR. MICHAELS:
**Q. When you say you believe he received good care, I want you to rank these things in order of best to worst.**
**Which -- was it -- was it good care when they waited over an hour and 40 minutes from the diagnosis of a STEMI to start the thrombolytic? Was it good care when they -- assuming that you're right -- waited an hour and four minutes to do the followup EKG? Was it good care when they decided not to give the second**

Page 149

**dose of Lovenox 12 hours later?**
MR. DRAHOS: Object to the form. That question is entirely argumentative.
MR. MICHAELS: I'm just asking him to rank those in terms of best care to worst care.
MR. DRAHOS: Assuming your arguments, which he's not required to do. So, I mean, that is the epitome of an argumentative question.
If you want to ask him whether or not he agrees with those timelines, I suppose that may be a fair question after four hours of questioning, but he's not going to sit here and rank what you believe to be the worst parts of your argument against our clients.
BY MR. MICHAELS:
**Q. Do you think that --**
A. Well, I would --
**Q. -- are good care?**
A. Well, I would answer by -- I would answer in the following manner, and let's look at the big picture.
He sustained by natural history, by nature, one of the most serious hospital medical events you could have onboard a ship.
He was diagnosed and treated, and I believe

there's sufficient clinical indicators favoring the idea that he reperfused; he received medications that prevented him from going into a lethal heart rhythm; he was monitored with vital signs that were favorable throughout; good judgment was exercised in not trying to engineer a transfer that may have been dangerous or hazardous; he was delivered in good condition with regard to vital signs and general freedom from symptoms to a shoreside hospital where he underwent a cardiac procedure relatively expeditiously that corrected an artery that had become occluded, again, we're not entirely sure when, but he was dismissed from the hospital after four days, and is now at a stage where he is doing well, no cardiac symptoms, working as a firefighter with an ejection fraction that is reduced, but he's well compensated with a good outlook.

So I think if we step back and look at the entire picture, we can say that his care was successful, the outcome of this scenario could have been far, far, far worse either by the natural history or if some of the measures that we talked about were not taken.

There may be some imperfections in the way the case was handled. We talked about the EKGs and the Lovenox. But when we step back and look at the overall picture, he is someone who, if I were caring for him as a



continuing outpatient, I would encourage him to believe that his outcome is relatively good considering the initial dire clinical situation at presentation.

**Q. Well, that -- that's the purpose of doctors; right? When people go to the emergency room, whether on a ship or on land with a cardiac emergency, the doctor receives them, begins treatment when they are in a critical stage; fair?**

A. Yes, of course.

**Q. Right. Cardiologist and emergency doctors who are treating someone with a STEMI all start with a patient with a STEMI; correct?**

A. Of course.

**Q. Their responsibility to that patient is to provide reasonable care to try to best improve their situation; correct?**

A. Yes.

**Q. Would it be reasonable to wait an hour and 40 minutes from the diagnosis of a STEMI to the beginning of thrombolytics, unless you don't have the ability to do the --**

A. Well, I think I already agreed that --

MR. DRAHOS: Object to the form.

THE WITNESS: I think I already agreed that if the facts support that interpretation, that's



too long of a time delay.

BY MR. MICHAELS:

**Q. Would it be good care to wait an hour and four minutes to follow up on an abnormal EKG with large T waves in a -- or high T waves with a patient showing these symptoms?**

MR. DRAHOS: Object to the form.

THE WITNESS: Well again, I've already testified that if -- if the facts support what you're asking, that that's too long a time frame, when we would seek a 15-minute interval --

BY MR. MICHAELS:

**Q. Would it be good care to not give a followup dose of Lovenox 12 hours after the first one?**

MR. DRAHOS: Object to the form.

THE WITNESS: Again, as we said, that is -- that goes outside of the standard. Whether it had any material effect or not is -- is not something we can say definitely.

BY MR. MICHAELS:

**Q. Would it be good care to not begin the Lovenox treatment with an IV bolus if they had already made the determination that he was suffering from the STEMI?**

MR. DRAHOS: Object to the form.



THE WITNESS: Well again, that hinges on the question of when the STEMI was actually diagnosed.

