**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:24-cv-21295-RAR

CHAD REEVES,

     Plaintiff,

v.

CARNIVAL CORPORATION,
a Panamanian Corporation,

     Defendants.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT CARNIVAL CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DR. KIM KLANCKE, M.D. PURSUANT TO DAUBERT v. MERRILL DOW PHARM, INC.**

Plaintiff, CHAD REEVES, by and through undersigned counsel, hereby files his Response to Defendant CARNIVAL CORPORATION's Motion in Limine to Exclude Certain Opinions and Testimony of Dr. Kim Klancke, M.D. Pursuant to *Daubert v. Merrill Dow Pharm, Inc.* (DE 35), and states as follows:

**INTRODUCTION**

Carnival has filed a *Daubert* motion directed to Plaintiff's retained cardiologist Dr. Kim Klancke.  Carnival objects to the following four opinions:

A)    Any and all opinions, testimony or reference to the suitability and/or viability of a medical evacuation at sea;

B)    Any and all opinions, testimony or reference to a "drip and ship" treatment option;

C)    Any and all opinions suggesting that the shipboard medical staff deviated from acceptable care standards in failing to obtain consultation with shoreside specialist; and

1

D)      Any and all speculative opinions concerning Plaintiff's life expectancy, particularly the possibility that he may eventually need a heart transplant.

Dr. Klancke will not and has not provided opinions concerning the suitability and/or viability of medical evacuation at sea. However, he has provided an opinion, as a cardiologist, that Carnival's physician should at least have asked the Captain of the ship to consider whether medical evacuation was proper. Dr. Klancke is perfectly qualified to provide that limited opinion, as well as each of the other clearly medical opinions that Carnival improperly seeks to exclude.

## MEMORANDUM OF LAW

This Circuit holds that the rejection of expert testimony under *Daubert* is the exception rather than the rule. *Moore v. Intuitive Surgical Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) at *8 (quoting Fed.R.Evid. 702 Advisory Committees Note to 2000 Amendments). "[C]ourts must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial. . . ." Id. *See also, City of S. Miami v. DeSantis*, 2020 WL 7074644 at *3 (S.D. Fla. 2020) ("The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility") (quoting *Little v. Wash. Metro. Area Transit Auth.*, 249 F.Supp.3d 394, 408 (D.D.C. 2017) (citing *Daubert*, 509 U.S. at 588).

*Daubert*, as expanded by subsequent Supreme Court cases, applies to all forms of expert testimony that are "technical" or "specialized." In *Kumho Tire Company v. Carmichael*, 526 U.S. 127, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) the Supreme Court observed that "engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases . . . in other cases, the relevant reliability concerns may focus upon personal knowledge or experience."

When evaluating non-scientific expert testimony, the trial court *may* consider one or more of the *Daubert* factors, but "the test of the reliability is flexible and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141.

### A.  The *Daubert* Standard

In determining the admissibility of expert testimony, courts analyze three basic requirements: (1) the expert's qualifications; (2) the reliability of the testimony; (3) and the extent to which the testimony will help the trier of fact. *Sorrels v. NCL (Bahamas) Ltd.,* 796 F.3d 1275, 1281 (11th Cir. 2015).

### (1)  Qualifications

"The qualifications of an expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury." *Lewis v. Carnival Corp.*, 2021 WL 5088941 at *1 (S.D. Fla. 2021) (quoting *McWilliams v. Novartis AG*, 2018 WL 3364617 at *2 (S.D. Fla. 2018).

The qualification threshold to be applied under *Daubert* is not stringent, and, as long as an expert is "minimally" qualified, the opinion evidence should be admissible. *Feliciano v. City of Miami Beach,* 844 F.Supp.2d 1258 (S.D. Fla. 2012); *J.G. v. Carnival Corp.*, 2013 WL 752697 (S.D. Fla. 2013) (describing qualification threshold as "relatively low").

CARNIVAL argues that Dr. Klancke's medical expertise as a "land-based" cardiologist does not permit him to testify as to "maritime" medicine.  But there is no such thing, and the cruise lines' attempts to cabin expert testimony to experts with maritime experience has been rejected by courts in this district.  *See, e.g., Peck v. Carnival Corp.*, 2017 WL 7726728 (S.D. Fla. 2017):

> The Defendant does not explain how the incident aboard the vessel necessitates that Mr. Zimmerman be qualified as a marine architect as opposed to a land-based

architect.    The allegations of the Plaintiff's Complaint do not contain any allegations that indicate that the alleged incident was somehow different from a similar incident that could occur on land-based stage stairs, nor does the Defendant offer any evidence to support its contention that it is necessary for an expert to have published in a given field. . . .

*Id.* at *3.