If they gave the Lovenox, aspirin and Plavix for an acute coronary syndrome upfront, that would be the correct thing to do. And then later thrombolytic therapy would not require the ramp-up dose of Lovenox because it would already be in his system. It would be redundant.

BY MR. MICHAELS:

**Q. Again, you didn't -- you didn't answer my question. I gave you a specific set of facts, and I want you to assume these facts for the purpose of answering them.**

**If they already knew that he was suffering from a STEMI, would it have been appropriate to give him the first dose subcutaneously or intramuscularly without first giving the IV bolus?**

MR. DRAHOS: Object to the form.

THE WITNESS: So if a person came in and the STEMI was diagnosed and they were going to be giving them thrombolytic therapy right upfront, then yes, the IV bolus of Lovenox would be needed in addition to the subcutaneous dose.

BY MR. MICHAELS:

Q. So if at 7:17 they diagnosed the STEMI, at 7:25 they should not have been giving him a subcutaneous or intramuscular dose of Lovenox; fair?
MR. DRAHOS: Object to the form.
THE WITNESS: No. They would -- if -- if the diagnosis were made upfront, let's say at 7:17, in addition to the thrombolytic therapy, aspirin and Plavix, the Lovenox protocol would have been the 100 milligrams subcutaneously and the ramp-up IV dose of 0.3 milligrams per kilogram.
BY MR. MICHAELS:
Q. Actually, what it would have been for Mr. Reeves would have been 30 milligrams by intravenous bolus, and then 15 minutes later, the 100 milligrams subcutaneously; correct?
A. Right. And those are essentially simultaneous. The point being that you want to ramp up the levels of anticoagulation in the bloodstream as soon as possible.
Q. You want to mainline it so new clots stop forming immediately.
A. Correct, as the decision is being made to give thrombolytic therapy, whenever that takes place.
Q. Let's talk about your compensation.



The fee schedule, which I have received, Doctor, indicates that for your work as an expert, you are paid 500 per hour to review records, images, consultation, creation of reports and depositions; correct?
A. Yeah. I don't know when you got this.
Q. Yesterday.
A. Okay. But I'm not sure when it was distributed because we've increased the deposition fee to 750 per hour, 3,000 minimum.
Q. All right. So --
A. I think I probably -- you may be looking at something that's -- that's old.
Q. This was sent to me yesterday by Mr. Drahos. But just to be clear, when you're doing work for Mr. Drahos in this case, you charged him $500 an hour. But for the right to take your deposition, you charged me $750 an hour for a minimum of four hours; correct?
A. That's correct.
Q. So just for the privilege of talking to you here today, I had to pay you $3,000?
MR. DRAHOS: Object to the form.
THE WITNESS: It was at your request.
BY MR. MICHAELS:



Q. Well, sure.
My question isn't who requested it. My question is what you're charging me to do it. I'm not going to commit legal malpractice to compound a medical malpractice because it cost money.
Now, if you testify at trial, your charge is a $6,000 per day minimum plus your expenses; correct?
A. That's correct.
Q. And that's portal to portal; correct?
A. No. It depends on what the travel arrangements are. You know, if I were coming to Florida and fly down the night before and it would be one day of testimony, on the other -- it has to do with how much work you would miss in your regular clinical job.
If I had to fly out to California and spend one day traveling where I couldn't do business consultations or procedures, and then testify the next day, then that would be two days. But I wouldn't charge for travel time in the evening when I wouldn't be doing clinical work.
Q. Right. So if you're talking to a jury in this case in April, you'd charge a minimum of $6,000 for that day of your time. And then do you also charge an hourly rate on top of it?
A. No. No. That's a single -- that's a



single day, because maybe I would only testify for two hours, but I would need to take the entire day away from work.
Q. Now, I want to move on to your invoices. I received three invoices that you have submitted to Mr. Drahos's firm in addition to the $3,000 I paid you. And I think I want to start at the end, which is the last invoice I received was November 29th. Obviously that was over a month ago, new depositions have come in, you had to get ready for your depositions.
How many hours do you have into this case since that last invoice on November 29th?
A. Probably about 10 or so with regard to all of the things you mentioned, but I haven't composed an invoice yet.
Q. All right. So your best guess is that between reviewing all the depositions that would have come after-the-fact, preparing for today's deposition, you got another $10,000 outstanding to invoice?
A. Another 10 hours.
Q. Right. Which would be $5,000?
A. Yes. Roughly that.
Q. All right. As to the invoices -- on the invoices, we got -- we always have a list of images.
Are those the documents that you would have