Likewise, in *Darby v. Carnival Corp.*, 2021 WL 6428039 (S.D. Fla. 2021), the court rejected Carnival's argument that a land-based architect needed to have a degree in naval architecture or marine engineering in order to testify in a slip and fall case aboard a cruise line.  In *Lewis v. Carnival Corp.,* 2021 WL 5088941, *2 (S.D. Fla. 2021) the court specifically ruled that "[d]efendant's argument that Correa is unqualified because he is neither an expert nor certified in various maritime subjects is too demanding a standard."  *Id.* at *2 citing*, inter alia, Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) ("An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand.").  *See also, Goins v. Royal Caribbean Cruises, Ltd.*, 2017 WL 5891469, at *2 (S.D. Fla. 2017) (finding a civil engineer, who is not licensed as a marine or naval engineer, competent to testify as to a slip and fall on a vessel that was no different than a land-based slip and fall).

"Carnival is free to explore at trial whether [whether certain industry standards] should be used in the maritime passenger context, and – if so- whether the standards discussed … would have any applicability in the area of the vessel where [the Plaintiff's] fall allegedly took place". *Ward v. Carnival Corp.*, 2019 WL 1228063 at *13 (S.D. Fla. 2019) (citing *Sorrels v. NCL*, 796 F.2d 1275, 1282 (11th Cir. 2015); *Scaccetti v. NCL (Bahamas) Ltd.*, 2018 WL 6113467, at *6 (S.D. Fla. Nov. 21, 2018); *Medeiros v. NCL (Bahamas) LTD.*, 2020 WL 1308728 *5 (S.D. Fla. 2020) (holding because there is no legal standard for massage therapists on cruise ships, advisory

guidelines and recommendations are admissible as bearing on the standard of care in determining negligence).

### Reliability

Testimony by physicians may or not be scientific evidence like the epidemiologic testimony at issue in *Daubert*. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). "A trial court should admit medical expert testimony of physicians accepted as useful and reliable," but it need not be conclusive because medical knowledge is often uncertain. *Primiano*, 598 F.3d at 566. In *Primiano* the court held that the fact that the plaintiff's physician expert did not speak with the plaintiff, or cite to a publication supporting his opinion "might be useful to the jury as impeachment, but neither furnished an adequate basis for excluding his opinion." 598 F.3d at 567. *See also Schenone v. Zimmer Holdings, Inc.*, 2014 WL 9879924 (M.D. Fla. 2014).

Medical opinions such as those held by Dr. Klancke are considered to be experience-based opinions. *See, e.g., Hoff v. Steiner Transocean, Ltd.*, 2014 WL 273075 (S.D. Fla. 2014) ("Whatever the appropriate inquiry in a particular case, however, where, as here, the proposed expert's opinion relies principally upon his experience and knowledge, the court must satisfy itself that the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") In *Hoff*, Judge Rosenbaum rejected the cruise line's argument that Dr. Thea's testimony was speculative. The court noted that a medical expert must simply testify to a reasonable degree of medical certainty. *Id.* at *4 (citing *Wilson v. Taser International, Inc.*, 303 Fed.Appx. 708, 715 (11th Cir. 2008)).

As a general rule, questions such as those raised by CARNIVAL's motion, related to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than

its admissibility and should be left for the jury's consideration.  The Eleventh Circuit has repeatedly stressed, in maritime cases that it is the role of the adversary system, *not the court*, to highlight allegedly weak evidence.  *Rosenfeld v. Oceania Cruises, Inc.*, 654 Fed.3d. 1190, 1193 (11th Cir. 2011); *Sorrels*, 796 F.3d at 1285; *see generally Daubert* 509 U.S. at 596 ("vigorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").  *See also, Maiz v. Virani*, 253 F.3d 641, 666-68 (11th Cir. 2001).  The district court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury."  *Allison v. McGhan Medical Corp.*, 184 F.3d. 1300, 1311 (11th Cir. 1999).

## Helpfulness/Fit

Expert testimony is helpful and therefore admissible if it concerns matters beyond the understanding of the average lay person.  *U.S. v. Frazer*, 387 F.3d 2044, 2062 (11th Cir. 2004).