received since the last invoice that you submitted?
A. So -- well, why don't we take them in order because I'm not really sure what you're asking.
Q. Sure. So October 25, 2024 you submitted a --
A. Right. So, yeah. So there's images and then there's documents. That's everything I received up to that point.
Q. Okay. So if I look at the images and documents, I will know what your file consists of.
A. Correct.
Q. The first invoice you submitted on October 25th was an initial invoice in the amount of $4,000; correct?
A. That is correct.
Q. You then submitted another invoice on November 13th for your work in the amount of $5,000; correct?
A. Yeah. So that one I think was mainly for some new case materials that we got, I think probably the physical therapy, and then the reports, the writing of the report.
Q. And then we got another invoice submitted November 29th --
A. Right.



Q. -- for an additional $3,000; correct?
A. Yes. And that was for review of new documents.
Q. So that would mean that for your work in this case up to this point, including the unbilled $5,000 and the $3,000 I had to pay you today, you've already billed $20,000; correct?
A. If it adds up to that. I'm not doing the math, but I will accept your accounting.
Q. And I'm seeing in the last document, documents new since November 29th, can you give me any accounting of what documentation you have received?
A. So you're looking at the November 29th?
Q. Right. The only deposition I see you as having received up to this point is Dr. Desai. I assume you --
A. Right.
Q. -- subsequent depositions.
A. Right. The ones of Thomas and Leonards I just got in the last week.
Q. So just Thomas and Leonards? None of the other -- none of the other nurses, staff, Mr. Reeves, Mrs. Reeves?
A. No, only those.
Q. So the only depositions you have received



as of today are Leonards, Desai, Thomas.
A. Right. And not yet Dr. Klancke's either.
Q. Right. I had sent you interrogatories, I'm not casting aspersions here, they were just sent in late December and they wouldn't be due yet, but since I have you, I just want to run through and ask you some of these questions, and then I'll start casting aspersions. Just kidding.
A. Okay.
Q. These are very brief.
To the best of your ability for the preceding three years, what percentage of your work has been on behalf of plaintiffs as opposed to defendants in a medical/legal context?
A. So the bulk of the testimony with depositions or trials has been for plaintiffs, although the cases that I review now are probably about 50/50 for plaintiffs and defense.
Q. And is that solely within the context of medical malpractice or is some of that also testifying to damages or in other cases?
A. Yeah. So there's some cases that have to do with cardiac questions regarding injuries, you know, workplace, motor vehicle accidents, those are -- those are some of the other things that are not -- not related



to medical/legal liability.
Q. So if we were to limit this question in the case where you've been retained to opine on medical care provided, whether it met the standard of care, whether it was negligent, whether negligence caused damage to a patient, what percentage of that would be for the defendant doctor, and what percentage of that would be for the injured patient?
A. So again, right now, about 50/50 on the files that I'm reviewing that are open. But in terms of the testimony, because I have done more work on behalf of plaintiffs in the past, probably the larger portion of trials or depositions over the last four years would be for the plaintiffs.
Q. Over the course of the past three years, what portion of your time or work has been devoted to services as a litigation expert?
A. So maybe 5 percent of the time.
Q. And would that correlate to your income as well, 5 percent of your income?
A. No. It's slightly more remunerative than my regular work, I suppose. For income, it's probably closer to 15 percent.
Q. And to your knowledge, this is your first time working with Mr. Drahos or his firm?