## ARGUMENT

1. **DR. KLANCKE, A BOARD CERTIFIED CARDIOLOGIST, IS PERFECTLY QUALIFIED TO RENDER STANDARD OF CARE AND CAUSATION OPINIONS FROM THE STANDPOINT OF A CARDIOLOGIST, AND HE FULLY EXPLAINED THE METHODOLOGY AND SUPPORT FOR HIS OPINIONS THAT MR. REEVES WILL MORE LIKELY THAN NOT BE A CANDIDATE FOR A HEART TRANSPLANT AND/OR FACE A SHORTENED LIFE EXPECTANCY**

### A.    There is No Such Thing as a Maritime Medical Care Specialty

Carnival fails to cite a single case that holds that there is a separate "maritime medical" specialty or standard of care that requires a physician to have worked on – i.e., **be employed by** – a cruise line before he or she may testify as an expert in a medical malpractice action against a cruise line.  That is because there is no such case.   The cruise lines themselves have agreed that their physicians will follow standard land-based ACEP (American College of Emergency

6

Physicians) protocols. Indeed, Dr. Klancke himself has testified in a maritime medical malpractice action in this district. *See Goodloe v. Royal Caribbean Cruises*, Case Number 18-cv-21125-CMA. In that case, his expert testimony was presented to the jury, which returned a $5 million verdict (reduced by 30% comparative negligence) in a medical malpractice action against Royal Caribbean Cruises for the negligence of its ship's physicians.

Contrary to Carnival's argument, Dr. Klancke never admitted that he was unqualified to offer medical opinions in this case. He merely stated that he had no actual experience working as a physician onboard a cruise line. But no such experience is required. *See, supra,* at p. 3-4.

As noted, Dr. Klancke will not be opining on the actual feasibility of a medical evacuation in this case. He clearly stated that he could not do so. Thus, Carnival's motion should be denied on the basis that it mischaracterizes his testimony. His sole opinion – a medical one – concerning evacuation is that the physicians onboard the vessel should at least have asked the Captain if evacuation was feasible. That is no different from a physician at a rural hospital or even in an urban urgent care center inquiring into the feasibility of transport to a level one trauma hospital for a patient undergoing a STEMI heart attack. Whether Dr. Klancke is a "seagoing" physician is legally irrelevant. Any factual gaps in his knowledge about what is available or not available in the cruise ship scenario can be explored on cross examination. *See, e.g., J.G. v. Carnival Corp.*, 2013 WL 752697 (S.D. Fla. 2013) where then district court Judge Robin S. Rosenbaum rejected a similar argument made by a plaintiff against Carnival's security expert noting:

> Plaintiff has not shown that cruise-ship security is so vastly unrelated to security in other areas as to render Black's expertise inapplicable and negate his qualifications as an expert in this case. The extent of Black's unfamiliarity with cruise ships goes, instead, to the weight and credibility of his testimony and is, therefore, appropriately a subject for plaintiff's vigorous cross examination at trial.

*Id.* at *4.

7

B.      **Dr. Klancke's "Drip and Ship" Testimony is Well Within His Wheelhouse**

Dr. Klancke merely testified "if possible it should have been done, because there is a huge benefit to getting him transported. . . ." (DE 35-3, p. 58).  Contrary to Carnival's assertions, it is not necessary for Dr. Klancke to have knowledge of the "intricacies of hoist maneuvers from a cruise ship to a helicopter."  That is classic fodder for cross examination.

C.      **Dr. Klancke is Well Qualified to Provide Testimony Concerning the Need to Communicate With Other Experts Ashore**

The cruise lines including Carnival tout their easy access to shoreside medical consultations with available experts – such as cardiologists – on their websites and their marketing literature.  They all have contracts with land-based hospitals in the South Florida area for just such exigencies, much like any emergency room physician (which is what the cruise line physicians are) require expert consultations at a hospital setting.  Unless Carnival has evidence to the contrary, there was no impediment to their physician seeking further expert opinions from their contracted physician referral service ashore.  A telephone call or a Zoom conference is a telephone call or a Zoom conference whether it occurs ashore or at sea – again, unless Carnival has positive proof to offer that it was impossible to do so in this case.  But any such evidence would be speculative because Carnival's physicians never tried to obtain a shoreside expert consult.

2.      **DR. KLANCKE'S OPINIONS CONCERNING PLAINTIFF'S LIFE EXPECTANCY AND EVENTUAL NEED FOR A HEART TRANSPLANT ARE FULLY SUPPORTED BY MEDICAL LITERATURE, DATA COMPILED FROM STUDIES, AND DR. KLANCKE'S DECADES OF EXPERIENCE AS A BOARD-CERTIFIED CARDIOLOGIST**

Dr. Klancke testified that Mr. Reeves' most recent echocardiogram (ECG) showed an ejection fraction of 30 to 35 percent.  (DE 35-3, Exhibit C, p. 91).  His ejection fraction was lower

in October 2024 than March 2024.  "He's lost ground over time."  (DE 35-3, Exhibit C, p. 93-94).

When asked why his ejection fraction dropped, he responded:

> A.     Because when you have a damaged pump and it has to work harder with what's left, that's kind of the natural history of the thing.  People tend to get worse over time.  That's why his – that's why his – his long-term outlook is not nearly as good as it would be if he had not had a heart attack or if he had less damage with the heart attack.