A. Again, other than what we said before, looking at a case, this is the first time where there has been any testimony.
**Q. Is there anything else that you did in preparing your opinions that we have not yet discussed?**
A. I don't believe so.
**Q. Is there anything else that you reviewed, journals, authoritative literature, records that we haven't talked about or isn't contained in your invoices?**
A. I think it's contained in the invoices and what we talked about today, the guideline document.
**Q. Okay. Is there -- any other periodicals, journals, treatises, published documents that you relied upon that -- beyond the guidelines?**
A. No, I haven't. It's just my entire education, training and experience are what informs my practice and my opinions.
**Q. Other than the opinions that are contained in your report and/or opinions that we talked about today, do you hold any other opinions that you intend to offer in this case?**
A. No.
MR. DRAHOS: Object to the form.
THE WITNESS: These are the principal opinions. Again, if at trial I'm asked questions



in a little bit different way or I'm asked to expand on any of the opinions, I want to reserve that right.
I'd also like to reserve the right to provide opinions if there's any new discovery. But other than that, what I have presented today are the principal opinions.
BY MR. MICHAELS:
**Q. And if there's any changes to any of your opinions, obviously you will make sure that I'm made aware of that?**
A. Of course.
**Q. With the exception that you might learn some new information in the future, are the opinions that you have offered today final?**
A. Yes, I believe so. Other than with the proviso that I just mentioned.
**Q. Do you intend to --**
A. Again, you pointed out that there's a couple of depositions I haven't seen yet, which I will request.
**Q. Do you intend to be present in person for the April trial date?**
A. Yeah. I haven't heard the date yet, but it sounds like you're saying it's in April.



**Q. I think it's April 7th.**
A. Okay.
MR. MICHAELS: I've got nothing further.
Mr. Drahos might have some questions and might not.
MR. DRAHOS: Thanks. Very briefly, just to make sure, Doctor, both for the Court's benefit and the jury's, the defendant's position on some of these issues are crystal clear. So let me go back over the Lovenox issue briefly.

CROSS EXAMINATION

BY MR. DRAHOS:
**Q. Doctor, in your experience, can a patient who has been successfully reperfused with thrombolytic therapy reclot even if on a 48-hour dose of Lovenox?**
A. Yes. I think I mentioned earlier that there was not a 1-to-1 correlation with regards to Lovenox. There are patients who receive Lovenox and reocclude, there are patients who don't receive Lovenox and remain open. So it's not a 1-to-1 correlation.
**Q. All right. So using the layman's terms or the analogy that was provided by counsel in the context of this snow on the driveway, and Lovenox being this drug that prevents snow from reaccumulating on a driveway, what you're telling the members of the jury and the Court**



**is that there's no guaranty that if given Lovenox, snow is still not going to accumulate on the driveway.**
A. Correct. In some of the earlier trials, there was a benefit to Lovenox, but it wasn't a 100 percent finding.
**Q. So in this case, can it be determined within a reasonable degree of medical probability that the failure to administer a second dose of Lovenox in the morning had any causative effect on Mr. Reeves' outcome?**
A. I don't believe it could be determined with certitude.
**Q. And why not?**
A. Because again, when the gold standard for knowing the condition of the vessel is angiography, and unless you somehow had sequential angiograms, which obviously doesn't exist in the real world throughout all the different time points that we are regarding as potentially influential in this case, we can't really know what the vessel looks like at any point.
**Q. And in this particular case, what we do know is that when Mr. Reeves presented to Osceola Hospital, he was given a bolus dose of Lovenox?**
A. No. He's given a bolus dose of intravenous heparin, which is just as good.
**Q. So basically the same thing in terms of**

**what it's designed to try and do?**

A. Correct. It's the same medication, just given in a different way, but it still gets into the circulation.

**Q. And despite being given this medication, ultimately four hours later he's in the cath lab with an occluded lateral interior descending artery.**

A. That's correct.

**Q. I want to ask a similar question as it relates to TPA. That was discussed at length today.**

**I want you, for the purposes of my question, to assume that time delays that the plaintiff is trying to advance in this case relative to the administration of that TPA. Even if you were to assume those time delays, do you believe, based upon your review of this case, your knowledge, training and experience in the field of interventional cardiology, that it had any causative effect on Mr. Reeves' outcome?**

MR. MICHAELS: Form as to plaintiffs trying to advance. If you reword and take that out, I will not object to the question.

BY MR. DRAHOS:

**Q. Go ahead, Doctor.**

A. Yes, I think that, as we said earlier, in the great scheme of the time frame here, the delay would



be considered modest, and it's very difficult to quantitate how much that would translate into an alteration either up or down to his ejection fraction.