(DE 35-3, Exhibit C, p. 94).  He also noted that if Mr. Reeves' ejection fraction stays under 50%

"he has sort of an eight-fold increase in mortality over the next ten years.  So is – everything in

cardiology in terms of survival resolves around pumping function.  The better it is, the better your

chances.  The worse it is, the worst your chances.  An ejection fraction of 30 to 35 percent is severe

ventricular damage . . . ."  (*Id.* at p. 95).

When asked for the basis of his opinion that Mr. Reeves is going to need an ICD implanted,

he responded:

> Because at the time of his echocardiogram he needed an ICD.  His MRI shows a big area of scar, all dead, no viable tissue, involving a large portion of his heart. That creates an arrhythmia-prone situation.  And then he has an ejection fraction in the range that multiple studies have shown he would benefit in terms of life expectancy from an ICD placement.

*Id.,* p. 96-97.

When asked what supported his opinion that the chance that Mr. Reeves will require a heart

transplant is greater than 50%, he testified:

> A.     His age and the fact that he's a perfect candidate for it.  Obviously, most people don't get heart transplants, but he is stable enough that they can follow him closely and see if he deteriorates over time.  But he's in an ejection fraction range as he continues to remodel and gets worse, they would have time to intervene.  He has congestive heart failure.  He's being treated for congestive heart failure.  That tends to be a progressive condition. . . .

*Id.*, p. 97).  He specifically opined that Mr. Reeves "will become a candidate for a transplant."  (*Id.*,

p. 98).  He testified that "there is a data set that shows over time he is likely to become somebody

who would benefit from either mechanical therapies or a transplant." (*Id.*, p. 98). Dr. Klancke further testified that "the 20-year survival is certainly less than 50%." (*Id.*, p. 99). Logically, then, there is a greater than 50% chance that Mr. Reeves will need a transplant in order to survive.

When asked about literature he referred defense counsel to the YOUNG-MI registry and failure to improve ejection fraction, which is surgical data out of Emory. (*Id.*, p. 100). When asked how long Mr. Reeves could go without an ICD he responded, "he should have had an ICD recommended in November of 2024." (*Id.*, p. 100). He explained that the available data is based upon groups of patients:

> It's groups of patients. You can't individualize and tell you exactly how long one patient would live. I've just given you the data. I could paint it really grim, refer you to the Framingham study and how patients who are asymptomatic with LV disfunction do. They do terrible. But those are older data sets, and his prognosis if better than those data sets would imply. . . . I would estimate on average he would have 20 years of life expectancy.

(*Id.*, p. 101).

Thus, contrary to Carnival's motion, Dr. Klancke fully supported his opinions on life expectancy.

## CONCLUSION

For the foregoing reasons, this Court should deny Carnival Corporation's Motion in *Limine* to Exclude Certain Opinions and Testimony of Plaintiff's Cardiology Expert Dr. Kim Klancke, M.D.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court via CM/ECF on February 19, 2025. I also certify that the foregoing was served on all counsel or parties of record on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

**THE HAGGARD LAW FIRM**
*Counsel for Plaintiff*
330 Alhambra Circle
Coral Gables, Florida 33134
Tel: 305-446-5700/Fax: 305-446-1154
Primary: TJM@haggardlawfirm.com
Secondary: Jbush@haggardlawfirm.com
By:___*/s/Todd J. Michaels*___
        Todd J. Michaels
         Florida Bar No.: 568597


**Philip D. Parrish, P.A.**
*Co-counsel for Plaintiff*
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Tel. 305-670-5550/Fax: 305 670-5552
Email: phil@parrishappeals.com
        betty@parrishappeals.com

By:___*/s/ Philip D. Parrish*___
        Philip D. Parrish
        Florida Bar No. 541877

**SERVICE LIST**

Michael J. Drahos, Esquire
W. Cooper Jarnagin, Esquire
Ashley Genoese, Esquire
GRAYROBINSON PA
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Telephone: 561-268-5727
Facsimile: 561-268-5747
Michael.drahos@gray-robinson.com
Cooper.jarnagin@gray-robinson.com
Ashley.genoese@gray-robinson.com
*Counsel for Defendant*

Philip D. Parrish, Esquire
PHILIP D. PARRISH PA
7301 S.W. 57 Court, Suite 430
Miami, Florida 33143
Telephone: 305-670-5550
Facsimile: 305-670-5552
phil@parrishappeals.com
betty@parrishappeals.com
*Co-Counsel for Plaintiff*

Todd J. Michaels, Esquire
Adam C. Finkel, Esquire
THE HAGGARD LAW FIRM
330 Alhambra Circle
Coral Gables, Florida 33134
Tel: 305-446-5700
Fax: 305-446-1154
Primary: TJM@haggardlawfirm.com
Primary : ACF@haggardlawfirm.com
Secondary: Jbush@haggardlawfirm.com
*Counsel for Plaintiff*

12