The point is that he got the thrombolytic therapy, they were important clinical indicators that suggested that it worked successfully. Ultimately, as we know, the vessel was closed at the time of angiography, but it's very difficult to say at what point it was fully opened, partially opened, not open at all, opened and then reoccluded during that time frame, and equally difficult to provide quantification for how the ejection fraction would be changed had the thrombolytic therapy been given a half hour earlier.

**Q. So in this particular case, what we do know is, on the cardiac MRI is that Mr. Reeves' ejection fraction was read to be 37 percent.**

**Based upon your knowledge, training and experience in the field of interventional cardiology, a patient who upon -- during a cath lab is found to have a totally occluded lateral interior descending artery who receives treatment, and ultimately following a cardiac MRI is found to have a 37 percent ejection fraction, would you find that to be a good outcome?**

A. Again, I think you have to look at the global picture of his life. He's not having cardiac



symptoms, he's not having rhythm disturbances, he's not having congestive heart failure, he's doing well at physical therapy and back to work as a firefighter.

Is the ejection fraction normal? No, it's reduced to some extent. But given the dire circumstances in which he presented, one of the most serious possible medical events that a person can suffer out on a cruise ship, and he's alive and well and working today, I think overall that's a good outcome.

MR. DRAHOS: Okay. Thank you. Those are all the questions I have.

MR. MICHAELS: Very brief followup.

REDIRECT EXAMINATION

BY MR. MICHAELS:

**Q. Doctor, can we agree that in medicine, as in life, there are very few guaranties for anything?**

A. Of course.

**Q. We can't guarantee that the failure to administer Lovenox is what caused him to reocclude; correct?**

A. I don't know that I used the word guarantee. I think it's difficult to prove a link.

**Q. Let's talk about what we know. We know that Lovenox is an anticoagulant; correct?**

A. Yes.



**Q. We know that the guidelines for someone who's suffering for a STEMI is that they receive an initial dose of Lovenox without even getting into the IV bolus versus the subcutaneous, and then receive their next dose 12 hours later for at least 48 hours; correct?**

MR. DRAHOS: Object to the form.

If this recross is just going to be a simple reiteration of what you argued over the last four hours, then it's improper.

If there's some clarity that you need to elicit, then I'm going to allow it, but it's totally improper.

MR. MICHAELS: It's in general response -- in absolute response to your question.

Do you know what, I don't even have to respond.

BY MR. MICHAELS:

**Q. The question was, we know that according to the guidelines, regardless of whether the initial dose was administered correctly or not, a second dose is supposed to be provided 12 hours later for up to 48 hours; correct? or more than --**

MR. DRAHOS: Object to the form. Asked and answered.

THE WITNESS: Yes, that's what the

guidelines call for in this situation.
BY MR. MICHAELS:
**Q. Not only the guidelines call for that, the package insert calls for that.**
A. Yes.
**Q. The evidence based therapy says that that is the effective way to provide that; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. And I don't think I'm quarreling with that interpretation of the guidelines, product insert, and Lovenox we give for lots of different reasons, and it's usually an every 12-hour dose.
BY MR. MICHAELS:
**Q. And the reason why you give it every 12 hours, the Lovenox, like any other medicine, has a period of time at which it has a therapeutic effect on the body; correct?**
A. Yes. At 12 hours, the action of Lovenox in the circulation is beginning to decay or degrade to the point where an additional dose is needed.
Now, it doesn't become 0 at that stage. The doses are designed to overlap to some degree. But to keep the levels therapeutic throughout, every 12-hour administration is what is called for.



**Q. And what Lovenox is, as we discussed, is an anticoagulant; correct?**
A. Yes.
MR. DRAHOS: Object to the form.
BY MR. MICHAELS:
**Q. It's not a clot buster; correct?**
A. That's correct. It's not a thrombolytic agent.
**Q. So even if it is subsequently given after he has started to reocclude, there's not an expectation that it's going to bust up the clot that has started to reform.**
A. It may not. It would help to prevent that clot from propagating further, but it would not eliminate the clot as thrombolytic therapy would be designed to do.
**Q. And what we can say with certainty is that despite experiencing a STEMI, he was not provided with the followup doses of Lovenox as the guideline directed therapy would recommend; correct?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, he did not receive the next dose of heparin until he was at Osceola.
BY MR. MICHAELS:
**Q. Right. And that -- and that bolus of heparin, again, that would prevent future clots from**



**forming, but would not bust the clot that have reformed.**
A. If a clot -- I'm sorry, if a clot had reformed by that point.
**Q. We know that when they did the angiogram or angioplasty in Osceola, he had complete occlusion; correct?**
A. Yes.
MR. DRAHOS: Object to the form.
THE WITNESS: All this has been asked and answered.
MR. MICHAELS: It is in direct response to your cross examination.
MR. DRAHOS: But that doesn't allow you to reiterate your entire 4-hour deposition. So, you know, if anything --
MR. MICHAELS: Mike -- Mike, stop talking.
MR. DRAHOS: Well, no, I'm not going to --
MR. MICHAELS: Yeah, you are going to. This is the last question. I know you don't like hearing it again. You asked cross. I have a right to clarify this stuff. Let him finish his answer so we can get out of here. Otherwise you and I will bicker all afternoon.
MR. DRAHOS: Okay, good. We'll bicker later then, in light of your representation it's



the last question. That's why I'm raising the issue.
THE WITNESS: So the answer is that he was given intravenous heparin a few minutes after 4 o'clock at Osceola on 9 July, 2023.
Thereafter, he had additional chest discomfort which prompted moving up the angiographic procedure to 7 p.m. that night versus what had been planned for July 10th, the next day. And at the time of that angiography, the vessel was totally occluded.
Is it possible that the vessel occluded between 4 and 7 p.m. coincident with the recurrence of the chest discomfort? Yes. We just can't completely know that with certainty.
What we do know is by 7 p.m., the vessel was occluded.
The mechanism of the lack of Lovenox in the morning versus the later administration of high dose intravenous heparin, as to whether it opened a vessel, closed a vessel, when it actually closed, again, we have to be somewhat agnostic about that because we are not seeing serial angiography during that time. But the catheterization was prompted by a recurrence of

symptoms, and so it is possible that the vessel reoccluded at 6 p.m. that night. We really can't say with great certainty.

MR. MICHAELS: Thank you, Doctor, for your time. I have no further questions.

I assume you want to read?

MR. DRAHOS: Yeah, we'll read.

MR. MICHAELS: Mike, get home safely.

MR. DRAHOS: Okay. Thank you, guys.

THE VIDEOGRAPHER: The time is 1:45 and we're off the record.

(Thereupon, the proceedings concluded at 1:45 p.m.)



CERTIFICATE OF OATH

THE STATE OF FLORIDA )
COUNTY OF MANATEE )

I, the undersigned authority, certify that JOHN SETARO, MD appeared before me and was duly sworn on the 8th day of January, 2025.

Signed this 12th day of January, 2025.

Deponent produced driver's license.

Aurora C. Sloan, FPR
Notary Public - State of Florida
My Commission No. HH-128670
My Commission Expires: May 23, 2025



CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )
COUNTY OF MANATEE )

I, Aurora C. Sloan, Florida Professional Reporter, certify that I was authorized to and did stenographically report the deposition of JOHN SETARO, MD, pages 1 through 179; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 12th day of January, 2025.

Aurora C. Sloan, FPR



Michael Drahos, Esquire
Michael.drahos@gray-robinson.com

January 12, 2025

RE: Reeves vs. Carnival
1/8/25 John Setaro, MD Job No. 815577

The above-referenced transcript is available for review.

The witness should read the testimony to verify its accuracy. If there are any changes, The witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Universal Court Reporting at production@ucrinc.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,

Universal Court Reporting

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

Reeves vs. Carnival
1/8/25 John Setaro, MD Job No. 815577

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

Under penalties of perjury, I declare that I have Read the foregoing document and that the facts Stated in it are true.

________________________________ _______________
JOHN SETARO, MD DATE



ACKNOWLEDGEMENT OF DEPONENT

I, JOHN SETARO, MD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________
JOHN SETARO, MD

*IF NOTARY IS REQUIRED:
SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC